# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CITRIX SYSTEMS, INC.,

                    Plaintiff,

      v.

WORKSPOT, INC.

                    Defendant.

C.A. No. 1:18-cv-00588-GMS

## PLAINTIFF CITRIX SYSTEMS, INC.'S
## OPENING BRIEF IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

Dated: May 15, 2018

**OF COUNSEL**:

Michael G. Strapp (*Pro Hac Vice* )
Larissa Park (*Pro Hac Vice* )
Kristoffer W. Lange (*Pro Hac Vice* )
Yasmin Ghassab (*Pro Hac Vice* )
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Telephone: (617) 406-6031
michael.strapp@dlapiper.com
larissa.park@dlapiper.com
kris.lange@dlapiper.com
yasmin.ghassab@dlapiper.com

Denise S. Kraft (DE Bar No. 2778)
Brian A. Biggs (DE Bar No. 5591)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Plaintiff*
*Citrix Systems, Inc.*

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    STATEMENT OF FACTS ..................................................................... 3

    A.    Citrix Is a Pioneer in the Field of Virtual Desktops and Apps. .............................. 3

    B.    Citrix's Virtualization Patents ................................................................. 5

    C.    The Accused Products ............................................................................ 7

    D.    Workspot Was Founded and Populated by Former Citrix Personnel Who Helped Develop Citrix's Virtualization Solutions. ................................. 7

    E.    Workspot's Infringement and False Statements Have Harmed Citrix's Business. ............................................................................................ 9

III.   LEGAL STANDARD .......................................................................... 10

IV.   WORKSPOT SHOULD BE ENJOINED FROM INFRINGING CITRIX'S PATENTS AND FROM FALSE ADVERTISING ................................... 11

    A.    Citrix Is Likely to Succeed in Proving that Workspot Infringes the Asserted Patents. ................................................................................ 11

        1.    Citrix Is Likely to Show Workspot Infringes Claim 15 of the '677 Patent ................................................................................. 11

        2.    Citrix Is Likely to Show Workspot Infringes Claim 20 of the '732 Patent ................................................................................. 13

        3.    Citrix Is Likely to Show Workspot Infringes Claim 1 of the '018 Patent ................................................................................. 14

        4.    Citrix Is Likely to Show Workspot Infringes Claim 1 of the '843 Patent ................................................................................. 15

        5.    The Asserted Patents Are Presumptively Valid ......................... 16

    B.    Citrix Is Likely to Show False Advertising. .......................................... 16

    C.    Citrix Will Suffer Continued Irreparable Harm Absent Injunctive Relief. .......... 18

        1.    Irreparable Harm Is Presumed Because Workspot Directly Competes with Citrix. ....................................................... 18

        2.    Workspot's Patent Infringement and False Statements Have Caused and Will Continue to Cause Citrix Significant and Irreparable Harm. .......................................................... 19

    D.    The Balance of the Equities Favors a Preliminary Injunction. ............................. 22

    E.    The Public Interest in Enforcing Valid Patent Rights and Discouraging False Statements Favors a Preliminary Injunction ................................. 24

V.    CONCLUSION ..................................................................................... 24

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Accenture Global Servs. GMBH v. Guidewire Software Inc.*,
    581 F. Supp. 2d 654 (D. Del. 2008) ........................................................................16

*Acumed LLC v. Stryker Corp.*,
    551 F.3d 1323 (Fed. Cir. 2008) ..............................................................................19

*Apple Inc. v. Samsung Elecs. Co.*,
    809 F.3d 633 (Fed. Cir. 2015) ................................................................................23

*AstraZeneca LP v. Apotex Corp.*,
    633 F.3d 1042 (Fed. Cir. 2010) ........................................................................10, 11

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
    664 F.3d 922 (Fed. Cir. 2012) ....................................................................18, 19, 23

*Cordis Corp. v. Medtronic, Inc.*,
    780 F.2d 991 (Fed. Cir. 1985) ................................................................................24

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
    717 F.3d 1336 (Fed. Cir. 2013) ..............................................................................18

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*,
    774 F.3d 192 (3d Cir. 2014) ...................................................................................23

*Highmark, Inc. v. UPMC Health Plan, Inc.*,
    276 F.3d 160 (3d Cir. 2001) ...................................................................................10

*Hybritech v. Abbott Labs.*,
    849 F.2d 1446 (Fed. Cir. 1988) ................................................................10, 22, 24

*Metromedia, Inc. v. City of San Diego*,
    453 U.S. 490 (1981) ...............................................................................................24

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002) ..................................................................16, 20, 23, 24

*Opticians Ass'n v. Indep. Opticians*,
    920 F.2d 187 (3d Cir. 1990) ...................................................................................23

*Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*,
    292 F. Supp. 2d 611 (D.N.J. 2003) ........................................................................18

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012)............................................................................20

*Revision Military, Inc. v. Balboa Mfg. Co.*,
  700 F.3d 524 (Fed. Cir. 2010)..............................................................................11

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006)......................................................................23, 24

*Schering–Plough Healthcare Prods. v. Neutrogena Corp.*,
  702 F. Supp. 2d 266 (D. Del. 2010)......................................................................16

*Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*,
  74 F.3d 1216 (Fed. Cir. 1996)..............................................................................11

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002)............................................................................10

*Titan Tire Corp. v. Case New Holland, Inc.*,
  566 F.3d 1372 (Fed. Cir. 2009)............................................................................16

*Upjohn Co. v. Riahom Corp.*,
  641 F. Supp. 1209 (D. Del. 1986)........................................................................24

*W.L. Gore & Assocs., Inc. v. Totes. Inc.*,
  788 F. Supp. 800 (D. Del. 1992)....................................................................19, 24

**Statutes**

35 U.S.C. § 282(a) ................................................................................................16

Delaware Deceptive Trade Practices Act, 6 Del. C. § 2532 (2009) ............................................16

## I.    PRELIMINARY STATEMENT

Plaintiff Citrix Systems, Inc. ("Citrix") seeks a preliminary injunction to stop Defendant Workspot, Inc. ("Workspot") from infringing Citrix's industry-leading patents and from making false and misleading statements about Citrix's products.  An injunction is necessary because Workspot's patent infringement and false advertising—spearheaded by former Citrix employees who now direct Workspot's illegal activity—have caused and will continue to cause irreparable harm to Citrix in the form of lost sales, customers, market share, and business opportunities, and damage to Citrix's reputation.  The balance of the equities weighs in favor of enjoining Workspot from patent infringement and false advertising, and the public interest will be served by protecting Citrix's patent rights and preventing further confusion caused by Workspot's misleading advertisements.

Citrix is a pioneer and market leader in the field of application and desktop virtualization, technologies that optimize productivity for businesses by enabling universal access to apps, desktops, and data from any device.  Citrix has devoted significant resources to the research and development of cutting-edge app and desktop virtualization solutions (Citrix's "Virtualization Solutions").  Citrix's Virtualization Solutions have been successful and received critical acclaim since their launch.

Workspot was founded by former Citrix employees who had been intimately involved in the research, development, and marketing of Citrix's Virtualization Solutions.  Unlike Citrix, which spent almost 30 years and billions of dollars to develop the technologies necessary to enable virtualization, Workspot relied upon the knowledge gained by former Citrix employees to develop, market and sell its own virtualization solutions.  The products and services Workspot sells use the same technology developed and patented by Citrix.  Workspot is misappropriating Citrix proprietary technology to compete head-to-head with Citrix's Virtualization Solutions.  In

particular, Workspot has brought to market virtualization products (the "Accused Products") that practice several of Citrix's VDI-related patents, including U.S. Patent Nos. 7,949,677; 8,341,732; 7,594,018; and 8,135,843 (collectively, the "Asserted Patents").

But Workspot has not only infringed the Asserted Patents. Workspot also embarked on a campaign of false advertisements designed to steal customers from Citrix. Workspot's advertisements are replete with false claims about the purported benefits of the Accused Products as compared to Citrix's Virtualization Solutions. For purposes of this motion Citrix identifies seven representative Workspot false advertisements. Workspot's false advertisements violate the Lanham Act, the Delaware Deceptive Trade Practices Act, and the common law.

Workspot's patent infringement and false advertising has already caused and, if not enjoined, will continue to inflict, irreparable harm on Citrix. Because Workspot directly competes with Citrix, Workspot's illegal activities have caused Citrix to lose customers. This harm is magnified and irreparable because Citrix's customers tend to be brand-loyal, and initial sales of Virtualization Solutions often lead to significant revenue in the form of ongoing subscriptions, renewals, sales of updated and new software, and maintenance, service and support revenue. For this reason, the loss of even one Citrix customer means also losing significant prospective revenue from that same customer.

Workspot's actions have also irreparably harmed Citrix's reputation and goodwill because they have led to negative customer and industry reaction. Moreover, Workspot has also damaged industry alliances and partnerships that Citrix relies upon to promote its Virtualization Solutions. Thus, Workspot's infringement and false advertising have irreparably undermined and diluted the value of Citrix's core patented technology patents and inflicted real damage on Citrix's business and services built on that technology.

For these reasons, the balance of equities and the public interest favor an injunction. To become an industry leader, Citrix expended significant resources to research, develop, patent, and sell its Virtualization Solutions. Workspot, on the other hand, illegally leveraged know-how it gained from the myriad ex-Citrix employees Workspot recruited. After misappropriating Citrix's technology, Workspot engaged in a false advertising campaign to drive sales of its Accused Products. Enjoining Workspot from making, using, selling, and offering to sell its Accused Products and from making false statements is equitable and in the public interest because it will protect Citrix's patent rights, maintain the status quo, and stop Workspot from misleading consumers .

## II. STATEMENT OF FACTS

### A. Citrix Is a Pioneer in the Field of Virtual Desktops and Apps.

Founded in 1989, Citrix is a pioneer in the field of computing solutions. (Fleck Decl. ¶ 2.[1]) From its beginning, Citrix recognized that managing hardware and software resources is a challenge for many companies, so it designed systems that enable users to remotely access apps and desktops hosted on centralized server hardware. (*Id.* at ¶¶ 2-3.) Citrix discovered that moving app software off of individual user computers and onto a centralized system would allow employees to work from anywhere, while reducing costs associated with installing, upgrading, and maintaining software. (*Id.* at ¶ 3.) Using this principle, known as "app virtualization," Citrix developed its pioneering software, now known as "XenApp," which delivers centrally-hosted Windows apps to desktops, laptops, tablets, and other user devices without the user's need to install the apps on the devices. (*Id.* at ¶ 4.)

---

[1] Citrix supports this motion with the declarations of Christopher Fleck ("Fleck Decl."); Juan Rivera ("Rivera Decl."); Calvin Hsu ("Hsu Decl."); Nabeel Youakim ("Youakim Decl."); and Brian A. Biggs ("Biggs Decl.").

In 2005, Citrix recognized that breakthroughs in computer hardware virtualization could allow users to concurrently access separate copies of the Windows operating system running on a single server. (*Id.* at ¶ 5.) In 2007, Citrix acquired the company XenSource and adapted its software to create a new technology: Virtual Desktop Infrastructure ("VDI"). (*Id.*) Citrix's VDI solution, "XenDesktop," allows multiple users to access their own customized Windows desktop installed at a centralized, remote server. (*Id.*) This eliminates the need to install and maintain separate copies of Windows on each user's local computer and permits users to access Windows from any device. (*Id.*)

Citrix's Virtualization Solutions, which include XenApp and XenDesktop, comprise several components, such as a virtualization platform, or hypervisor,[2] that runs on a server, a client app (referred to as "Citrix Receiver") to be installed and run on different types of client devices, and a broker that manages connections between the clients and server, all of which interoperate to provide remote access to virtual apps and desktops. (*Id.* at ¶ 6.)

A user downloads the client app, Citrix Receiver, to a device to run XenDesktop and XenApp. (*Id.* at ¶ 7.) Devices with Citrix Receiver installed are able to access virtual desktops via XenDesktop or individual apps via XenApp. (*Id.*) Citrix's broker acts as a middleman between the clients and server, and maintains a database of virtual apps and desktop resources (or "sessions") available on the server, as well as rules and policy information regarding which users are allowed (or required) to connect to which resources. (*Id.* at ¶ 8.) When a user wants to access a remote app or desktop, Citrix Receiver connects to the broker, which in turn

---

[2] A hypervisor is computer software or hardware that creates and runs virtual machines, which are emulated computer systems that can run multiple operating systems on a single real computer system. (*Id.*)

authenticates the user, and sends information back to Citrix Receiver that allows the client to connect to the appropriate remote apps or desktop.  (*Id.*)[3]

Between approximately 2009 and 2013, Citrix redesigned the XenApp and XenDesktop products based on a Flex Management Architecture ("FMA").  (Rivera Decl. ¶ 3.)  This effort culminated in the release of XenApp version 7.0, and was spearheaded by then-Citrix Vice President Amitabh Sinha, who left Citrix shortly before the release of XenApp 7.0 to co-found Workspot.  (*Id.*)  While many Citrix customers have made the transition from XenApp 6.5 to 7.0, Citrix continues to work with some customers who have not yet transitioned to XenApp 7.0. (Hsu Decl. ¶ 7.)

Citrix's Virtualization Solutions have been well-received in the industry and Citrix enjoys a significant portion of the virtualization market.  (Hsu Decl. ¶ 3.)  Citrix's Virtualization Solutions have proven popular with businesses of all sizes because they provide fully personalized desktops for each user with the security and simplicity of centralized management. (*Id.*)  Virtualization enables customers to streamline management and costs by centralizing desktops while delivering end-users mobility and the freedom to access virtual desktops and apps anytime, from anywhere, on any device.  (*Id.*)

### B.     Citrix's Virtualization Patents.

In connection with the research and development of its Virtualization Solutions, Citrix applied for and received many patents, including the four Asserted Patents.  (D.I. 1, ¶¶ 7-12.) Two of the Asserted Patents, the '677 and '732 patents, arise from the same provisional application, were filed on the same date, and share a common specification.  (Biggs Decl., Exs. 1, 2.)

---

[3] The broker can also track the apps or desktop a user connects to and enable the user to reconnect to those same resources in the future.  (*Id.*)

The '677 patent claims systems and methods for (i) receiving, from different client machines associated with a user, requests to access a remote resource, (ii) granting different levels of access to the resource based on applying a policy to information gathered about the client machines, and (iii) identifying virtual desktop environments associated with the user and providing the resource according to the different levels of access.

The '732 patent claims systems and methods for (i) enumerating applications available to a client machine based on received user credentials, (ii) receiving a request to execute an application, (iii) and selecting, based on a policy, one of a plurality of methods for executing the requested application by a virtual machine. FIGs. 22A and 22B of the '732 patent show two different methods for executing an application on a remote machine.

The '018 patent claims particular methods and an apparatus that provides remote access to application sessions associated with a user. (Biggs Decl., Ex. 3.) In one embodiment, a user can maintain multiple application sessions on remote machines, each of which can be connected to and disconnected from at will. ('018 patent, claim 1, Figs. 1, 4, 1:49-58.) Based on a set of rules, a management server can authenticate a user and reestablish the user with the disconnected session and the remotely accessed resources. (*Id.*, claim 1.) The '018 patent provides users with access to "persistent" application sessions, meaning users can connect, disconnect, and reconnect to the same remote session from different locations and devices. ('018 patent, 1:49-55.)

The '843 patent claims a system and methods for providing remote application access through use of a web service directory and a publishing server. (Biggs Decl., Ex. 4, '843 patent, 2:26-46, claim 1, Fig. 2.) The user may search the web service directory for a particular web service or remote application, and a content server enables the user to select the web service or remote application. ('843 patent, 4:49-60.) The web service directory provides a service access

point, which is a unique address associated with a particular app located on a remote server. ('843 patent, claim 1, 5:11-27.)  When a remote resource has been identified, a remote web publishing tool may also be launched to publish the requested resource to the user's device.  (*Id.* at 5:28-42, Fig. 2, claim 1.)

C.     **The Accused Products.**

Workspot sells cloud-based virtual desktop solutions such as Cloud Apps, Cloud Desktops, and Cloud Workstations.  These Accused Products include a variety of components such as Workspot Control, Workspot Client, Workspot Connector, and Workspot Agent.

Workspot Control is a server-based component that authenticates users and then handles the provisioning of remote desktops and apps to the authenticated user.  For instance, when a user makes a request for a particular remote resource, Workspot Control functions as the policy engine to determine the user's access rights, and as the brokering agent that selects suitable remote app/desktop resources.  Workspot Client is an application that the user installs on the user's desktop, tablet, and/or smartphone devices.  Workspot Client includes an Enterprise App Store which lists apps available based on the user's access rights as determined by Workspot Control.  Workspot Connector is a server component that is installed on the remote servers or machines that provide the remote desktops and apps.  Workspot Connector receives configuration information from Workspot Control and handles provisioning of remote desktops and apps.  Workspot Agent runs within each remote Windows desktop and provides load and availability information to Workspot Control.

D.     **Workspot Was Founded and Populated by Former Citrix Personnel Who Helped Develop Citrix's Virtualization Solutions.**

Workspot was co-founded in July 2012 by Amitabh Sinha, a former Citrix Vice President and General Manager.  Mr. Sinha spent several years working on all aspects of Citrix's patented

Virtualization Solutions. (Rivera Decl. ¶ 3.) Specifically, Mr. Sinha served as product manager for Citrix's XenDesktop starting in 2006, during which time he was intimately involved in all aspects of developing and bringing to market XenDesktop, including the technology claimed in the Asserted Patents. (*Id.*; Hsu Decl. ¶ 5; Rivera Decl. ¶ 3.) Mr. Sinha also oversaw development of Citrix's FMA, which represented a major architectural shift for the Citrix Virtualization Solutions to a desktop brokering model, like that disclosed in the '677 and '732 patents. (*Id.*) Mr. Sinha also managed periodic updates to XenDesktop. (*Id.*) Additionally, Mr. Sinha was responsible for developing Citrix's opportunities and business relationships with businesses interested in Citrix's Virtualization Solutions. (*Id.*; Hsu Decl. ¶ 5.)

Since its founding, Workspot has recruited many Citrix employees who have intimate knowledge of Citrix's trade secrets, patented technology, and sales, marketing, and business tactics and strategies. (Fleck Decl. ¶¶ 9-14 (listing former Citrix employees).) For example, Workspot's Vice President of Marketing, Brad Peterson, worked for Citrix for almost a decade and specialized in marketing Citrix's Virtualization Solutions. Mr. Peterson provided demonstrations of Citrix's Virtualization Solutions in which he would emphasize aspects of the technology described in the Asserted Patents. For example, during marketing demonstrations, Mr. Peterson highlighted Citrix's ability to provide persistent application sessions, an element claimed in the '843 patent, and a core element that Workspot now touts as a significant feature of the Accused Products. (Rivera Decl. ¶ 4.) Similarly, Workspot's Vice President of Products and Alliances, Jimmy Chang, worked for Citrix for almost a decade as Director of Product Management and Strategic Alliances. (*Id.* at ¶ 5.) Mr. Chang worked on improving the Citrix Receiver product, an important part of the patented Virtualization Solutions. (*Id.*)

## E. Workspot's Infringement and False Statements Have Harmed Citrix's Business.

Workspot's patent infringement became clear when it published in 2017 *VDI Reinvented: The Innovation Behind the Revolutionary Workspot VDI Cloud Service and Provisioning Desktops – Integration Configuration Guide*, Technical White Papers that disclose exactly how Workspot is infringing each of the Asserted Patents. (Biggs Decl., Exs. 5 and 6.)

Furthermore, over the past year, Workspot has marketed the Accused Products by making numerous false claims about Citrix's Virtualization Solutions. For instance, in 2017 and 2018, Workspot published several statements that include materially false comparisons of Citrix's Virtualization Products and the Accused Products. (See, e.g., Biggs Decl., Exs. 14-17; D.I. 1, ¶ 29, Ex. 10) What is more, Workspot has promoted these false statements on its website and through its Twitter account, both of which are accessible by and directed to Citrix's customers.

Over the past few months, Workspot ramped up its aggressive targeting of Citrix's clients, including small- to medium-sized businesses, an important segment of Citrix's customer base. (Hsu Decl. ¶ 6.) And, because of its infringement of the Asserted Patents and its false and misleading advertisements, Workspot recently won business from Citrix's customers. (Biggs Decl. ¶ 8, Ex. 7.) In fact, Workspot touts on its website several Citrix customers that switched to Workspot, such as law firm Alston, Hunt, Floyd & Ing, and training firm Learning Tree International. (*Id.* (highlighting eight Citrix customers who are now Workspot customers).)

Workspot has harmed Citrix not only through infringing Citrix patents and disseminating false information about Citrix products, but also by deliberately disrupting Citrix's most important, invitation-only annual customer conference, "Synergy," which was held in May 2017. (Youakim Decl. ¶ 2.) Although Citrix had expressly informed Workspot that it was prohibited from sponsoring or maintaining a booth at Synergy 2017, Workspot executive (and ex-Citrix

employee) Brad Peterson encouraged Synergy 2017 attendees to bring a Workspot badge to the conference, "find someone with the same number on their badge, tweet a selfie . . . using @Workspot and #CitrixSynergy tags, then head over to booth #409 and collect $1,000!" (*Id.*; Biggs Decl., Ex. 9.)  Knowing Workspot had been expressly banned from Synergy 2017, Workspot employees then gate-crashed Synergy 2017 after convincing an unwitting official sponsor to let Workspot employees speak in the sponsor's booth one evening.  (Youakim Decl. ¶ 2.)  Citrix was forced to contact the convention center's security and demand that Workspot employees leave the premises.  (*Id.*)

## III.   LEGAL STANDARD

The four factors guiding this Court's decision to grant or deny a preliminary injunction are (1) Citrix's likelihood of success on the merits; (2) whether irreparable harm to Citrix is likely if the injunction is not granted; (3) the balance of equities between Citrix and Workspot; and (4) the public interest. *AstraZeneca LP v. Apotex Corp.*, 633 F.3d 1042, 1049 (Fed. Cir. 2010).  No one factor is dispositive. *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002).

The decision whether to grant a preliminary injunction and enjoin the infringement of patents is a question of substantive patent law governed by Federal Circuit precedent.  However, the law of the regional circuit applies to procedural issues, like the preliminary injunction standard. *Hybritech v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).  The regional circuit law governs the issuance of a preliminary injunction for false advertising claims brought under the Lanham Act. *See Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 170–71 (3d Cir. 2001).

## IV. WORKSPOT SHOULD BE ENJOINED FROM INFRINGING CITRIX'S PATENTS AND FROM FALSE ADVERTISING

### A. Citrix Is Likely to Succeed in Proving that Workspot Infringes the Asserted Patents.

For purposes of this preliminary injunction motion, Citrix will demonstrate its likelihood of proving that Workspot infringes the Asserted Patents by analyzing a representative claim from each of the Asserted Patents and showing how each claim limitation is embodied in the Accused Products.[4] At the preliminary injunction stage, the claims need not be conclusively interpreted. *See Sofamor Danek Grp., Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996). In any event, one of ordinary skill in the art would have understood the limitations of the asserted claims to have their plain and ordinary meaning.

### 1. Citrix Is Likely to Show Workspot Infringes Claim 15 of the '677 Patent.

Citrix is likely to prove that Workspot infringes at least apparatus claim 15 of the '677 patent.[5] Workspot has published information about the Accused Products that demonstrates that these Products, including Workspot Control, Workspot Connector, Workspot Agent, and Workspot Client, practice each of the limitations of claim 15, as evidenced by the claim charts attached to the Complaint (D.I. 1).[6]

---

[4] Although Citrix alleges that Workspot infringes several claims of four of its patents, all that it must demonstrate with respect to likelihood of success is that it is "more likely than not" that Workspot infringes at least one claim of one of the Asserted Patents. *AstraZeneca*, 633 F.3d at 1050; *Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2010).

[5] At this time, Citrix relies on Workspot's publicly available information. In furtherance of this motion, and in support of this brief, Citrix respectfully requests an opportunity to conduct discovery, and then submit supplemental materials, including an expert declaration, addressing the information Workspot produces.

[6] Charts showing the claim limitations for each asserted claim can be found attached to the Complaint (D.I. 1) as Exhibits 5–8. Given the length of certain claims, Citrix has annotated claim elements in those charts with identifiers, like "Element 15[a]" and "Element 15[b]," which match the identifications provided in this brief.

Thus, for example, the Accused Products provide authorized remote access to resources on desktop computing environments, as recited in the preamble of claim 15. (Element 15[pre]; Biggs Decl., Ex. 5, p. 5 ("Workspot offers the only solution on the market that enables delivery of virtualized apps, server hosted desktops, virtual desktops, and GPU accelerated workstations.").) A user installs Workspot Client on their machine or device to secure access to resources, such as virtual apps and desktops, using connection information provided by Workspot Control. (Element 15[a][i].) Workspot Control functions as a policy engine that receives a request for access to a resource from Workspot Client. (Element 15[a][i].) Workspot Control coordinates with Workspot Client to collect information about the user's machine. (Elements 15[a][ii], [iii]; Biggs Decl., Ex. 5, p. 22 ("Workspot client is launched and checks with Workspot Control … [to] Perform[] posture checks").) Workspot Control grants the user a certain level of access to the remote resource based on the collected machine information and policy. (Element 15[a][iii]; Biggs Decl., Ex. 10, p. 13 ("Set different policies based on different classes of devices").)

Workspot Control, in coordination with Workspot Agent, functions as a broker machine to identify a virtual desktop computing environment that is associated with a user and that provides the requested resource according to the granted level of access. (Elements 15[a][iv], [b][i]; Biggs Decl., Ex. 5, p. 13 ("Workspot Control evaluates load information it has for various Workspot Agents and provides the best resource for the user to connect.").) The Accused Products allow each user to be assigned (or associated with) one or more "persistent" desktops that execute within virtual machines executing on a hypervisor. (Elements 15[a][iv],[b][i]; Biggs Decl., Ex. 5, p. 12,  p. 6 ("Workspot is tightly integrated with Microsoft Azure.  … Workspot also integrates with VMWare, VSphere, Nutanix Acropolis, Microsoft Hyper-V and KVM.").)

The Accused Products establish a connection between the user's machine and a virtual desktop computing environment that provides the requested resource. (Element 15[b][ii].)

The user can make a request to access the resource from a second machine or device. Similar to the first request, Workspot Control and Workspot Client coordinate to collect information about the second machine, grant a second level of access based on the collected information and a policy, and establish a connection between the second machine and a second virtual desktop computing environment that provides the requested resource according to the second level of access. (Elements 15[c], [d].)

   2.   *Citrix Is Likely to Show Workspot Infringes Claim 20 of the '732 Patent.*

Citrix is likely to prove that Workspot infringes at least apparatus claim 20 of the '732 patent. Workspot has published information about the Accused Products that demonstrates that these Products, including Workspot Control, Workspot Agent, and Workspot Client, practice each of the limitations of claim 20, as evidenced by the claim charts attached to the Complaint (D.I. 1).

Workspot's Accused Products, for example, provide different methods of executing apps, as claimed in apparatus claim 20. (Element 20[pre].) Workspot Control functions as a transceiver, receiving user credentials from the user's machine or device, transmitting a list of apps available to the user based on the credentials, and receiving a request to execute one of the apps. (Elements 20[a][i]-[iii]; Biggs Decl., Ex. 5, p. 10 ("Once the user enters the token in the client, Workspot Client downloads the relevant configuration for that user/company from Workspot Control.").) Workspot Control, in coordination with Workspot Agent, also functions as a server agent that uses policies to determine which method to use to execute an app. (Element 20[b]; Biggs Decl., Ex. 5, p. 13 ("Workspot Control evaluates the load information it has from various Workspot Agents and provides the best resource for the user to connect."), p.

23 ("Other aspects of Workspot Client behavior can be configured using Workspot Control, including ... Enabling/disabling offline usage of the application.").)

Workspot Control also performs the functions of identification, execution, and management as recited in claim 20. (Elements 20[c], [d], [e]; Biggs Decl., Ex. 5, p. 7("At the core of the solution is Workspot Control, the cloud service that brings together the VDI control plane, the broker, and the load balancer into a unified platform . . . .).) Workspot Control identifies a remote machine that is, at the time of the user request, running a hypervisor that will provide access to the requested app. (Element 20[c], [f][iii].) It also executes the requested app in the virtual desktop computing environment by loading that environment on the remote machine running the hypervisor, and then launching the requested app into the loaded desktop computing environment. (Elements 20[d], [f][i], [iv]-[vi].) Workspot Control also functions as a management component that selects which virtual machine to provide to the desktop computing environment and operating system, and then establishes a connection between the user machine and the desktop computing environment. (Elements 20[e], [f][ii], [vii].)

3. *Citrix Is Likely to Show Workspot Infringes Claim 1 of the '018 Patent.*

Citrix is likely to prove that Workspot infringes at least method claim 1 of the '018 patent. Workspot has published information about the Accused Products that demonstrates that these Products, including Workspot Control, practice each of the limitations of method claim 1, as evidenced by the claim charts attached to the Complaint (D.I. 1).

For example, Workspot Control provides Workspot Client with remote access to app sessions (Element 1[pre].). Workspot allows one or more persistent desktops to be assigned to a given user. (Element 1[a].) A user can connect and reconnect to their remote desktops and apps using any device with Workspot Client installed. (Biggs Decl., Ex.5, p. 9.) Workspot Control receives authentication information from Workspot Client and uses this information to identify

app sessions (including previously disconnected app sessions on persistent desktops) that are associated with the user. (Elements 1[a]-[c].) Workspot Control allows an enterprise to configure various types of policies or rules related to apps, users, and devices (Element 1[d]; Biggs Decl., Ex. 11, p. 11 (showing that "Workspot Control" manages policies for "App/User/Geo/Device.").) Workspot Control determines if a user is, for example, permitted or required to connect to a particular app session, and then reestablishes the app session with Workspot Client running on the user's device. (Elements 1[e], [f].)

        4.     *Citrix Is Likely to Show Workspot Infringes Claim 1 of the '843 Patent.*

Citrix is also likely to prove that Workspot infringes at least method claim 1 of the '843 patent. Workspot has published information about the Accused Products that demonstrates that these Products, including Workspot Control, Workspot Agent, and Workspot Client, practice each of the limitations of claim 1, as evidenced by the claim charts attached to the Complaint (D.I. 1).

As required in claim 1 of the '843 patent, for example, the Accused Products provide access to a remote app to a user on the user's machine. (Element 1[pre].) When the user installs Workspot Client to a device, Workspot Client downloads configuration information from Workspot Control including service access points associated with remote app or desktop resources. (Element 1[a]; Ex.5, p. 10 ("Once the user enters the token in the client, Workspot Client downloads the relevant configuration for that user/company from Workspot Control."), p. 19 ("In order to provision access to those web applications, you just need to specify the URL of those applications in Workspot Control.").) Workspot Client also connects to a web server identified by the service access point, such as SharePoint, and receives address information for the remote app or desktop resource. (Element 1[b].) Additionally, Workspot Client launches an

app on the user's device that communicates with the resource running on a remote application server.  (Elements 1[c], [d].)

> ### 5. The Asserted Patents Are Presumptively Valid.

All of Citrix's patents are presumed valid.  35 U.S.C. § 282(a).  Accordingly, Workspot must prove invalidity by the heightened clear and convincing evidence standard.  At the preliminary injunction stage, Workspot retains the burden to establish invalidity, and Citrix need only show a reasonable likelihood that any invalidity challenge of the Asserted Patents would fail.  *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1376 (Fed. Cir. 2009).  Therefore, absent Workspot proving the contrary, the "presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue."  *Id.*

## B.      Citrix Is Likely to Show False Advertising.

Citrix is likely to prove at trial, by a preponderance of the evidence, that (i) Workspot made false and misleading statements regarding its Accused Products and Citrix's Virtualization Solutions; (ii) the advertised goods traveled in interstate commerce; and (iii) Citrix has been injured as a result.  *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002).  If an advertisement is literally false, the plaintiff need not prove actual consumer deception."  *Id.*[7]

For purposes of this motion, Citrix identifies below a sample of seven Workspot statements that are each literally false.  Some of these statements were made by Mr. Sinha, who

---

[7] A similar standard applies under the Delaware Deceptive Trade Practices Act ("DTPA"), 6 *Del. C.* § 2532 (2009), and common law unfair competition.  *See Schering–Plough Healthcare Prods. v. Neutrogena Corp.,* 702 F. Supp. 2d 266 (D. Del. 2010) ("[P]roof of a Lanham Act claim would necessarily meet the requirements for a claim under the DTPA."); *Accenture Global Servs. GMBH v. Guidewire Software Inc.*, 581 F. Supp. 2d 654, 665 n.17 (D. Del. 2008) ("The DTPA codifies the common law of unfair competition.").  Because Citrix's claims under Delaware law require only that Workspot have made false representations, by meeting the requirements for a claim under the Lanham Act, Citrix thereby establishes a claim under Delaware law as well.

published an article on Workspot's website entitled "Cloud-Native is Better Than Cloud-Hosted: Workspot vs. Citrix Cloud," which includes a comparison chart between "Workspot (Cloud-Native)" and "Citrix Cloud (Cloud-hosted)." (Biggs Decl., Ex. 14.) That chart is replete with false statements including the following:

> **False Statement #1**: Under the subject heading "Agility," Workspot states that Citrix's cloud-hosted platform requires "weeks" of set up while Workspot's time to value is on the order or minutes.
>
> **Truth**: A typical roll-out time is measured in minutes or hours for the Citrix Virtualization Solutions with which Workspot competes. (Rivera Decl. ¶ 6.) Also, Citrix has publicly demonstrated that it can set up sixty virtual machines or operating systems in sixty minutes. (*Id.*)
>
> **False Statement #2**: Under the subject heading "Agility," Workspot states that Citrix's "feature velocity," *i.e.* the rate at which new features are added to a product takes "months," while Workspot's Accused Products are available in "days."
>
> **Truth**: Citrix's cloud-hosted platform has a feature velocity of days, not months. (*Id.* at ¶ 7.)
>
> **False Statement #3**: Under the subject heading "Availability, Elasticity, and Performance," Workspot states that Citrix does not have "automatic scaling."
>
> **Truth**: Citrix Cloud automatically scales the capacity of the cloud service for the Citrix Virtualization Solutions in a way that is transparent for customers. (*Id.* at ¶ 8.)

Similarly, in another series of blogposts, Workspot makes several literally false statements grossly overstating how long it takes for Citrix to roll out its Virtualization Solutions.

> **False Statement #4**: In "Workspot is 10x better than Citrix," (Biggs Decl., Ex. 15) Workspot states that its products have a 60-minute time to value while Citrix takes "several months (or more)."
>
> **False Statement #5**: In "Is It Time To Break Up With Citrix? Another 4 Reasons," (Biggs Decl., Ex. 16), Workspot states that "a typical customer takes 6-9 months to roll Citrix out in production (Workspot can be as quick as 60 minutes)."
>
> **False Statement #6**: In a January 10, 2018 tweet, Workspot asked "Spend months upgrading XenApp? Or deploy @Workspot in a day on #Azure at a fraction of the cost?" (Biggs Decl., Ex. 17.)
>
> **Truth**: The Citrix Virtualization Solutions referenced in Workspot's blogpost, such as Cloud XenApp and XenDesktop Service, require a typical roll-out time of as little as a

few hours.  (Rivera Decl. ¶ 6.)  More complex Citrix Virtualization Solutions may take at most about 35 days for set up.  (*Id.*)

**False Statement #7**: In "Workspot is 10x better than Citrix" (Biggs Decl., Ex. 15), Workspot states that because it adds features to its products "every month," Workspot will "implement customers' feature enhancement requests 10 times faster than ANY other traditional vendor" who have a "typical 12-18 month release cycle."

**Truth**:  Citrix's Cloud Services for the Citrix Virtualization Solutions get feature updates every two weeks, not every 12-18 months.  (Rivera Decl. ¶ 9.)

### C.    Citrix Will Suffer Continued Irreparable Harm Absent Injunctive Relief.

If Workspot continues to infringe Citrix's Asserted Patents and disseminate false advertising about the Accused Products and Citrix's Virtualization Solutions, Citrix will suffer irreparable harm in the form of lost sales, loss of market share, consumer confusion, loss of goodwill and reputation, and other injuries.

#### 1.    *Irreparable Harm Is Presumed Because Workspot Directly Competes with Citrix.*

Workspot's Accused Products directly compete with Citrix's Virtualization Solutions (*e.g.*, XenDesktop and XenApp).  (Hsu Decl. ¶ 10.)  *Douglas Dynamics, LLC v. Buyers Prods. Co.,* 717 F.3d 1336, 1344–45 (Fed. Cir. 2013) (infringement by a direct competitor is "often irreparable").  Indeed, Workspot actively targets Citrix's current and prospective customers and solicits sales of Workspot's Accused Products.  (Hsu Decl. ¶ 6.)  For instance, Workspot highlights eight customers on its website who have switched from Citrix products.  (Biggs Decl. ¶ 8.)  When a patentee is forced to compete with an infringer, "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer."  *Celsis In Vitro*, *Inc. v. CellzDirect, Inc*., 664 F.3d 922, 926 (Fed. Cir. 2012).

In Lanham Act cases, "where the challenged advertising makes a misleading comparison or reference to a competitor's product, irreparable harm is presumed." *Pharmacia Corp. v.*

*GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F. Supp. 2d 611, 621 (D.N.J. 2003) . Here, Workspot has made several literally false statements about Citrix's products. What is more, these statements have already had a demonstrable impact in the marketplace. Themes of Workspot's false advertisements have been repeated by former Citrix customers who have switched to Workspot's Accused Products. Thus, according to Workspot, Citrix customers have switched because of Workspot's purported ability to offer a "simplified, migration that took a day" after running on "outdated Citrix XenApp." (Biggs Decl. ¶ 8.) In this instance, irreparable harm must be presumed.

>    2.    *Workspot's Patent Infringement and False Statements Have Caused and Will Continue to Cause Citrix Significant and Irreparable Harm.*

As a direct result of its infringement and false statements, Workspot has unlawfully taken existing or prospective customers from Citrix, causing Citrix to lose market share by competing against its own patented technology. *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (in view of the patentee's right to exclude, infringement may cause a patentee irreparable harm not remediable by a reasonable royalty). Workspot's illegal activity has caused Citrix irreparable harm in the form of lost sales, lost market share, lost business opportunities, damage to reputation, loss of knowledgeable and skilled employees, and dilution of the value of Citrix's Asserted Patents. *See Celsis In Vitro*, 664 F.3d at 930 (*citing Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1362 (Fed. Cir. 2008)) (evidence of loss of profits and loss of research opportunities may constitute irreparable harm); *W.L. Gore & Assocs., Inc. v. Totes. Inc.*, 788 F. Supp. 800, 810 (D. Del. 1992) ("To prove irreparable injury under § 43(a), [the plaintiff] need only provide a reasonable basis for the belief that [it] is likely to be damaged as a result of the false advertising."). Such harm is necessarily irreparable when the parties are direct competitors.

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012).  .

Citrix claims a significant portion of the desktop and app virtualization market, but has been losing customers to Workspot.  (Youakim Decl. ¶ 3; Biggs Decl. ¶ 8 (Workspot listing former Citrix customers).)  Workspot drives sales of its Accused Products by providing them on Microsoft's Azure cloud computing platform, and Citrix provides the main other Virtualization Solutions for businesses on the same platform.  (*Id.*)  Were it not for Workspot, businesses looking for desktop and app virtualization using a Microsoft cloud platform would necessarily look to Citrix.  (*Id.*)

Moreover, in the software market in general, but even more so in the Software-as-a-Service market,[8] even one lost sale to a customer can cause a cascade of lost revenue over a years-long period.  (Fleck Decl. ¶ 15.)  First, customers in these markets tend to be brand-loyal. (*Id.*)  Accordingly, for each actual or potential customer Citrix has lost because of Workspot's infringing conduct and misleading advertisements, Citrix has also lost opportunities to sell updated software, and to cross-sell other products and services.  (*Id.*)  These are opportunities which will be difficult or impossible to recapture.  (*Id.*); *Novartis*, 290 F.3d at 596 ("In a competitive industry where consumers are brand-loyal, we believe that loss of market share is a 'potential harm which cannot be redressed by a legal or an equitable remedy following a trial.'"). Second, a significant portion of Citrix's revenues are derived from renewals, service, maintenance, and support provided to its customers.  (Fleck Decl. ¶ 16.)  For instance, Citrix licenses its Virtualization Solutions to customers on a periodically-renewable subscription basis.

---

[8] Citrix's Virtualization Products are sold both as on-premises perpetual licenses and as "Software-as-a-Service," which is a software licensing model in which software is licensed on a subscription basis and is hosted, generally, by someone other than the customer.  (Fleck Decl. ¶ 15.)

(*Id.*)  Moreover, Citrix also provides service, maintenance, and support to its customers for an additional, periodic fee.  (*Id.*)  Renewal, service, maintenance, and support are a significant revenue stream for the Virtualization Solutions, often totaling more than the initial sale of the solution over the term of the customer relationship.  (*Id.*)

Workspot's infringement and unfair competition come at a particularly critical time for Citrix.  (Hsu Decl. ¶ 7.)  XenApp 7.0 was released in 2013, and Citrix continues to work with its customers and industry partners to transition from the legacy XenApp 6.5 to XenApp 7.0. (Fleck Decl. ¶ 17.)  Taking advantage of this transition, Workspot is falsely advertising the Accused Products to divert and capture current and prospective Citrix customers.  Indeed, Workspot's 2017 eBook, *XenApp 6.5 Migration Guide e-Book*, is an attempt, based on false and misleading advertising, to siphon current and former Citrix clients such as Alston, Hunt, Floyd & Ing.  (Biggs Decl. ¶ 8 ("Due to Citrix XenApp 6.5 end of life . . . [Alston's] switch to Workspot gave the IT team a quick, painless solution to Citrix migration.").)

Workspot's actions have also irreparably harmed Citrix's reputation .  Citrix has a long history of providing solutions of the highest quality, and its reputation for quality and service is a key part of not only maintaining its current customer base, but also attracting new customers.  (Fleck Decl. ¶ 18.)  Workspot's false advertising has already caused industry confusion by generating negative press coverage of Citrix and its competing products.  (Hsu Decl. ¶ 8.)  Further, Workspot's false advertising, if taken as true, (which, of course, is Workspot's intention), will cause customer and industry confusion.  (Fleck Decl. ¶ 18.)

Workspot's infringement and unfair competition also strains Citrix's alliance relationships with other market participants, such as Nutanix.  For example, in 2015, Citrix entered into a partnership with Nutanix to power Citrix's Virtualization Solutions with Nutanix's

Acropolis Solutions.  (Hsu Decl. ¶ 9; Biggs Decl., Ex. 12.)  Citrix and Nutanix announced the integration of XenApp and XenDesktop MCS with Nutanix's AHV product, and within a few months Citrix had over "100+ customers currently using or planning to deploy" the integrated solution.  (Hsu Decl. ¶ 9; Biggs Decl., Ex. 12.)

Workspot interfered with Citrix's relationship with Nutanix by creating its own alliance with Nutanix using the technology claimed in Citrix's Asserted Patents.  (Hsu Decl. ¶ 10; Biggs Decl., Ex. 13 ("Nutanix is working with Workspot to help its channel get customers VDI systems. Workspot VDI 2.0 products—including Cloud Apps, Cloud Desktops and Cloud Workstations—are deployed on Nutanix systems.").)  As a result of Workspot's infringement and unfair competition, Citrix must directly compete with Workspot not only for customers, but also for alliance partners like Nutanix.  (Hsu Decl. ¶ 10.)

Workspot's patent infringement also irreparably dilutes the value of Citrix's patents.  By infringing Citrix's patented technology, Workspot dilutes the market value of the Asserted Patents by flooding the market with the unlicensed, infringing Accused Products.  Further, by using Citrix's Asserted Patents without a license, Workspot decreases the sale, licensing, and/or cross-licensing value to other market participants of the Asserted Patents and Citrix's patent portfolio.

### D.    The Balance of the Equities Favors a Preliminary Injunction.

In deciding whether to grant a preliminary injunction, a court must consider the "harm that will occur to the moving party from a denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted."  *Hybritech*, 849 F.2d at 1457. Courts have issued injunctions despite the harm to the accused infringer because the infringer's harms "were the result of its own calculated risk in selling the product with knowledge of [the

plaintiff]'s patent." *Celsis In Vitro*, 664 F.3d at 922 (*citing Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006)).

Citrix has expended extensive resources to research and develop the inventions in the Asserted Patents, and it has taken the initiative to protect its investment by obtaining patent protection. *Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015); *see also Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014). Citrix predicated its development efforts on the assumption that it could securely market its unique products and charge a price to help recover its research and development costs and make a profit.

Workspot has not expended even a fraction of the research or development efforts that Citrix has. Instead, Mr. Sinha and the other former Citrix employees now employed by Workspot capitalized unfairly on knowledge of Citrix's patented technology to develop the Accused Products. (Hsu Decl. ¶ 5; Rivera Decl. ¶¶ 2-5; Fleck Decl. ¶¶ 9-14.) Mr. Sinha, for example, led the Citrix Virtualization Solutions product line, including XenDesktop and XenApp; drove product strategy and roadmap for XenDesktop; and delivered the Citrix Receiver product. Mr. Sinha used the information he had gained to substantially benefit Workspot at no cost. (Rivera Decl. ¶ 3.)

The balance of hardships favors enjoining false advertising because "the injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis*, 290 F.3d at 596; *Opticians Ass'n v. Indep. Opticians*, 920 F.2d 187, 197 (3d Cir. 1990). It should be possible for Workspot to promote non-infringing products on the merits. Instead, Workspot persists with disparaging Citrix's products through false and misleading advertisements despite receiving two cease and desist letters from Citrix. (Biggs Decl., Exs. 18, 19.) A preliminary injunction will simply bar Workspot from

further disseminating false information and advertisements, which the law does not protect.

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981).

      **E.**      **The Public Interest in Enforcing Valid Patent Rights and Discouraging False Statements Favors a Preliminary Injunction.**

No public interest is harmed by enjoining Workspot from infringing the Asserted Patents or making false statements about Citrix's Virtualization Solutions. *Hybritech*, 849 F.2d at 1458 (the public interest in enforcing valid patents outweighed the adverse impact on the market caused by the alleged infringer's absence). The Federal Circuit and courts throughout the country have "long acknowledged the importance of the patent system in encouraging innovation." *Sanofi-Synthelabo*, 470 F.3d at 1383. Enjoining Workspot from further infringing acts would preserve the status quo, an important policy interest. *Cordis Corp. v. Medtronic, Inc.*, 780 F.2d 991, 994 (Fed. Cir. 1985).

The public interest also favors an injunction to prevent the dissemination of false statements. Indeed, "[t]here is a strong public interest in the prevention of misleading advertisements . . . [and] where the plaintiff has demonstrated a likelihood of success on the merits, the public interest leans even more towards granting the injunction." *Novartis,* 290 F. 3d at 597. Additionally, as consumers rely on Citrix's Virtualization Solutions, the interest of the consuming public dictates that advertising regarding these products be truthful. *W.L. Gore & Assocs.,* 788 F. Supp. at 813-14; *see also Upjohn Co. v. Riahom Corp.*, 641 F. Supp. 1209, 1225-26 (D. Del. 1986).

**V.**      **CONCLUSION**

Citrix is likely to prove infringement of at least one asserted claim of each of the Asserted Patents and the literal falsity of each of the challenged Workspot statements. Moreover, Citrix has demonstrated that it will suffer irreparable harm as long as Workspot's infringement and

unfair competition are allowed to continue, and that the balance of equities and public interest favor an injunction. For these reasons, the Court should preliminarily enjoin Workspot from infringing the Asserted Patents and from making false statements about the Accused Products and Citrix's Virtualization Solutions.

Dated: May 15, 2018

**DLA PIPER LLP (US)**

**OF COUNSEL**:

Michael G. Strapp (*Pro Hac Vice*)
Larissa Park (*Pro Hac Vice*)
Kristoffer W. Lange (*Pro Hac Vice*)
Yasmin Ghassab (*Pro Hac Vice*)
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Telephone: (617) 406-6031
michael.strapp@dlapiper.com
larissa.park@dlapiper.com
kris.lange@dlapiper.com
yasmin.ghassab@dlapiper.com

_/s/ Denise S. Kraft_
Denise S. Kraft (DE Bar No. 2778)
Brian A. Biggs (DE Bar No. 5591)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Plaintiff*
*Citrix Systems, Inc.*