**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CITRIX SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-588-LPS-SRF |
| | ) | |
| WORKSPOT, INC., | ) | REDACTED |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM ORDER</u>**

At Wilmington this **28th** day of **March, 2019**, the court having considered: (1) Citrix

Systems, Inc.'s ("Citrix") motion to compel the production of Puneet Chawla's devices for a

forensic examination by a neutral third party (D.I. 185; D.I. 191; D.I. 195; D.I. 196); (2) the

parties' submissions on the request for an *in camera* review of documents designated as

privileged (D.I. 186; D.I. 188; D.I. 192; D.I. 194); and Citrix's application for fees and costs

(D.I. 187; D.I. 189; D.I. 190; D.I. 193); IT IS HEREBY ORDERED THAT (1) Citrix's motion

to compel a forensic examination is GRANTED; (2) Citrix's request to compel the production of

certain allegedly privileged communications is GRANTED-IN-PART; and (3) the application for

costs is GRANTED-IN-PART for the reasons set forth below.

**1.      Background.** On April 19, 2018, Citrix Systems Inc. ("Citrix") initiated the

present litigation by filing a complaint against Workspot, Inc. ("Workspot"), alleging causes of

action for infringement of United States Patent Nos. 7,949,677; 8,341,732; 7,594,018; and

8,135,843 (collectively, the "patents-in-suit"). (D.I. 1 at ¶¶ 43-100) The patents-in-suit are

directed to application virtualization, virtual desktop infrastructure ("VDI"), mobile device

management ("MDM"), mobile application management ("MAM"), and related technologies.

(*Id.* at ¶¶ 7, 10, 12)  The complaint also alleges causes of action for false advertising under Section 43(a) of the Lanham Act, violations of the Delaware Deceptive Trade Practices Act, and unfair competition.  (*Id.* at ¶¶ 101-29)

2.       Between October 9 and October 16, 2018, an anonymous individual sent emails and posted information to websites to harass, intimidate, and extort Citrix and two of its executives: David Henshall, Citrix's President and Chief Executive Officer, and Juan Rivera, Citrix's Senior Vice President, Cloud and Server Engineer.  (D.I. 185 at 1; D.I. 115 at ¶ 2; D.I. 119 at ¶ 14)  The anonymous individual threatened to release Citrix's confidential information with the intention of depressing Citrix's stock value and tarnishing the careers and reputations of Mr. Henshall and Mr. Rivera.  (D.I. 102 at 5-6; 12/12/18 Tr. at 9:13-13:14)  Specifically, on October 11, 2018, posts were made to Pastebin.com and TheLayoff.com revealing the contents of an email message purportedly sent by Mr. Henshall to PJ Hough, Citrix's Executive Vice President and Chief Product Officer, urging him to "go aggressive and make sure we block this [potential merger and acquisition] using any means."  (D.I. 119 at ¶ 14; Figs. 7 & 8)

3.       Citrix investigated the source of the threatening emails and determined that they were sent by Workspot's chief technology officer ("CTO"), Puneet Chawla.  (D.I. 102 at 6-8; D.I. 185 at 1)  Citrix notified Workspot of its allegations against Mr. Chawla on the evening of October 15, 2018.  (D.I. 187 at 3)

4.       On October 16, 2018, Citrix filed a motion for a temporary restraining order ("TRO") against Workspot, alleging that: (1) Workspot violated the terms of the Protective Order by sharing highly confidential information regarding a license agreement between Citrix and Microsoft with its key executives, and (2) Mr. Chawla sent harassing emails to Citrix and two of its executives, threatening to leak Citrix's highly confidential information on the "dark

2

web" and to destroy the careers and reputations of Citrix executives. (D.I. 101; D.I. 102 at 1)
Workspot then began requesting the actual emails and associated metadata that were allegedly
sent to Citrix executives so that Workspot could independently analyze them. (D.I. 113, Ex. 1)
Following the filing of the motion, Mr. Henshall received another email attempting to extort
Citrix for bitcoin in connection with the email leaks. (12/12/18 Tr. at 16:21-17:7; D.I. 119 at ¶
14) Citrix was unable to verify the IP address associated with the October 16, 2018 email.
(12/12/18 Tr. at 16:21-17:1)

     **5.**     On October 20, 2018, Citrix received another anonymous email stating, "I have
no emails. No leaks. The email I sent is not real. I made it up to mess with you." (D.I. 119 at ¶
14, Fig. 13) On October 22, 2018, Citrix's forensic investigator collected the email files of Mr.
Henshall, PJ Hough, and Juan Rivera to investigate evidence of the reported "leaked email"
posted on Pastebin.com on October 11, 2018. (D.I. 119 at ¶ 8) On October 25, 2018, Kivu
Consulting ("Kivu") was retained on behalf of Workspot to perform research regarding IP
address obfuscation possibilities with the Guerrilla Mail disposable email address service, email
header forging, and Microsoft Azure log analysis. (D.I. 116 at ¶ 5; D.I. 133 at ¶ 6)

     **6.**     Workspot responded to Citrix's motion for a TRO on October 30, 2018, claiming
that Citrix's allegations against Mr. Chawla were speculative and unsupported by competent
evidence, and requesting attorney's fees associated with responding to the allegedly "vexatious"
TRO motion. (D.I. 112 at 1, 19-20; 12/12/18 Tr. at 16:7-15) In conjunction with Workspot's
response, Mr. Chawla filed a declaration, under penalty of perjury, categorically denying that he
ever sent any emails to Mr. Henshall and Mr. Rivera, or that he posted threats to Citrix and/or
Mr. Henshall on TheLayoff.com and Pastebin.com. (D.I. 115 at ¶¶ 2-4) Workspot also
submitted the declaration of Douglas Brush from Kivu, which generally discussed "the

3

capabilities of the Guerrilla Mail service and the methods with which an IP address could be hidden or discovered while using this service," but did not extend to an analysis of the specific circumstances leading up to the TRO. (D.I. 116 at ¶ 6)

7.      On November 2, 2018, Citrix informed Workspot that the email purportedly written by Mr. Henshall, which was posted to Pastebin.com and TheLayoff.com on October 11, 2018, may have been fabricated. (D.I. 131 at 5)

8.      On November 16, 2018, Kivu received Microsoft Azure activity logs from the period between October 10, 2018 and October 12, 2018. (D.I. 133 at ¶ 8) Kivu's analysis revealed that a user operating under the username *puneet@workspot.com* created a virtual machine on October 11, 2018 and deleted the virtual machine hours later on the same date. (*Id.* at ¶ 9) The user also unsuccessfully attempted to delete the related virtual machine infrastructure, including the IP address, disk, network interface, and security group. (*Id.*) Subsequent evaluation revealed that the same user successfully deleted the public IP address, disk, network interface, security group, and virtual network related to the virtual machine on October 16, 2018. (*Id.* at ¶ 10) Kivu was unable to image the virtual machine due to the deletion of the virtual machine and the associated disk. (*Id.* at ¶¶ 10-11)

9.      Citrix did not agree to allow anyone at Workspot to access the sealed TRO filings until November 26, 2018, when Workspot's CEO was allowed to view the briefing in person at counsel's office. (D.I. 187 at 3; D.I. 131 at 5 n.2) Mr. Chawla was not permitted to review evidence of the allegations against him. (*Id.*) On November 27, 2018, counsel for Workspot represented that it "will not contest a resolution in which measures are taken to address Citrix's concerns regarding Mr. Chawla as the source of the emails . . . and posts on Pastebin.com and TheLayoff.com." (D.I. 188, Ex. 3 at 2)

10.     On December 7, 2018, Workspot filed a sur-reply brief in opposition to Citrix's

motion for a TRO, in which it acknowledged Mr. Chawla's potential role in sending the

anonymous emails and urged the court to disregard Mr. Chawla's October 30, 2018 declaration.

(D.I. 131 at 6 n.3)  Workspot represented that it had formally reprimanded Mr. Chawla. (*Id.* at 7)

On the same date, Citrix served its First Set of Requests for Production ("RFPs"). (D.I. 185, Ex.

5 at 1)  RFP No. 4 sought "[f]orensic images of Puneet Chawla's Devices that may have been

used in connection with the Email Threats, including, but not limited to, any Workspot-issued

computer, tablet, or mobile device." (D.I. 185, Ex. 3 at 12)

11.     On December 12, 2018, Chief Judge Stark conducted a hearing on the motion for

a preliminary injunction and the motion for a temporary restraining order.  (12/12/18 Tr.)  Chief

Judge Stark denied Citrix's motion for a TRO, but he expressed concerns about the allegedly

false declaration signed by Mr. Chawla on October 30, 2018.[1]  (12/12/18 Tr. at 4:25-5:18)

Consequently, he ordered the parties to engage in limited discovery regarding the apparent filing

of a false declaration signed by Mr. Chawla.  (*Id.* at 110:5-17)  Chief Judge Stark also ordered

Workspot to "pay 50 percent of the costs that the plaintiffs have incurred to date in connection

with the filing of the TRO motion.  And that is reasonable attorney fees as well as the costs

including their retention of the forensic expert to do the investigation." (*Id.* at 111:18-23)

12.     On December 18, 2018, counsel reached an agreement to allow Workspot's Board

of Directors, excluding Mr. Chawla, to review the filings relating to Citrix's TRO motion. (D.I.

---

[1] Counsel for Workspot represents that it "no longer seeks to rely on the Chawla Declaration in
support of its opposition to the TRO motion," (D.I. 131 at 6 n.3), acknowledging that "[c]ertainly
the evidence is starting to pile and point towards Mr. Chawla, and not really any other direction
at this point," (12/12/18 Tr. at 26:4-6).  Nonetheless, counsel refused to stipulate that Mr.
Chawla's declaration was false, stressing that "we don't know for certain, one way or the other."
(12/12/18 Tr. at 26:3-4)

143) Mr. Chawla was removed from the Board of Directors and his employment was terminated by Workspot on December 26, 2018. (*Id.*; D.I. 185, Ex. 7 at 1)

     **13.**     On December 21, 2018, Workspot served its response to Citrix's RFP No. 4 seeking "[f]orensic images of Puneet Chawla's Devices that may have been used in connection with the Email Threats, including, but not limited to, any Workspot-issued computer, tablet, or mobile device." (D.I. 185, Ex. 3 at 12) Workspot objected to RFP No. 4, but agreed to produce "relevant, non-privileged documents responsive to this Request and within the Relevant Timeframe, that are in its possession, custody, or control, to the extent such documents and information exist and can be located after a reasonable search and without undue burden and expense." (*Id.* at 12-13) Accordingly, Workspot hired technical consultants to assist in the electronic search for responsive documents. (*Id.*, Ex. 5 at 1) Workspot searched its own server, as well as client-side devices in Mr. Chawla's possession for work purposes which were returned to Workspot. (*Id.*)

     **14.**     With respect to Workspot's server, Workspot searched the inbox and sent box of CEO Amitabh Sinha, COO Maryam Alexandrian, former CTO Puneet Chawla, and counsel Richard Yoza and Karen Gibbs for emails and documents using a list of twenty-two search terms. (D.I. 185, Ex. 5 at 2-3) On January 11, 2019 and January 25, 2019, Workspot produced the emails and documents that were deemed responsive and not privileged to Citrix. (*Id.* at 3)

     **15.**     With respect to the client-side devices, Mr. Chawla turned over a Microsoft Surface Laptop 2, a Lenovo Laptop, an HTC Phone, a Samsung Tablet, Leadtech Research Zero Client, and a 2014 MacBook Pro. (D.I. 185, Ex. 5 at 3) Workspot's consultants imaged the Microsoft Surface Laptop 2, the Lenovo Laptop, the HTC Phone, the Samsung Tablet, and the 2014 MacBook Pro. (*Id.*) The Microsoft Surface Laptop 2 was purchased on October 4, 2018,

and it was released by Microsoft on October 16, 2018. (*Id.* at 2)  Mr. Chawla set up his user

account on the device on October 19, 2018, after the incriminating emails were sent. (*Id.* at 2-3)

Workspot produced images of emails, web activity, and browsing history from this device. (*Id.*)

16.     Workspot represented that the other devices did not include information

responsive to the RFPs. (*Id.* at 3)  Specifically, the Lenovo Laptop allegedly had no user-related

data from October 9, 2018 to October 23, 2018. (*Id.*)  The HTC Phone and Samsung Tablet had

content from the relevant time period, but the content was purportedly not responsive. (*Id.*)  The

Leadtech Research Zero Client does not have local storage and therefore has no user-related

data.  The 2014 MacBook Pro was imaged, but it was not bootable and it had no data. (*Id.*)  Mr.

Chawla represented that the 2014 MacBook Pro was his personal device, and the device was

returned to him through counsel. (*Id.*)

17.     Workspot also produced a privilege log containing 516 entries. (D.I. 188, Ex. 5)

Twenty documents were produced to Citrix. (D.I. 188 at 2)

18.     In early January 2019, Workspot sought to amend its answer and assert

counterclaims premised on a purported email between Mr. Henshall and Mr. Hough. (D.I. 189,

Ex. 5)  On January 9, 2019, Citrix sent a letter to Workspot reiterating that the purported email

from Mr. Henshall was not authentic, but was instead fabricated by Mr. Chawla. (*Id.*)  Citrix

indicated that it would pursue Rule 11 sanctions against Workspot if Workspot filed its

counterclaims in reliance on the authenticity of the email purportedly from Mr. Henshall. (*Id.*)

19.     On January 11, 2019, Citrix served subpoenas on Mr. Chawla seeking: (1)

documents relating to the email threats and an identification of the devices used to set up virtual

machines during the relevant time period; (2), an inspection of all devices in Mr. Chawla's

possession, custody, or control during the relevant time period; and (3) a deposition of Mr.

Chawla on February 11, 2019.  (D.I. 146)  Citrix subsequently cancelled the deposition, which

has not been rescheduled to date.  (D.I. 185, Ex. 7 at 1)

      **20.**     On January 18, 2019, Workspot informed Citrix that it found no evidence

showing that any other Workspot employee was involved in the Chawla emails.  (D.I. 150)

      **21.**     On March 1, 2019, Citrix initiated ████████████████████

████████████████████████████████ seeking a forensic examination of Mr. Chawla's

personal computing devices.  (D.I. 191, Ex. A)

### CITRIX'S MOTION TO COMPEL FORENSIC INSPECTION OF CHAWLA DEVICES[2]

      **22.**     Citrix moves the court for an order compelling Workspot to make the computing

devices of Mr. Chawla available for forensic inspection by a neutral third-party chosen by the

court or agreed upon by the parties.  (D.I. 185 at 1)  Citrix alleges that the information on Mr.

Chawla's Workspot-issued devices used between October 9-16, 2018 is within the scope of

discovery ordered by Chief Judge Stark.  (*Id.* at 3)  Citrix asserts that the discovery is necessary

to determine "whether there were others at Workspot who knew about Puneet Chawla's actions

beforehand or who were involved in any cover up after the fact."  (12/12/18 Tr. at 17:2-7)

      **23.**     In response, Workspot contends that it already identified the Workspot-issued

devices in Mr. Chawla's possession during the relevant time period.  (D.I. 191 at 2)  Workspot

notes that Citrix is pursuing discovery regarding Mr. Chawla's personal devices by way of a

subpoena served on Mr. Chawla and ████████████████████████

██████████  Moreover, Workspot explains that it already forensically imaged the Workspot-

---

[2] The briefing associated with Citrix's motion to compel is located at D.I. 185, D.I. 191, D.I. 195, and D.I. 196.

issued devices in question, and an additional forensic examination would be duplicative, resulting in unnecessary fees and costs. (*Id.*)

**24.** Citrix's motion to compel (D.I. 185) is granted. The record reflects that Citrix has subpoenaed Mr. Chawla to search his personal devices, and a ███████████████████ ██████████████████████████ regarding Mr. Chawla's misuse of the devices. (D.I. 146; D.I. 191, Ex. A) In the instant case, Workspot identified Mr. Chawla's Workspot-issued devices, which were forensically examined by Kivu, and Workspot shared Kivu's summary of the forensic examination with Citrix. However, during oral argument on March 27, 2019, Citrix indicated that Kivu's forensic evaluation did not encompass all means of examining deleted information to determine the relevant data points pertaining to potential spoliation.

**25.** Citrix's reservations about the thoroughness of Workspot's investigative efforts are supported by the record before the court. Specifically, after being notified of the allegations against Mr. Chawla on October 15, 2018, Workspot took no steps to obtain the work-issued devices in Mr. Chawla's possession. Instead, Workspot categorically denied Citrix's allegations and submitted Mr. Chawla's declaration on October 30, 2018.

**26.** The McSweeney declaration filed by Citrix on November 6, 2018 provided detailed screenshots of the harassing emails, website posts, and Mr. Chawla's Twitter postings, as well as more detailed information regarding the originating IP addresses of the harassing communications, further substantiating the claims against Mr. Chawla. (D.I. 119) Nonetheless, Workspot reviewed Mr. Chawla's devices only in response to Citrix's document requests, which were served on December 7, 2018. Despite the allegations and evidence against him, Mr. Chawla retained his position on the Workspot Board, as well as his position as CTO, until December 26, 2018.

27.     Citrix identified its specific concern regarding the reliability of the forensic examination performed by Kivu based on the lack of information regarding deleted data, warranting the performance of another forensic imaging of the same devices. Therefore, the parties shall meet and confer on the issue of a further forensic inspection of Mr. Chawla's Workspot-issued devices on or before **March 29, 2019**. On or before **April 5, 2019**, the parties shall identify their agreed-upon forensic inspector and a proposed budget for the inspection. The forensic inspection shall be completed on or before **April 12, 2019**. The costs of this neutral forensic examination shall be split evenly between the parties.[3]

### *IN CAMERA* PRIVILEGE REVIEW[4]

28.     **Legal standard.** The attorney-client privilege "is designed to encourage clients to make full disclosure of facts to counsel so that [counsel] may properly, competently, and ethically carry out representation." *Identix Pharms., Inc. v. Gilead Scis., Inc.*, 195 F. Supp. 3d 639, 642 (D. Del. 2016) (quoting *In re Impounded*, 241 F.3d 308, 316 (3d Cir. 2001)). The attorney-client privilege protects communications between a client and an attorney related to the purpose of securing legal advice. *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994). The privilege applies to communications from an attorney to a client as well as from a client to its attorney. *See Upjohn v. United States*, 449 U.S. 383, 390 (1981).

29.     The burden of demonstrating the applicability of the attorney-client privilege rests on the party asserting the privilege. *See Matter of Bevill, Bresler & Schulman Asset Mgmt.*

---

[3] Workspot cannot dispute the reasonableness of retaining a "neutral" forensic expert for a "second opinion." Thus, the only basis for Workspot's objection is the expense of the expert.
[4] The briefing associated with the *in camera* review and application of the attorney-client privilege and work product doctrine is located at D.I. 186, D.I. 188, D.I. 192, and D.I. 194.

*Corp.*, 805 F.2d 120, 126 (3d Cir. 1986).  Specifically, the party asserting privilege must show each of the following:

> (1) [T]he asserted holder of the privilege is or sought to become a client;
>
> (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer;
>
> (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and
>
> (4) the privilege has been (a) claimed and (b) not waived by the client.

*In re Grand Jury Investigation*, 599 F.2d 1224, 1233 (3d Cir. 1979) (internal quotation marks omitted).

**30.**   **Analysis.**  Workspot alleges that the twenty-five emails which have been submitted to the court for *in camera* review should not be produced to Citrix because they are irrelevant and privileged.[5]  (D.I. 186 at 2)  Workspot categorizes the emails into two groups. Emails dated before October 30, 2018 fall in Group I.[6]  Emails dated after October 30, 2018 fall in Group II.[7]  The chart below identifies the results of the court's *in camera* review:

---

[5] Citrix takes issue with the assertion of privilege on all 516 logged entries, so its motion to compel extends beyond the 25 representative documents produced for *in camera* reviews. Therefore, the court's ruling with respect to the representative documents is intended to dispose of the dispute for corresponding documents on the privilege log which have not been reviewed *in camera*.

[6] The Group I emails included for *in camera* review are found at Log Nos. 7, 15, 62, 104, 125, 232, 255, 256, 260, 263, 312, 342, 346, and 516.

[7] The Group II emails included for *in camera* review are found at Log Nos. 21, 64, 120, 251, 252, 266, 269, 288, 417, 433, and 496.

| Log No. | Description | Privileged?[8] |
|---|---|---|
| 7 | <u>Group I</u> - 10/22/18 email from Gibbs (L) to Sinha forwarding attorney-client privileged communication from outside counsel Mark Lyon (L) re: Citrix litigation | YES |
| 15 | <u>Group I</u> - 10/29/18 email from Gibbs (L) to outside counsel Hsin (L) regarding declarations by Chawla and Douglas Brush (Kivu Consulting) | NO – CFE |
| 21 | <u>Group II</u> - 11/5/18 email chain between Gibbs (L), Moore (L), Chawla and Sinha re: Comcast subpoena | YES |
| 62 | <u>Group I</u> - 10/19/18 email chain between Gibbs (L), Sinha, Chawla, and Lyon (L) re: Citrix's subpoenas served on Microsoft, Comcast, Pastebin.com, and TheLayoff.com | NO – CFE |
| 64 | <u>Group II</u> – 12/19/19 email in which Sinha forwards TRO briefing to Bill Portelli, a Workspot Board member, per instruction of Hsin (L) | YES |
| 104 | <u>Group I</u> – 10/25/18 email chain between Gibbs (L), Chawla, and Sinha forwarding email from Lyon (L), discussing Lyon's handling of the TRO. | NO – CFE |
| 120 | <u>Group II</u> – 12/15/18 email from Chawla to his Gmail account forwarding 10/16/18 email from Sinha to Lyon (L) and Gibbs (L) suggesting disgruntled Citrix employee sent harassing messages. | NO – NAC & CFE |
| 125 | <u>Group I</u> – email chain from 10/16/18 to 10/22/18 between Gibbs (L), Lyon (L), Palapura (L), Sinha, and Chawla re: Workspot's investigation into TRO allegations. | NO – CFE |
| 232 | <u>Group I</u> – 10/22/18 emails between Gibbs (L) and Chawla re: Chawla's tweet and related Citrix "patent troll" article | NO – CFE |
| 251 | <u>Group II</u> – 12/13/18 email from Chawla to Lyon (L) with cc to Illovsky (L) seeking access to TRO briefing | NO – 3PD & Not work product |
| 252 | <u>Group II</u> – email chain from 12/4/18 to 12/7/18 between Hsin (L), Chawla, Sinha, and Steve Ward (Insite forensic imager) with cc to Illovsky (L) regarding forensic images of Chawla's Workspot devices | NO – 3PD & Not work product |
| 255 | <u>Group I</u> – email chain from 10/28/18 to 10/30/18 between Gibbs (L), Hsin (L), Palapura (L), Lyon (L), Sinha, and Chawla re: Workspot's answering brief to TRO, Chawla's declaration, and Kivu's declaration | NO – CFE |
| 256 | <u>Group I</u> – 10/30/18 signed Chawla declaration | NO – CFE |
| 260 | <u>Group I</u> – email chain from 10/16/18 to 10/23/18 between Lyon (L), Gibbs (L), Sinha, Chawla, and Palapura (L) re: Workspot's investigation into IP address | NO – CFE |

---

[8] For purposes of the chart, "CFE" stands for "crime-fraud exception," "3PD" stands for "third-party disclosure," and "NAC" stands for "non-attorney communication."

| 263 | <u>Group I</u> – 10/15/18 email from Lyon (L) to Sinha, Chawla, Gibbs (L), Hsin (L), and Palapura (L) forwarding email from Citrix counsel re: allegations forming the basis of the TRO motion. | NO – CFE |
|---|---|---|
| 266 | <u>Group II</u> – email chain from 12/4/18 to 12/7/18 between Chawla, Hsin (L), Sinha, Ward (Insite), Nicolo (Kivu), and Illovsky (L) re: forensic images of Chawla's Workspot devices | NO – 3PD and Not work product |
| 269 | <u>Group II</u> – 11/2/18 email from Chawla to Lyon (L), Gibbs (L), Sinha, and Hsin (L) re: Kivu examination | NO – CFE (duplicative of 125) |
| 288 | <u>Group II</u> – 12/7/18 email from Sinha to Chawla, cc'ing Lyon (L), Gibbs (L), and Palapura (L), re: Citrix allegations re: Chawla. | YES |
| 312 | <u>Group I</u> – 10/16/18 email from Chawla to Lyon (L), Sinha, and Gibbs (L) where Chawla discusses Guerrilla Mail. | NO – CFE |
| 342 | <u>Group I</u> – 10/16/18 email from Chawla to Labana and Sinha asking Labana to delete his response to Chawla's "patent troll" tweet | NO – Uncontested |
| 346 | <u>Group I</u> – 10/16/18 email from Labana to Chawla and Sinha confirming he deleted his response to Chawla's "patent troll" tweet | NO – Uncontested |
| 417 | <u>Group II</u> – 11/14/18 emails between Gibbs (L), Lyon (L), and Illovsky (L) re: Comcast's response to subpoena. | NO – 3PD & Not work product |
| 433 | <u>Group II</u> – 12/7/18 email from Chawla to Illovsky forwarding email in Log No. 288. | YES |
| 496 | <u>Group II</u> – 12/5/18 emails between Chawla, Ward (Insite), and Nicolo (Kivu) re: logistics of meeting in India to image Chawla's laptop | NO - NAC |
| 516 | <u>Group I</u> – 10/16/18 email from Chawla to Sinha re: upcoming meeting with Microsoft | NO – NAC |

31.    ***Crime-fraud exception ("CFE").***  Citrix alleges that the crime-fraud exception prohibits Workspot from asserting privilege over communications regarding Mr. Chawla's declaration.  (D.I. 188 at 2)  According to Citrix, Mr. Chawla was a Workspot officer, Board member, and agent for the litigation against Citrix at the time his false declaration was filed, and his communications with others at Workspot regarding his false declaration should not be withheld from production.  (D.I. 188 at 2)

32.    According to Workspot, there is no basis for contending that Workspot or its attorneys committed a crime or fraud, even if Mr. Chawla filed a false declaration, because Mr.

13

Chawla acted on his own. (D.I. 186 at 3)  Moreover, Workspot alleges that none of the emails reveal Workspot used the privileged communications "in furtherance" of the alleged crime or fraud.  (*Id.*)  With respect to the Group II emails exchanged after the October 30 Chawla declaration, Workspot alleges that the crime fraud exception cannot apply because the communications were sent after the completion of the alleged crime or fraud.  (*Id.*)

      **33.**    **Legal standard.**  A client waives the attorney-client privilege and the crime-fraud exception applies "when the lawyer is consulted, not with respect to past wrongdoing but to future illegal activities." *In re Impounded*, 241 F.3d at 316-17 (internal quotation marks omitted).  In applying the crime-fraud exception, "the client's intention controls and the privilege may be denied even if the lawyer is altogether innocent." *United States v. Doe*, 429 F.3d 450, 454 (3d Cir. 2005) (internal citation and quotation marks omitted).

      **34.**    The crime-fraud exception is an "extreme remedy." *See Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1359 (Fed. Cir. 2011).  Consequently, it applies only where there is "a reasonable basis to suspect that the privilege holder was committing or intending to commit a crime or fraud and that the attorney-client communications or attorney work product were used in furtherance of the alleged crime or fraud." *In re Grand Jury*, 705 F.3d at 153.  "The reasonable basis standard is intended to be reasonably demanding; neither speculation nor evidence that shows only a distant likelihood of corruption is enough." *Id.* (internal quotation marks omitted).  But "the party opposing the privilege is not required to introduce evidence sufficient to support a verdict of crime or fraud or even to show that it is more likely than not that the crime or fraud occurred." *Id.* at 153-54 (internal citation and quotation marks omitted). "[U]nder federal law, the [crime-fraud] exception can encompass communications and attorney work product in furtherance of an intentional tort that undermines the adversary system itself,"

14

including misrepresentations by omission. *Wachtel v. Guardian Life Ins. Co.*, 239 F.R.D. 376, 380 (D.N.J. 2006) (internal citation and quotation marks omitted); *see also In re Sealed Case*, 162 F.3d 670 (D.C. Cir. 1998) (finding that obstruction of justice through false declaration can serve to establish crime-fraud exception).

35.    **Analysis.** The crime-fraud exception applies to waive the privilege with respect to certain of the Group I emails in the present case because there is a reasonable basis to believe that Mr. Chawla intended to file, and filed, a false declaration under penalty of perjury. *See In re Grand Jury Matter*, 847 F.3d 157, 165 (3d Cir. 2017). Specifically, the crime-fraud exception applies to Log Nos. 15, 62, 104, 125, 232, 255, 256, 260, 263, 269, and 312, as set forth in the chart above at ¶ 30, *supra*. These emails precede[9] the filing of the allegedly false Chawla declaration, and the contents of the emails address the Chawla declaration itself and/or the investigations by Citrix and Workspot into the harassing emails. Thus, these communications relate to the subsequent filing of the allegedly false Chawla declaration.

36.    Workspot's position that Mr. Chawla acted on his own does not preclude the application of the crime-fraud exception.[10] At the time, Mr. Chawla was CTO, Board member, and co-founder of Workspot, and Workspot did not decide to disassociate itself from Mr. Chawla until December 26, 2018, nearly two months after Workspot filed Mr. Chawla's declaration. Workspot's counsel reviewed the allegations in the TRO motion and, nonetheless, took no steps

---

[9] Log No. 269 does not precede the filing of the Chawla declaration. However, the crime-fraud exception applies to this communication in which Mr. Chawla inquires about the nature of the forensic examination performed by Kivu in support of the TRO briefing and related declarations.
[10] Workspot cites no authority suggesting that the crime fraud exception does not apply to a corporate party if only one individual associated with the corporate party commits a crime or fraud.

to investigate the allegations independently[11] in the two weeks prior to filing Workspot's response.  Instead, Workspot's counsel prepared its response to the TRO motion, categorically denying the allegations lodged by Citrix and filing Mr. Chawla's allegedly false declaration in conjunction with the response.

37.     The crime-fraud exception does not extend to Log No. 7, which does not pertain to Mr. Chawla's declaration.

38.     The crime-fraud exception does not extend to the Group II emails, which were exchanged following the filing of the allegedly false Chawla declaration, and thus were not used to advance the crime or fraud.  These emails do not suggest an intention to cover up the alleged falsity of the Chawla declaration.

39.     ***Waiver by disclosure to third parties ("3PD").***  Citrix contends that Workspot waived the privilege with respect to certain Group II emails by disclosing certain communications to Mr. Chawla's personal attorney, Mr. Illovsky.  (D.I. 188 at 3)  According to Citrix, the common interest doctrine does not apply under these circumstances because Mr. Chawla's interests were no longer aligned with Workspot's interests when Mr. Chawla engaged Mr. Illovsky.  (*Id.*)  In response, Workspot argues that Citrix's assertion of waiver fails with respect to the five emails including Mr. Illovsky because each email contains work product belonging to Workspot, and Mr. Illovsky is a non-adversary to Workspot.  (D.I. 186 at 4)

40.     **Legal standard.**  Pursuant to Rule 26(b)(3)(A), "a party may not discover documents . . . that are prepared in anticipation of litigation or for trial by or for another party or

---

[11] Although Workspot retained Kivu on October 25, 2018 to draft a declaration for purposes of the TRO briefing, Kivu's first investigation was limited to the functioning of the Guerrilla Mail system generally.  Kivu did not conduct an investigation into Mr. Chawla's devices or the emails and web postings made about Citrix executives.

its representative." The work product doctrine promotes the adversary system by guarding the

confidentiality of documents prepared in anticipation of litigation, allowing a party to prepare for

litigation without fear that its work-product will be used against it. *See Westinghouse Elec.*

*Corp. v. Republic of Philippines*, 951 F.2d 1414, 1428 (3d Cir. 1991); *Hickman v. Taylor*, 329

U.S. 495, 510-11 (1947). "[T]he protection stemming from the work product doctrine belongs to

the professional, rather than the client." *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d

851, 866 (3d Cir. 1994). "[D]isclosure to a third party does not necessarily waive the protection

of the work-product doctrine," so long as the disclosure is made to a non-adversary. *See*

*Westinghouse*, 951 F.2d at 1428.

     **41.**    Courts which have afforded attorney work product this protection generally

"distinguish between two kinds of work product: ordinary work product, which includes raw

factual information, and opinion work product, which encompasses counsel's mental

impressions, conclusions, opinions, or legal theories," finding that the former "is generally

discoverable upon a showing of substantial need and an inability to secure the substantial

equivalent of the materials by alternate means without undue hardship, and that the latter "enjoys

a nearly absolute immunity and can be discovered only in very rare and extraordinary

circumstances," such as when it appears "that the attorney in question was aware of or a knowing

participant in the criminal conduct." *In re Green Grand Jury Procs.*, 492 F.3d 976, 980-81 (8th

Cir. 2007) (internal citations and quotation marks omitted).

     **42.**    **Analysis.** Mr. Chawla's interests were not sufficiently adverse to Workspot

during the time period the communications were sent. Although these emails coincided with, or

occurred after, Mr. Chawla's formal reprimand by Workspot, the emails illustrate the

collaboration between Workspot's attorneys and Mr. Illovsky regarding the investigation into

Mr. Chawla's conduct.  Thus, to the extent that the documents are protected by the work product doctrine, the protection was not waived due to the disclosure to Mr. Illovsky.

**43.**    For the foregoing reasons, Log No. 433 may be withheld under the work product doctrine despite their disclosure to Mr. Illovsky.  However, Workspot has not demonstrated why Log Nos. 251, 252, 266, and 417 should be protected under the attorney-client privilege or work product doctrine.  *See Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir. 1982) (the "burden of demonstrating that a document is protected as work-product rests with the party asserting the doctrine.").  The privilege should not extend to these documents, which were disclosed to a third party and do not contain work product.

**44.**    *Non-attorney communications ("NAC").*  Citrix contends that the attorney-client privilege cannot be properly extended to cover communications between Workspot personnel and members of the Workspot Board of Directors.  (D.I. 188 at 3)  According to Citrix, these communications are business communications to which the privilege does not apply.  (*Id.* at 4)  In the same vein, Citrix argues that Workspot cannot assert privilege over communications forwarded by Mr. Chawla from his work email to his personal email.  (*Id.*)  Workspot contends that the non-attorney emails are privileged because the communications discuss legal advice in the context of the litigation.  (D.I. 192 at 2)  Workspot withdraws its privilege assertion with respect to Log Nos. 342 and 346.  (*Id.*)

**45.**    **Analysis.**  The court's *in camera* review reveals that Log Nos. 496 and 516 did not include an attorney and, as a result, the attorney-client privilege does not apply.  These communications were exchanged between Mr. Chawla and Mr. Sinha, who were executives at Workspot, or between Mr. Chawla and forensic consultants from Insite and Kivu.  *See Inventio AG v. ThyssenKrupp Elevator Am. Corp.*, C.A. No. 08-874-ER, 2010 WL 9546391, at *1 (D.

Del. June 17, 2010) (holding that a communication between non-attorneys cannot be privileged unless it facilitates the legal representation of a client by the client's attorney). *MPEG LA, L.L.C. v. Dell Global B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013) (attorney-client privilege does not apply to business communications).

46.     ***Inadequate privilege log entries.*** Citrix contends that Workspot provides insufficient descriptions of certain documents in the privilege log, and supplementation of the log to provide more detail is inadequate in this instance because Workspot already had an opportunity to supplement its privilege log to provide more detailed descriptions. (D.I. 188 at 4) Citrix asks the court to find that Workspot has waived the privilege as a remedy for the insufficient privilege log descriptions. (*Id.*) Workspot does not address Citrix's contentions regarding the adequacy of the privilege log. The court concludes that the privilege log is not deficient in this case.

47.     The foregoing rulings on the results of the *in camera* review shall be extended to all documents identified in the privilege log, and shall not be limited to the twenty-five documents sampled for purposes of the *in camera* review. Production of the documents shall be held in abeyance until the resolution of objections, if any, by the District Judge.

### ATTORNEY'S FEES & COSTS[12]

48.     During the December 12, 2018 hearing, Chief Judge Stark imposed sanctions on Workspot, indicating that he would "make the defendants pay 50 percent of the costs that the plaintiffs have incurred to date in connection with the filing of the TRO motion. And that is reasonable attorney fees as well as the costs including their retention of the forensic expert to do

---

[12] The briefing associated with Citrix's request for attorney's fees and costs is located at D.I. 187, D.I. 189, D.I. 190, and D.I. 193.

the investigation." (12/12/18 Tr. at 111:18-23)  The parties now dispute the calculation of the attorney's fees and costs ordered by Chief Judge Stark.  Citrix seeks fees in the amount of $303,979.28.  (D.I. 187, Ex. A)  Workspot argues that this amount should be reduced to $49,464.11.  (D.I. 187, Ex. C)

**49.** *Fees for criminal investigation.*  Workspot contends that Citrix's request for attorneys' fees and costs is unreasonable because the requested fees associated with a criminal investigation of Mr. Chawla were not awarded by the court.  (D.I. 187 at 2)  According to Workspot, the court ordered only the recovery of fees and costs relating to the filing of the TRO motion, and the criminal investigation of Mr. Chawla is peripheral to this action.  (*Id.*) Consequently, Workspot contends that the amount of fees incurred by Citrix should be reduced by at least $53,559.99.  (*Id.*)  In response, Citrix contends that Chief Judge Stark expressly ordered Workspot to pay for the costs of the forensic investigation, which necessarily encompasses Citrix's criminal investigation.  (D.I. 189 at 2-3)

**50.** Citrix properly included the fees and costs associated with the criminal investigation in its calculation.  Chief Judge Stark's order contemplated fees and costs associated with both the TRO motion and the related forensic investigation.  Specifically, Chief Judge Stark ordered Workspot to "pay 50 percent of the costs that the plaintiffs have incurred to date in connection with the filing of the TRO motion.  And that is reasonable attorney fees as well as the costs including their retention of the forensic expert to do the investigation."  (12/12/18 Tr. at 111:18-23)  Thus, Chief Judge Stark's order expressly contemplated the inclusion of expenses relating to the investigation into Mr. Chawla's conduct.  To the extent that Workspot now argues the subpoenas of Mr. Chawla's personal devices and the action going forward in the Northern District of California are "peripheral" to the TRO motion in the present litigation, the court notes

20

that Workspot accused Citrix of advancing baseless, speculative allegations against Mr. Chawla

in its response to the TRO motion.  Consequently, Citrix was justified in further investigating

Mr. Chawla's conduct to bolster its accusations.

51.     *Adequacy of documentation.*  Workspot alleges that Citrix does not provide

sufficient documentation to support the hours claimed by the attorneys.  (D.I. 187 at 2-3)

According to Workspot, Citrix has provided a generic description of the work performed, no

basis to assess the dates worked, the time billed on each date, whether time was spent solely on

the TRO motion or other matters, or the specific tasks performed.  (*Id.*)  In response, Citrix

submitted attorney and consultant invoices to the court for *in camera* review.  (D.I. 190, Ex. A)

These documents provide sufficient detail.  Consequently, the court rejects Workspot's argument

regarding the adequacy of Citrix's documentation.

52.     *Reasonableness of hours spent.*  Workspot argues that the 600+ hours allegedly

expended by Citrix on the TRO motion is unreasonable.  (D.I. 187 at 3)  According to Workspot,

Citrix should have spent a total of 75 hours on the TRO motion and the related investigation.

(*Id.*)  Workspot also challenges the fact that more than two-thirds of the claimed hours were

billed by partners, and Workspot accuses Citrix of strategically withholding information and

obstructing Workspot's ability to investigate, needlessly drawing out the investigation.  (*Id.*)

53.     In response, Citrix contends that the number of hours billed is reasonable, given

that the TRO motion required a large volume of correspondence and conferences with Workspot,

discovery, and third-party subpoenas.  (D.I. 189 at 3)  Citrix argues that 600 hours is not

excessive in light of the fact that Citrix filed three rounds of briefs and two expert declarations in

connection with the TRO motion, served third-party subpoenas, served discovery, and presented

oral argument to the court.  (*Id.*)  According to Citrix, the ratio of partner-to-associate hours is

21

reasonable in this case because the tasks were not routine or easily delegable to an associate. (*Id.* at 3 n.3)

54.     Both parties rely on Judge Andrews' decision in *Seagate Technology (US) Holdings, Inc. v. Syntellect, Inc.*, which held that 600 hours spent drafting two summary judgment briefs and holding oral argument was excessive, reducing the fees billed by partners by 10% to 540 hours. C.A. No. 12-1686-RGA, 2016 WL 5724774, at *5 (D. Del. Sept. 30, 2016) (concluding that the hours billed involved a disproportionate number of partner hours, and also that an excessive amount of time was spent on deposition preparation and summary judgment). The court concludes that this decision provides more support for Citrix's position regarding the reasonableness of the hours expended in the present case. In *In re Seagate*, the court noted that it was unreasonable for counsel to spend 482 hours preparing for, and taking, four depositions of three witnesses. *Id.* at *5. Moreover, the court concluded that 600 hours was excessive for the filing of two briefs and preparation for a single argument. *Id.* In the present case, attorneys from DLA spent approximately 600 hours not only preparing the TRO briefing, but also pursuing discovery and investigating the source of the harassing emails and posts. (D.I. 187, Ex. A)

55.     ***Reasonableness of hourly rate.*** Workspot contends that the hourly rates are unreasonable. (D.I. 187 at 3-4) According to Workspot, the average hourly billing rate for partners in Delaware is $397, and the 90th percentile hourly billing rate for partners is $528. (D.I. 187 at 4) The average hourly billing rate for associates in Delaware is $334, and the 90th percentile hourly billing rate is $487. (*Id.*) Workspot contends that the hourly rates proposed by Citrix far exceed the lodestar rates used in *Princeton* or the AIPLA 90th percentile billing rates for the region including Delaware. (*Id.*) Workspot proposes rates of no more than $595 for partners and no more than $500 for associates. (*Id.*)

**56.**     In response, Citrix contends that its rates are reasonable for this market under the circumstances, applying the rates of Delaware attorneys practicing complex commercial litigation. (D.I. 189 at 4)  Citrix notes that the Federal Circuit recently upheld the attorneys' billing rates in a case without adjusting them to Delaware rates.  (*Id.*)

**57.**     The hourly rates are generally reasonable under the circumstances of this case. Courts in this district award fees that are "consistent with both counsel's usual and customary fixed preferred hourly rates." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 254 F. Supp. 3d 680, 723 n.58 (D. Del. 2017), *rev'd on other grounds*.  Workspot has not shown that the hourly rates for DLA Piper, Wilks, Lukoff & Bracegirdle, or Stroz Friedberg are unreasonable under these unusual circumstances.  However, the rates for Skadden, Arps, Slate, Meagher & Flom LLP shall be reduced from $1,140.00 to $940.00 to bring the fees in line with other New York counsel of record.  This reduces Skadden's total fees by $3,680.00, from $20,990.99 to $17,310.99.  (D.I. 187, Ex. A)

**58.**     ***Work performed by in-house counsel.*** Workspot alleges that Citrix cannot recover fees for work performed by internal Citrix employees and counsel. (D.I. 187 at 4) According to Workspot, in-house counsel fees can only be recovered for legal work that would otherwise be performed by outside counsel, and Citrix has offered an insufficient explanation for how it calculated the rate of in-house counsel.  (*Id.*)  In response, Citrix contends that fee awards can include in-house activities.  (D.I. 189 at 4)

**59.**     Citrix's request for reimbursement of time spent by in-house employees is denied. Generally, attorney's fees for the services of in-house counsel are not recoverable, particularly where, as here, in-house counsel served primarily as a liaison between the client and outside counsel who had responsibility for the conduct of the case. *See Dictiomatic, Inc. v. U.S. Fidelity*

*& Guar. Co.*, 2000 WL 33115333, at *4-5 (S.D. Fla. May 2, 2000) (citing cases from 11th Cir., D.C. Cir., S.D.N.Y., & Fed. Cir.); *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983). While the court does not seek to diminish the substantial contributions by in-house counsel and cyber security personnel in this matter, Citrix did not incur additional expense in the payment of these employees' salaries.

60.     In view of the foregoing analysis, Citrix's demand for attorneys' fees and costs is GRANTED-IN-PART. The court awards fees in the amount of $271,963.30, which represents the amount requested by Citrix, minus fees for in-house counsel and in-house investigative efforts, as well as the reduction in rates for Skadden counsel.

61.     **Conclusion.** For the foregoing reasons, IT IS HEREBY ORDERED THAT (1) Citrix's motion to compel a forensic examination is GRANTED; (2) Citrix's request to compel the production of certain allegedly privileged communications is GRANTED-IN-PART; and (3) the application for costs is GRANTED-IN-PART.

62.     Given that the court has relied upon material that technically remains under seal, the court is releasing this Memorandum Order under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Memorandum Order should be redacted, the parties should jointly submit a proposed redacted version by no later than **April 5, 2019**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The court will subsequently issue a publicly available version of its Memorandum Order.

63.    This Memorandum Order is filed pursuant to 28 U.S.C. § 636(b)(1)(A), Fed. R.

Civ. P. 72(a), and D. Del. LR 72.1(a)(2).  The parties may serve and file specific written

objections within seven (7) days after being served with a copy of this Memorandum

Order.  Fed. R. Civ. P. 72(a). The objections and responses to the objections are limited to five

(5) pages each.

64.    The parties are directed to the court's Standing Order For Objections Filed Under

Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,

www.ded.uscourts.gov.

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE