# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CITRIX SYSTEMS, INC.,

                    Plaintiff,

      v.

WORKSPOT, INC.

                    Defendant.

C.A. No. 1:18-cv-00588-LPS

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Citrix Systems, Inc. ("Plaintiff" or "Citrix") as and for its Amended Complaint against Workspot, Inc. ("Defendant" or "Workspot"), states and alleges as follows:

## NATURE OF THE ACTION

1.      This action for damages and injunctive relief arises under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*, the Lanham Act, 15 U.S.C. § 1125, the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2532, and Delaware common law.

## PARTIES

2.      Plaintiff Citrix Systems, Inc. is a Delaware corporation with its principal place of business at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

3.      Defendant Workspot, Inc. is a Delaware corporation with its principal place of business at 1601 S. De Anza Boulevard, Cupertino, California 95014.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367, in that Citrix seeks, *inter alia*, relief for

Workspot's false and misleading advertising under the Lanham Act, relief for Workspot's violations under Delaware state law and relief for Workspot's infringement of Citrix's patents.

5.    This Court has personal jurisdiction over Workspot because Workspot conducts, and has conducted, continuous, systematic, substantial, and routine business within Delaware, including, but not limited to, offering products and services for sale in Delaware, and because Workspot is a Delaware corporation.

6.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 28 U.S.C § 1400 because Defendant is a Delaware corporation and because a portion of the events giving rise to the claims asserted in this Amended Complaint occurred in this District.

## BACKGROUND

### Relevant Citrix History

7.    Founded in 1989, Citrix is a pioneer and leader in the field of application and desktop virtualization, networking, Software-as-a-Service (SaaS), and cloud computing technologies.  Citrix's technology enables the future of work by delivering the industry's most comprehensive and integrated platform for secure application ("app") and data delivery and network functionality through technology leadership in cloud-based app virtualization, virtual desktop infrastructure (VDI), mobility, business file synchronization and sharing, and networking. Citrix's products and services target customers of all sizes, from small businesses to large global enterprises.  Citrix on-premises ("on-prem") and cloud-based solutions offer the most complete and integrated workspace to enable people to securely access their apps, desktops and data from anywhere.  Citrix products and services include on-prem products and services such as XenApp, XenDesktop, XenMobile, NetScaler, and Citrix Receiver, and cloud-based products and services, such as ShareFile and Citrix Cloud and its attendant services (including the XenApp and

2

XenDesktop Service, XenMobile Service, NetScaler Gateway Service, and ShareFile service) (the Citrix on-prem and could-based products and services are collectively referred to as "Citrix's Products and Services").

8.    XenApp and XenDesktop provide app virtualization and VDI services that give individuals the freedom to work from anywhere while reducing information technology costs. XenApp (initially released in 2008) was a natural evolution from earlier Citrix products such as WinFrame (initially released in 1995), MetaFrame (initially released in 1998), and Presentation Server (initially released in 2005).  XenApp is an app virtualization solution that provides secure delivery of Windows, Web, and SaaS applications to a wide variety of user devices, including desktops, tablets, and smartphones.  XenApp optimizes productivity with universal access to virtual apps, desktops, and data from any device.

9.    XenDesktop carries all the same functionality as XenApp, plus the option to implement a scalable VDI solution.  Citrix continues to release new versions of XenDesktop with enhanced features.

10.    Citrix's XenMobile product provides both mobile device management (MDM) and mobile application management (MAM) functionality, allowing businesses to manage employee mobile devices and mobile apps, and allowing employees to securely work on both enterprise-owned and personal mobile devices.  XenMobile MDM protects enterprise data by leveraging device-level policies provided by the device manufacturer or platform provider.  For example, a business can use XenMobile MDM to enable device-wide encryption and automatically lock or wipe an employee's device.  XenMobile MAM provides application-level encryption and security policies that are not dependent on device security.  This provides an additional layer of security, so the risk of data loss is lower in the event a device is compromised.  In addition, with

3

XenMobile per-app encryption and containerization, enterprise apps are restricted from sharing data with personal apps.

11.     Citrix StoreFront manages the delivery of desktops and apps from XenApp, XenDesktop, and XenMobile servers to user devices.  Citrix StoreFront enumerates and aggregates available desktops and apps into stores.  Users access Citrix StoreFront stores through Citrix Receiver directly or by browsing to a Citrix Receiver for Web or Desktop Appliance site. Users can also access Citrix StoreFront using thin clients and other end-user-compatible devices through a XenApp Services site.  Citrix StoreFront keeps a record of each user's applications and automatically updates their devices, providing users with a consistent experience as they roam between their smartphones, tablets, laptops, and desktop computers.

### Patents-in-Suit

12.     Citrix's efforts in developing application virtualization, VDI, MDM, MAM, and related technologies and Citrix's Products and Services have resulted in the issuance of numerous United States patents, including U.S. Patent No. 7,949,677; U.S. Patent No. 8,341,732; U.S. Patent No. 7,594,018; ~~and~~ U.S. Patent No. 8,135,843; and U.S. Patent No. 10,063,595 (collectively referred to as the "Patents-in-Suit"; these patents are attached as Exhibits 1, 2, 3, ~~and~~ 4, and 20 respectively).    These ~~four~~five patents are only a small slice of Citrix's intellectual property portfolio, which includes over 1200 issued patents in the United States and over 2400 issued patents and 1000 pending patent applications worldwide.

### Relevant Workspot History

13.     The broad adoption of Citrix's Products and Services has resulted in substantial growth for Citrix.  Citrix's success has not gone unnoticed by its competitors including, in particular, Defendant Workspot.

4

14.     Founded in 2012, Workspot is a competitor of Citrix that is relatively new to the cloud technology industry.  Workspot was co-founded in July 2012 by Amitabh Sinha, who had worked from June 2006 through April 2012 for Citrix as Vice President and General Manager for Enterprise Desktops and Apps, Vice President, Product Management for XenDesktop, and as a Vice President of Engineering.  While at Citrix, Mr. Sinha (i) led the desktop virtualization product line, including XenDesktop and XenApp; (ii) drove product strategy and roadmap for XenDesktop; and (iii) delivered the Citrix Receiver product.  Mr. Sinha founded Workspot and has served as the Chief Executive Officer of Workspot since its inception.

15.     Led by Sinha, Workspot has recruited numerous additional Citrix employees, including multiple former Citrix executives.  For example, Workspot's Vice President of Marketing, Brad Peterson, worked for Citrix for almost a decade from 2004 through 2014 as a Director of Customer Care, a Technology Strategist, and a Senior Director, Technology Specialist prior to joining Workspot.  Workspot's Vice President of Products and Alliances, Jimmy Chang, worked for Citrix from 2006 through 2014, and held an almost identical role at Citrix as Director of Product Management and Strategic Alliances responsible for XenDesktop product management. Further, Workspot's Vice President of Engineering, Prasad Krothapalli, worked for Citrix from 2006 through 2013, and served as the Senior Director of Engineering of Enterprise Desktops and Application Division at Citrix, where he led XenDesktop development teams.  Workspot continues to engage former high-ranking Citrix executives in leadership positions, recently hiring former Citrix Vice President and Chief Technology Officer for XenApp, Harry Labana, as its Chief Customer Officer.

16.     Mr. Sinha, Mr. Peterson, Mr. Chang, Mr. Labana, and Mr. Krothapalli had senior roles at Citrix, were well aware of Citrix's technology and extensive patent portfolio, worked on

5

Citrix products with which Workspot now competes, and worked with inventors of the Patents-in-Suit.  Moreover, since Workspot was formed, several additional Citrix employees have left to join Workspot, bringing with them their knowledge of Citrix's products and intellectual property.

## Workspot Infringes Citrix's Patents-in-Suit

17.     Workspot has infringed on Citrix's valuable and proprietary intellectual property, including at least the Patents-in-Suit.  Workspot is using Citrix's patented technology without a license or Citrix's permission.

18.     In particular, Workspot manufactures, sells, and offers for sale products and services, including without limitation those marketed by Workspot as Cloud Apps, Cloud Desktops, and Cloud Workstations, that infringe Citrix's patented technology.  The Workspot products and services include a variety of components such as Workspot Client, Workspot Connector, and Workspot Control.  Workspot's products and services, and each of their components, are collectively referred to herein as the "Infringing Products."

19.     The Infringing Products use the same Citrix-patented technology as do Citrix's Products and Services.

20.     The Infringing Products enable access to desktops and applications from a user device using a system architecture and technologies described in the Patents-in-Suit.

21.     For example, Workspot Control is a server-based component that handles the provisioning of remote desktops and applications along with user authentication. Workspot Client is an application that can be installed on desktop, tablet, and smartphone devices, and includes an Enterprise App Store which lists applications available to a user based on provisioning done through Workspot Control.  Workspot Connector is a server component that is installed on remote desktop infrastructure.

6

22. This architecture and technology is claimed in the Patents-in-Suit. Additional detail concerning Workspot's infringement is included below at Counts I to IVV and in the claim charts attached as Exhibits 5 to 8 and Exhibit 21.

**Workspot Engages in False and Misleading Advertising**

23. Workspot has not only infringed Citrix's patented technology, it is also promoting the Infringing Products by intentionally making numerous false and misleading claims in its marketing materials and social media posts about Citrix's Products and Services. Workspot's false and misleading advertisements are promoted on Workspot's website and through Workspot's Twitter account, both of which are accessible by consumers nationwide, including in Delaware.

24. On information and belief, Workspot is intentionally making false and misleading claims about Citrix's Products and Services in an attempt to legitimize itself with inaccurate comparisons to Citrix's well-developed and protected technology, and to compensate for the fact that Workspot is relatively new to the market and is trying to unfairly capture market share from Citrix.

25. Workspot has continued to make false and misleading claims about Citrix even after receiving multiple letters from Citrix informing Workspot of the false and misleading nature of its statements, identifying specific examples of such statements, explaining why the statements are problematic, and requesting information about the data and resources upon which Workspot relied to create such statements. After receiving two such letters from Citrix in January and June 2017, Workspot made only minor, inconsequential modifications to its false and misleading statements that did not cure the factual inaccuracies that Citrix had addressed in its letters. Workspot also refused to provide any basis for continuing to post false and misleading statements about Citrix. Even more egregiously, Workspot made new false and misleading statements about

7

Citrix *after* receiving the January and June 2017 letters from Citrix.

26.     In particular, Workspot's website currently includes numerous charts, articles, and blog posts comparing the features of the Infringing Products with Citrix's Products and Services. These charts, articles, and blog posts are replete with false, misleading, and unsubstantiated statements.

27.     Thus, for example, a comparison chart on Workspot's website entitled *Cloud-Native is Better Than Cloud-Hosted: Workspot vs. Citrix Cloud* (the "Citrix Comparison Chart") includes several false and misleading claims about Citrix's Products and Services.   *See* http://blog.workspot.com/top-5-differences-between-workspot-and-citrix-workspace-cloud-cwc, attached as Exhibit 9 (last visited on April 19, 2018).  For example, under the subject heading of "Agility" in the Citrix Comparison Chart, Workspot states that Citrix's cloud-hosted platforms require "weeks" to be up and running, and that "feature-velocity" – a term referring to the rate at which new features are added to a product – takes "months."    These claims are literally false. First, Citrix has publically demonstrated that it can have sixty virtual machines, or operating systems that imitate dedicated software, functioning in sixty minutes, a far cry from "weeks." Second, Citrix's cloud-hosted platform has a feature velocity of days, not "months."

28.     In the Citrix Comparison Chart, Workspot also states under the heading "Availability, Elasticity, and Performance" that Citrix does not have "automatic scaling."  This claim is literally false.  Citrix Cloud automatically scales the capacity of its cloud service in a way that is transparent for customers.

29.     In another chart comparing Citrix and Workspot, contained in a Workspot e-book entitled *XenApp 6.5 Migration Guide*, Workspot falsely suggests that Workspot, but not Citrix, has products with the following capabilities: (i) enterprise class deployment in a day; (ii)

8

predictable subscription billing; (iii) automatic scaling; (iv) automatic high availability; (v) automatic updates; (vi) offline document access; (vii) visibility into performance, availability and usage; and (viii) granular visibility into end-user activity.  *See* https://land.workspot.com/citrix-alternatives-xenapp6.5 (webpage where e-book may be downloaded), e-book attached as Exhibit 10 (last visited on April 19, 2018).  Most of this statement is literally false because features (i) – (v) and (vii) – (viii) are available to Citrix customers who migrate to XenApp and XenDesktop Service in Citrix Cloud, and because features (iii) and (vii) – (viii) are available to Citrix customers who use the on-prem XenApp product.

30.    Workspot makes similarly false and misleading claims in a blog post entitled *Workspot is 10x better than Citrix*, where it purportedly explains "[w]hy the Workspot solution is 10x better than Citrix."  *See* http://blog.workspot.com/is-the-workspot-workspace-solution-10x-better-than-citrix, attached as Exhibit 11 ("the 10x blog post") (last visited on April 19, 2018).  In the 10x blog post, Workspot states that it has a "[c]onsiderably faster time to value: 60 minutes with Workspot vs. several months (or more) with Citrix."  This is literally false because, as stated above, Citrix has publically demonstrated that it can have as many as sixty virtual machines functioning in sixty minutes.  If the customer chooses the Citrix Cloud XenApp and XenDesktop Service, then the implementation simplicity is similar to that of Workspot's, and on-boarding a customer to the service and allowing access to a first virtual desktop will only take a few hours.

31.    Workspot also states in the 10x blog post that it has a "[w]ay lower" total cost of ownership ("TCO") because it is "priced at $144/user/year" as compared to the total cost of ownership of a Citrix deployment which can be "upwards of $1000/user/year."  *Id.*  This statement is misleading because it offers a comparison between Workspot's list price and the total cost of ownership for deploying Citrix's Products and Services.  Upon information and belief, were

9

Workspot to include the total cost of ownership for deploying the Infringing Products, its cost would be higher than the list price stated in the blog post.

32.     Finally, Workspot states in the 10x blog post that, because it adds features to its products "every month," Workspot will "implement your feature enhancement requests 10 times faster than with ANY other traditional vendor" who has a "typical 12-18 month release cycle." *Id.* This statement is at least misleading, if not literally false, because Citrix's cloud-based products and services get feature updates every two weeks, not every 12-18 months.

33.     In another of its Citrix-focused blog posts, entitled *Is It Time To Break Up With Citrix? Another 4 Reasons*, Workspot also states without basis that "a typical customer takes 6-9 months to roll Citrix out in production (Workspot can be as quick as 60 minutes)." *See* http://blog.workspot.com/time-to-break-up-with-citrix-another-4-reasons, attached as Exhibit 12 (last visited on April 19, 2018).   This statement is literally false.  As explained above, Citrix is capable of setting up sixty virtual desktops in sixty minutes.  If the customer choses the Citrix Cloud XenApp and XenDesktop Service, then the implementation simplicity is similar to that of Workspot's, and on-boarding a customer to the service and allowing access to a first virtual desktop will only take a few hours.  If the customer wants a full, on-premises XenApp environment, that rollout takes only about 20 days.  If a customer opts for the Citrix Consulting standard service for designing and rolling out a full on-premises XenApp environment, the rollout is about 35 days.

34.     Workspot also makes false and misleading statements in a blog post entitled *Compare Workspot VDI 2.0 & DaaS 2.0 to Other Solutions* ("VDI Comparison Chart").  *See* http://blog.workspot.com/daas-and-vdi-solution-comparison, attached as Exhibit 13 (last visited on April 19, 2018).  The VDI Comparison Chart contains numerous false, unsubstantiated, and

10

misleading claims.  For example, Workspot makes the unsubstantiated statement that its TCO is "50-90% lower than VDI 1.0 Solutions," without providing any evidence or rationale to support its calculations.  Upon information and belief, the total cost of deployment of the Infringing Products is not 50-90% lower than XenDesktop.  Additionally, Workspot states that it can provide "high availability" with "no IT resources," while indicating that VDI 1.0 Solutions require such resources.  This is both false and misleading.  Like all other vendors, Workspot requires an on-premises connector (Workspot Enterprise Connector) that needs to be implemented for high availability.  Workspot also relies on third-party components that must be highly available to deliver their service to the end user, such as for multi-factor or general user authentication. These functions need to be designed, implemented, and maintained by qualified IT personnel.

35.     Workspot also falsely states, in its blog post entitled *How You Can Achieve VDI Simplicity with a Single Platform*, that while Workspot only uses two hops (or steps) for non-persistent desktops and apps, "[i]n contrast, Citrix Receiver uses 33 hops for a connection." *See* http://blog.workspot.com/how-workspot-achieves-vdi-simplicity-with-a-single-platform, attached as Exhibit 14 (last visited on April 19, 2018).  This is literally false and misleading.  A user needs only to authenticate to the environment, which is easily automated by means of single sign-on, and click an application icon for a connection. Workspot's statement misleadingly implies significant complexity and a high time to access apps and data, which is factually incorrect.

36.     Workspot has also made false, misleading and unsubstantiated claims in promoting its Infringing Products as using "an architecture that scales infinitely," as compared to Citrix's "XenApp 6.5 - an outdated IMA architecture."  *See* http://blog.workspot.com/top-3-windows-workloads-for-microsoft-azure (last visited on April 19, 2018); *see also*

11

http://blog.workspot.com/new-features-application-publishing-vdi-on-azure (last visited on April 19, 2018) , attached as Exhibits 15 and 16.  First, it is unsubstantiated and, upon information and belief, impossible for Workspot's Infringing Products to use an infinitely scalable architecture. Second, Workspot's contention that Citrix uses "an outdated IMA architecture" is literally false. Citrix's XenApp and XenDesktop Service, for example, is a cloud environment, not an "an outdated IMA architecture."

37.     Additionally, in a blog entitled, *Top 10 Questions You Must Ask About Citrix Cloud* ("Top 10 Questions"), Workspot posits ten questions about Citrix's Products and Services, and provides false, misleading, and unsubstantiated answers to each question.   *See* http://blog.workspot.com/10-questions-to-ask-citrix-cloud, attached as Exhibit 17 (last visited on April 19, 2018).  What is more, Workspot implicitly suggests that each of the answers is provided by Citrix, when that is not the case.    An example of one such Workspot question and so-called "Citrix Answer" is reproduced below:

## 1. Are you really hosting 1 instance of XenApp/XenDesktop for each customer?

Citrix Answer: Yes, we host one copy of a legacy XenApp/XenDesktop deployment per customer, including Storefront, Brokers, Databases, AD, Licensing servers, etc.

The "Citrix Answer" to the question above is not only misleading because of Workspot's suggestion that the answer was an *official* response provided directly by Citrix, it is also literally false.  Citrix's XenApp and XenDesktop Service offer a cloud environment built from scratch that hosts multiple copies of XenApp and XenDesktop deployments per customer.

38.     Workspot's "Top 10 Questions" contains several additional false statements.  For

12

example, Workspot asks, "Is my company's data flowing through Citrix Cloud?"  *Id.*  It purports to provide the following "Citrix Answer":  "Yes.  When a user connects to a virtual application or desktop, data flows through the Citrix Cloud.  You can avoid this by installing NetScaler Gateway on premises."  *Id.*  This "Citrix Answer" is literally false.  The XenApp and XenDesktop Service stores only metadata needed for the brokering and monitoring of the customer's applications and desktops and does not store customer data files.

39.     Another of the "Top 10 Questions" posed by Workspot is as follows:  "Is the Citrix Cloud a single point of failure?"  *Id.*  The purported "Citrix Answer" is, "Yes. Since all authentication and data traffic goes through the Citrix Cloud, if it is unavailable, then your users will not be able to access their applications and desktops."  *Id.*  This "Citrix Answer" is literally false.  First, Citrix's cloud-based services run on a highly-available and globally-distributed infrastructure.  Second, users of Citrix's cloud-based services can still launch apps if they are not able to connect to Citrix Cloud, provided they have launched those apps before.

40.     One additional false Workspot Top 10 Question is the following:  "If I'm a Citrix Cloud customer, do I work with a single support group?  Citrix Answer: No.  Depending on the Citrix Cloud service that you use, you will be routed to different support groups depending on the issue and severity."  *Id.*  This statement is false because Citrix has only one globally-integrated support organization.

41.     Workspot's false statements are also present outside their website.  On its official Twitter account, for example, Workspot has posted a tweet stating "Time to modernize your virtual app solution! Spend months upgrading XenApp? Or deploy @Workspot in a day at a fraction of the cost?"  *See* https://twitter.com/Workspot/status/946138958056120320, attached as Exhibit 18 (last visited on April 19, 2018).  This is literally false because upgrading XenApp

13

does not take months.

42.     Citrix brings this action to end Workspot's wrongful and infringing use of Citrix's patented technology and to stop Workspot from engaging in false and deceptive marketing practices about its Infringing Products and Citrix's Products and Services.

## COUNT I
### (Infringement of United States Patent No. 7,949,677)

43.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

44.     United States Patent No. 7,949,677 ("the '677 patent") was issued on May 24, 2011 to Richard Jason Croft, Anthony Edward Low, Richard James Mazzaferri, David Neil Robinson, and Bradley J. Pedersen.  A copy of the '677 patent, titled "Methods and Systems for Providing Authorized Remote Access to a Computing Environment Provided by a Virtual Machine," is attached as Exhibit 1.

45.     The '677 patent is valid and enforceable.

46.     Citrix is the owner of the entire right, title, and interest in and to the '677 patent.

47.     Workspot had actual notice of the '677 patent, at least as of the filing date of ~~this~~its Complaint.

48.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '677 patent prior to the filing date of this Complaint and may have known of the '677 patent itself prior to the filing date of ~~this~~the Complaint.

49.     The '677 patent relates to providing different levels of access to a remote resource based on policies.  For example, claim 1 recites, in part, receiving first and second requests for access to a resource from respective first and second client machines.  In response to a policy, a

14

policy engine then grants first and second levels of access to the resource.  A broker machine identifies first and second desktop computing environments and establishes the connections between the first and second client machines and the first and second desktop environments.

50.     Workspot has directly infringed and continues to directly infringe the '677 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '677 patent.  By way of example and not limitation, the Infringing Products infringe claims 1-16 and 18-21 of the '677 patent.  Exhibit 5 is a claim chart detailing Workspot's infringement of the asserted claims of the '677 patent.

51.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '677 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '677 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

52.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court.  Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

53.     Upon information and belief, Workspot has willfully infringed the '677 patent by directly infringing the '677 patent with knowledge that its actions constituted infringement of the '677 patent.

54.     As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

15

## COUNT II
### (Infringement of United States Patent No. 8,341,732)

55.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

56.     United States Patent No. 8,341,732 ("the '732 patent") was issued on March 13, 2012 to Richard Jason Croft, Anthony Edward Low, Richard James Mazzaferri, and Bradley J. Pedersen.  A copy of the '732 patent, titled "Methods and Systems for Selecting A Method For Execution, By a Virtual Machine, of an Application Program," is attached as Exhibit 2.

57.     The '732 patent is valid and enforceable.

58.     Citrix is the owner of the entire right, title, and interest in and to the '732 patent.

59.     Workspot had actual notice of the '732 patent, at least as of the filing date of ~~this~~the Complaint.

60.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '732 patent prior to the filing date of ~~this~~the Complaint and may have known of the '732 patent itself prior to the filing date of ~~this~~the Complaint.

61.     The '732 patent relates to methods and systems for execution of an application remotely or locally based on a policy associated with a user.  For example, claim 1 recites a method for selecting a method of execution for an application program.  Claim 1 recites, in part, enumerating a plurality of applications available to a client machine responsive to received user credentials.  Upon receipt of a request to execute one of the enumerated applications, a broker machine selects a method for executing the application and the requested application can be launched in the desktop computing environment.

62.     Workspot has directly infringed and continues to directly infringe the '732 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling

16

within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '732 patent.  By way of example and not limitation, the Infringing Products infringe claims 1, 3, 4, 16, 20, 21, 23, 24, 27, 30-34, and 38-42 of the '732 patent.  Exhibit 6 is a claim chart detailing Workspot's infringement of the asserted claims of the '732 patent.

63.    To the extent Workspot does not perform each and every step of a particular asserted method claim of the '732 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '732 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

64.    Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court.  Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

65.    Upon information and belief, Workspot has willfully infringed the '732 patent by directly infringing the '732 patent with knowledge that its actions constituted infringement of the '732 patent.

66.    As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

<u>**COUNT III**</u>
**(Infringement of United States Patent No. 7,594,018)**

67.    Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

EAST\153285377.1 EAST\166084415.1

68.     United States Patent No. 7,594,018 ("the '018 patent") was issued on September 22, 2009 to Bradley J. Pedersen.  A copy of the '018 patent, titled "Methods and Apparatus for Providing Access to Persistent Application Sessions," is attached as Exhibit 3.

69.     The '018 patent is valid and enforceable.

70.     Citrix is the owner of the entire right, title, and interest in and to the '018 patent.

71.     Workspot had actual notice of the '018 patent, at least as of the filing date of ~~this~~the Complaint.

72.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '018 patent prior to the filing date of ~~this~~the Complaint and may have known of the '018 patent itself prior to the filing date of ~~this~~the Complaint.

73.     The '018 patent claims particular methods and an apparatus that provides remote access to application sessions associated with a user.  For example, claim 1 recites a method for providing remote access to a plurality of application sessions.  Claim 1 recites, in part, identifying a plurality of disconnected application sessions already associated with a user.  Using a rule, a determination is made that the user is one of required, permitted, and forbidden to connect to a first one of the disconnected application sessions.  The first disconnected application session is then reestablished with a client computer operated by the user.

74.     Workspot has directly infringed and continues to directly infringe claims 1-14, 16, and 29-42 of the '018 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '018 patent.  Exhibit 7 is a claim chart detailing Workspot's infringement of the asserted claims of the '018 patent.

18

75.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '018 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '018 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

76.     Workspot also actively induces infringement by others of claims 17-28 of the '018 patent.  For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

77.     Evidence of inducement of infringement includes, but is not limited to:  (i) Workspot's knowledge of the '018 patent since at least as of the filing date of ~~this~~the Complaint; (ii) Workspot's intent to induce direct infringement of the '018 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement.  For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

78.     For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device.  *See* Workspot, "VDI Reinvented:  The Innovation Behind the Revolutionary Workspot VDI Cloud Service" ("VDI Reinvented"), attached as Exhibit 19, at pp. 5 and 9.  As another example, Workspot directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure.  *See id.* at pp.  7, 12, 13, and 15 ("Workspot is tightly integrated with [Microsoft]

19

Azure to enable rapid creation of virtual desktops," "Workspot automates … Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

79.     On information and belief, Workspot knows or should know that such activities induce others to directly infringe the '018 patent.  For example, Workspot knows or should know that its actions induce others to directly infringe the '018 patent because Workspot knows or should know about the existence of the '018 patent, especially given the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

80.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court.  Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

81.     Upon information and belief, Workspot has willfully infringed the '018 patent by directly and/or indirectly infringing the '018 patent with knowledge that its actions constituted infringement of the '018 patent.

82.     As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

<u>**COUNT IV**</u>
**(Infringement of United States Patent No. 8,135,843)**

83.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

84.     United States Patent No. 8,135,843 ("the '843 patent") was issued on March 13, 2012 to Andre Kramer.  A copy of the '843 patent, titled "Methods and Systems for Providing Access to an Application," is attached as Exhibit 4.

85.     The '843 patent is valid and enforceable.

86.     Citrix is the owner of the entire right, title, and interest in and to the '843 patent.

87.     Workspot had actual notice of the '843 patent, at least as of the filing date of ~~this~~the Complaint.

88.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '843 patent prior to the filing date of ~~this~~the Complaint and may have known of the '843 patent itself prior to the filing date of ~~this~~the Complaint.

89.     The '843 patent relates to a system and methods for providing remote application access to an application client.  For example, claim 1 recites, in part, receiving, by a client, from a web service directory on a content server, a service access point associated with a first application, the service access point identifying a web server.  The client receives, from the web server identified by the service access point, address information associated with the first application.  The client launches a second application, the second application communicating via a presentation layer protocol with an application server identified by the received address information.  The application server launches the first application and returns information to the second application via the presentation layer protocol.

90.     Workspot has directly infringed and continues to directly infringe claims 1, 9, 12, and 19 of the '843 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in

EAST\153285377.1 EAST\166084415.1

the '843 patent.  Exhibit 8 is a claim chart detailing Workspot's infringement of the asserted claims of the '843 patent.

91.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '843 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '843 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

92.     Workspot also contributes to infringement by others of claim 9 of the '843 patent including its customers, either literally or under the doctrine of equivalents.  By way of example and not limitation, Workspot offers to sell and/or sells within the United States to its customers or imports into the United States components of patented devices, including but not limited to, the Infringing Products, knowing the same to be especially made or especially adapted for use in an infringement of the '843 patent.  Such components are not staple articles or commodities of commerce suitable for substantial non-infringing use.

93.     Workspot also actively induces infringement of claims 1, 12, and 19 of the '843 patent.  For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

94.     Evidence of Workspot's contributory infringement includes, but is not limited to: (i) Workspot's knowledge of the '843 patent since at least as of the filing date of ~~this~~the Complaint; (ii) Workspot's knowledge that its accused products are especially adapted to infringe the '843 patent; and (iii) the lack of substantial non-infringing uses for the Infringing Products.  The lack of substantial non-infringing uses with respect to the '843 patent is confirmed by the fact that the Infringing Products are sold with the components required by the asserted claims of the '843

22

patent.  Not only are the components designed to implement the infringing features, but the default settings of the Infringing Products, as sold, are set accordingly.

95.     Evidence of Workspot's inducement of infringement includes, but is not limited to: (i) Workspot's knowledge of the '843 patent since at least as of the filing date of ~~this~~the Complaint; (ii) Workspot's intent to induce direct infringement of the '843 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement.  For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

96.     For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device.  See VDI Reinvented, attached as Exhibit 19, at pp. 5 and 9.  As another example, Workspot directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure.  *See id.* at pp.  7, 12, 13, and 15 ("Workspot is tightly integrated with Azure to enable rapid creation of virtual desktops," "Workspot automates … Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

97.     On information and belief, Workspot knows or should know that such activities induce infringement and contribute to the infringement by others of the '843 patent.  For example, Workspot knows or should know that its actions induce others to directly infringe the '843 patent because Workspot knows or should know about the existence of the '843 patent, especially given

the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

98.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court.  Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

99.     Upon information and belief, Workspot has willfully infringed the '843 patent by directly and/or indirectly infringing the '843 patent with knowledge that its actions constituted infringement of the '843 patent.

100.    As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

**COUNT V**
**(Infringement of United States Patent No. 10,063,595)**

101.    Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

102.    United States Patent No. 10,063,595 ("the '595 patent") was issued on August 28, 2018 to Waheed Qureshi, et al.  A copy of the '595 patent, titled "Secure Execution of Enterprise Application on Mobile Devices" is attached hereto as Exhibit 20.

103.    The '595 patent is valid and enforceable.

104.    Citrix is the owner of the entire right, title, and interest in and to the '595 patent.

105.    Workspot had actual notice of the '595 patent, at least as of the filing date of this Amended Complaint.

EAST\153285377.1 EAST\166084415.1

106.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '595 patent prior to the filing date of this Amended Complaint and may have known of the '595 patent itself prior to the filing date of this Amended Complaint.

107.     The '595 patent relates to a system and methods for enabling enterprise users to securely access enterprise resources, such as documents and data, using their mobile devices.

108.     Workspot has directly infringed and continues to directly infringe at least claim 1 of the '595 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '595 patent.  Exhibit 21 is a claim chart detailing Workspot's infringement of the asserted claims of the '595 patent.

109.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '595 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '595 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

110.     Workspot also contributes to infringement by others of at least claim 1 of the '595 patent including its customers, either literally or under the doctrine of equivalents.  By way of example and not limitation, Workspot offers to sell and/or sells within the United States to its customers or imports into the United States components of patented devices, including but not limited to, the Infringing Products, knowing the same to be especially made or especially adapted for use in an infringement of the '595 patent.  Such components are not staple articles or commodities of commerce suitable for substantial non-infringing use.

25

111.     Workspot also actively induces infringement of at least claim 1 of the '595 patent. For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

112.     Evidence of Workspot's contributory infringement includes, but is not limited to: (i) Workspot's knowledge of the '595 patent since at least the filing date of this Amended Complaint; (ii) Workspot's knowledge that its accused products are especially adapted to infringe the '595 patent; and (iii) the lack of substantial non-infringing uses for the Infringing Products. The lack of substantial non-infringing uses with respect to the '595 patent is confirmed by the fact that the Infringing Products are sold with the features required by the asserted claims of the '595 patent.  Not only are the Infringing Products designed to implement the infringing features, but the default settings of the Infringing Products, as sold, are set accordingly.

113.     Evidence of Workspot's inducement of infringement includes, but is not limited to: (i) Workspot's knowledge of the '595 patent since at least the filing date of this Amended Complaint; (ii) Workspot's intent to induce direct infringement of the '595 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement.  For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

114.     For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device.  *See* VDI Reinvented, D.I. 1, Ex. 19, at pp. 5 and 9; *see also* https://www.workspot.com/download ("Use one of the

26

following links to download the Workspot Client application onto your Windows 64 bit, Windows 32 bit, Mac, iOS, or Android device") (last visited March 7, 2019).  Workspot also directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure.  *See id.* at pp.  7, 12, 13, and 15 ("Workspot is tightly integrated with Azure to enable rapid creation of virtual desktops," "Workspot automates … Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

115.   On information and belief, Workspot knows or should know that such activities induce infringement and contribute to the infringement by others of the '595 patent.  For example, Workspot knows or should know that its actions induce others to directly infringe the '595 patent because Workspot knows or should know about the existence of the '595 patent, especially given the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

116.   Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court.  Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

117.   Upon information and belief, Workspot has willfully infringed the '595 patent by directly and/or indirectly infringing the '595 patent with knowledge that its actions constituted infringement of the '595 patent.

118.    As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

## COUNT VI
**(Violation of Section 43(a) of The Lanham Act; 15 U.S.C. § 1125(a))**

119.    ~~101.~~ Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

120.    ~~102.~~ Defendant's false and misleading statements constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

121.    ~~103.~~ Sections 1125(a)(1)(A) and (B) of the Lanham Act provide, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . .

122.    ~~104.~~ Workspot has made false, deceptive and unsubstantiated statements of fact about its own products and about Citrix's products in its advertisements and marketing materials, as described herein, with the intent to mislead and deceive consumers.

123.    ~~105.~~ Upon information and belief, Workspot's false and misleading statements of fact have actually deceived or tended to deceive a substantial segment of the relevant and intended consumer population into purchasing Workspot's Infringing Products instead of Citrix's Products

28

and Services by misleading consumers into wrongly believing that Citrix's Products and Services lack features that the Workspot's Infringing Products purportedly provide and that the Workspot's Infringing Products are superior to Citrix's Products and Services.

124. ~~106.~~ Upon information and belief, Workspot's false and misleading statements of fact have influenced the buying decisions of consumers for cloud computing services and products throughout the United States because Workspot's claims relate to fundamental features of the parties' respective technologies and products.

125. ~~107.~~ Workspot's false and misleading statements of fact were and are made in interstate commerce.

126. ~~108.~~ Workspot's improper activities have been willful and deliberate, thereby making this an exceptional case under the Lanham Act.  Indeed, Workspot was specifically informed by Citrix in January and June 2017 that its advertisements and marketing material were false and misleading.  Therefore, Workspot's false advertising of its products was purposeful and knowing and merits a finding that exceptional circumstances exist sufficient to support an award of attorneys' fees and treble damages.

127. ~~109.~~ Workspot's unlawful actions have caused, and will continue to cause, Citrix irreparable harm unless enjoined.

128. ~~110.~~ Workspot has profited from its unlawful actions and has been unjustly enriched to the detriment of Citrix.  Workspot's unlawful actions have caused Citrix monetary damage in an amount presently unknown, but in an amount to be determined at trial.

**COUNT ~~VI~~VII**
**(Violation of Delaware Deceptive Trade Practices Act;**
**Del. Code Ann. Tit. 6 § 2531 et. seq.)**

129. ~~111.~~ Citrix realleges and incorporates each of the foregoing paragraphs of the

29

complaint.

130. 112. Workspot's advertising and promotional materials, as described herein, contain literally false and misleading statements regarding the nature, characteristics, benefits, uses, or qualities of goods in commerce.

131. 113. Workspot's advertising and promotional materials, as described herein, contain literally false and misleading representations of fact of the goods of Citrix.  Workspot has engaged in deceptive trade practices through its advertising claims that are replete with false and misleading statements that disparage Citrix and Citrix's Products and Services, including through several advertisements on its website that purport to compare features of the Workspot Infringing Products and Citrix's Products and Services, where numerous claims in such advertisements, including the claims identified in Paragraphs 23–42, are intentionally false (some of which are literally false) and misleading.  *See* Exhibits 9-17.

132. 114. Workspot's advertising and promotional materials, as described herein, create a likelihood of confusion, deception, and misunderstanding because Workspot's claims lead consumers to wrongly believe that Citrix's Products and Services lack features that the Workspot Infringing Products purportedly contain and that the Workspot Infringing Products are superior to Citrix's Products and Services.

133. 115. These literally false and misleading advertising and promotional statements are material to consumer purchasing decisions and, in addition to creating a likelihood of consumer confusion, are, upon information and belief, causing actual consumer confusion and damages to Citrix.

134. 116. Defendant's false and misleading advertising and promotional statements violate the Delaware Deceptive Trade Practices Act and the common law of Delaware.

30

135.   ~~117.~~ Unless this Court enjoins Workspot from continuing to make these false and misleading claims and orders their retraction and/or correction, the false and misleading advertising will continue to cause Citrix to suffer a loss of consumer confidence, sales, profits, and goodwill, which will irreparably harm Citrix.

136.   ~~118.~~ Workspot's false and misleading statements are willful, with malicious and deceptive intent, making this an exceptional case.

137.   ~~119.~~ As a result of Workspot's conduct, Citrix has been and continues to be substantially and irreparably harmed.  Citrix has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief to prevent Workspot's continuing acts.

138.   ~~120.~~ Workspot has willfully engaged in the aforementioned deceptive trade practices, making this an exceptional case.

139.   ~~121.~~ Pursuant to 6 Del. C. § 2533, Citrix is entitled to treble damages, attorneys' fees and costs, and injunctive relief.

**COUNT ~~VII~~VIII**
**(Common Law Unfair Competition)**

140.   ~~122.~~ Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

141.   ~~123.~~ Workspot's unlawful acts, as described above, constitute unfair competition under Delaware law.

142.   ~~124.~~ By making false and misleading statements about its own product, Workspot has utilized unfair methods of competition and deceptive trade practices.

143.   ~~125.~~ On information and belief, Workspot's conduct has wrongly interfered with Citrix's reasonable business relationships concerning its products and services, including expected

31

sales, because Workspot's conduct causes consumers to wrongly believe that Citrix's Products and Services lack features that the Workspot Infringing Products provide.

144.   126. Workspot engaged in such misrepresentations with malicious intent.

145.   127. Workspot's unlawful actions have caused, and will continue to cause, Citrix irreparable harm to its business and reputation unless enjoined.

146.   128. Workspot has also profited from its unlawful actions and has been unjustly enriched to the detriment of Citrix.  Workspot's unlawful actions have caused Citrix monetary damage in an amount presently unknown, but to be determined at trial.

147.   129. Workspot knew or should have known that its conduct was reasonably likely to result in injury, damage, or other harm, thus warranting the award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment:

1.      In favor of Plaintiff and against Defendant on all of Plaintiff's claims;

2.      Enjoining and restraining Defendant, its officers, directors, agents, servants, employees, attorneys, and all others in active concert or participation with Defendant, during the pendency of this action and thereafter permanently from:

        A.      Unfairly competing with Plaintiff in any manner whatsoever;

        B.      Engaging in any deceptive trade practice with respect to Plaintiff or Plaintiff's Products and Services in any manner whatsoever;

        C.      Engaging in any false or misleading advertising with respect to Plaintiff, Plaintiff's Products and Services and any related goods or services in any manner whatsoever; and

        D.      Disparaging Plaintiff's Products and Services in any manner whatsoever;

3.      Requiring Defendant to deliver up, or cause to be delivered up, for destruction all advertisements, marketing material, and all other materials in the possession or control of Defendant that contain any false or misleading statements of fact about its Infringing Products and any related goods or services, Plaintiff, and Plaintiff's Products and Services;

4.      Requiring Defendant to perform corrective advertising to correct the false and misleading statements of Defendant about its Infringing Products and any related goods or services, Plaintiff, and Plaintiff's Products and Services;

5.      Requiring Defendant to pay over to Plaintiff the amount of Plaintiff's costs of corrective advertising to correct the false and misleading statements of Defendant about its Infringing Products and any related goods or services, Plaintiff, and Plaintiff's Products and Services;

6.      Requiring Defendant to account for and pay over to Plaintiff the amount of Plaintiff's damages pursuant to 15 U.S.C. § 1117 and Delaware law;

7.      Requiring Defendant to account for and pay over to Plaintiff the amount of Defendant's profits pursuant to 15 U.S.C. § 1117 and Delaware law;

8.      Requiring Defendant to account for and pay over to Plaintiff the costs of the action pursuant to 15 U.S.C. § 1117 and Delaware law;

9.      Trebling any damage award pursuant to 15 U.S.C. § 1117 and Delaware law;

10.     Finding this case exceptional and requiring Defendant to pay over to Plaintiff its attorneys' fees incurred in connection with this case pursuant to 15 U.S.C. § 1117 and Delaware law;

11.     Finding that Defendant intentionally or recklessly engaged in unfair competition under Delaware law and requiring Defendant to pay over to Plaintiff punitive damages;

33

12.     Declaring that Defendant has infringed and is infringing the claims of the Patents-in-Suit;

13.     Compensating Plaintiff for all damages caused by Defendant's infringement of the Patents-in-Suit;

14.     Enhancing Plaintiff's damages up to three times their amount under 35 U.S.C. § 284;

15.     Granting Plaintiff pre- and post-judgment interests, together with all costs and expenses;

16.     Granting Plaintiff its reasonable attorneys' fees under 35 U.S.C. § 285;

17.     Granting a preliminary and permanent injunction enjoining and restraining Defendant and its officers, directors, agents, servants, employees, attorneys, and all others in active concert or participation with Defendant, from making, using, offering to sell, selling, and importing into the United States any product, or using, offering to sell, or selling any service, that fall within the scope of any claim of the Patents-in-Suit;

18.     Entering a judgment that Defendant's infringement of the Patents-in-Suit has been willful; and

19.     Awarding Plaintiff such other relief in its favor as the Court may deem just and equitable.


## JURY DEMAND

Plaintiff demands trial of its claims for relief herein before a jury.

Dated:  April ~~19~~18, ~~2018~~2019                    **DLA PIPER LLP (US)**


                                                            _/s/ Denise S. Kraft_
                                                        Denise S. Kraft (DE ID No. 2778)
**OF COUNSEL**:                                          Brian A. Biggs (DE ID No. 5591)
                                                        1201 North Market Street, Suite 2100
Michael Strapp (*Pro Hac Vice* ~~motion forthcoming~~)) Wilmington, DE  19801
Larissa ~~Park~~Bifano (*Pro Hac Vice* ~~motion forthcoming~~) Telephone:  (302) 468-5700
Kristoffer W. Lange (*Pro Hac Vice* ~~motion forthcoming~~) Facsimile:   (302) 394-2341
**DLA PIPER LLP (US)**                                  denise.kraft@dlapiper.com
33 Arch Street, 26th Floor                              brian.biggs@dlapiper.com
Boston, MA 02110-1447
Telephone:  (617) 406-6031                              *Attorneys for Plaintiff*
michael.strapp@dlapiper.com                             *Citrix Systems, Inc.*
larissa.~~park~~bifano@dlapiper.com
kris.lange@dlapiper.com

~~EAST\153285377.1~~ EAST\166084415.1