## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CITRIX SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 18-588-LPS |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| WORKSPOT, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## WORKSPOT, INC.'S ANSWER TO
## AMENDED COMPLAINT AND COUNTERCLAIMS

Defendant Workspot, Inc. ("Workspot"), by and through undersigned counsel, hereby

submits its Answer to the Amended Complaint filed by plaintiff Citrix Systems, Inc. ("Citrix")

and Counterclaims against Citrix. Workspot hereby responds in numbered paragraphs

corresponding to numbered paragraphs of the Complaint, and in doing so denies the allegations

of the Complaint except as specifically stated:

1.     This action for damages and injunctive relief arises under the Patent Laws of the
United States, 35 U.S.C. § 1, *et seq.*, the Lanham Act, 15 U.S.C. § 1125, the Delaware Deceptive
Trade Practices Act, 6 Del. C. § 2532, and Delaware common law.

**ANSWER TO PARAGRAPH 1:** Workspot admits that the Complaint purports to set forth an

action for damages and injunctive relief under the Patent Laws of the United States, 35 U.S.C. §

1, *et seq.*, the Lanham Act, 15 U.S.C. § 1125, the Delaware Deceptive Trade Practices Act, 6

Del. C. § 2532, and Delaware common law. However, as set out below, Workspot denies that

the Complaint sets forth a valid claim for damages and/or injunctive relief

2.     Plaintiff Citrix Systems, Inc. is a Delaware corporation with its principal place of
business at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

**ANSWER TO PARAGRAPH 2:** Workspot admits on information and belief the allegation of

Paragraph 2.

3.      Defendant Workspot, Inc. is a Delaware corporation with its principal place of business at 1601 S. De Anza Boulevard, Cupertino, California 95014.

**ANSWER TO PARAGRAPH 3:** Workspot admits that it is a Delaware corporation.  Workspot denies the remaining allegations in Paragraph 3.  Workspot's principal place of business is located 1901 S. Bascom Avenue, Suite 900, Campbell, CA 95008.

4.      This Court has subject matter jurisdiction over the claims asserted in this Workspot's false and misleading advertising under the Lanham Act, relief for Workspot's violations under Delaware state law and relief for Workspot's infringement of Citrix's patents.

**ANSWER TO PARAGRAPH 4:** Workspot admits that the Court has subject matter jurisdiction over Citrix's patent infringement and Lanham Act claims. Workspot is without sufficient knowledge or information to form a belief as to whether the Court has subject matter jurisdiction over Citrix's claims arising under Delaware state law, and on that basis denies each and every such allegation.

5.      This Court has personal jurisdiction over Workspot because Workspot conducts, and has conducted, continuous, systematic, substantial, and routine business within Delaware, including, but not limited to, offering products and services for sale in Delaware, and because Workspot is a Delaware corporation.

**ANSWER TO PARAGRAPH 5:** Workspot admits that it is incorporated in Delaware and that the Court has personal jurisdiction over Workspot. Otherwise, Workspot denies the allegations in Paragraph 5.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 and 28 U.S.C § 1400 because Defendant is a Delaware corporation and because a portion of the events giving rise to the claims asserted in this Amended Complaint occurred in this District.

**ANSWER TO PARAGRAPH 6:** Workspot admits that venue is proper in this Court. Otherwise, Workspot denies the allegations in Paragraph 6.

7.      Founded in 1989, Citrix is a pioneer and leader in the field of application and desktop virtualization, networking, Software-as-a-Service (SaaS), and cloud computing technologies. Citrix's technology enables the future of work by delivering the industry's most comprehensive and integrated platform for secure application ("app") and data delivery and network functionality through technology leadership in cloud-based app virtualization, virtual

desktop infrastructure (VDI), mobility, business file synchronization and sharing, and networking. Citrix's products and services target customers of all sizes, from small businesses to large global enterprises. Citrix on-premises ("on-prem") and cloud-based solutions offer the most complete and integrated workspace to enable people to securely access their apps, desktops and data from anywhere. Citrix products and services include on-prem products and services such as XenApp, XenDesktop, XenMobile, NetScaler, and Citrix Receiver, and cloud-based products and services, such as ShareFile and Citrix Cloud and its attendant services (including the XenApp and XenDesktop Service, XenMobile Service, NetScaler Gateway Service, and ShareFile service) (the Citrix on-prem and could-based products and services are collectively referred to as "Citrix's Products and Services").

**ANSWER TO PARAGRAPH 7:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 7 and on that basis denies each and every such allegation.

8.       XenApp and XenDesktop provide app virtualization and VDI services that give individuals the freedom to work from anywhere while reducing information technology costs. XenApp (initially released in 2008) was a natural evolution from earlier Citrix products such as WinFrame (initially released in 1995), MetaFrame (initially released in 1998), and Presentation Server (initially released in 2005). XenApp is an app virtualization solution that provides secure delivery of Windows, Web, and SaaS applications to a wide variety of user devices, including desktops, tablets, and smartphones. XenApp optimizes productivity with universal access to virtual apps, desktops, and data from any device.

**ANSWER TO PARAGRAPH 8:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 8 and on that basis denies each and every such allegation.

9.       XenDesktop carries all the same functionality as XenApp, plus the option to implement a scalable VDI solution. Citrix continues to release new versions of XenDesktop with enhanced features.

**ANSWER TO PARAGRAPH 9:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 9 and on that basis denies each and every such allegation.

10.       Citrix's XenMobile product provides both mobile device management (MDM) and mobile application management (MAM) functionality, allowing businesses to manage employee mobile devices and mobile apps, and allowing employees to securely work on both enterprise-owned and personal mobile devices. XenMobile MDM protects enterprise data by leveraging device-level policies provided by the device manufacturer or platform provider. For example, a

business can use XenMobile MDM to enable device-wide encryption and automatically lock or wipe an employee's device. XenMobile MAM provides application-level encryption and security policies that are not dependent on device security. This provides an additional layer of security, so the risk of data loss is lower in the event a device is compromised. In addition, with XenMobile per-app encryption and containerization, enterprise apps are restricted from sharing data with personal apps.

**ANSWER TO PARAGRAPH 10:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 10 and on that basis denies each and every such allegation.

11.    Citrix StoreFront manages the delivery of desktops and apps from XenApp, XenDesktop, and XenMobile servers to user devices. Citrix StoreFront enumerates and aggregates available desktops and apps into stores. Users access Citrix StoreFront stores through Citrix Receiver directly or by browsing to a Citrix Receiver for Web or Desktop Appliance site. Users can also access Citrix StoreFront using thin clients and other end-user-compatible devices through a XenApp Services site. Citrix StoreFront keeps a record of each user's applications and automatically updates their devices, providing users with a consistent experience as they roam between their smartphones, tablets, laptops, and desktop computers.

**ANSWER TO PARAGRAPH 11:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 11 and on that basis denies each and every such allegation.

12.    Citrix's efforts in developing application virtualization, VDI, MDM, MAM, and related technologies and Citrix's Products and Services have resulted in the issuance of numerous United States patents, including U.S. Patent No. 7,949,677; U.S. Patent No. 8,341,732; U.S. Patent No. 7,594,018; U.S. Patent No. 8,135,843; and U.S. Patent No. 10,063,595 (collectively referred to as the "Patents-in-Suit"; these patents are attached as Exhibits 1, 2, 3, 4, and 20 respectively). These five patents are only a small slice of Citrix's intellectual property portfolio, which includes over 1200 issued patents in the United States and over 2400 issued patents and 1000 pending patent applications worldwide.

**ANSWER TO PARAGRAPH 12:** Workspot admits that Exhibits 1, 2, 3, 4 and 20 purport to be U.S. Patent Nos. 7,949,677; 8,341,732; 7,594,018; 8,135,843; and 10,063,595. Workspot is without sufficient knowledge or information to form a belief as to the truth of the remaining allegations contained in Paragraph 12 and on that basis denies each and every such allegation.

13.     The broad adoption of Citrix's Products and Services has resulted in substantial growth for Citrix. Citrix's success has not gone unnoticed by its competitors including, in particular, Defendant Workspot.

**ANSWER TO PARAGRAPH 13:** Workspot denies each and every allegation contained in

Paragraph 13.

14.     Founded in 2012, Workspot is a competitor of Citrix that is relatively new to the cloud technology industry. Workspot was co-founded in July 2012 by Amitabh Sinha, who had worked from June 2006 through April 2012 for Citrix as Vice President and General Manager for Enterprise Desktops and Apps, Vice President, Product Management for XenDesktop, and as a Vice President of Engineering. While at Citrix, Mr. Sinha (i) led the desktop virtualization product line, including XenDesktop and XenApp; (ii) drove product strategy and roadmap for XenDesktop; and (iii) delivered the Citrix Receiver product. Mr. Sinha founded Workspot and has served as the Chief Executive Officer of Workspot since its inception.

**ANSWER TO PARAGRAPH 14:** Workspot admits that it was co-founded in July 2012 by,

among others, Amitabh Sinha and that Mr. Sinha has served as the Chief Executive Officer of

Workspot since Workspot was founded in July 2012. Workspot admits that, while at Citrix, Mr.

Sinha led the desktop virtualization product line, including XenDesktop and XenApp; was

involved in developing the product strategy and roadmap for XenDesktop; and was involved in

the development of the Citrix Receiver product. Otherwise, Workspot denies the allegations in

Paragraph 14. Notably, Workspot was founded with the mission of simplifying desktop

virtualization. Mr. Sinha left Citrix because Citrix's products were too complex and he did not

see a path forward for those products. After years of innovation, Workspot invented an

alternative approach that achieved their goal of providing a simpler and better performing virtual

desktop experience for their customers. Workspot's products have been met with much acclaim

by its customers. Rather than improve its products in an attempt to compete in the marketplace

with Workspot's innovative technology, Citrix filed this lawsuit in an apparent attempt to

distract and intimidate Workspot.

15.     Led by Sinha, Workspot has recruited numerous additional Citrix employees, including multiple former Citrix executives. For example, Workspot's Vice President of Marketing, Brad Peterson, worked for Citrix for almost a decade from 2004 through 2014 as a Director of Customer Care, a Technology Strategist, and a Senior Director, Technology Specialist

prior to joining Workspot. Workspot's Vice President of Products and Alliances, Jimmy Chang, worked for Citrix from 2006 through 2014, and held an almost identical role at Citrix as Director of Product Management and Strategic Alliances responsible for XenDesktop product management. Further, Workspot's Vice President of Engineering, Prasad Krothapalli, worked for Citrix from 2006 through 2013, and served as the Senior Director of Engineering of Enterprise Desktops and Application Division at Citrix, where he led XenDesktop development teams. Workspot continues to engage former high-ranking Citrix executives in leadership positions, recently hiring former Citrix Vice President and Chief Technology Officer for XenApp, Harry Labana, as its Chief Customer Officer.

**ANSWER TO PARAGRAPH 15:** Workspot admits that Brad Peterson is Workspot's Vice President of Marketing, Jimmy Chang is Workspot's Vice President of Products and Alliances, Prasad Krothapalli is Workspot's Vice President of Engineering, and Harry Labana is Workspot's Chief Customer Officer at Workspot, and that each previously held positions at Citrix. Otherwise, Workspot denies the allegations in Paragraph 14.

16.     Mr. Sinha, Mr. Peterson, Mr. Chang, Mr. Labana, and Mr. Krothapalli had senior roles at Citrix, were well aware of Citrix's technology and extensive patent portfolio, worked on Citrix products with which Workspot now competes, and worked with inventors of the Patents-in-Suit. Moreover, since Workspot was formed, several additional Citrix employees have left to join Workspot, bringing with them their knowledge of Citrix's products and intellectual property.

**ANSWER TO PARAGRAPH 16:** Workspot admits that Mr. Sinha, Mr. Peterson, Mr. Chang, Mr. Labana, Mr. Krothapalli, and other Workspot employees, previously held positions at Citrix. Workspot admits that Mr. Sinha, Mr. Peterson, Mr. Chang, Mr. Labana, Mr. Krothapalli were aware that Citrix owned patents. Workspot admits that Mr. Sinha, Mr. Peterson, Mr. Chang, Mr. Labana, Mr. Krothapalli worked with one or more of the purported inventors of the Patents-in-Suit. Otherwise, Workspot denies the allegations in Paragraph 16.

17.     Workspot has infringed on Citrix's valuable and proprietary intellectual property, including at least the Patents-in-Suit. Workspot is using Citrix's patented technology without a license or Citrix's permission.

**ANSWER TO PARAGRAPH 17:** Workspot denies each and every allegation contained in Paragraph 17.

18.     In particular, Workspot manufactures, sells, and offers for sale products and services, including without limitation those marketed by Workspot as Cloud Apps, Cloud

Desktops, and Cloud Workstations, that infringe Citrix's patented technology. The Workspot products and services include a variety of components such as Workspot Client, Workspot Connector, and Workspot Control. Workspot's products and services, and each of their components, are collectively referred to herein as the "Infringing Products."

**ANSWER TO PARAGRAPH 18:** Workspot admits that it manufactures, sells, and offers for sale software that includes features referred to as Workspot Client, Workspot Enterprise Connector, and Workspot Control. Otherwise, Workspot denies the allegations in Paragraph 18.

19.     The Infringing Products use the same Citrix-patented technology as do Citrix's Products and Services.

**ANSWER TO PARAGRAPH 19:** Workspot denies each and every allegation contained in Paragraph 19.

20.     The Infringing Products enable access to desktops and applications from a user device using a system architecture and technologies described in the Patents-in-Suit.

**ANSWER TO PARAGRAPH 20:** Workspot denies each and every allegation contained in Paragraph 20.

21.     For example, Workspot Control is a server-based component that handles the provisioning of remote desktops and applications along with user authentication. Workspot Client is an application that can be installed on desktop, tablet, and smartphone devices, and includes an Enterprise App Store which lists applications available to a user based on provisioning done through Workspot Control. Workspot Connector is a server component that is installed on remote desktop infrastructure.

**ANSWER TO PARAGRAPH 21:** Workspot admits that Workspot Client is an application that can be installed on a desktop, tablet, and smartphone devices, and includes an Enterprise App Store. Otherwise, Workspot denies the remaining allegations of Paragraph 21.

22.     This architecture and technology is claimed in the Patents-in-Suit. Additional detail concerning Workspot's infringement is included below at Counts I to V and in the claim charts attached as Exhibits 5-8 and Exhibit 21.

**ANSWER TO PARAGRAPH 22:** Workspot denies each and every allegation contained in

Paragraph 22. Additionally, Workspot denies that the claim charts attached as Exhibits 5-8 and

Exhibit 21 establish infringement of any claim of the Patents-in-Suit.

23.     Workspot has not only infringed Citrix's patented technology, it is also
promoting the Infringing Products by intentionally making numerous false and misleading
claims in its marketing materials and social media posts about Citrix's Products and Services.
Workspot's false and misleading advertisements are promoted on Workspot's website and
through Workspot's Twitter account, both of which are accessible by consumers nationwide,
including in Delaware.

**ANSWER TO PARAGRAPH 23:** Workspot denies each and every allegation contained in

Paragraph 23.

24.     On information and belief, Workspot is intentionally making false and misleading
claims about Citrix's Products and Services in an attempt to legitimize itself with inaccurate
comparisons to Citrix's well-developed and protected technology, and to compensate for the fact
that Workspot is relatively new to the market and is trying to unfairly capture market share from
Citrix.

**ANSWER TO PARAGRAPH 24:** Workspot denies each and every allegation contained in

Paragraph 24.

25.     Workspot has continued to make false and misleading claims about Citrix even
after receiving multiple letters from Citrix informing Workspot of the false and misleading
nature of its statements, identifying specific examples of such statements, explaining why the
statements are problematic, and requesting information about the data and resources upon which
Workspot relied to create such statements. After receiving two such letters from Citrix in January
and June 2017, Workspot made only minor, inconsequential modifications to its false and
misleading statements that did not cure the factual inaccuracies that Citrix had addressed in its
letters. Workspot also refused to provide any basis for continuing to post false and misleading
statements about Citrix. Even more egregiously, Workspot made new false and misleading
statements about Citrix *after* receiving the January and June 2017 letters from Citrix.

**ANSWER TO PARAGRAPH 25:** Workspot denies each and every allegation contained in

Paragraph 25.

26.     In particular, Workspot's website currently includes numerous charts, articles, and
blog posts comparing the features of the Infringing Products with Citrix's Products and Services.
These charts, articles, and blog posts are replete with false, misleading, and unsubstantiated
statements.

**ANSWER TO PARAGRAPH 26:** Workspot admits that Workspot's website includes charts, articles, and blog posts comparing features of Workspot's products with Citrix's Products and Services. Otherwise, Workspot denies the allegations in paragraph 26.

27.     Thus, for example, a comparison chart on Workspot's website entitled *Cloud-Native is Better Than Cloud-Hosted: Workspot vs. Citrix Cloud* (the "Citrix Comparison Chart") includes several false and misleading claims about Citrix's Products and Services. *See* http://blog.workspot.com/top-5-differences-between-workspot-and-citrix-workspace-cloud-cwc, attached as Exhibit 9 (last visited on April 19, 2018). For example, under the subject heading of "Agility" in the Citrix Comparison Chart, Workspot states that Citrix's cloud-hosted platforms require "weeks" to be up and running, and that "feature-velocity" – a term referring to the rate at which new features are added to a product – takes "months." These claims are literally false. First, Citrix has publically demonstrated that it can have sixty virtual machines, or operating systems that imitate dedicated software, functioning in sixty minutes, a far cry from "weeks." Second, Citrix's cloud-hosted platform has a feature velocity of days, not "months."

**ANSWER TO PARAGRAPH 27:** Workspot admits that Exhibit 9 of the Complaint includes the text "Agility," "Time to Value (Up and Running in Minutes vs. Weeks)," and "Feature-Velocity (Available in Days vs. Months)." Otherwise, Workspot denies the allegations in paragraph 27.

28.     In the Citrix Comparison Chart, Workspot also states under the heading "Availability, Elasticity, and Performance" that Citrix does not have "automatic scaling." This claim is literally false. Citrix Cloud automatically scales the capacity of its cloud service in a way that is transparent for customers.

**ANSWER TO PARAGRAPH 28:** Workspot admits that Exhibit 9 of the Complaint includes the text "Availability, Elasticity, and Performance"; under a column titled "Features," includes the following text: "Automatic Scaling"; under a column titled "Workspot (Cloud-Native)," includes the following text "Yes"; and under a column titled "Citrix Cloud (Cloud-Hosted)," includes the text "No." Otherwise, Workspot denies the allegations in paragraph 28.

29.     In another chart comparing Citrix and Workspot, contained in a Workspot e-book entitled *XenApp 6.5 Migration Guide*, Workspot falsely suggests that Workspot, but not Citrix, has products with the following capabilities: (i) enterprise class deployment in a day; (ii) predictable subscription billing; (iii) automatic scaling; (iv) automatic high availability; (v) automatic updates; (vi) offline document access; (vii) visibility into performance, availability and usage; and (viii) granular visibility into end-user activity. *See* https://land.workspot.com/citrix-alternatives-

xenapp6.5 (webpage where e-book may be downloaded), e-book attached as Exhibit 10 (last visited on April 19, 2018). Most of this statement is literally false because features (i) – (v) and (vii) – (viii) are available to Citrix customers who migrate to XenApp and XenDesktop Service in Citrix Cloud, and because features (iii) and (vii) – (viii) are available to Citrix customers who use the on-prem XenApp product.

**ANSWER TO PARAGRAPH 29:** Workspot denies each and every allegation contained in

Paragraph 29.

30.     Workspot makes similarly false and misleading claims in a blog post entitled *Workspot is 10x better than Citrix*, where it purportedly explains "[w]hy the Workspot solution is 10x better than Citrix." *See* http://blog.workspot.com/is-the-workspot-workspace-solution-10x-better-than-citrix, attached as Exhibit 11 ("the 10x blog post") (last visited on April 19, 2018). In the 10x blog post, Workspot states that it has a "[c]onsiderably faster time to value: 60 minutes with Workspot vs. several months (or more) with Citrix." This is literally false because, as stated above, Citrix has publically demonstrated that it can have as many as sixty virtual machines functioning in sixty minutes. If the customer chooses the Citrix Cloud XenApp and XenDesktop Service, then the implementation simplicity is similar to that of Workspot's, and on-boarding a customer to the service and allowing access to a first virtual desktop will only take a few hours.

**ANSWER TO PARAGRAPH 30:** Workspot admits that Exhibit 11 to the Complaint includes

the following text: "Considerably faster time to value: 60 minutes with Workspot vs. several

months (or more) with Citrix." Otherwise, Workspot denies the allegations in paragraph 30.

31.     Workspot also states in the 10x blog post that it has a "[w]ay lower" total cost of ownership ("TCO") because it is "priced at $144/user/year" as compared to the total cost of ownership of a Citrix deployment which can be "upwards of $1000/user/year." *Id.* This statement is misleading because it offers a comparison between Workspot's list price and the total cost of ownership for deploying Citrix's Products and Services. Upon information and belief, were Workspot to include the total cost of ownership for deploying the Infringing Products, its cost would be higher than the list price stated in the blog post.

**ANSWER TO PARAGRAPH 31:** Workspot admits that Exhibit 11 to the Complaint states:

"Way lower TCO: Workspot is priced at $144/user/year vs. the total cost of ownership (servers,

storage, people, licenses) of a Citrix deployment which can be upwards of $1000/user/year."

Otherwise, Workspot denies the allegations in paragraph 31.

32.     Finally, Workspot states in the 10x blog post that, because it adds features to its products "every month," Workspot will "implement your feature enhancement requests 10 times faster than with ANY other traditional vendor" who has a "typical 12-18 month release cycle."

*Id.* This statement is at least misleading, if not literally false, because Citrix's cloud-based products and services get feature updates every two weeks, not every 12-18 months.

**ANSWER TO PARAGRAPH 32:** Workspot admits that Exhibit 11 to the Complaint states "Contrast that to a typical 12-18 month release cycle from any traditional vendor. Since we upgrade features each month, Workspot users enjoy a better product every month. Moreover, this monthly innovation cycle ensures that we implement your feature enhancement requests 10 times faster than with ANY other traditional vendor." Otherwise, Workspot denies the allegations in paragraph 32.

33.    In another of its Citrix-focused blog posts, entitled *Is It Time To Break Up With Citrix? Another 4* Reasons, Workspot also states without basis that "a typical customer takes 6-9 months to roll Citrix out in production (Workspot can be as quick as 60 minutes)." *See* http://blog.workspot.com/time-to-break-up-with-citrix-another-4-reasons, attached as Exhibit 12 (last visited on April 19, 2018). This statement is literally false. As explained above, Citrix is capable of setting up sixty virtual desktops in sixty minutes. If the customer choses the Citrix Cloud XenApp and XenDesktop Service, then the implementation simplicity is similar to that of Workspot's, and on-boarding a customer to the service and allowing access to a first virtual desktop will only take a few hours. If the customer wants a full, on-premises XenApp environment, that rollout takes only about 20 days. If a customer opts for the Citrix Consulting standard service for designing and rolling out a full on-premises XenApp environment, the rollout is about 35 days.

**ANSWER TO PARAGRAPH 33:** Workspot admits that Exhibit 12 to the Complaint includes the following text: "Considering a typical customer takes 6-9 months to roll Citrix out in production (Workspot can be as quick as 60 minutes), it is definitely unpleasant to pay again when you've barely gotten the product working." Otherwise, Workspot denies the allegations in paragraph 33.

34.    Workspot also makes false and misleading statements in a blog post entitled *Compare Workspot VDI 2.0 & DaaS 2.0 to Other Solutions* ("VDI Comparison Chart"). *See* http://blog.workspot.com/daas-and-vdi-solution-comparison, attached as Exhibit 13 (last visited on April 19, 2018). The VDI Comparison Chart contains numerous false, unsubstantiated, and misleading claims. For example, Workspot makes the unsubstantiated statement that its TCO is "50-90% lower than VDI 1.0 Solutions," without providing any evidence or rationale to support its calculations. Upon information and belief, the total cost of deployment of the Infringing Products is not 50-90% lower than XenDesktop. Additionally, Workspot states that it can provide "high availability" with "no IT resources," while indicating that VDI 1.0 Solutions require such resources. This is both false and misleading. Like all other vendors, Workspot

requires an on-premises connector (Workspot Enterprise Connector) that needs to be implemented for high availability. Workspot also relies on third-party components that must be highly available to deliver their service to the end user, such as for multi-factor or general user authentication. These functions need to be designed, implemented, and maintained by qualified IT personnel.

**ANSWER TO PARAGRAPH 34:** Workspot admits that Exhibit 13 to the Complaint includes

the following text: "Workspot TCO is 50-90% lower than VDI 1.0 Solutions" and "Each

component in the solution (load balancer, gateway, portal, broker, database, licensing server, and

provisioning servers) must be configured to high availability," and "No IT resources should be

required for high availability." Otherwise, Workspot denies the allegations in paragraph 34.

35.     Workspot also falsely states, in its blog post entitled *How You Can Achieve VDI Simplicity with a Single Platform*, that while Workspot only uses two hops (or steps) for non-persistent desktops and apps, "[i]n contrast, Citrix Receiver uses 33 hops for a connection." *See* http://blog.workspot.com/how-workspot-achieves-vdi-simplicity-with-a-single-platform, attached as Exhibit 14 (last visited on April 19, 2018). This is literally false and misleading. A user needs only to authenticate to the environment, which is easily automated by means of single sign-on, and click an application icon for a connection. Workspot's statement misleadingly implies significant complexity and a high time to access apps and data, which is factually incorrect.

**ANSWER TO PARAGRAPH 35:** Workspot admits that Exhibit 14 to the Complaint the

following text: "Two hops for non-persistent desktops and apps (In contrast, Citrix Receiver

uses 33 hops for a connection.)." Otherwise, Workspot denies the allegations in paragraph 35.

36.     Workspot has also made false, misleading and unsubstantiated claims in promoting its Infringing Products as using "an architecture that scales infinitely," as compared to Citrix's "XenApp 6.5 - an outdated IMA architecture." *See* http://blog.workspot.com/top-3-windows-workloads-for-microsoft-azure (last visited on April 19, 2018); *see also* http://blog.workspot.com/new-features-application-publishing-vdi-on-azure (last visited on April 19, 2018) , attached as Exhibits 15 and 16. First, it is unsubstantiated and, upon information and belief, impossible for Workspot's Infringing Products to use an infinitely scalable architecture. Second, Workspot's contention that Citrix uses "an outdated IMA architecture" is literally false. Citrix's XenApp and XenDesktop Service, for example, is a cloud environment, not an "an outdated IMA architecture."

**ANSWER TO PARAGRAPH 36:** Workspot admits that Exhibit 15 and 16 to the Complaint

includes the following text: "Figure 5: Workspot Cloud Apps: Replace XenApp 6.5 with an

architecture that scales infinitely" and "Today, upwards of 150,000 customers are still running

XenApp 6.5 - an outdated IMA architecture that is scheduled for EOL in 2018." Otherwise,

Workspot denies the allegations in paragraph 36.

37.     Additionally, in a blog entitled, *Top 10 Questions You Must Ask About Citrix Cloud* ("Top 10 Questions"), Workspot posits ten questions about Citrix's Products and Services, and provides false, misleading, and unsubstantiated answers to each question. *See* http://blog.workspot.com/10-questions-to-ask-citrix-cloud, attached as Exhibit 17 (last visited on April 19, 2018). What is more, Workspot implicitly suggests that each of the answers is provided by Citrix, when that is not the case. An example of one such Workspot question and so-called "Citrix Answer" is reproduced below:

### 1. Are you really hosting 1 instance of XenApp/XenDesktop for each customer?

Citrix Answer: Yes, we host one copy of a legacy XenApp/XenDesktop deployment per customer, including Storefront, Brokers, Databases, AD, Licensing servers, etc.

The "Citrix Answer" to the question above is not only misleading because of Workspot's suggestion that the answer was an *official* response provided directly by Citrix, it is also literally false. Citrix's XenApp and XenDesktop Service offer a cloud environment built from scratch that hosts multiple copies of XenApp and XenDesktop deployments per customer.

**ANSWER TO PARAGRAPH 37:** Workspot admits that Exhibit 17 to the Complaint includes

the following:

### 1. Are you really hosting 1 instance of XenApp/XenDesktop for each customer?

Citrix Answer: Yes, we host one copy of a legacy XenApp/XenDesktop deployment per customer, including Storefront, Brokers, Databases, AD, Licensing servers, etc.

Otherwise, Workspot denies the allegations in paragraph 37.

38.     Workspot's "Top 10 Questions" contains several additional false statements. For example, Workspot asks, "Is my company's data flowing through Citrix Cloud?" *Id.* It purports to provide the following "Citrix Answer": "Yes. When a user connects to a virtual application or desktop, data flows through the Citrix Cloud. You can avoid this by installing NetScaler Gateway on premises." *Id.* This "Citrix Answer" is literally false. The XenApp and XenDesktop Service stores only metadata needed for the brokering and monitoring of the customer's applications and desktops and does not store customer data files.

**ANSWER TO PARAGRAPH 38:** Workspot admits that Exhibit 17 to the Complaint includes

the following:

### 3. Is my company's data flowing through Citrix Cloud?

Citrix Answer: Yes. When a user connects to a virtual application or desktop, data flows
through the Citrix Cloud. You can avoid this by installing Netscaler Gateway on premises.

Otherwise, Workspot denies the allegations in paragraph 38.

39.     Another of the "Top 10 Questions" posed by Workspot is as follows: "Is the
Citrix Cloud a single point of failure?" *Id.* The purported "Citrix Answer" is, "Yes. Since all
authentication and data traffic goes through the Citrix Cloud, if it is unavailable, then your users
will not be able to access their applications and desktops." *Id.* This "Citrix Answer" is literally
false. First, Citrix's cloud-based services run on a highly-available and globally-distributed
infrastructure. Second, users of Citrix's cloud-based services can still launch apps if they are not
able to connect to Citrix Cloud, provided they have launched those apps before.

**ANSWER TO PARAGRAPH 39:** Workspot admits that Exhibit 17 to the Complaint includes

the following:

### 5. Is the Citrix Cloud a single point of failure?

Citrix Answer: Yes. Since all authentication and data traffic goes through the Citrix Cloud,
if it is unavailable, then your users will not be able to access their applications and
desktops.

Otherwise, Workspot denies the allegations in paragraph 39.

40.     One additional false Workspot Top 10 Question is the following: "If I'm a Citrix
Cloud customer, do I work with a single support group? Citrix Answer: No. Depending on the
Citrix Cloud service that you use, you will be routed to different support groups depending on the
issue and severity." *Id.* This statement is false because Citrix has only one globally-integrated
support organization.

**ANSWER TO PARAGRAPH 40:** Workspot admits that Exhibit 17 to the Complaint includes

the following:

### 9. If I'm a Citrix Cloud customer, do I work with a single support group?

Citrix Answer: No.  Depending on the Citrix Cloud service that you use, you will be routed
to different support groups depending on the issue and severity.

Otherwise, Workspot denies the allegations in paragraph 40.

41.     Workspot's false statements are also present outside their website. On its official Twitter account, for example, Workspot has posted a tweet stating "Time to modernize your virtual app solution! Spend months upgrading XenApp? Or deploy @Workspot in a day at a fraction of the cost?" *See* https://twitter.com/Workspot/status/946138958056120320, attached as Exhibit 18 (last visited on April 19, 2018). This is literally false because upgrading XenApp does not take months.

**ANSWER TO PARAGRAPH 41:** Workspot admits that Exhibit 18 of the Complaint includes

the following text: "Time to modernize your virtual app solution! Spend months upgrading

XenApp? Or deploy @Workspot in a day at a fraction of the cost?" Otherwise, Workspot denies

the allegations of paragraph 41.

42.     Citrix brings this action to end Workspot's wrongful and infringing use of Citrix's patented technology and to stop Workspot from engaging in false and deceptive marketing practices about its Infringing Products and Citrix's Products and Services.

**ANSWER TO PARAGRAPH 42:** Workspot denies each and every allegation contained in

Paragraph 42. It appears that Citrix has brought this action in an attempt to distract and

intimidate Workspot. Indeed, Workspot notes that Citrix has also recently sued other companies

in the virtual desktop industry, including Avi Networks, Inc. and Egnyte, Inc. Citrix's recent

lawsuits appear to be an effort to attack companies it views as threats to its business with costly

and time-consuming litigation instead of developing better products to compete with those

companies in the marketplace.

## RESPONSE TO COUNT I

43.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 43:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

44.     United States Patent No. 7,949,677 ("the '677 patent") was issued on May 24, 2011 to Richard Jason Croft, Anthony Edward Low, Richard James Mazzaferri, David Neil Robinson, and Bradley J. Pedersen. A copy of the '677 patent, titled "Methods and Systems for

Providing Authorized Remote Access to a Computing Environment Provided by a Virtual Machine," is attached as Exhibit 1.

**ANSWER TO PARAGRAPH 44:** Workspot admits that on its face the '677 patent attached as Exhibit 1 to the Complaint issued on May 24, 2011, is titled "Methods and Systems for Providing Authorized Remote Access to a Computing Environment Provided by a Virtual Machine," and lists as its purported inventors Richard Jason Croft, Anthony Edward Low, Richard James Mazzaferri, David Neil Robinson, and Bradley J. Pedersen. Otherwise, Workspot denies the allegations in Paragraph 44.

45.     The '677 patent is valid and enforceable.

**ANSWER TO PARAGRAPH 45:** Workspot denies each and every allegation contained in Paragraph 45.

46.     Citrix is the owner of the entire right, title, and interest in and to the '677 patent.

**ANSWER TO PARAGRAPH 46:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 46 and on that basis denies each and every such allegation.

47.     Workspot had actual notice of the '677 patent, at least as of the filing date of its Complaint.

**ANSWER TO PARAGRAPH 47:** Workspot admits that it was provided notice of the '677 patent by Citrix's Complaint. Otherwise, Workspot denies the allegations in Paragraph 47.

48.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '677 patent prior to the filing date of this Complaint and may have known of the '677 patent itself prior to the filing date of the Complaint.

**ANSWER TO PARAGRAPH 48:** Workspot denies each and every allegation contained in Paragraph 48.

49.     The '677 patent relates to providing different levels of access to a remote resource based on policies. For example, claim 1 recites, in part, receiving first and second requests for

access to a resource from respective first and second client machines. In response to a policy, a policy engine then grants first and second levels of access to the resource. A broker machine identifies first and second desktop computing environments and establishes the connections between the first and second client machines and the first and second desktop environments.

**ANSWER TO PARAGRAPH 49:** Workspot denies each and every allegation contained in

Paragraph 49.

50.     Workspot has directly infringed and continues to directly infringe the '677 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '677 patent. By way of example and not limitation, the Infringing Products infringe claims 1-16 and 18-21 of the '677 patent. Exhibit 5 is a claim chart detailing Workspot's infringement of the asserted claims of the '677 patent.

**ANSWER TO PARAGRAPH 50:** Workspot denies each and every allegation contained in

Paragraph 50. Additionally, Workspot denies that the claim charts attached as Exhibit 5 establish

infringement of any claim of the '677 patent.

51.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '677 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '677 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

**ANSWER TO PARAGRAPH 51:** Workspot denies each and every allegation contained in

Paragraph 51.

52.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court. Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

**ANSWER TO PARAGRAPH 52:** Workspot denies each and every allegation contained in

Paragraph 52.

53.     Upon information and belief, Workspot has willfully infringed the '677 patent by directly infringing the '677 patent with knowledge that its actions constituted infringement of the '677 patent.

**ANSWER TO PARAGRAPH 53:** Workspot denies each and every allegation contained in

Paragraph 53.

54.     As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER TO PARAGRAPH 54:** Workspot denies each and every allegation contained in

Paragraph 54.

<u>**RESPONSE TO COUNT II**</u>

55.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 55:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

56.     United States Patent No. 8,341,732 ("the '732 patent") was issued on March 13, 2012 to Richard Jason Croft, Anthony Edward Low, Richard James Mazzaferri, and Bradley J. Pedersen. A copy of the '732 patent, titled "Methods and Systems for Selecting A Method For Execution, By a Virtual Machine, of an Application Program," is attached as Exhibit 2.

**ANSWER TO PARAGRAPH 56:** Workspot admits that on its face the '732 patent attached as

Exhibit 2 to the Complaint issued on March 13, 2012, is titled "Methods and Systems for

Selecting A Method For Execution, By a Virtual Machine, of an Application Program," and lists

as its purported inventors Richard Jason Croft, Anthony Edward Low, Richard James

Mazzaferri, and Bradley J. Pedersen. Otherwise, Workspot denies the allegations in Paragraph

56.

57.     The '732 patent is valid and enforceable.

**ANSWER TO PARAGRAPH 57:** Workspot denies each and every allegation contained in

Paragraph 57.

58.     Citrix is the owner of the entire right, title, and interest in and to the '732 patent.

**ANSWER TO PARAGRAPH 58:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 58 and on that basis denies each and every such allegation.

59.     Workspot had actual notice of the '732 patent, at least as of the filing date of the Complaint.

**ANSWER TO PARAGRAPH 59:** Workspot admits that it was provided notice of the '732 patent by Citrix's Complaint. Otherwise, Workspot denies the allegations in Paragraph 59.

60.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '732 patent prior to the filing date of the Complaint and may have known of the '732 patent itself prior to the filing date of the Complaint.

**ANSWER TO PARAGRAPH 60:** Workspot denies each and every allegation contained in Paragraph 60.

61.     The '732 patent relates to methods and systems for execution of an application remotely or locally based on a policy associated with a user. For example, claim 1 recites a method for selecting a method of execution for an application program. Claim 1 recites, in part, enumerating a plurality of applications available to a client machine responsive to received user credentials. Upon receipt of a request to execute one of the enumerated applications, a broker machine selects a method for executing the application and the requested application can be launched in the desktop computing environment.

**ANSWER TO PARAGRAPH 49:** Workspot denies each and every allegation contained in Paragraph 61.

62.     Workspot has directly infringed and continues to directly infringe the '732 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '732 patent. By way of example and not limitation, the Infringing Products infringe claims 1, 3, 4, 16, 20, 21, 23, 24, 27, 30-34, and 38-42 of the '732 patent. Exhibit 6 is a claim chart detailing Workspot's infringement of the asserted claims of the '732 patent.

**ANSWER TO PARAGRAPH 62:** Workspot denies each and every allegation contained in Paragraph 62. Additionally, Workspot denies that the claim charts attached as Exhibit 6 establish infringement of any claim of the '732 patent.

63.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '732 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '732 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

**ANSWER TO PARAGRAPH 63:** Workspot denies each and every allegation contained in

Paragraph 63.

64.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court. Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

**ANSWER TO PARAGRAPH 64:** Workspot denies each and every allegation contained in

Paragraph 64.

65.     Upon information and belief, Workspot has willfully infringed the '732 patent by directly infringing the '732 patent with knowledge that its actions constituted infringement of the '732 patent.

**ANSWER TO PARAGRAPH 65:** Workspot denies each and every allegation contained in

Paragraph 65.

66.     As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER TO PARAGRAPH 66:** Workspot denies each and every allegation contained in

Paragraph 66.

## <u>RESPONSE TO COUNT III</u>

67.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 67:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

68.     United States Patent No. 7,594,018 ("the '018 patent") was issued on September 22, 2009 to Bradley J. Pedersen. A copy of the '018 patent, titled "Methods and Apparatus for Providing Access to Persistent Application Sessions," is attached as Exhibit 3.

**ANSWER TO PARAGRAPH 68:** Workspot admits that on its face the '018 patent attached as Exhibit 3 to the Complaint issued on September 22, 2009, is titled "Methods and Apparatus for Providing Access to Persistent Application Sessions," and lists as its purported inventor Bradley J. Pederson. Otherwise, Workspot denies the allegations in Paragraph 68.

69.     The '018 patent is valid and enforceable.

**ANSWER TO PARAGRAPH 69:** Workspot denies each and every allegation contained in Paragraph 69.

70.     Citrix is the owner of the entire right, title, and interest in and to the '018 patent.

**ANSWER TO PARAGRAPH 70:** Workspot is without sufficient knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 70 and on that basis denies each and every such allegation.

71.     Workspot had actual notice of the '018 patent, at least as of the filing date of the Complaint.

**ANSWER TO PARAGRAPH 71:** Workspot admits that it was provided notice of the '018 patent by Citrix's Complaint. Otherwise, Workspot denies the allegations in Paragraph 71.

72.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '018 patent prior to the filing date of the Complaint and may have known of the '018 patent itself prior to the filing date of the Complaint.

**ANSWER TO PARAGRAPH 72:** Workspot denies each and every allegation contained in Paragraph 72.

73.     The '018 patent claims particular methods and an apparatus that provides remote access to application sessions associated with a user. For example, claim 1 recites a method for providing remote access to a plurality of application sessions. Claim 1 recites, in part, identifying a plurality of disconnected application sessions already associated with a user. Using a rule, a determination is made that the user is one of required, permitted, and forbidden to connect to a first one of the disconnected application sessions. The first disconnected application session is then reestablished with a client computer operated by the user.

**ANSWER TO PARAGRAPH 73:** Workspot denies each and every allegation contained in

Paragraph 73.

74.     Workspot has directly infringed and continues to directly infringe claims 1-14, 16, and 29-42 of the '018 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or by importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '018 patent. Exhibit 7 is a claim chart detailing Workspot's infringement of the asserted claims of the '018 patent.

**ANSWER TO PARAGRAPH 74:** Workspot denies each and every allegation contained in

Paragraph 74. Additionally, Workspot denies that the claim charts attached as Exhibit 7 establish

infringement of any claim of the '018 patent.

75.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '018 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '018 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

**ANSWER TO PARAGRAPH 75:** Workspot denies each and every allegation contained in

Paragraph 75.

76.     Workspot also actively induces infringement by others of claims 17-28 of the '018 patent. For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

**ANSWER TO PARAGRAPH 76:** Workspot denies each and every allegation contained in

Paragraph 76.

77.     Evidence of inducement of infringement includes, but is not limited to: (i) Workspot's knowledge of the '018 patent since at least as of the filing date of the Complaint; (ii) Workspot's intent to induce direct infringement of the '018 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement. For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

**ANSWER TO PARAGRAPH 77:** Workspot denies each and every allegation contained in

Paragraph 77.

78.     For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device. *See* Workspot, "VDI Reinvented: The Innovation Behind the Revolutionary Workspot VDI Cloud Service" ("VDI Reinvented"), attached as Exhibit 19, at pp. 5 and 9. As another example, Workspot directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure. *See id.* at pp. 7, 12, 13, and 15 ("Workspot is tightly integrated with [Microsoft] Azure to enable rapid creation of virtual desktops," "Workspot automates ... Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

**ANSWER TO PARAGRAPH 78:** Workspot denies each and every allegation contained in

Paragraph 78.

79.     On information and belief, Workspot knows or should know that such activities induce others to directly infringe the '018 patent. For example, Workspot knows or should know that its actions induce others to directly infringe the '018 patent because Workspot knows or should know about the existence of the '018 patent, especially given the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

**ANSWER TO PARAGRAPH 79:** Workspot denies each and every allegation contained in

Paragraph 79.

80.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will

continue to be harmed unless and until Workspot's acts of infringement are enjoined and

restrained by order of this Court. Citrix has no adequate remedy at law and is entitled to a

preliminary and permanent injunction against Workspot and its infringing products.

**ANSWER TO PARAGRAPH 80:** Workspot denies each and every allegation contained in

Paragraph 80.

81.     Upon information and belief, Workspot has willfully infringed the '018 patent by directly and/or indirectly infringing the '018 patent with knowledge that its actions constituted infringement of the '018 patent.

**ANSWER TO PARAGRAPH 81:** Workspot denies each and every allegation contained in

Paragraph 81.

82.     As a result of Workspot's acts of infringement, Citrix has suffered and will
continue to suffer damages in an amount to be proven at trial.

**ANSWER TO PARAGRAPH 82:** Workspot denies each and every allegation contained in

Paragraph 82.

<u>**RESPONSE TO COUNT IV**</u>

83.     Citrix realleges and incorporates each of the foregoing paragraphs of the
complaint.

**ANSWER TO PARAGRAPH 83:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

84.     United States Patent No. 8,135,843 ("the '843 patent") was issued on March 13,
2012 to Andre Kramer. A copy of the '843 patent, titled "Methods and Systems for Providing
Access to an Application," is attached as Exhibit 4.

**ANSWER TO PARAGRAPH 84:** Workspot admits that on its face the '843 patent attached as

Exhibit 4 to the Complaint issued on March 13, 2012, is titled "Methods and Systems for

Providing Access to an Application," and lists as its purported inventor Andre Kramer.

Otherwise, Workspot denies the allegations in Paragraph 84.

85.     The '843 patent is valid and enforceable.

**ANSWER TO PARAGRAPH 85:** Workspot denies each and every allegation contained in

Paragraph 85.

86.     Citrix is the owner of the entire right, title, and interest in and to the '843 patent.

**ANSWER TO PARAGRAPH 86:** Workspot is without sufficient knowledge or information to

form a belief as to the truth of the allegations contained in Paragraph 86 and on that basis denies

each and every such allegation.

87.     Workspot had actual notice of the '843 patent, at least as of the filing date of the Complaint.

**ANSWER TO PARAGRAPH 87:** Workspot admits that it was provided notice of the '843 patent by Citrix's Complaint. Otherwise, Workspot denies the allegations in Paragraph 87.

88.     Upon information and belief, Workspot knew of the specific technology described and claimed in the '843 patent prior to the filing date of the Complaint and may have known of the '843 patent itself prior to the filing date of the Complaint.

**ANSWER TO PARAGRAPH 88:** Workspot denies each and every allegation contained in Paragraph 88.

89.     The '843 patent relates to a system and methods for providing remote application access to an application client. For example, claim 1 recites, in part, receiving, by a client, from a web service directory on a content server, a service access point associated with a first application, the service access point identifying a web server. The client receives, from the web server identified by the service access point, address information associated with the first application. The client launches a second application, the second application communicating via a presentation layer protocol with an application server identified by the received address information. The application server launches the first application and returns information to the second application via the presentation layer protocol.

**ANSWER TO PARAGRAPH 89:** Workspot denies each and every allegation contained in Paragraph 89.

90.     Workspot has directly infringed and continues to directly infringe claims 1, 9, 12, and 19 of the '843 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '843 patent. Exhibit 8 is a claim chart detailing Workspot's infringement of the asserted claims of the '843 patent.

**ANSWER TO PARAGRAPH 90:** Workspot denies each and every allegation contained in Paragraph 90. Additionally, Workspot denies that the claim charts attached as Exhibit 8 establish infringement of any claim of the '843 patent.

91.     To the extent Workspot does not perform each and every step of a particular asserted method claim of the '843 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '843 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

**ANSWER TO PARAGRAPH 91:** Workspot denies each and every allegation contained in

Paragraph 91.

92.     Workspot also contributes to infringement by others of claim 9 of the '843 patent including its customers, either literally or under the doctrine of equivalents. By way of example and not limitation, Workspot offers to sell and/or sells within the United States to its customers or imports into the United States components of patented devices, including but not limited to, the Infringing Products, knowing the same to be especially made or especially adapted for use in an infringement of the '843 patent. Such components are not staple articles or commodities of commerce suitable for substantial non-infringing use.

**ANSWER TO PARAGRAPH 92:** Workspot denies each and every allegation contained in

Paragraph 92.

93.     Workspot also actively induces infringement of claims 1, 12, and 19 of the '843 patent. For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

**ANSWER TO PARAGRAPH 93:** Workspot denies each and every allegation contained in

Paragraph 93.

94.     Evidence of Workspot's contributory infringement includes, but is not limited to: (i) Workspot's knowledge of the '843 patent since at least as of the filing date of the Complaint; (ii) Workspot's knowledge that its accused products are especially adapted to infringe the '843 patent; and (iii) the lack of substantial non-infringing uses for the Infringing Products. The lack of substantial non-infringing uses with respect to the '843 patent is confirmed by the fact that the Infringing Products are sold with the components required by the asserted claims of the '843 patent. Not only are the components designed to implement the infringing features, but the default settings of the Infringing Products, as sold, are set accordingly.

**ANSWER TO PARAGRAPH 94:** Workspot denies each and every allegation contained in

Paragraph 94.

95.     Evidence of Workspot's inducement of infringement includes, but is not limited to: (i) Workspot's knowledge of the '843 patent since at least as of the filing date of the Complaint; (ii) Workspot's intent to induce direct infringement of the '843 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement. For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and

encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

**ANSWER TO PARAGRAPH 95:** Workspot denies each and every allegation contained in

Paragraph 95.

96.     For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device. See VDI Reinvented, attached as Exhibit 19, at pp. 5 and 9. As another example, Workspot directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure. *See id.* at pp. 7, 12, 13, and 15 ("Workspot is tightly integrated with Azure to enable rapid creation of virtual desktops," "Workspot automates ... Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

**ANSWER TO PARAGRAPH 96:** Workspot denies each and every allegation contained in

Paragraph 96.

97.     On information and belief, Workspot knows or should know that such activities induce infringement and contribute to the infringement by others of the '843 patent. For example, Workspot knows or should know that its actions induce others to directly infringe the '843 patent because Workspot knows or should know about the existence of the '843 patent, especially given the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

**ANSWER TO PARAGRAPH 97:** Workspot denies each and every allegation contained in

Paragraph 97.

98.     Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court. Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

**ANSWER TO PARAGRAPH 98:** Workspot denies each and every allegation contained in

Paragraph 98.

99.     Upon information and belief, Workspot has willfully infringed the '843 patent by directly and/or indirectly infringing the '843 patent with knowledge that its actions constituted infringement of the '843 patent.

**ANSWER TO PARAGRAPH 99:** Workspot denies each and every allegation contained in

Paragraph 99.

100.   As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER TO PARAGRAPH 100:** Workspot denies each and every allegation contained in

Paragraph 100.

<u>RESPONSE TO COUNT V</u>

101.   Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 101:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

102.   United States Patent No. 10,063,595 ("the '595 patent") was issued on August 28, 2018 to Waheed Qureshi, et al. A copy of the '595 patent, titled "Secure Execution of Enterprise Application on Mobile Devices" is attached hereto as Exhibit 20.

**ANSWER TO PARAGRAPH 102:** Workspot admits that on its face the '595 patent attached

as Exhibit 20 to the Complaint on August 28, 2018, is titled "Secure Execution of Enterprise

Application on Mobile Devices," and lists as its purported inventors Waheed Qureshi, et al.

Otherwise, Workspot denies the allegations in Paragraph 102.

103.   The '595 is valid and enforceable.

**ANSWER TO PARAGRAPH 103:** Workspot denies each and every allegation contained in

Paragraph 103.

104.   Citrix is the owner of the entire right, title, and interest in and to the '595 patent.

**ANSWER TO PARAGRAPH 104:** Workspot is without sufficient knowledge or information to

form a belief as to the truth of the allegations contained in Paragraph 104 and on that basis denies

each and every such allegation.

105.    Workspot had actual notice of the '595 patent, at least as of the filing date of this Amended Complaint.

**ANSWER TO PARAGRAPH 105:** Workspot admits that Citrix identified the '595 patent to Workspot at least as of the filing date of this Amended Complaint. Otherwise, Workspot denies the allegations in Paragraph 105.

106.    Upon information and belief, Workspot knew of the specific technology described and claimed in the '595 patent prior to the filing date of this Amended Complaint and may have known of the '595 patent itself prior to the filing date of this Amended Complaint.

**ANSWER TO PARAGRAPH 106:** Workspot denies each and every allegation contained in Paragraph 106.

107.    The '595 patent relates to a system and methods for enabling enterprise users to securely access enterprise resources, such as documents and data, using their mobile devices.

**ANSWER TO PARAGRAPH 107:** Workspot denies each and every allegation contained in Paragraph 107.

108.    Workspot has directly infringed and continues to directly infringe at least claim 1 of the '595 patent, both literally and under the doctrine of equivalents, by making, using, offering for sale, selling within the United States, and/or importing into the United States, without permission or license from Citrix, products that embody the inventions disclosed and claimed in the '595 patent. Exhibit 21 is a claim chart detailing Workspot's infringement of the asserted claims of the '595 patent.

**ANSWER TO PARAGRAPH 108:** Workspot denies each and every allegation contained in Paragraph 108.   Additionally, Workspot denies that the claim charts attached as Exhibit 21 establish infringement of any claim of the '595 patent.

109.    To the extent Workspot does not perform each and every step of a particular asserted method claim of the '595 patent, Workspot directs or controls the performance by others of each step of the asserted method claims of the '595 patent that it does not perform itself, such that the performance of each step of the asserted method claims can be attributed to Workspot.

**ANSWER TO PARAGRAPH 109:** Workspot denies each and every allegation contained in Paragraph 109.

110.    Workspot also contributes to infringement by others of at least claim 1 of the '595 patent including its customers, either literally or under the doctrine of equivalents. By way of example and not limitation, Workspot offers to sell and/or sells within the United States to its customers or imports into the United States components of patented devices, including but not limited to, the Infringing Products, knowing the same to be especially made or especially adapted for use in an infringement of the '595 patent. Such components are not staple articles or commodities of commerce suitable for substantial non-infringing use.

**ANSWER TO PARAGRAPH 110:** Workspot denies each and every allegation contained in

Paragraph 110.

111.    Workspot also actively induces infringement of at least claim 1 of the '595 patent. For example, Workspot induces infringement of these claims when its customers operate the Infringing Products in their intended manner in the United States.

**ANSWER TO PARAGRAPH 111:** Workspot denies each and every allegation contained in

Paragraph 111.

112.    Evidence of Workspot's contributory infringement includes, but is not limited to: (i) Workspot's knowledge of the '595 patent since at least the filing date of this Amended Complaint; (ii) Workspot's knowledge that its accused products are especially adapted to infringe the '595 patent; and (iii) the lack of substantial non-infringing uses for the Infringing Products. The lack of substantial non-infringing uses with respect to the '595 patent is confirmed by the fact that the Infringing Products are sold with the features required by the asserted claims of the '595 patent. Not only are the Infringing Products designed to implement the infringing features, but the default settings of the Infringing Products, as sold, are set accordingly.

**ANSWER TO PARAGRAPH 112:** Workspot denies each and every allegation contained in

Paragraph 112.

113.    Evidence of Workspot's inducement of infringement includes, but is not limited to:  (i) Workspot's knowledge of the '595 patent since at least the filing date of this Amended Complaint; (ii) Workspot's intent to induce direct infringement of the '595 patent; (iii) Workspot's active inducement of third parties' direct infringement; and (iv) Workspot's actual or constructive knowledge that its actions would induce infringement. For example, Workspot induces infringement at least by advertising the Infringing Products, providing the Infringing Products in a default configuration that implement the infringing features, and by instructing and encouraging its customers (in user manuals and otherwise) to operate the Infringing Products in an infringing manner.

**ANSWER TO PARAGRAPH 113:** Workspot denies each and every allegation contained in

Paragraph 113.

114.    For example, Workspot directs its customers to download the "Workspot Client" software onto the customer's smartphone, tablet, laptop, or other device. *See* VDI Reinvented, D.I. 1, Ex. 19, at pp. 5 and 9; *see also* https://www.workspot.com/download ("Use one of the following links to download the Workspot Client application onto your Windows 64 bit, Windows 32 bit, Mac, iOS, or Android device") (last visited March 7, 2019). Workspot also directs its customers to install—and facilitates the installation of—the "Workspot Connector" and "Workspot Agent" software onto the customer's cloud-based or on-premises desktop infrastructure. *See id.* at pp. 7, 12, 13, and 15 ("Workspot is tightly integrated with Azure to enable rapid creation of virtual desktops," "Workspot automates ... Azure account creation for the customer," and Workspot provides "[o]rchestration required to handle VDI and RD pools" within Microsoft Azure.).

**ANSWER TO PARAGRAPH 114:** Workspot denies each and every allegation contained in

Paragraph 114.

115.    On information and belief, Workspot knows or should know that such activities induce infringement and contribute to the infringement by others of the '595 patent. For example, Workspot knows or should know that its actions induce others to directly infringe the '595 patent because Workspot knows or should know about the existence of the '595 patent, especially given the fact that one or more of Workspot's senior leaders, including its founder and CEO, Mr. Sinha, are or should be aware of Citrix's extensive patent portfolio due to their previous Citrix employment.

**ANSWER TO PARAGRAPH 115:** Workspot denies each and every allegation contained in

Paragraph 115.

116.    Citrix has been irreparably harmed by Workspot's acts of infringement, and will continue to be harmed unless and until Workspot's acts of infringement are enjoined and restrained by order of this Court. Citrix has no adequate remedy at law and is entitled to a preliminary and permanent injunction against Workspot and its infringing products.

**ANSWER TO PARAGRAPH 116:** Workspot denies each and every allegation contained in

Paragraph 116.

117.    Upon information and belief, Workspot has willfully infringed the '595 patent by directly and/or indirectly infringing the '595 patent with knowledge that its actions constituted infringement of the '595 patent.

**ANSWER TO PARAGRAPH 117:** Workspot denies each and every allegation contained in Paragraph 117.

118.     As a result of Workspot's acts of infringement, Citrix has suffered and will continue to suffer damages in an amount to be proven at trial.

**ANSWER TO PARAGRAPH 118:** Workspot denies each and every allegation contained in Paragraph 118.

## RESPONSE TO COUNT VI

119.     Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 119:** Workspot realleges and incorporates herein its answers to the forgoing paragraphs of the complaint.

120.     Defendant's false and misleading statements constitute false advertising in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

**ANSWER TO PARAGRAPH 120:** Workspot denies each and every allegation contained in Paragraph 120.

121.     Sections 1125(a)(1)(A) and (B) of the Lanham Act provide, in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

    (A)    is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or

    (B)    in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . .

**ANSWER TO PARAGRAPH 121:** The allegations in Paragraph 121 are statements that do not warrant a response. To the extent a response is required, Workspot denies each and every allegation in Paragraph 121.

122.    Workspot has made false, deceptive and unsubstantiated statements of fact about its own products and about Citrix's products in its advertisements and marketing materials, as described herein, with the intent to mislead and deceive consumers.

**ANSWER TO PARAGRAPH 122:** Workspot denies each and every allegation contained in Paragraph 122.

123.    Upon information and belief, Workspot's false and misleading statements of fact have actually deceived or tended to deceive a substantial segment of the relevant and intended consumer population into purchasing Workspot's Infringing Products instead of Citrix's Products and Services by misleading consumers into wrongly believing that Citrix's Products and Services lack features that the Workspot's Infringing Products purportedly provide and that the Workspot's Infringing Products are superior to Citrix's Products and Services.

**ANSWER TO PARAGRAPH 123:** Workspot denies each and every allegation contained in Paragraph 123.

124.    Upon information and belief, Workspot's false and misleading statements of fact have influenced the buying decisions of consumers for cloud computing services and products throughout the United States because Workspot's claims relate to fundamental features of the parties' respective technologies and products.

**ANSWER TO PARAGRAPH 124:** Workspot denies each and every allegation contained in Paragraph 124.

125.    Workspot's false and misleading statements of fact were and are made in interstate commerce.

**ANSWER TO PARAGRAPH 125:** Workspot denies each and every allegation contained in Paragraph 125.

126.    Workspot's improper activities have been willful and deliberate, thereby making this an exceptional case under the Lanham Act. Indeed, Workspot was specifically informed by Citrix in January and June 2017 that its advertisements and marketing material were false and misleading. Therefore, Workspot's false advertising of its products was purposeful and knowing

and merits a finding that exceptional circumstances exist sufficient to support an award of attorneys' fees and treble damages.

**ANSWER TO PARAGRAPH 126:** Workspot denies each and every allegation contained in

Paragraph 126.

127.   Workspot's unlawful actions have caused, and will continue to cause, Citrix irreparable harm unless enjoined.

**ANSWER TO PARAGRAPH 127:** Workspot denies each and every allegation contained in

Paragraph 127.

128.   Workspot has profited from its unlawful actions and has been unjustly enriched to the detriment of Citrix. Workspot's unlawful actions have caused Citrix monetary damage in an amount presently unknown, but in an amount to be determined at trial.

**ANSWER TO PARAGRAPH 128:** Workspot denies each and every allegation contained in

Paragraph 128.

## **RESPONSE TO COUNT VII**

129.   Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 129:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

130.   Workspot's advertising and promotional materials, as described herein, contain literally false and misleading statements regarding the nature, characteristics, benefits, uses, or qualities of goods in commerce.

**ANSWER TO PARAGRAPH 130:** Workspot denies each and every allegation contained in

Paragraph 130.

131.   Workspot's advertising and promotional materials, as described herein, contain literally false and misleading representations of fact of the goods of Citrix. Workspot has engaged in deceptive trade practices through its advertising claims that are replete with false and misleading statements that disparage Citrix and Citrix's Products and Services, including through several advertisements on its website that purport to compare features of the Workspot Infringing Products and Citrix's Products and Services, where numerous claims in such

advertisements, including the claims identified in Paragraphs 23–42, are intentionally false (some of which are literally false) and misleading. See Exhibits 9-17.

**ANSWER TO PARAGRAPH 131:** Workspot denies each and every allegation contained in

Paragraph 131.

132.   Workspot's advertising and promotional materials, as described herein, create a likelihood of confusion, deception, and misunderstanding because Workspot's claims lead consumers to wrongly believe that Citrix's Products and Services lack features that the Workspot Infringing Products purportedly contain and that the Workspot Infringing Products are superior to Citrix's Products and Services.

**ANSWER TO PARAGRAPH 132:** Workspot denies each and every allegation contained in

Paragraph 132.

133.   These literally false and misleading advertising and promotional statements are material to consumer purchasing decisions and, in addition to creating a likelihood of consumer confusion, are, upon information and belief, causing actual consumer confusion and damages to Citrix.

**ANSWER TO PARAGRAPH 133:** Workspot denies each and every allegation contained in

Paragraph 133.

134.   Defendant's false and misleading advertising and promotional statements violate the Delaware Deceptive Trade Practices Act and the common law of Delaware.

**ANSWER TO PARAGRAPH 134:** Workspot denies each and every allegation contained in

Paragraph 134.

135.   Unless this Court enjoins Workspot from continuing to make these false and misleading claims and orders their retraction and/or correction, the false and misleading advertising will continue to cause Citrix to suffer a loss of consumer confidence, sales, profits, and goodwill, which will irreparably harm Citrix.

**ANSWER TO PARAGRAPH 135:** Workspot denies each and every allegation contained in

Paragraph 135.

136.   Workspot's false and misleading statements are willful, with malicious and deceptive intent, making this an exceptional case.

**ANSWER TO PARAGRAPH 136:** Workspot denies each and every allegation contained in

Paragraph 136.

137.    As a result of Workspot's conduct, Citrix has been and continues to be substantially and irreparably harmed. Citrix has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief to prevent Workspot's continuing acts.

**ANSWER TO PARAGRAPH 137:** Workspot denies each and every allegation contained in

Paragraph 137.

138.    Workspot has willfully engaged in the aforementioned deceptive trade practices, making this an exceptional case.

**ANSWER TO PARAGRAPH 138:** Workspot denies each and every allegation contained in

Paragraph 138.

139.    Pursuant to 6 Del. C. § 2533, Citrix is entitled to treble damages, attorneys' fees and costs, and injunctive relief.

**ANSWER TO PARAGRAPH 139:** Workspot denies each and every allegation contained in

Paragraph 139.

## <u>RESPONSE TO COUNT VIII</u>

140.    Citrix realleges and incorporates each of the foregoing paragraphs of the complaint.

**ANSWER TO PARAGRAPH 140:** Workspot realleges and incorporates herein its answers to

the forgoing paragraphs of the complaint.

141.    Workspot's unlawful acts, as described above, constitute unfair competition under Delaware law.

**ANSWER TO PARAGRAPH 141:** Workspot denies each and every allegation contained in

Paragraph 141.

142.    By making false and misleading statements about its own product, Workspot has utilized unfair methods of competition and deceptive trade practices.

**ANSWER TO PARAGRAPH 142:** Workspot denies each and every allegation contained in Paragraph 142.

143.    On information and belief, Workspot's conduct has wrongly interfered with Citrix's reasonable business relationships concerning its products and services, including expected sales, because Workspot's conduct causes consumers to wrongly believe that Citrix's Products and Services lack features that the Workspot Infringing Products provide.

**ANSWER TO PARAGRAPH 143:** Workspot denies each and every allegation contained in Paragraph 143.

144.    Workspot engaged in such misrepresentations with malicious intent.

**ANSWER TO PARAGRAPH 144:** Workspot denies each and every allegation contained in Paragraph 144.

145.    Workspot's unlawful actions have caused, and will continue to cause, Citrix irreparable harm to its business and reputation unless enjoined.

**ANSWER TO PARAGRAPH 145:** Workspot denies each and every allegation contained in Paragraph 145.

146.    Workspot has also profited from its unlawful actions and has been unjustly enriched to the detriment of Citrix. Workspot's unlawful actions have caused Citrix monetary damage in an amount presently unknown, but to be determined at trial.

**ANSWER TO PARAGRAPH 146:** Workspot denies each and every allegation contained in Paragraph 146.

147.    Workspot knew or should have known that its conduct was reasonably likely to result in injury, damage, or other harm, thus warranting the award of punitive damages.

**ANSWER TO PARAGRAPH 147:** Workspot denies each and every allegation contained in Paragraph 147.

## PRAYER FOR RELIEF

148.     Workspot denies that Citrix is entitled to either the requested relief or any other relief.

## DEFENSES

Workspot hereby asserts the following defenses without undertaking or otherwise shifting any applicable burdens of proof. Workspot reserves the right to assert additional defenses, as warranted by facts revealed through investigation and discovery.

### FIRST DEFENSE – FAILURE TO STATE A CLAIM

Citrix's Complaint fails to state a claim on which relief can be granted.

### SECOND DEFENSE – NON-INFRINGEMENT

Workspot does not infringe, has not infringed, and does not and has not induced infringement or contributed to infringement of any claim of the '677, '732, '018, '843 or '595 patents (collectively, the "Patents-in-Suit") under any theory, including literal infringement or infringement under the doctrine of equivalents.

### THIRD DEFENSE -- INVALIDITY

The Patents-in-Suit are invalid for failure to comply with one or more provisions of Title 35, United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

### FOURTH DEFENSE – FAILURE TO MARK

To the extent Citrix has failed to comply with the notice requirements of 35 U.S.C. § 287, Citrix is barred from all monetary relief for acts that occurred prior to Citrix providing actual notice to Workspot.

### FIFTH DEFENSE – LIMITATION OF DAMAGES

Pursuant to 35 U.S.C. § 286, Citrix is barred from recovering any damages for acts that occurred more than six years before it filed the Complaint in this action.

## SIXTH DEFENSE – WAIVER AND ESTOPPEL

Citrix's claims are barred, in whole or in part, by the doctrines of waiver and/or equitable estoppel.

## SEVENTH DEFENSE – UNCLEAN HANDS

Citrix's claims are barred, in whole or in part, by the doctrine of unclean hands.

## EIGHTH DEFENSE – LACHES

Citrix's Counts 6-8 are barred, in whole or in part, by the doctrine of laches.

## NINTH DEFENSE – FIRST AMENDMENT

Citrix's Counts 6-8 are barred, in whole or in part, insofar as they challenge the exercise of rights protected by the First Amendment to the United States Constitution.

## TENTH DEFENSE – NON-ENTITLEMENT TO COSTS

Citrix is not entitled to any costs in this lawsuit because of its failure to comply with 35 U.S.C. § 288.

## ELEVENTH DEFENSE – NO ATTORNEYS' FEES

Citrix cannot prove that this is an exceptional case justifying an aware of attorneys' fees against Workspot under 35 U.S.C. § 285 or otherwise.

## WORKSPOT'S COUNTERCLAIMS AGAINST CITRIX

Workspot, Inc. ("Workspot") alleges the following counterclaims against Citrix Systems, Inc. ("Citrix"):

## THE PARTIES

1.      Workspot is a Delaware corporation with its headquarters located at 1901 S. Bascom Avenue, Suite 900, Campbell, CA 95008.

2.      Upon information and belief, Citrix is a Delaware corporation with its corporate headquarters located at 851 West Cypress Creek Road, Fort Lauderdale, Florida.

## JURISDICTION AND VENUE

3.      This case arises under the patent laws of the United States, 35 U.S.C. § 101 et seq.

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1338, and 1367 in that Workspot seeks, *inter alia*, relief for Citrix's infringement of Workspot's patent.

5.      Pursuant to 28 U.S.C. § § 2201-02, this Court may declare the rights and other legal relations of the parties because there exists an actual controversy.

6.       Citrix is subject to personal jurisdiction in this district because Citrix is incorporated in Delaware. Further, upon information and belief, Citrix purposefully directs its activities toward this forum. Citrix conducts, and has conducted, continuous, systematic, substantial, and routine business within Delaware including, but not limited to, marketing, advertising, offering products and services for sale, and selling products and services in Delaware.

7.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 because Citrix is a Delaware corporation. Further, upon information and belief, Citrix has committed acts of infringement and has a regular and established place of business in this District.

## FACTUAL ALLEGATIONS

### A.     PLAINTIFF WORKSPOT AND ITS INNOVATIVE PRODUCTS

8.     Workspot was founded in August 2012 and launched in April 2013. It provides Virtual Desktop Infrastructure ("VDI") products to help enterprise information technology ("IT") departments deliver applications ("apps") and data to mobile devices.

9.     Workspot has garnered significant attention in the VDI industry for its innovative software, including being recognized by Gartner, Inc. as a "Cool Vendor" in endpoint computing, being awarded the 2018 MSUS Partner Award for Partner Seller of the Year by Microsoft, and winning the Best of VMworld 2016 Gold Award in the "Desktop and Application Delivery" category.

10.     There was a revolution in mobile technology in the late 2000s which made powerful handheld devices ubiquitous. Despite this revolution, the VDI industry clung to its thin client model (where client devices with little processing power rely on the computational power of servers). Workspot's founders recognized that straining the thin client model to accommodate the technological advances in mobile computer processing power and cloud-based computing was akin to fitting a square peg into a round hole.

11.     Thus, in August 2012, Workspot's founders set out to build a new and fundamentally different platform from the ground up that harnessed recent advancements in the computing power and memory of client devices, making reliance on middleman "brokers" for control and data no longer necessary or desired. In 2013, Workspot debuted its product at TechCrunch Disrupt in New York. Since that time, Workspot has attracted, and continues to

41

attract, new customers seeking to embrace its innovative and flexible cloud-based software architecture.

12.     Aspects of Workspot's software architecture are illustrated below:



As shown, Workspot's architecture separates control (dotted lines) and data (solid lines). That separation eliminates the bottleneck that the broker used by legacy systems would otherwise impose, providing a better user experience (e.g., reduced lag/freezing). Workspot is able to do so by empowering the client device to handle many of the tasks that, in thin client systems used by much of the industry, must be handled by the broker (e.g., authentication, establishing a connection with the backend).

### B.     WORKSPOT'S ASSERTED PATENT

13.     Workspot's development of its software architecture has resulted in, *inter alia*, the issuance of U.S. Patent No. 9,426,182 B1 ("the '182 patent"). A copy of the '182 patent is attached hereto as Exhibit A.

14.     The inventors of the '182 patent recognized that then-current IT management techniques were not "properly equipped to maintain a heterogeneous environment where the

various components of the environment are not under control of the IT departments of enterprises." Ex. A at 1:38–41.

15.     To provide the flexibility needed for such environments, the '182 patent describes methods and systems that "allow [for] adaptive authentication of client devices." *Id.* at 1:45–16. The '182 patent describes an "access control system" that "manages access control for requests sent by client devices to applications associated with an enterprise." *Id.* at 1:46–48.

16.     For example, Figure 1A (below), illustrates an example of "an environment for adaptive authentication." *Id.* at 2:34–36. The environment includes one or more enterprises 100, one or more access control systems 120, and a plurality of client devices 130. *Id.* at 2:36–39. Each enterprise can allow users of client devices 130 to access applications 115 hosted within the enterprise's data centers 105. *Id.* at 2:45–64.



**FIG. 1A**

17.     The '182 patent explains that when a "user requests access to an application 115 via a client application 135," an authentication module included in the access control system can receive two sets of information: "the context and an identifier of the user." *Id.* at 8:20–25.

"[F]actors" that "may be included in the context" include, for example, "the enterprise or company for which the device is being used." *Id.* at 4:20–21.

18.     The claims of the '182 patent set forth methods and systems that were unconventional solutions to problems unique to systems that provide remote access to computing resources and that improved the functioning of those systems' access control mechanisms. For example, the claims of the '182 patent solved the problem of managing authentication in heterogeneous environments where IT departments may not have control over client devices or the Software as a Service ("SaaS") applications accessed through client devices. It accomplished this by, *inter alia*, utilizing innovative adaptive techniques that take into account, e.g., the contexts of requests from a client device and the enterprise associated with the client device.

## C.     THE ACCUSED CITRIX PRODUCTS

19.     Upon information and belief, Citrix offers for sale in the United States systems that enable users to remotely access apps and desktops hosted on centralized server hardware. These systems include the Citrix Workspace (formerly Citrix Workspace Service) and the Citrix Gateway Service (collectively, the "Accused Citrix Products").

20.     Citrix Workspace includes Citrix Virtual Apps and Desktops, Citrix Endpoint Management, Citrix Content Collaboration, Citrix Access Control, Citrix Analytics, and Citrix Browser Service. *See, e.g.,* http://www.citrix.com/products/citrix-cloud; https://www.citrix.com/blogs/2018/05/17/citrix-workspace-embedded-browser-vs-secure-browser-service-vs-secure-browsing/.

21.     Upon information and belief, Citrix Gateway Service provides users with access to the Citrix Virtual Apps and Desktop applications provided by Citrix Workspace.

### FIRST COUNTERCLAIM
### (INFRINGEMENT OF WORKSPOT'S '182 PATENT)

22.     Workspot repeats and re-alleges the allegations set forth in the foregoing

paragraphs of the Counterclaim as if fully set forth herein.

23.     Workspot is the owner of the entire right, title, and interest in and to United States

Patent No. 9,426,182 B1 ("the '182 patent"), entitled "Context-Based Authentication of Mobile

Devices," which was duly and legally issued by the United States Patent and Trademark Office

to Robert Zeljko, Puneet Chawla, Christopher N. Thomas, Amitabh Sinha, Yatin Vasavada,

Abhijeet Kumar, and Guang Yuan Li on August 23, 2016, a copy of which is attached hereto as

Exhibit A.

24.     The claims of the '182 patent are valid and enforceable.

25.     Citrix, without authority, has made, used, offered to sell, sold, and/or imported

into the United States the Accused Citrix Products.

26.     The Accused Citrix Products incorporate or make use of the inventions covered

by the '182 patent, thereby infringing, literally and/or under the doctrine of equivalents, one or

more claims of the '182 patent. Hence, Citrix has directly infringed, and continues to directly

infringe, one or more claims of the '182 patent. Citrix will continue to infringe the '182 patent

unless enjoined by this Court.

27.     The '182 patent includes 18 claims, of which claims 1, 13, and 18 are

independent. Claim 1 is reproduced below.

> 1. A method comprising:
>
> storing, by an access control system, action control policies for a
> plurality of enterprises, wherein the access control system is external
> to each of the plurality of enterprises;
>
> storing, by the access control system, action control policies for the
> plurality of enterprises as a mapping from contexts of requests to the

action control policies, each context specifying one or more attributes describing a request received from a client device, wherein the request is for an action performed by an application hosted by a software as a services (SaaS) hosting system, each action control policy identifying actions that the client device is allowed in a given context;

receiving, by the access control system, from a first client device, a first request for interacting with the application hosted by the SaaS hosting system, the first request providing information describing a first context;

identifying a first enterprise from the plurality of enterprises, the first enterprise associated with the first client device;

determining, by the access control system, a first action control policy associated with the first enterprise for the first context based on the mapping, the first action control policy allowing a first set of actions supported by the application;

sending information describing the first action control policy to the first client device for enforcement of the first action control policy by an agent executing on the first client device;

receiving from a second client device, a second request for interacting with the application hosted by the SaaS hosting system, the second request providing information describing a second context;

identifying a second enterprise from the plurality of enterprises, the second enterprise associated with the second client device;

determining a second action control policy associated with the second enterprise for the second context based on the mapping, the second action control policy allowing a second set of actions supported by the application; and

sending information describing the second action control policy to the second client device for enforcement of the second action control policy by the agent executing on the second client device.

*Id.* at 13:60–14:37 (emphasis added).

28.     The Accused Citrix Products infringe at least claim 1 of the '182 Patent.

Specifically, upon information and belief, the Accused Citrix Products store, by an access control

system, action control policies for a plurality of enterprises, wherein the access control system is

46

external to each of the plurality of enterprises. This is illustrated, for example, in Citrix's

technical and marketing documentation regarding the Accused Citrix Products, as shown by the

exemplary excerpts below:

> The Access Control service enables the administrators to provide a cohesive experience integrating single sign-on, remote access, and content inspection into a single solution for end-to-end access control. IT administrators can govern access to approved SaaS apps with a simplified single sign-on experience. With the Access Control service, administrators can also protect the organization's network and end user devices from malware and data leaks by filtering access to specific websites and website categories. Administrators can enforce enhanced access security policies for secure access to SaaS applications. Once authenticated, employees have access to all critical business applications from any device irrespective of whether they are in the office premises, at home, or traveling.

*See* Ex. B ("Citrix Cloud") at 127;



*See* Ex. C ("Citrix Virtual Apps and Desktops Service") at 237;

### Access Control service overview

Using the Access Control service, administrators can provide a cohesive experience that integrates single sign-on, remote access, and content inspection into a single solution for end-to-end access control. IT administrators can govern access to approved SaaS apps with a simplified single sign-on experience. With the Access Control service, administrators can also protect the organization's network and end user devices from malware and data leaks by filtering access to specific websites and website categories. Administrators can enforce enhanced access security policies for secure access to SaaS applications. Once authenticated, employees have access to all critical business applications from any device irrespective of whether they are in the office premises, at home, or traveling.

Administrators can monitor user activities, such as

- malicious, dangerous, or unknown websites visited
- the bandwidth consumed
- risky download and upload behaviors.

Using the Analytics around websites and website categories accessed, administrators can take corrective action to protect the enterprise network. At the same time, the service provides end users seamless and secure access to all their hosted apps.

Administrators can also restrict actions, such as restricted printing, downloads, and clipboard access (copy-paste).

*See* Ex. D ("Citrix Gateway Service SSO with Access Control Citrix Validated Reference Design")

at 2;



*See* Ex. E (docs.citrix.com/en-us/tech-zone/learn/tech-briefs/access-control.html) at 5;



*See* Ex. H ("Deliver secure, contextual user access on any device anywhere, without sacrificing IT control") at 2-3.

29.    Upon information and belief, the Accused Citrix Products store, by the access control system, action control policies for the plurality of enterprises as a mapping from contexts of requests to the action control policies, each context specifying one or more attributes describing a request received from a client device, wherein the request is for an action performed by an application hosted by a software as a services (SaaS) hosting system, each action control policy identifying actions that the client device is allowed in a given context. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpts below:

How SaaS apps work with Citrix Gateway service

1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
2. Admin provides the service URL to the users to access Citrix Workspace.
3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
4. To launch the app, user clicks on the enumerated SaaS app icon.
5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;

## Content Control

To protect content, organizations incorporate enhanced security policies within the SaaS applications. Each policy enforces a restriction on the embedded browser when using Workspace app for desktop or on Secure Browser when using Workspace app web or mobile.

- Preferred browser: Disables local browser use and relies on the embedded browser engine (Workspace app - desktop) or Secure Browser service (Workspace app – mobile and web).
- Restrict clipboard access: Disables cut/copy/paste operations between the app and endpoint clipboard.
- Restrict printing: Disables ability to print from within the app browser.
- Restrict navigation: Disables the next/back browser buttons.
- Restrict downloads: Disables the user's ability to download from within the SaaS app.
- isplay watermark: Overlays a screen-based watermark showing the username and IP address of the endpoint. If a user tries to print or take a screenshot, the watermark will appear as displayed on the screen.

Ex. E at p. 4;

> **6**  The Gateway Service requests an assertion from the Single Sign-on μ-service and enhanced security policies from the Access Control service.
>
> **7**  The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

Ex. E at p. 5;

## ⌄ Granular security controls

Citrix Gateway provides multi-factor nFactor authentication (MFA) that allows configuring any number of authentication steps to access confidential data based on user role, location, device state, and more. It supports LDAP, RADIUS, TACACS, Diameter, and SAML2.0 authentication mechanisms, among others.

Ex. F at p. 2.

30.    Upon information and belief, the Accused Citrix Products receive, by the access control system, from a first client device, a first request for interacting with the application hosted by the SaaS hosting system, the first request providing information describing a first

context. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpts below:



Ex. E at 5;



*See* https://www.citrix.com/blogs/2018/09/25/tech-insight-into-access-control;

Ex. F at p. 2;

## Launching a configured app – end-user flow

**To launch a configured app, perform the following steps:**

1. Logon to Citrix workspace with AD user credentials.
2. Admin configured app is shown.
3. Click on the app to launch the app.
4. The app is launched and the user is signed-in to the app.

Ex. G at 9.

31.    Upon information and belief, the Accused Citrix Products identify a first enterprise from the plurality of enterprises, the first enterprise associated with the first client device. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpt below:

### How SaaS apps work with Citrix Gateway service

1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
2. Admin provides the service URL to the users to access Citrix Workspace.
3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
4. To launch the app, user clicks on the enumerated SaaS app icon.
5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;

4  When the user selects a SaaS app, Workspace App sends the request to Workspace, which requests a one-time-use URL from the Gateway Service.

5  The embedded browser, within Workspace App, initiates a connection to the Gateway Service.

6  The Gateway Service requests an assertion from the Single Sign-on μ-service and enhanced security policies from the Access Control service.

7  The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

Ex. E at 5.

32.     Upon information and belief, the Accused Citrix Products determine, by the access control system, a first action control policy associated with the first enterprise for the first context based on the mapping, the first action control policy allowing a first set of actions supported by the application. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpt below:

How SaaS apps work with Citrix Gateway service

1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
2. Admin provides the service URL to the users to access Citrix Workspace.
3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
4. To launch the app, user clicks on the enumerated SaaS app icon.
5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;

Content Control

To protect content, organizations incorporate enhanced security policies within the SaaS applications. Each policy enforces a restriction on the embedded browser when using Workspace app for desktop or on Secure Browser when using Workspace app web or mobile.

• Preferred browser: Disables local browser use and relies on the embedded browser engine (Workspace app - desktop) or Secure Browser service (Workspace app – mobile and web).
• Restrict clipboard access: Disables cut/copy/paste operations between the app and endpoint clipboard.
• Restrict printing: Disables ability to print from within the app browser.
• Restrict navigation: Disables the next/back browser buttons.
• Restrict downloads: Disables the user's ability to download from within the SaaS app.
• isplay watermark: Overlays a screen-based watermark showing the username and IP address of the endpoint. If a user tries to print or take a screenshot, the watermark will appear as displayed on the screen.

Ex. E at p. 4;

6   The Gateway Service requests an assertion from the Single Sign-on μ-service and enhanced security policies from the Access Control service.

7   The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

Ex. E at p. 5;

⊙ Granular security controls

Citrix Gateway provides multi-factor nFactor authentication (MFA) that allows configuring any
number of authentication steps to access confidential data based on user role, location, device
state, and more. It supports LDAP, RADIUS, TACACS, Diameter, and SAML2.0 authentication
mechanisms, among others.

Ex. F at p. 2.

33.     Upon information and belief, the Accused Citrix Products send information
describing the first action control policy to the first client device for enforcement of the first
action control policy by an agent executing on the first client device. This is illustrated, for
example, in Citrix's technical and marketing documentation regarding the Accused Citrix
Products, as shown by the exemplary excerpt below:

5   The embedded browser, within Workspace App, initiates a
    connection to the Gateway Service.

6   The Gateway Service requests an assertion from the Single Sign-on
    μ-service and enhanced security policies from the Access Control
    service.

7   The embedded browser is redirected to the SaaS app logon page
    where the assertion is presented.

8   The SaaS app contacts the Gateway Service to validate the assertion
    and authenticates the user.

9   Once authenticated, communication occurs directly between the
    browser and SaaS application.

Ex. E at p. 5;



*See* https://www.citrix.com/blogs/2018/09/25/tech-insight-into-access-control.

34.     Upon information and belief, the Accused Citrix Products receive, from a second client device, a second request for interacting with the application hosted by the SaaS hosting system, the second request providing information describing a second context. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpts below:

> How SaaS apps work with Citrix Gateway service
>
> 1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
> 2. Admin provides the service URL to the users to access Citrix Workspace.
> 3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
> 4. To launch the app, user clicks on the enumerated SaaS app icon.
> 5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;



Ex. E at 5;



*See* https://www.citrix.com/blogs/2018/09/25/tech-insight-into-access-control;

⊙ Granular security controls

Citrix Gateway provides multi-factor nFactor authentication (MFA) that allows configuring any number of authentication steps to access confidential data based on user role, location, device state, and more. It supports LDAP, RADIUS, TACACS, Diameter, and SAML2.0 authentication mechanisms, among others.

Ex. F at p. 2;

## Launching a configured app – end-user flow

**To launch a configured app, perform the following steps:**

1. Logon to Citrix workspace with AD user credentials.
2. Admin configured app is shown.
3. Click on the app to launch the app.
4. The app is launched and the user is signed-in to the app.

Ex. G at 9.

35.     Upon information and belief, the Accused Citrix Products identify a second enterprise from the plurality of enterprises, the second enterprise associated with the second client device. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpt below:

### How SaaS apps work with Citrix Gateway service

1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
2. Admin provides the service URL to the users to access Citrix Workspace.
3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
4. To launch the app, user clicks on the enumerated SaaS app icon.
5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;

4. When the user selects a SaaS app, Workspace App sends the request to Workspace, which requests a one-time-use URL from the Gateway Service.

5. The embedded browser, within Workspace App, initiates a connection to the Gateway Service.

6. The Gateway Service requests an assertion from the Single Sign-on μ-service and enhanced security policies from the Access Control service.

7. The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

Ex. E at 5.

36.     Upon information and belief, the Accused Citrix Products determine a second action control policy associated with the second enterprise for the second context based on the mapping, the second action control policy allowing a second set of actions supported by the application. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpt below:

How SaaS apps work with Citrix Gateway service

1. Customer admin configures SaaS apps using Citrix Gateway service UI (citrix.cloud.com). The admin then adds subscribers (users) for the apps.
2. Admin provides the service URL to the users to access Citrix Workspace.
3. Users subscribed for an app can see the app upon log on to Citrix Workspace.
4. To launch the app, user clicks on the enumerated SaaS app icon.
5. SaaS app trusts SAML assertion provided by Citrix Gateway service and the app is launched.

Ex. G at p. 1;

Content Control

To protect content, organizations incorporate enhanced security policies within the SaaS applications. Each policy enforces a restriction on the embedded browser when using Workspace app for desktop or on Secure Browser when using Workspace app web or mobile.

• Preferred browser: Disables local browser use and relies on the embedded browser engine (Workspace app - desktop) or Secure Browser service (Workspace app – mobile and web).
• Restrict clipboard access: Disables cut/copy/paste operations between the app and endpoint clipboard.
• Restrict printing: Disables ability to print from within the app browser.
• Restrict navigation: Disables the next/back browser buttons.
• Restrict downloads: Disables the user's ability to download from within the SaaS app.
• isplay watermark: Overlays a screen-based watermark showing the username and IP address of the endpoint. If a user tries to print or take a screenshot, the watermark will appear as displayed on the screen.

Ex. E at p. 4;

6   The Gateway Service requests an assertion from the Single Sign-on µ-service and enhanced security policies from the Access Control service.

7   The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

Ex. E at p. 5;

⊙ Granular security controls

Citrix Gateway provides multi-factor nFactor authentication (MFA) that allows configuring any number of authentication steps to access confidential data based on user role, location, device state, and more. It supports LDAP, RADIUS, TACACS, Diameter, and SAML2.0 authentication mechanisms, among others.

Ex. F at p. 2.

37.     Upon information and belief, the Accused Citrix Products send information describing the second action control policy to the second client device for enforcement of the second action control policy by an agent executing on the second client device. This is illustrated, for example, in Citrix's technical and marketing documentation regarding the Accused Citrix Products, as shown by the exemplary excerpt below:

5   The embedded browser, within Workspace App, initiates a connection to the Gateway Service.

6   The Gateway Service requests an assertion from the Single Sign-on μ-service and enhanced security policies from the Access Control service.

7   The embedded browser is redirected to the SaaS app logon page where the assertion is presented.

8   The SaaS app contacts the Gateway Service to validate the assertion and authenticates the user.

9   Once authenticated, communication occurs directly between the browser and SaaS application.

Ex. E at p. 5;



*See* https://www.citrix.com/blogs/2018/09/25/tech-insight-into-access-control.

38.     To the extent Citrix does not perform each and every step of claim 1 of the '182 patent, Citrix directs or controls the performance by others of each step of claim 1 that it does not perform itself, such that the performance of each step of claim 1 can be attributed to Citrix. Indeed, Citrix's technical and marketing documentation for the Accused Citrix Products provides specific instruction for using, and actively encourages its customers to use, the Accused Citrix Products in an infringing manner. *See e.g.* Exhibits B – H attached hereto. Upon information and belief, Citrix's instructions and encouragement actually resulted in direct infringement of claim 1 of the '182 patent.

39.     On April 19, 2018, Citrix filed a petition for *inter partes* review of claims 1-18 of the '182 patent (PTAB proceeding no. IPR2018-00917). Upon information and belief, Citrix filed its petition for *inter partes* review because it was concerned that the Accused Citrix Products infringed at least claim 1 of the '182 patent.

40.     Citrix has had knowledge of the '182 patent at least as of April 19, 2018 when it filed its petition for *inter partes* review of the '182 patent.

41.     Upon information and belief, Citrix has willfully infringed the '182 patent by infringing the '182 patent with knowledge that its actions constituted infringement of the '182 patent. Despite this knowledge, Citrix continued to make, use, offer to sell, sell, and/or import the Accused Citrix Products.

42.     Citrix's intentional infringement is egregious. Because Citrix's infringement has been egregious, and was done with knowledge of the '182 patent, Citrix is liable for willful infringement and Workspot is entitled to enhanced damages under 35 U.S.C. § 284.

43.     As a direct result of Citrix's infringement of the '182 patent, Workspot has been, is being, and will continue to be, seriously damaged and irreparably harmed unless Citrix is enjoined by this Court from the actions complained of herein, and thus Workspot is without an adequate remedy at law.

44.     Workspot is entitled to recover from Citrix the damages sustained by Workspot as a result of Citrix's wrongful acts in an amount subject to proof at trial.

### SECOND COUNTERCLAIM
### (INVALIDITY OF CITRIX'S '677 PATENT)

45.     Workspot repeats and re-alleges the allegations set forth in Counterclaim Paragraphs 1 through 44 as if fully set forth herein.

46.     The claims of U.S. Patent No. 7,949,677 ("the '677 patent") are invalid for failure to comply with one or more of the conditions for patentability specified in Title 35 of the United States code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

47.     By way of example, at least the '677 patent's Applicant Admitted Prior Art ("AAPA"), US20060053215, US7,475,419, US20060190532, US 2004/0111643, US 8,200,796, and US20040243835, references and products identified in the invalidity contentions Workspot has served in this case, among other prior art references and/or products to be identified and/or

discovered, as well as the knowledge of a person of ordinary skill in the art, alone and/or in combination, render the claims of the '677 patent invalid under 35 U.S.C. §§ 101, 102 and/or 103.

48.     Workspot is informed and believes, and on that basis alleges, that Citrix contends that the '677 patent's claims are valid and enforceable.

49.     A valid and justiciable controversy has arisen and exists between Citrix and Workspot.  Workspot desires a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

50.     Accordingly, Workspot is entitled to a declaratory judgment that the claims of the '677 patent are invalid.

### THIRD COUNTERCLAIM
### (NON-INFRINGEMENT OF THE '677 PATENT)

51.     Workspot repeats and realleges the allegations set forth in Counterclaim Paragraphs 1 through 50 as if set forth fully herein.

52.     Workspot has not been and is not now infringing, either directly or indirectly, nor has it contributed to or induced infringement by others, of any valid claim of the '677 patent, either literally or under the doctrine of equivalents.

53.     Citrix has expressly charged Workspot with infringement of the '677 patent by initiating this lawsuit, maintaining infringement allegations concerning the '677 patent in the Amended Complaint, and continuing to seek, among other things, money damages, and preliminary and permanent injunctive relief.

54.     In view of Citrix's Amended Complaint, there exists an actual controversy between Citrix and Workspot regarding Workspot's infringement or noninfringement of the '677

patent and a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

55.     Accordingly, Workspot is entitled to a declaratory judgment that: (a) it has not infringed, and is not infringing, the '677 patent, (b) it has not contributed to, and is not contributing to, infringement of the '677 patent, and (c) it has not induced, and is not inducing, infringement of the '677 patent.

## FOURTH COUNTERCLAIM
### (INVALIDITY OF CITRIX'S '732 PATENT)

56.     Workspot repeats and re-alleges the allegations set forth in Counterclaim Paragraphs 1 through 55 as if fully set forth herein.

57.     The claims of U.S. Patent No. 8,341,732 ("the '732 patent") are invalid for failure to comply with one or more of the conditions for patentability specified in Title 35 of the United States code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

58.     By way of example, at least the '732 patent's Applicant Admitted Prior Art ("AAPA"), US20060053215, US7,475,419, US20060190532, US8,200,796 and US20040243835 , references and products identified in the invalidity contentions Workspot has served in this case, among other prior art references and/or products to be identified and/or discovered, as well as the knowledge of a person of ordinary skill in the art, alone and/or in combination, render the claims of the '732 patent invalid under 35 U.S.C. §§ 101, 102 and/or 103.

59.     Workspot is informed and believes, and on that basis alleges, that Citrix contends that the '732 patent's claims are valid and enforceable.

60.     A valid and justiciable controversy has arisen and exists between Citrix and Workspot.  Workspot desires a judicial determination and declaration of the respective rights and

duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

61.     Accordingly, Workspot is entitled to a declaratory judgment that the claims of the '732 patent are invalid.

### FIFTH COUNTERCLAIM
### (NON-INFRINGEMENT OF THE '732 PATENT)

62.     Workspot repeats and realleges the allegations set forth in Counterclaim Paragraphs 1 through 61 as if set forth fully herein.

63.     Workspot has not been and is not now infringing, either directly or indirectly, nor has it contributed to or induced infringement by others, of any valid claim of the '732 patent, either literally or under the doctrine of equivalents.

64.     Citrix has expressly charged Workspot with infringement of the '732 patent by initiating this lawsuit, maintaining infringement allegations concerning the '732 patent in the Amended Complaint, and continuing to seek, among other things, money damages, and preliminary and permanent injunctive relief.

65.     In view of Citrix's Amended Complaint, there exists an actual controversy between Citrix and Workspot regarding Workspot's infringement or noninfringement of the '732 patent and a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

66.     Accordingly, Workspot is entitled to a declaratory judgment that: (a) it has not infringed, and is not infringing, the '732 patent, (b) it has not contributed to, and is not contributing to, infringement of the '732 patent, and (c) it has not induced, and is not inducing, infringement of the '732 patent.

## SIXTH COUNTERCLAIM
### (INVALIDITY OF CITRIX'S '018 PATENT)

67.     Workspot repeats and re-alleges the allegations set forth in Counterclaim Paragraphs 1 through 66 as if fully set forth herein.

68.     The claims of U.S. Patent No. 7,594,018 ("the '018 patent") are invalid for failure to comply with one or more of the conditions for patentability specified in Title 35 of the United States code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

69.     By way of example, at least the '018 patent's Applicant Admitted Prior Art ("AAPA"), US 7,487,248, US 2003/195963, US 7,386,855, US 2003/084165, US7,191,233, *Supporting Ubiquitous Computing With Stateless Consoles And Computation Caches* by Brian Keith Schmidt, US5,928,363, US6,477,373, US20030188195, US7,430,755, US20040078341, US20030233361, US8,612,590 and US5,812,819, references and products identified in the invalidity contentions Workspot has served in this case, among other prior art references and/or products to be identified and/or discovered, as well as the knowledge of a person of ordinary skill in the art, alone and/or in combination, render the claims of the '018 patent invalid under 35 U.S.C. §§ 101, 102 and/or 103.

70.     Workspot is informed and believes, and on that basis alleges, that Citrix contends that the '018 patent's claims are valid and enforceable.

71.     A valid and justiciable controversy has arisen and exists between Citrix and Workspot. Workspot desires a judicial determination and declaration of the respective rights and duties of the parties herein. Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

72.     Accordingly, Workspot is entitled to a declaratory judgment that the claims of the '018 patent are invalid.

## SEVENTH COUNTERCLAIM
### (NON-INFRINGEMENT OF THE '018 PATENT)

73.      Workspot repeats and realleges the allegations set forth in Counterclaim Paragraphs 1 through 72 as if set forth fully herein.

74.      Workspot has not been and is not now infringing, either directly or indirectly, nor has it contributed to or induced infringement by others, of any valid claim of the '018 patent, either literally or under the doctrine of equivalents.

75.      Citrix has expressly charged Workspot with infringement of the '018 patent by initiating this lawsuit, maintaining infringement allegations concerning the '018 patent in the Amended Complaint, and continuing to seek, among other things, money damages, and preliminary and permanent injunctive relief.

76.      In view of Citrix's Amended Complaint, there exists an actual controversy between Citrix and Workspot regarding Workspot's infringement or noninfringement of the '018 patent and a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

77.      Accordingly, Workspot is entitled to a declaratory judgment that: (a) it has not infringed, and is not infringing, the '018 patent, (b) it has not contributed to, and is not contributing to, infringement of the '018 patent, and (c) it has not induced, and is not inducing, infringement of the '018 patent.

## EIGHTH COUNTERCLAIM
### (INVALIDITY OF CITRIX'S '843 PATENT)

78.      Workspot repeats and re-alleges the allegations set forth in Counterclaim Paragraphs 1 through 77 as if fully set forth herein.

79.     The claims of U.S. Patent No. 8,135,843 ("the '843 patent") are invalid for failure to comply with one or more of the conditions for patentability specified in Title 35 of the United States code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

80.     By way of example, at least the '843 patent's Applicant Admitted Prior Art ("AAPA"), US7,269,664, US7,502,838, US7,159,007, 8,166,006, AU737604, US 7,111,060, US7,937,325, US7,260,600, US20020002602A1, US6,339,785, references and products identified in the invalidity contentions Workspot has served in this case, among other prior art references and/or products to be identified and/or discovered, as well as the knowledge of a person of ordinary skill in the art, alone and/or in combination, render the claims of the '843 patent invalid under 35 U.S.C. §§ 101, 102 and/or 103.

81.     Workspot is informed and believes, and on that basis alleges, that Citrix contends that the '843 patent's claims are valid and enforceable.

82.     A valid and justiciable controversy has arisen and exists between Citrix and Workspot.  Workspot desires a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

83.     Accordingly, Workspot is entitled to a declaratory judgment that the claims of the '843 patent are invalid.

## NINTH COUNTERCLAIM
### (NON-INFRINGEMENT OF THE '843 PATENT)

84.     Workspot repeats and realleges the allegations set forth in Counterclaim Paragraphs 1 through 83 as if set forth fully herein.

85.     Workspot has not been and is not now infringing, either directly or indirectly, nor has it contributed to or induced infringement by others, of any valid claim of the '843 patent, either literally or under the doctrine of equivalents.

86.     Citrix has expressly charged Workspot with infringement of the '843 patent by initiating this lawsuit, maintaining infringement allegations concerning the '843 patent in the Amended Complaint, and continuing to seek, among other things, money damages, and preliminary and permanent injunctive relief.

87.     In view of Citrix's Amended Complaint, there exists an actual controversy between Citrix and Workspot regarding Workspot's infringement or noninfringement of the '843 patent and a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

88.     Accordingly, Workspot is entitled to a declaratory judgment that: (a) it has not infringed, and is not infringing, the '843 patent, (b) it has not contributed to, and is not contributing to, infringement of the '843 patent, and (c) it has not induced, and is not inducing, infringement of the '843 patent.

### TENTH COUNTERCLAIM
### (INVALIDITY OF CITRIX'S '595 PATENT)

89.     Workspot repeats and re-alleges the allegations set forth in Counterclaim Paragraphs 1 through 88 as if fully set forth herein.

90.     The claims of U.S. Patent No. 10,063,595 ("the '595 patent") are invalid for failure to comply with one or more of the conditions for patentability specified in Title 35 of the United States code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112.

91.     By way of example, at least the '595 patent's Applicant Admitted Prior Art ("AAPA"), among other prior art references and/or products to be identified and/or discovered,

as well as the knowledge of a person of ordinary skill in the art, alone and/or in combination, render the claims of the '595 patent invalid under 35 U.S.C. §§ 101, 102 and/or 103.

92.    Workspot is informed and believes, and on that basis alleges, that Citrix contends that the '595 patent's claims are valid and enforceable.

93.    A valid and justiciable controversy has arisen and exists between Citrix and Workspot.  Workspot desires a judicial determination and declaration of the respective rights and duties of the parties herein.  Such a determination and declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

94.    Accordingly, Workspot is entitled to a declaratory judgment that the claims of the '595 patent are invalid.

### THIRD COUNTERCLAIM
### (NON-INFRINGEMENT OF THE '595 PATENT)

95.    Workspot repeats and realleges the allegations set forth in Counterclaim Paragraphs 1 through 94 as if set forth fully herein.

96.    Workspot has not been and is not now infringing, either directly or indirectly, nor has it contributed to or induced infringement by others, of any valid claim of the '595 patent, either literally or under the doctrine of equivalents.

97.    Citrix has expressly charged Workspot with infringement of the '595 patent by initiating this lawsuit, maintaining infringement allegations concerning the '595 patent in the Amended Complaint, and continuing to seek, among other things, money damages, and preliminary and permanent injunctive relief.

98.    In view of Citrix's Amended Complaint, there exists an actual controversy between Citrix and Workspot regarding Workspot's infringement or noninfringement of the '595

patent and a judicial declaration is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

99.     Accordingly, Workspot is entitled to a declaratory judgment that: (a) it has not infringed, and is not infringing, the '595 patent, (b) it has not contributed to, and is not contributing to, infringement of the '595 patent, and (c) it has not induced, and is not inducing, infringement of the '595 patent.

## **PRAYER FOR RELIEF**

WHEREFORE, Workspot prays for judgment and relief as follows:

A.     That this Court enter an Order declaring that Citrix infringes the '182 patent;

B.     That this Court permanently enjoin Citrix, its officers, agents, employees, representatives, successors and assigns, and any others acting in concert with it, from infringing the '182 patent;

C.     That this Court award Workspot adequate damages resulting from Citrix's infringement of the '182 patent;

D.     That this Court award Workspot treble damages due to Citrix's willful infringement of the '182 patent;

E.     That this Court declare this to be an exceptional case within the meaning of 35 U.S.C. § 285;

F.     That this Court Dismiss Citrix's Complaint with prejudice;

G.     On its Second Counterclaim, declare that the claims of the '677 patent are invalid;

H.     On its Third Counterclaim, declare that the claims of the '677 patent are not infringed by Workspot;

I.     On its Fourth Counterclaim, declare that the claims of the '732 patent are invalid;

J.      On its Fifth Counterclaim, declare that the claims of the '732 patent are not infringed by Workspot;

K.      On its Sixth Counterclaim, declare that the claims of the '018 patent are invalid;

L.      On its Seventh Counterclaim, declare that the claims of the '018 patent are not infringed by Workspot;

M.      On its Eighth Counterclaim, declare that the claims of the '843 patent are invalid;

N.      On its Ninth Counterclaim, declare that the claims of the '843 patent are not infringed by Workspot;

O.      On its Tenth Counterclaim, declare that the claims of the '595 patent are invalid;

P.      On its Eleventh Counterclaim, declare that the claims of the '595 patent are not infringed by Workspot;

Q.      Grant Workspot such other relief as it deems just and proper.

## **JURY DEMAND**

Workspot requests a jury trial for those issues so triable herein.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Ronald F. Lopez
NIXON PEABODY LLP
One Embarcadero Center, 18th Floor
San Francisco, CA 94111-3600
Tel: (415) 984-8200

Jennifer Hayes
NIXON PEABODY LLP
300 South Grand Avenue, Suite 4100
Los Angeles, CA 90071-3151
Tel: (213) 629-6179

Matthew A. Werber
Angelo J. Christopher
NIXON PEABODY LLP
70 West Madison, Suite 3500
Chicago, IL 60602-4224
Tel: (312) 977-4400

Karen A. Gibbs
1901 S. Bascom Avenue, Suite 900
Campbell, CA  95008

Dated:  May 7, 2019
6201163 / 45039

By:   */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Stephanie E. O'Byrne (#4446)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    sobyrne@potteranderson.com

*Attorneys for Defendant Workspot, Inc.*