# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CITRIX SYSTEMS, INC.,

|                        | Plaintiff, |
|---|---|

v.

WORKSPOT, INC.

|                        | Citrix. |
|---|---|

C.A. No. 1:18-cv-00588-LPS



PUBLIC VERSION

## PLAINTIFF CITRIX SYSTEMS, INC.'S OPENING BRIEF
### IN SUPPORT OF ITS MOTION TO STAY DEFENDANT'S PATENT INFRINGEMENT COUNTERCLAIM PENDING INSTITUTED INTER PARTES REVIEW

Dated: May 13, 2019

**OF COUNSEL**:
Michael Strapp (admitted *Pro Hac Vice*)
Larissa Bifano (admitted *Pro Hac Vice*)
Kristoffer W. Lange (admitted *Pro Hac Vice*)
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Telephone:  (617) 406-6031
michael.strapp@dlapiper.com
larissa.bifano@dlapiper.com
kris.lange@dlapiper.com

**DLA PIPER LLP (US)**
Denise S. Kraft (DE Bar No. 2778)
Brian A. Biggs (DE Bar No. 5591)
Erin E. Larson (DE Bar No. 6616)
1201 North Market Street, Suite 2100
Wilmington, DE  19801-1147
Telephone:  (302) 468-5700
Facsimile:   (302) 394-2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com
erin.larson@dlapiper.com

*Attorneys for Plaintiff Citrix Systems, Inc.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................................1

II.    STATEMENT OF FACTS AND NATURE AND STAGE OF PROCEEDINGS ........................2

    A.     Workspot Chooses Not to Assert the '182 Patent in Its Original Answer. ......................2

    B.     Citrix's *Inter Partes* Review Is Instituted on All Claims. ..................................................2

    C.     Citrix's Preliminary Injunction Motion and Temporary Restraining Order.......................3

    D.     Workspot Asserts the '182 Patent in a Counterclaim for the First Time in its Amended Answer. ........................................................................................................................4

III.   LEGAL STANDARD ...........................................................................................................5

IV.    ARGUMENT ......................................................................................................................6

    A.     A Brief Stay Is Likely to Dispose of or Simplify Workspot's Patent Counterclaim. .........6

    B.     Discovery Has Not Yet Begun on Workspot's Patent Counterclaim...............................9

    C.     A Stay Will Not Unduly Prejudice Workspot or Give Citrix Any Clear Tactical Advantage. ...................................................................................................................10

V.     CONCLUSION .................................................................................................................12

EAST\164622874.6

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*454 Life Sci. Corp. v. Ion Torrent Sys, Inc.*,
No. 15-595-LPS, 2016 WL 6594083 (D. Del. Nov. 7, 2016) ................................................. 6, 10, 11

*Bonutti Skeletal Innovations, L.L.C. v. Zimmer Holdings, Inc.*,
No. 12-cv-1107-GMS, 2014 WL 1369721 (D. Del. April 7, 2014) ......................................... 6, 9, 10

*CANVS Corp. v. United States*,
118 Fed. Cl. 587 (2014) ................................................................................................................. 8

*Card Tech. Corp. v. Datacard Corp.*,
No. 05-2546, 2007 WL 551615 (D. Minn. Feb. 21, 2007) ............................................................ 8, 9

*Delphix Corp. v. Actifio, Inc.*,
2014 WL 6068407 (N.D. Cal. 2014) ............................................................................................. 9

*In re Dex Media, Inc.*,
595 B.R. 19 (D. Del. 2018) ............................................................................................................. 12

*General Electric Co. v. Vibrant Media, Inc.*,
No. 12-00526-LPS, 2013 WL 6328063 (D. Del. Dec. 4, 2013) ........................................................ 9

*Message Notification Techs. LLC v. Microsoft Corp.*,
No. 13-1881-GMS, 2015 U.S. Dist. LEXIS 30626 (D. Del. Feb. 23, 2015) ....................................... 6

*Neste Oil OYJ v. Dynamic Fuels, LLC*,
C.A. No. 12-1744-GMS, 2013 WL 3353984 (D. Del. July 2, 2013) .................................................. 7

*Novartis AG et al., v. HEC Pharm. Co. LTD*,
183 F. Supp. 3d 560 (D. Del. 2016) ...............................................................................5, 7, 8, 11

*Orthophoenix, LLC v. Dfine, Inc.*,
No. 13-1003-LPS, 2015 WL 1938702 (D. Del. Apr. 28, 2015) ........................................................ 9

*Peschke Map Techs., LLC v. J.J. Gumberg Co.*,
40 F. Supp. 3d 393 (D. Del. 2014) ............................................................................................... 5

*Princeton Dig. Image Corp. v. Konami Dig. Entm't Inc.*,
No. 12-1461-LPS-CJB, 2014 WL 3819458 (D. Del. Jan. 15, 2014) ........................................... 5, 6, 9

**Statutes**

35 U.S.C. § 315(e) .......................................................................................................................7

35 U.S.C. § 316(a)(11)................................................................................................................3

## I.      INTRODUCTION

More than one year after Plaintiff Citrix Systems, Inc. ("Citrix") filed its petition for *inter partes* review ("IPR") of U.S. Patent No. 9,426,182 ( "the '182 patent"), and six months after the Patent Trial and Appeal Board ("PTAB") instituted review of **all claims** of the '182 patent, Defendant Workspot, Inc. ("Workspot") added a counterclaim asserting infringement by Citrix of the '182 patent.  But the PTAB already determined there is a reasonable likelihood that the challenged claims are invalid, (Ex. 1, Institution Decision at 12-19), and the PTAB will issue its final decision—potentially disposing of Workspot's counterclaim in its entirety—on or before October 30, 2019.  In effect, Workspot—without any explanation for its delay—now seeks to inject a new patent into a case filed more than a year ago in April 2018.  Surely Workspot will seek significant, unique discovery, all regarding a patent which may be invalidated by the PTAB well before the trial date of July 13, 2020 in this case.

All relevant factors favor staying Workspot's counterclaim for approximately five months.  *First*, a stay until the PTAB's final written decision in October 2019 is likely to completely dispose of or greatly simplify Workspot's patent infringement counterclaim. Moreover, a stay benefits judicial economy because Workspot's counterclaim will require substantial discovery and claim construction that would otherwise not be required in this action. *Second*, the case is in an early stage of discovery; the Court issued the scheduling order on February 4, 2019; fact discovery is set to close November 15, 2019; and trial is more than a year away.  *Third*, a stay would not unduly prejudice or present a clear tactical disadvantage to Workspot.  Indeed, Workspot cannot credibly claim prejudice when (1) it chose not to assert its counterclaim 11 months ago when it originally answered Citrix's complaint (D.I. 29), (2)

████████████████████ and (3) the stay sought by Citrix will not affect Workspot's ability to litigate the '182 patent should any of the claims survive the already-instituted IPR proceeding.

## II.    STATEMENT OF FACTS AND NATURE AND STAGE OF PROCEEDINGS

### A.    Workspot Chooses Not to Assert the '182 Patent in Its Original Answer.

Citrix filed its Complaint on April 19, 2018, alleging Workspot infringes U.S. Patent Nos. 7,949,677, 8,341,732, 7,594,018, and 8,135,843, and alleging Workspot falsely and misleadingly advertises its products.  D.I. 1.  On the same day, Citrix filed its petition seeking an IPR of the '182 patent, and challenging the validity of all asserted claims of the '182 patent.  Ex. 2, *Citrix Systems, Inc. v. Workspot, Inc.*, Case IPR2018-00917, Paper 2 (PTAB Apr. 19, 2018); *see* § II.B, *infra.*

On June 11, 2018, Workspot filed its Answer to Citrix's Complaint.  D.I. 29. Workspot alleged eleven defenses, D.I. 29 at 33-34, but Workspot declined to allege a patent infringement counterclaim, even though its '182 patent had issued in August 2016 and was the subject of Citrix's pending IPR petition.

### B.    Citrix's *Inter Partes* Review Is Instituted on All Claims.

Citrix's '182 patent IPR petition challenged all 18 claims of the '182 patent under post-AIA §102(a)(2) and §103(a) on several grounds, as reflected below:

| Claims Challenged | Basis | References |
|---|---|---|
| 1–5, 7, 8, and 10–18 | § 103(a) | Qureshi |
| 6 | § 103(a) | Qureshi and Joshi |
| 9 | § 103(a) | Qureshi and Shelest |
| 1–4, 7, 8, 10–16, and 18 | § 102(a)(2) | Narain |
| 5 and 17 | § 103(a) | Narain and Thomas |
| 6 | § 103(a) | Narain and Joshi |
| 9 | § 103(a) | Narain and Shelest |

2

Ex. 2.  Workspot filed a preliminary response on August 10, 2018.  *Citrix*, IPR 2018-00917, Paper 6 (PTAB Aug. 10, 2018).

On October 30, 2018, the PTAB instituted trial on Citrix's IPR petition on all claims of the '182 patent.  Ex. 1 at 24.  Specifically, the PTAB focused on the grounds related to Qureshi and found Citrix had demonstrated "a reasonable likelihood that it will prevail on its assertion that independent claims 1, 13, and 18 would have been obvious over Qureshi," and "a reasonable likelihood that it will prevail on its assertion that dependent claims 2–5, 7, 8, 10–12, and 14–17 would have been obvious over Qureshi; that dependent claim 6 would have been obvious over Qureshi in further view of Joshi; and that dependent claim 9 would have been obvious over Qureshi in further view of Shelest."  Ex. 1 at 12-19.  In other words, ***the PTAB concluded that Citrix had demonstrated a reasonable likelihood that it will prevail in proving that all claims of Workspot's '182 patent are invalid***.

Upon institution, the PTAB entered a schedule setting oral argument for July 24, 2019. Ex. 3, *Citrix*, IPR2018-00917, Paper 8 (PTAB Oct. 30, 2018).  By statute, the PTAB is required to issue its final decision no later than October 30, 2019.  35 U.S.C. § 316(a)(11).

### C.     Citrix's Preliminary Injunction Motion and Temporary Restraining Order.

On May 4, 2018, Citrix filed its Motion for Preliminary Injunction (the "PI motion"). D.I. 8.  The Court entered a discovery and briefing schedule, D.I. 31, which ultimately concluded with a hearing on December 12, 2018.  During the discovery period, Workspot took depositions of four Citrix personnel, and Citrix took depositions of Workspot's technical expert and three Workspot executives.  Notably, the '182 patent was not at issue in the PI motion, nor was any discovery taken on the '182 patent.

████████████████████████████████

████████████████████████████████



Immediately after the briefing on Citrix's preliminary injunction motion was complete, Citrix executives began receiving harassing and extortionate emails.  In response, Citrix filed its Motion for Temporary Restraining Order (the "TRO motion").  D.I. 101.  At a December 12, 2018 hearing, the Court awarded 50% of Citrix's fees and costs in investigating and bringing the TRO motion, Ex. 6, Hr'g Tr. at 111:18-112:11, and also requested the parties meet and confer regarding an appropriate schedule going forward on Citrix's patent infringement and false advertising claims.  *Id.* at 113:2-16.

The parties submitted a proposed schedule to the Court on December 21, 2018.  D.I. 140.  On January 24, 2019, the Court requested revisions to the proposed schedule, D.I. 152, and on February 4, 2019, the Court signed the revised scheduling order, D.I. 160.  Under the Court's schedule, fact discovery closes November 15, 2019, summary judgment motions are due March 2, 2020, and trial is set for July 13, 2020.  *Id.*

> **D.** **Workspot Asserts the '182 Patent in a Counterclaim for the First Time in its Amended Answer.**

Despite a heated litigation that has been ongoing since April of last year, Workspot filed its counterclaim of infringement of the '182 patent on May 7, 2019, D.I. 224, in response to

4

Citrix's amended complaint, filed on April 23, 2019.  D.I. 218.[1]  In its patent infringement

counterclaim, Workspot alleges infringement by the Citrix products Citrix Workspace and Citrix

Gateway Service (the "Accused Citrix Products").  D.I. 224, Counterclaims ¶¶ 19-21.

Before Workspot filed its counterclaim, Citrix requested that Workspot agree to stay its

claim given the advanced stage of the related IPR proceedings:

> As you know, the PTAB issued an order on October 30, 2018 instituting
> an IPR for the Workspot patent that Workspot now seeks to add to the
> litigation. The IPR is already far along, with final oral argument (if
> requested) scheduled to take place at the PTAB on July 24, 2019. Given
> the pendency of the IPR, please let us know if Workspot will stipulate to a
> stay of its counterclaim of infringement pending resolution of the IPR if
> Citrix agrees not to oppose Workspot's motion for leave to amend to add
> the counterclaim.

Ex. 7, Strapp Feb. 4, 2019 email.  Despite the fact that the PTAB had already instituted the IPR,

concluding Citrix had "demonstrate[ed] a reasonable likelihood" that it will prevail in

invalidating the'182 patent, Workspot opposed Citrix's request for a stay.  *Id.*, Moore Feb. 6,

2019 email.  Workspot reiterated its opposition to Citrix's request for a stay prior to the filing of

this motion. Ex. 8, Lopez May 13, 2019 email.

## III.    LEGAL STANDARD

In patent litigation, it is well established that courts have the authority to stay litigation,

in whole or in part, in cases where the PTAB has been asked to conduct an IPR of an asserted

patent.  *See, e.g.*, *Novartis AG et al., v. HEC Pharm. Co. LTD,* 183 F. Supp. 3d 560, 562 (D.

Del. 2016); *Princeton Dig. Image Corp. v. Konami Dig. Entm't Inc.*, No. 12-1461-LPS-CJB,

2014 WL 3819458, at *2 (D. Del. Jan. 15, 2014); *Peschke Map Techs., LLC v. J.J. Gumberg

Co.*, 40 F. Supp. 3d 393, 396 (D. Del. 2014).

---

[1] Without waiving its right to move to stay, Citrix agreed not to oppose Workspot's motion to
amend its answer to include a counterclaim.  Workspot filed a stipulation and proposed order
seeking leave to amend to add a counterclaim on February 6, 2019.  D.I. 172.

To determine whether granting a stay pending resolution of a related IPR is appropriate, courts examine the following three factors: (1) whether a stay will simplify the issues in question and trial of the case; (2) whether discovery is complete or whether a trial date has been set; and (3) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party. *Princeton Digital*, 2014 WL 3819458, at *2; *Bonutti Skeletal Innovations, L.L.C. v. Zimmer Holdings, Inc.*, No. 12-cv-1107-GMS, 2014 WL 1369721, at *2 (D. Del. April 7, 2014).

## IV.   ARGUMENT

The Court should stay Workspot's counterclaim pending final resolution of the '182 patent IPR in order to promote judicial efficiency, conserve the parties' and the Court's resources, and simplify the issues to be litigated in this case. Here, all three factors strongly weigh in favor of a stay because (a) a stay pending resolution of the IPR could entirely dispose of, or greatly simplify Workspot's patent counterclaim; (b) discovery has not yet begun on Workspot's patent counterclaim and the PTAB's final written decision is expected soon; and (c) a stay will not be unduly prejudicial to Workspot or give Citrix any clear tactical advantage.

### A.     A Brief Stay Is Likely to Dispose of or Simplify Workspot's Patent Counterclaim.

Citrix only seeks a stay of approximately five months until the PTAB issues its final written decision, at which time Workspot's patent infringement counterclaim should be either completely resolved or substantially simplified. *See, e.g., 454 Life Sci. Corp. v. Ion Torrent Sys, Inc.*, No. 15-595-LPS, 2016 WL 6594083, at *5 (D. Del. Nov. 7, 2016) (acknowledging litigation would be simplified if PTAB invalidated some or all of the challenged claims). If all claims of the '182 patent are declared invalid, Workspot's counterclaim will be dismissed in its entirety. *See, e.g., Message Notification Techs. LLC v. Microsoft Corp.*, No. 13-1881-GMS, 2015 U.S.

6

Dist. LEXIS 30626, at *3 n.4 (D. Del. Feb. 23, 2015) ("Moreover, should the PTAB invalidate any or all of the asserted claims, the issues for trial will undoubtedly be simplified.").

Should any claims of the '182 patent survive the final written decision, a stay will still simplify or eliminate issues, defenses, and the need for discovery regarding the validity of the '182 patent.  For instance, upon a final written decision, Citrix may be bound by IPR statutory estoppel.  35 U.S.C. § 315(e); *see also Novartis,* 2016 WL 1761956, at *6 (staying non-infringement and invalidity counterclaims).

Finally, a stay will reduce the costs for the parties and the burden for the Court because it will ensure that the parties and the Court do not waste resources litigating issues that are mooted by the IPR.  As this District has observed, IPR proceedings can simplify related litigation in a number of ways:

> (1) all prior art presented to the court at trial will have been first considered by the PTO with its particular expertise, (2) many discovery problems relating to the prior art can be alleviated, (3) if [the] patent is declared invalid, the suit will likely be dismissed, (4) the outcome of the reexamination may encourage a settlement without further involvement of the court, (5) the record of the reexamination would probably be entered at trial, reducing the complexity and the length of the litigation, (6) issues, defenses, and evidence will be more easily limited in pre-trial conferences and (7) the cost will likely be reduced both for the parties and the court.

*Neste Oil OYJ v. Dynamic Fuels, LLC*, C.A. No. 12-1744-GMS, 2013 WL 3353984, at *4 (D. Del. July 2, 2013) (quoting *Gioello Enters. Ltd. v. Mattel, Inc.*, No. 99-375-GMS, 2001 WL 125340, at *1 (D. Del. Jan. 29, 2001) and applying its standard to a request for stay pending IPR proceedings).

Counsel is not aware of this Court considering a stay of a patent infringement counterclaim pending an IPR final written decision.  However, "the Federal Circuit observes that, '[w]hile a motion to stay could be granted even before the PTAB rules on [whether to review a patent], no doubt the case for a stay is stronger after ... review has been instituted.'"

7

*CANVS Corp. v. United States*, 118 Fed. Cl. 587, 594 (2014) (quoting *Virtual Agility Inc. v. Salesforce.Com, Inc.* 759 F.3d 1307 (Fed. Cir. 2014)).  Indeed, in *Novartis*, this Court stayed non-infringement and invalidity declaratory judgment counterclaims pending the appeal of a PTAB decision invalidating the patent subject to the counterclaim.  *Novartis*, 183 F. Supp. 3d at 562-563.  *Novartis* found the Federal Circuit's decision on appeal had the potential to moot the counterclaims,  "thereby allowing the parties to avoid all the costs (including discovery) that would otherwise be incurred in litigation concerning whether [the patent] is valid and infringed.  Moreover, even if the Federal Circuit modifies the PTAB's decision, this Court will likely benefit from the Federal Circuit's guidance relating to that patent, guidance which will almost certainly include claim construction."  *Id.* at 562.

Similarly, here, the PTAB's final written decision in the '182 patent proceeding has the potential to moot Workspot's counterclaim.  Even if some claims remain intact, this Court will benefit from the PTAB's decision relating to the claim construction and validity of the '182 patent.  Importantly, discovery concerning the validity and infringement of the '182 patent does not overlap with other discovery already conducted or to be conducted in this case.  For instance, Workspot will likely expect core technical documents, source code, and other costly technical discovery in addition to financial discovery regarding the Accused Citrix Products.  Moreover, Citrix will be required to prepare invalidity contentions, take depositions of some or all of the seven named inventors of the '182 patent, and potentially seek discovery of third-party prior art.  "For this and other reasons, it would be complicated and potentially wasteful for the Court to litigate [the '182 patent] at the same time" as the PTAB enters the final stage of determining the validity of the '182 patent.  *Id.*

Courts have stayed patent infringement claims while allowing other patent claims to proceed in closely analogous situations.  *See, e.g., Card Tech. Corp. v. Datacard Corp.*, No. 05-

2546 (MJD / SRN), 2007 WL 551615, at *1 (D. Minn. Feb. 21, 2007); *Delphix Corp. v. Actifio, Inc.*, 2014 WL 6068407, *2-*3 (N.D. Cal. 2014) (granting a partial stay pending the PTO's decision on whether to grant IPR petitions for five of the plaintiff's asserted patents, but not staying plaintiff's other claims or defendant's counterclaim of infringement of its own patents); *Orthophoenix, LLC v. Dfine, Inc.*, No. 13-1003-LPS, 2015 WL 1938702, at *1 (D. Del. Apr. 28, 2015) (granting unopposed motion staying four patent claims pending IPR while other patent claims proceeded).   In *Card Tech.*, for example, the court granted the plaintiff's motion to stay the defendant's patent counterclaims pending the resolution of a PTO patent reexamination, even while allowing the plaintiff's claims of patent infringement to proceed.   *Card Tech.*, 2007 WL 551615, at *1.   The Court found it prudent to allow the PTO to make its ruling because the reexamination ruling could potentially simplify the case.   *Id.* at *3.   The rationale behind the ruling in *Card Tech.* applies here, especially since the PTAB has already stated it is reasonably likely that the '182 patent claims are invalid.

### B.   Discovery Has Not Yet Begun on Workspot's Patent Counterclaim.

The second factor also strongly favors a stay because no fact discovery has been taken on the '182 patent.   *Princeton Digital*, 2014 WL 3819458, at *3 ("Motions to stay like these are most often granted when the case is in the early stages of litigation."); *see also, e.g.*, *Bonutti*, 2014 WL 1369721, at *6 (weighing the "stage of litigation" factor in favor of granting a stay because the litigation was "still in its early stages").   Importantly, the '182 patent IPR is near completion, and will conclude before the close of fact discovery.   *General Electric Co. v. Vibrant Media, Inc.*, No. 12-00526-LPS, 2013 WL 6328063, at *1 (D. Del. Dec. 4, 2013) ("While the parties and the Court have invested resources in the litigation, and the litigation has advanced significantly since May, this action is far further away from conclusion than is the IPR.").   The issues Workspot seeks to inject at this stage, and the discovery Workspot will demand, are

unique and likely to waste resources of the parties and the Court prior to the PTAB's final written decision.

Oral argument on the IPR is set for July 24, 2019 and a final written decision is due by October 30, 2019, though it may issue sooner.  These dates are in advance of key deadlines in this litigation, such as the close of fact discovery (November 15, 2019), the deadline for summary judgment motions (March 2, 2020), and the trial date (July 13, 2020).  *See 454 Life Sci.*, 2016 WL 6594083, at *4 (granting a stay, and observing that the IPR proceedings were "mature" and "set for oral argument" compared to the litigation which remained in its "very early stages").  Indeed, the IPR of the '182 patent will be resolved nearly *nine* months prior to the July 2020 trial date.

### C.    A Stay Will Not Unduly Prejudice Workspot or Give Citrix Any Clear Tactical Advantage.

In this District, courts have examined the following four sub-factors to determine whether the "prejudice" factor weighs for or against granting a stay: (1) the timing of the IPR petition; (2) the timing of the request for stay; (3) the status of the IPR proceedings; and (4) the relationship of the parties.  *Bonutti*, 2014 WL 1369721, at *2.  The short duration of Citrix's requested stay and Workspot's deliberate choice not to file the '182 patent counterclaim until more than a year after Citrix filed its Complaint indicate that a stay will neither unduly prejudice Workspot nor give Citrix any clear tactical advantage.

Citrix was diligent in seeking an IPR of the '182 patent, filing its IPR petition at the same time the original Complaint was filed and more than a year *before* Workspot filed its counterclaim.  Workspot certainly cannot argue that the timing of Citrix's filing of the IPR petition is "a dilatory tactic," especially where this Court has found that IPRs filed months *after* complaints were filed were not dilatory.  *Id.* at *3 (finding that IPRs filed eight months and one year after complaints were served were not dilatory); *454 Life Sci.*, 2016 WL 6594083, at *4

10

(finding that an IPR filed less than six months into litigation did not prejudice the non-movant or give the movant an unfair tactical advantage).

Similarly, the timing of Citrix's request for a stay does not prejudice Workspot nor confer any unfair advantage upon Citrix.  Indeed, Citrix is seeking a stay ***at the earliest possible opportunity***—*i.e.*, just a few days after Workspot's infringement counterclaim was added to the case—and before the parties have begun conducting any discovery related to the '182 patent.  Indeed, Citrix began the meet and confer related to its stay motion weeks before Workspot even filed its counterclaim.  Ex. 7.

The mature status of the IPR does not prejudice Workspot in any way.  Quite the contrary, a stay pending the forthcoming final written decision from the PTAB will mitigate wasteful discovery, unnecessary motion practice, and inconsistent decisions between the PTAB and this Court.  Like the IPR appeal in *Novartis*, the '182 patent IPR "will be resolved before this case goes to trial (on the patent[s] asserted by Plaintiffs)."  2016 WL 1761956, at *5.  And, as in *Novartis*, if any claims of the '182 patent survive the IPR, the Court and the parties can revisit whether "[t]here may be sufficient time after the stay is lifted to complete discovery and other proceedings related to the [asserted] patent and still include the [asserted] patent at the [] trial" in July 2020.  *Id.*

Courts in this district often weigh whether the parties are competitors in the prejudice prong of the stay analysis.  *See, e.g., 454 Life Sci*, 2016 WL 6594083, at *5.  Workspot cannot credibly argue that the parties' business relationship is indicative that it will suffer harm if the Court grants a stay █████████████████████████████████████████

████████  D.I. 62 at, *e.g.*, 22-23. ████████████████████████████████

████████████████████████████Ex. 4; Ex. 5.

While Citrix disagrees with Workspot's allegations regarding the parties' competitive relationship, Workspot made its arguments in successfully opposing Citrix's PI motion. Thus, Workspot should be judicially estopped from making the opposite argument here. *In re Dex Media, Inc.*, 595 B.R. 19, 36-37 (D. Del. 2018) ("The basic principle of judicial estoppel, ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." (internal citations omitted)).

In sum, and on balance, all relevant sub-factors this Court is to consider regarding potential prejudice to Workspot strongly weigh in favor of a stay.

## V.     CONCLUSION

For the foregoing reasons, the Court should stay Workspot's patent infringement counterclaim pending final resolution of the '182 patent IPR.

Dated:  May 13, 2019

**DLA PIPER LLP (US)**

**OF COUNSEL**:

Michael G. Strapp (admitted *Pro Hac Vice* )
Larissa Bifano (admitted *Pro Hac Vice* )
Kristoffer W. Lange (admitted *Pro Hac Vice* )
**DLA PIPER LLP (US)**
33 Arch Street, 26th Floor
Boston, MA 02110-1447
Telephone:  (617) 406-6031
michael.strapp@dlapiper.com
larissa.bifano@dlapiper.com
kris.lange@dlapiper.com

/s/ Denise S. Kraft
Denise S. Kraft (DE Bar No. 2778)
Brian A. Biggs (DE Bar No. 5591)
Erin E. Larson (DE Bar No. 6616)
**DLA PIPER LLP (US)**
1201 North Market Street, Suite 2100
Wilmington, DE  19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com
erin.larson@dlapiper.com

*Attorneys for Plaintiff*
*Citrix Systems, Inc.*

# EXHIBIT 1

Trials@uspto.gov                                          Paper 7
571-272-7822                                  Entered: October 30, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

CITRIX SYSTEMS, INC.
Petitioner

v.

WORKSPOT, INC.
Patent Owner

_____

Case IPR2018-00917
Patent 9,426,182 B1

_____

Before WILLIAM M. FINK, *Vice Chief Administrative Patent Judge*,
THU A. DANG, and CHRISTA P. ZADO, *Administrative Patent Judges.*

DANG, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2018-00917
Patent 9,426,182 B1

Citrix Systems, Inc. ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–319 requesting an *inter partes* review of claims 1–18 of U.S. Patent No. 9,426,182 B1, issued on August 23, 2016 (Ex. 1001, "the '182 patent"). Paper 2 ("Pet."). Workspot, Inc. ("Patent Owner") filed a Preliminary Response. Paper 6 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we grant Petitioner's request and institute an *inter partes* review of all challenged claims.

## I.   BACKGROUND

### A.   *The '182 Patent (Ex. 1001)*

The '182 patent relates to context-based authentication of mobile devices. Ex. 1001, at [54]. An access control system receives context of a request, selects an access control policy based on the context of the request, and sends access control information from the access control policy selected to the client, wherein the client then interacts with the user to perform authentication using the access control information. *Id.* at [57].

Figure 1A of the '182 patent is reproduced below:



FIG. 1A

2

IPR2018-00917
Patent 9,426,182 B1

Figure 1A illustrates an environment comprising one or more enterprises 100, one or more software-as-a-service (SaaS) hosting systems 110, one or more access control systems 120, and a plurality of client devices 130. Ex. 1001, 2:34–44. Client devices 130 allow users to use applications 115 of enterprise 100 as well as SaaS applications 115. *Id.* Enterprise 100 allows users of client devices 130 to access applications 115 associated with enterprise 100. *Id.* at 2:45–46.

Applications 115 associated with enterprise 100 are hosted within data center 105 managed by enterprise 100. *Id.* at 2:61–63. Data center 105 includes a firewall to control access to applications 115 hosted by data center 105, wherein users associated with enterprise 100 use login credentials to access applications 115 in data center 105. *Id.* at 3:4–16.

Client device 130 executes client application 135 for communicating with enterprise 100 and SaaS hosting system 110 to access applications 115, wherein client application 135 authenticates access to a requested application by sending login credentials to data center 105 or SaaS hosting system 110. *Id.* at 3:32–52. Access control system 120 manages communications between client applications 135, enterprise 110, and SaaS hosting system 110. *Id.* at 3:53–61. Access control system 120 is external to enterprise 100 and SaaS hosting system 110. *Id.*

When a user requests access to application 115, client application 135 sends the request to access control system 120, and access control system 120 determines an address of the requested application and a type of access control for client application 135 based on a context of the request. *Id.* at 4:10–27. Factors included in the context include the enterprise or company for which the device is being used. *Id.* Using security policies associated

3

IPR2018-00917
Patent 9,426,182 B1

with enterprise 100 with which the user is associated, access control system

120 determines the type of access control required for the user to access the

requested application.  *Id.*  The level of security applied to applications 115

vary depending on the context in which client application 135 is operated.

*Id.* at 4:28–30.  The administrator of enterprise 100 interacts with an admin

tool to define access control policies for enterprise 100.  *Id.* at 7:50–58.

B.    *Illustrative Claim*

Of the challenged claims, claims 1, 13, and 18 are independent.

Claim 1 is illustrative of the claims at issue and is reproduced below:

1.    A method comprising:

storing, by an access control system, action control
policies for a plurality of enterprises, wherein the access control
system is external to each of the plurality of enterprises;

storing, by the access control system, action control
policies for the plurality of enterprises as a mapping from
contexts of requests to the action control policies, each context
specifying one or more attributes describing a request received
from a client device, wherein the request is for an action
performed by an application hosted by a software as a services
(SaaS) hosting system, each action control policy identifying
actions that the client device is allowed in a given context;

receiving, by the access control system, from a first client
device, a first request for interacting with the application hosted
by the SaaS hosting system, the first request providing
information describing a first context;

identifying a first enterprise from the plurality of
enterprises, the first enterprise associated with the first client
device;

determining, by the access control system, a first action
control policy associated with the first enterprise for the first
context based on the mapping, the first action control policy
allowing a first set of actions supported by the application;

4

sending information describing the first action control policy to the first client device for enforcement of the first action control policy by an agent executing on the first client device;

receiving from a second client device, a second request for interacting with the application hosted by the SaaS hosting system, the second request providing information describing a second context;

identifying a second enterprise from the plurality of enterprises, the second enterprise associated with the second client device;

determining a second action control policy associated with the second enterprise for the second context based on the mapping, the second action control policy allowing a second set of actions supported by the application; and

sending information describing the second action control policy to the second client device for enforcement of the second action control policy by the agent executing on the second client device.

Ex. 1001, 13:60–14:37.

C.    *Evidence of Record*

Petitioner relies on the following references and declaration (*see* Pet. 1–2):

| Reference or Declaration | Exhibit No. |
|---|---|
| U.S. Patent No. 8,869,235 B2 (October 21, 2014) ("Qureshi") | 1003 |
| U.S. Patent No. 8,578,443 B2 (November 5, 2013) ("Narain") | 1004 |
| U.S. Patent No. 8,713,633 B2 (April 29, 2014) ("Thomas") | 1005 |
| U.S. Patent Publication No. 2012/0210068 A1 (August 16, 2012) ("Joshi") | 1006 |
| U.S. Patent Publication No. 2006/0282876 (December 14, 2006) ("Shelest") | 1007 |
| Declaration of Dr. Jon Weissman ("Weissman Decl.") | 1002 |

IPR2018-00917
Patent 9,426,182 B1

> ### D.    *Asserted Grounds of Unpatentability*

Petitioner asserts that the challenged claims are unpatentable on the

following grounds (*see* Pet. 1–2):

| Claims Challenged | Basis | References |
|---|---|---|
| 1–5, 7, 8, and 10–18 | § 103(a) | Qureshi |
| 6 | § 103(a) | Qureshi and Joshi |
| 9 | § 103(a) | Qureshi and Shelest |
| 1–4, 7, 8, 10–16, and 18 | § 102(a)(2) | Narain |
| 5 and 17 | § 103(a) | Narain and Thomas |
| 6 | § 103(a) | Narain and Joshi |
| 9 | § 103(a) | Narain and Shelest |

## II.    ANALYSIS

> ### A.    *Claim Construction*

Petitioner proposes construction of the following claim language:

"action control policies," and "attributes describing a request received from

a client device."  Pet. 6–8.  Petitioner contends its proposed constructions are

consistent with the broadest reasonable interpretation standard.  *Id.*  Patent

Owner chooses not to address Petitioner's proposed claim constructions at

this stage of the proceeding but rather proposes construction of the claim

language "identifying a first [/second] enterprise."  Prelim. Resp. 10–14.

Only terms that are in controversy need to be construed, and only to

the extent necessary to resolve the controversy.  *See Nidec Motor Corp. v.

Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017)

(citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed.

Cir. 1999)).  At this time, we determine that it is unnecessary to construe any

claim term expressly to resolve the disputed issues before us.

IPR2018-00917
Patent 9,426,182 B1

B.    *Discretion Under 35 U.S.C. § 325(d)*

In determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." 35 U.S.C. § 325(d). The panel has considered the factors set forth in *Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, slip op. at 17–18 (PTAB Dec. 15, 2017) (Paper 8) (informative), and determined the factors do not weigh in favor of exercising discretion under § 325(d).

Patent Owner contends, during prosecution of the '182 patent, Applicant amended the independent claims to require, among other things, "identifying a first enterprise" and "identifying a second enterprise," and explained that the Abrams reference (Ex. 2001) "shows interaction of a single enterprise with the software provider," wherein, following Applicant's amendment and remarks, the Office issued a Notice of Allowance. Prelim. Resp. 5–6 (citing Ex. 1008). Although Patent Owner concedes that the Examiner relies on Borzycki for disclosing "identifying a first/second enterprise from the plurality of enterprises," Patent Owner points out the Examiner concluded that "if would not be obvious to one of ordinary skill in the art to reasonably combine the various teachings [of Borzycki and Abrams]." *Id.*

In response to the Petition, Patent Owner contends that, with respect to the claimed limitation of "identifying a first [/second] enterprise," Qureshi and Narain, relied upon by Petitioner here, "are cumulative to Abrams." *Id.* at 25. In particular, "[l]ike Qureshi and Narain, Abrams is directed to methods and systems for regulating access from a user device (e.g., mobile

7

IPR2018-00917
Patent 9,426,182 B1

phone) to an enterprise's resources," whereas "Qureshi at most discloses identifying a user and determining that he or she is associated with one particular enterprise" and "Narain at most discloses identifying a user." *Id.* at 24. Patent Owner contends that the differences between Abrams, considered during prosecution, and the claims overlaps completely with the differences between Qureshi/Narain and the claims. *Id.* at 25–26. Patent Owner concludes that "[t]he respective disclosures of Qureshi and Narain are 'substantially similar' to the disclosure of Abrams with respect to the claimed requirement of 'identifying a first [/second] enterprise.'" *Id.*

We are not persuaded that we should exercise our discretion to deny institution under the facts presented here. First, it is undisputed that neither Qureshi nor Narain was submitted to the Office during prosecution of the '812 patent, so they could not have been considered by the Examiner. Second, although Patent Owner contends that, with respect to the claimed limitation of "identifying a first [/second] enterprise," Qureshi and Narain, "are cumulative to Abrams" (Prelim. Resp. 25), we note that Patent Owner concedes that the Examiner relied on Borzycki, *not Abrams*, for disclosing "identifying a first/second enterprise from the plurality of enterprises." *Id.* at 5–6. Thus, Patent Owner's contention that "[t]he respective disclosures of Qureshi and Narain are 'substantially similar' to the disclosure of Abrams" (*id.* at 25–26) is not persuasive because the Examiner did not rely on Abrams for teaching and suggesting "identifying a first [/second] enterprise." Therefore, we are unpersuaded by Patent Owner's contention that the differences between Abrams and the claims overlaps completely with the differences between Qureshi or Narain and the claims. *Id.* Qureshi and Narain were not previously presented to the Office, and we are

8

IPR2018-00917
Patent 9,426,182 B1

unpersuaded that they are cumulative to Abrams. *See Unified Patents Inc. v. Berman*, Case IPR2016-01571, slip op. at 9 (PTAB Dec. 14, 2016) (Paper 10).

Accordingly, we decline to exercise our discretion to deny institution under 35 U.S.C. § 325(d).

C.   *Alleged Obviousness of the Claims over Qureshi*

Petitioner contends that claims 1–5, 7, 8, and 10–18 would have been obvious over Qureshi; that claim 6 would have been obvious over Qureshi and Joshi; and claim 9 would have been obvious over Qureshi and Shelest. Pet. 13–42. Petitioner relies on the declaration of Dr. Jon Weissman for support. *See* Ex. 1002 ¶¶ 120–196. Patent Owner disputes Petitioner's contentions. Prelim. Resp. 6–14. We provide a brief description of Qureshi before turning to the parties' contentions.

1.   *Qureshi (Ex. 1003)*

Qureshi relates to a system for enabling enterprise users to securely access enterprise resources using mobile devices. Ex. 1003, at [54]. The system implements policies for controlling mobile device accesses to enterprise resources based on device attributes, behavioral attributes, and other criteria. *Id.* at [57].

Figure 1B of Qureshi is reproduced below:

9



*FIG. 1B*

Figure 1B depicts a computer system 110 associated with an enterprise, and users 115 and mobile computing devices 120 associated therewith. Ex. 1003, 7:46–49. Mobile devices 120 are configured to communicate with enterprise system 110 over communication network 125. *Id.* at 7:53–55. Enterprise system 110 includes external firewall 122 and internal firewall 124, each firewall 122, 124 comprising one or more device designed to permit or deny network transmission based upon certain criteria. *Id.* at 7:64–67.

Enterprise system 110 includes secure mobile gateway 128. *Id.* at 8:25–28. Mobile device 120's enterprise access request is sent to secure mobile gateway 128, and gateway 128 sends the request to enterprise resource 130 via internal connection 154. *Id.* at 8:35–45. Mobile device management system 126 acts as a "tunneling mediator" within an application tunnel between mobile device 120 and enterprise resource 130. *Id.* at 8:49–54. Mobile device management system 126 and meta-application 150 are respectively located in cloud computing system 156. *Id.*

IPR2018-00917
Patent 9,426,182 B1

at 8:55–59.  Cloud-based device management system 126 is configured to provide gateway rules to secure mobile gateway 128 via connections 158. *Id.* at 9:7–12.

Device configuration information collected by an enterprise agent is reported to mobile device management system 126, which then uses the information to generate rules applied to secure mobile gateway 128 to control mobile device 120's accesses to enterprise resources 130.  *Id.* at 11:67–12:6.  Mobile device management system 126 includes enterprise access policies 218 stored in computer storage that defines conditions under which mobile device access to enterprise resources 130 will be granted or denied, wherein mobile device management system 126 uses access policies 218 to process mobile device access requests received by mobile device management system 126.  *Id.* at 16:8–27.

Secure mobile gateway 128 assists in protecting sensitive enterprise data accessed by mobile devices 120, monitors and logs traffic between enterprise resources 130 and mobile device 120, applies rules to implement enterprise policies applied to selected mobile device 120, and takes actions to implement enterprise policies as applied to selected mobile device 120 that is requesting access to enterprise resource 130.  *Id.* at 18:15–28.

Secure mobile gateway 128 can be implemented to handle requests associated with two or more different enterprise systems 110, including systems 110 of distinct companies or enterprises.  When handling requests associated with a plurality of different enterprise computing systems 110, secure mobile gateway 128 implements different rules for each of different enterprise computer systems 110.  *Id.* at 19:33–42.

IPR2018-00917
Patent 9,426,182 B1

>    2.    *Independent Claims 1, 13, and 18*
>          a.    *Preamble (Claim 1)*

Petitioner contends Qureshi teaches "methods for accessing enterprise resources using mobile devices."  Pet. 14–15 (citing Ex. 1003, 2:15–17; Weissman Decl. ¶ 53).

At this stage of the proceeding, Patent Owner does not dispute Petitioner's analysis of the preamble of claims 1, 13, and 18.  We have considered Petitioner's contentions and supporting evidence, and, for purposes of this Decision, we find that Petitioner has met its burden for this claim element.

>          b.    *"storing, by an access control system, action control policies for a plurality of enterprises"  (Claims 1, 13, and 18)*

According to Petitioner, Qureshi teaches "a mobile device management system 126 ('access control system') storing mobile device rules 214 ('action control policies')."  Pet. 15 (citing Ex. 1003, 52:52–55; Weissman Decl. ¶ 54).  In particular, Petitioner contends Qureshi teaches "that mobile device rules are a set of actions that can be performed by a mobile device (client device of a user) in a particular context."  *Id.* (citing Weissman Decl. ¶ 55).  Although Petitioner concedes that "Qureshi does not explicitly teach that the mobile device management system ('access control system') stores rules for a plurality of enterprises," Petitioner contends Qureshi discloses that "the secure mobile gateway 128 'can be implemented to handle requests associated ***with two or more different enterprise systems*** 110.'"  *Id.* at 17 (citing Ex. 1003, 19:35–48; Weissman Decl. ¶ 59).  Similar to Qureshi's secure mobile gateway 128, Petitioner the contends that it would have been obvious for Qureshi's mobile device management to store

12

IPR2018-00917
Patent 9,426,182 B1

rules for a plurality of enterprises.  *Id.* at 17–19 (citing Weissman Decl.
¶¶ 61–64).

At this stage of the proceeding, Patent Owner does not dispute
Petitioner's analysis of this claim element.  We have considered Petitioner's
contentions and supporting evidence, and, for purposes of this Decision, we
find that Petitioner has met its burden for this claim element.

> c.      *"wherein the access control system is external to
> each of the plurality of enterprises" (Claims 1, 13, and
> 18)*

Petitioner contends Qureshi teaches that the mobile device
management system can be located in cloud 156 "external to the enterprise
110."  Pet. 19 (citing Ex. 1003, 1:49–51, Fig. 1B; Weissman Decl. ¶ 65).

At this stage of the proceeding, Patent Owner does not dispute
Petitioner's analysis of this claim element.  We have considered Petitioner's
contentions and supporting evidence, and, for purposes of this Decision, we
find that Petitioner has met its burden for this claim element.

> d.      *"storing, by the access control system, action
> control policies for the plurality of enterprises as a
> mapping from contexts of requests to the action control
> policies, each context specifying one or more attributes
> describing a request received from a client device"
> (Claims 1, and 18; similarly recited in claim 13)*

Petitioner contends Qureshi teaches storing mobile device rules "as a
mapping from device information ('each context specifying one or more
attributes describing a request') to the mobile device rules ('action control
policies')."  Pet. 20 (citing Weissman Decl. ¶ 66).  In particular, Petitioner
contends Qureshi discloses "associating ('mapping') groups of mobile
device rules with particular types of mobile devices."  According to
Petitioner, in Qureshi, "[e]ach ***rule package can be designed or customized***

13

IPR2018-00917
Patent 9,426,182 B1

*for users 115 with specific types of user roles 206 and/or mobile device*
*properties* 208," wherein mobile device access is restricted to only
authorized enterprise resources 130 "in a way that is *customizable based on*
*user properties, mobile device properties, and/or the enterprise resources*
*130 for which mobile device access is requested*." *Id.* at 20–21 (citing
Ex. 1003, 17:49–53, 53:64–54:22; Weissman Decl. ¶ 67).

At this stage of the proceeding, Patent Owner does not dispute
Petitioner's analysis of these claim elements.  We have considered
Petitioner's contentions and supporting evidence, and, for purposes of this
Decision, we find that Petitioner has met its burden for these claim elements.

> e.      *"wherein the request is for an action performed by*
> *an application hosted by a software as a services (SaaS)*
> *hosting system" (Claims 1, 13, and 18)*

Petitioner contends Qureshi teaches applications hosted by an SaaS
hosting system, because any of systems 126, gateways 128 and resources
130 are "*deployed solely within the cloud* 156," wherein "a 'cloud' is an
SaaS hosting service in that it refers to services that are centrally hosted, can
be used to deliver[] various types of applications, and offer subscription-
based pricing models."   Pet. 22 (citing Ex. 1003, 67:33–34; Weissman Decl.
¶ 69).

At this stage of the proceeding, Patent Owner does not dispute
Petitioner's analysis of this claim element.  We have considered Petitioner's
contentions and supporting evidence, and, for purposes of this Decision, we
find that Petitioner has met its burden for this claim element.

> f.      *"each action control policy identifying actions that*
> *the client device is allowed in a given context"  (Claims*
> *1, 13, and 18)*

Petitioner contends Qureshi discloses that "a mobile device rule can

14

IPR2018-00917
Patent 9,426,182 B1

identify particular applications and features ('actions') that are allowed

based on the location of the device ('context')."  Pet. 23 (citing Ex. 1003,

60:12–36).  For example, "mobile device rules 214 can effectively lead to

***activation or deactivation of mobile device features based on a location of***

***the mobile device***."  *Id.* at 24 (citing Ex. 1003, 60:41–45; Weissman Decl.

¶ 72).

At this stage of the proceeding, Patent Owner does not dispute

Petitioner's analysis of this claim element.  We have considered Petitioner's

contentions and supporting evidence, and, for purposes of this Decision, we

find that Petitioner has met its burden for this claim element.

> g.      *"receiving, by the access control system, from a*
> *first client device, a first request for interacting with the*
> *application hosted by the SaaS hosting system, the first*
> *request providing information describing a first context"*
> *(Claims 1, and 18; similarly recited in claim 13)*

Petitioner contends Qureshi discloses that "mobile devices 120 can be

configured to send device-related data to the mobile device management

system 126 periodically, and/or whenever the mobile devices 120 connect to

the mobile device management system 126 (e.g., upon the formation of an

application tunnel.)."  Pet. 24 (citing Ex. 1003, 15:63–16:1 (emphasis

omitted); Weissman Decl. ¶ 73).  Thus, according to Petitioner, "Qureshi

teaches that the mobile device management system receives from a mobile

device a request for interacting with an application."  *Id.*  Petitioner also

contends Qureshi also teaches "the first request providing information

describing a first context" since "Qureshi discloses using information in the

request header or body to determine information about the user and/or

device associated with the device (i.e., context)."  *Id.* at 24–25 (citing

Ex. 1003, 44:30–34, Fig. 2; Weissman Decl. ¶ 75).

15

IPR2018-00917
Patent 9,426,182 B1

At this stage of the proceeding, Patent Owner does not dispute Petitioner's analysis of these claim elements.  We have considered Petitioner's contentions and supporting evidence, and, for purposes of this Decision, we find that Petitioner has met its burden for these claim elements.

> h.      *"identifying a first[/second] enterprise from the plurality of enterprises, the first[/second] enterprise associated with the first client device" (Claims 1, and 18; similarly recited in claim 13)*

Petitioner contends Qureshi teaches a plurality of enterprises wherein "secure mobile gateway 128 can be implemented to handle requests associated with ***two or more different enterprise systems*** 110."  Pet. 25 (citing Ex. 1003, 19:36–38).  Further, Petitioner contends Qureshi teaches "identifying if a mobile device user is associated with a particular ('first') enterprise" because in Qureshi, "analytics service 414 can employ a user determination algorithm for determining user information associated with the request 2302" and "whether the request 2302 was sent by a user 115 (as opposed to someone who is not associated or enrolled with the enterprise)." *Id.* (citing Ex. 1003, 80:30–36 (emphasis omitted); Weissman Decl. ¶ 77). According to Petitioner, "Qureshi discloses that mobile device rules can be customized for a particular enterprise," because an enterprise is enabled "to restrict mobile device access only to authorized enterprise resources 130, in a way that is customizable based on user properties, mobile device properties, and/or the enterprise resources 130 for which mobile device access is requested."  *Id.* at 25–26 (citing Ex. 1003, 17:49–53 (emphasis omitted); Weissman Decl. ¶ 78).

Patent Owner argues that the claim language "requires identification of two ***different*** enterprises," wherein none of Petitioner's allegations "relate

16

IPR2018-00917
Patent 9,426,182 B1

to 'identifying a second enterprise.'" Prelim. Resp. 11, 16.  Patent Owner

contends "the cited passage from Qureshi at most describes determining that

a request was received from someone associated or enrolled with one

particular enterprise." *Id.* at 17.  Although Patent Owner concedes that

Petitioner alleges that "Qureshi 'teaches a plurality of enterprises," Patent

Owner contends "it says nothing about whether an ***identification*** is made

from among a plurality of enterprises." *Id.*

Patent Owner then contends "the Petition does not set forth an

obviousness rationale with respect to the 'identifying a

first[/second]enterprise' limitations." *Id.* at 19.  That is, "the Petition does

not set forth a motivation to modify Qureshi to meet the 'identifying a

first[/second] enterprise' limitations." *Id.* (citing *Nevro Corp. v. Boston*

*Scientific Neuromodulation Corp.*, IPR2018-00143, slip op. at 19–20 (May

2, 2018) (Paper 7).

At this stage of the proceeding, we are unpersuaded by Patent

Owner's contentions.

As Patent Owner concedes, Qureshi "describes determining that a

request was received from someone associated or enrolled with one

particular enterprise."  Prelim. Resp. 17; Pet. 25 ("Qureshi further teaches

identifying if a mobile device user is associated with a particular ('first')

enterprise.").  As Petitioner points out, Qureshi also discloses that "user

information can include a determination of whether the request 2302 was

sent by a user 115 (as opposed to someone who is not associated or enrolled

with the enterprise)." *Id.* (citing Ex. 1003, 80:30–36 (emphasis omitted);

Weissman Decl. ¶ 77).

Further, although Patent Owner points out that the claim language

IPR2018-00917
Patent 9,426,182 B1

"requires identification of two ***different*** enterprises," Patent Owner concedes, "Qureshi 'teaches a plurality of enterprises.'"  Prelim. Resp. 11, 16, 17.  This is supported by Petitioner's cite to Qureshi's teaching that "secure mobile gateway 128 can be implemented to handle requests associated with ***two or more different enterprise systems*** 110."  Pet. 25 (citing Ex. 1003, 19:36–38).  Given these teachings, Petitioner's rationale that it would have been obvious for "Qureshi's mobile device management to store rules for a plurality of enterprises as taught by Qureshi's secure mobile gateway" (and thus, Qureshi teaches and suggests two different enterprise systems), *see* Pet. 17–19, is sufficiently supported for purposes of this decision.  *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007).

On this record, for purposes of this Decision, Petitioner has provided sufficient support that Qureshi teaches or suggests "identifying a first[/second] enterprise from the plurality of enterprises, the first[/second] enterprise associated with the first client device."

### *i.    Remaining Limitations*

Petitioner provides explanations and supporting evidence regarding the remaining limitations in independent claims 1, 13, and 18.  *See generally* Pet. 26–30.  At this stage in the proceeding, Patent Owner does not address separately Petitioner's showing as to these remaining limitations.  *See generally* Prelim. Resp. 16–19 (citing Welch Decl. ¶¶ 79–90).  We have reviewed Petitioner's explanations and supporting evidence regarding these remaining limitations, and we find them sufficiently persuasive for purposes of institution.

Based on the record before us, Petitioner has demonstrated a reasonable likelihood that it will prevail on its assertion that independent

IPR2018-00917
Patent 9,426,182 B1

claims 1, 13, and 18 would have been obvious over Qureshi.

Dependent Claims 2–12 and 14–17

Petitioner provides explanations and supporting evidence regarding the limitations of dependent claims 1–5, 7, 8, and 10–18. *See generally* Pet. 30–34. As to claim 6, Petitioner provides explanation and evidence that Qureshi and Joshi teach "wherein the first[/second] action control policy specifies a first[/second] cache size for storing data associated with the application." *Id.* at 34–38. Petitioner also provides a rationale for combining the teachings of Qureshi and Joshi. *Id.* Petitioner also provides explanation and evidence that Qureshi and Shelest teach the limitations of claim 9 and provides a rationale for combining the relevant teachings. *Id.* at 38–42.

At this stage in the proceeding, Patent Owner does not address separately Petitioner's showing as to these claims. *See generally* Prelim. Resp. 16–19. We have reviewed Petitioner's explanations and supporting evidence regarding the limitations of claims 2–12 and 14–17, and we find them sufficiently persuasive for purposes of institution. Based on the record before us, Petitioner has demonstrated a reasonable likelihood that it will prevail on its assertion that dependent claims 2–5, 7, 8, 10–12, and 14–17 would have been obvious over Qureshi; that dependent claim 6 would have been obvious over Qureshi in further view of Joshi; and that dependent claim 9 would have been obvious over Qureshi in further view of Shelest.

D. *Alleged Anticipation by and Obviousness of the Claims over Narain*

Petitioner contends that claims 1–4, 7, 8, 10–16, and 18 are anticipated by Narain; that claims 5 and 17 would have been obvious over

IPR2018-00917
Patent 9,426,182 B1

Narain and Thomas; that claim 6 would have been obvious over Narain and

Joshi; and that claim 9 would have been obvious over Narain and Shelest.

Pet. 42–64.  Petitioner relies on the declaration of Dr. Weissman for support.

*See* Weissman Decl. ¶¶ 132–194.  Patent Owner disputes Petitioner's

contentions.  Prelim. Resp. 20–22.  We provide a brief description of Narain

before turning to the parties' contentions.

> 1.    *Narain (Ex. 1004)*

Narain relates to a method of mobile device management that includes

routing communications between the mobile device and a network cloud

through an enforcement engine and generating a policy regarding the mobile

applications such that compliance of the mobile device with the policy is

enforced in real time.  Ex. 1004, Abstract.

Figure 1B of Narain is reproduced below:



Figure 1B depicts an operating environment 100 including mobile

device 104, public network and/or cloud 108, and enterprise network 110.

*Id.* at 5:36–44.  Mobile application management policy enforcement engine

IPR2018-00917
Patent 9,426,182 B1

150 is included in a mobile application management system in operating environment 100, wherein enforcement engine 150 manages mobile applications on mobile device 104. *Id.* at 5:44–50. Although Figure 1B depicts one mobile device 104, there may be multiple mobile devices 104 in operating environment 100. *Id.* a 5:58–60. Enforcement engine 150 is customized to operating environment 100 through the generation of a policy that may include specific controls and/or security features/protocols specific to operating environment 100. *Id.* at 7:48–59. The policy may include provisions for a first user to use a first private mobile application and a second user to use a second private mobile application, wherein the first user and/or the second user may include individuals, an enterprise group, or the enterprise itself. *Id.* at 19:11–18.

       2. *Claims 1–4, 7, 8, 10–16, and 18*

As discussed above with respect to the Qureshi reference, claim 1 recites, in relevant part, "storing, by an access control system, action control policies for a plurality of enterprises," "wherein the access control system is external to each of the plurality of enterprises," and "identifying a first[/second] enterprise from the plurality of enterprises, the first[/second] enterprise associated with the first[/second] client device." Claims 13 and 18 recite similar limitations.

According to Petitioner, "Narain teaches an access control system storing policies for a plurality of enterprises" because Narain discloses "an enforcement engine 150 ('access control system') that includes 'a client-side enforcement engine (client-side engine) 154, a runtime enforcement engine (runtime engine) 142, and a management platform 156 that in some combination ***enforce compliance with the policy***.'" Further, according to

IPR2018-00917
Patent 9,426,182 B1

Petitioner, "the management platform 156 'may accommodate a multi-tenant system in which *each tenant represents an enterprise customer 160A*'" and "the pooling module 228, which is part of the management platform 156, 'may centrally *store information related to the policy*.'"  Pet. 43 (citing Ex. 1004, 8:30–33, 13:64–65, Fig. 2; Weissman Decl. ¶ 133).  Furthermore, Petitioner contends Narain teaches "wherein the access control system is external to each of the plurality of enterprises," because Narain shows "runtime engine 142 and management platform 165 external to enterprise network 110."  *Id.* at 44 (citing Ex. 1004, Fig. 1B; Weissman Decl. ¶ 135).

Petitioner then contends that "Narain teaches identifying an enterprise associated with a mobile device" because "Narain discloses that a policy may apply to a set of users" wherein "a 'user' may correspond to an enterprise and, thus, a policy may apply to a particular enterprise."  *Id.* at 47–48 (citing Ex. 1004, 19:1–7, 15–17).

In response, Patent Owner argues that Petition "does not separately address the requirements of 'identifying a first enterprise' and 'identifying a second enterprise.'"  Prelim. Resp. 20.  According to Patent Owner, "identifying a 'user' does not constitute 'identifying a first enterprise.'"  *Id.*

"[A] prior art reference—in order to anticipate under 35 U.S.C. § 102—must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'"  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008) (citation omitted).

Here, as Patent Owner points out, the Petition "does not separately address the requirements of 'identifying a first enterprise' and 'identifying a second enterprise.'"  Prelim. Resp. 20.  Instead, Petitioner maps the claimed

IPR2018-00917
Patent 9,426,182 B1

"enterprise" to Narain's "enterprise network 110" when contending that
Narain teaches "storing, by an access control system, action control policies
for a plurality of enterprises," "wherein the access control system is external
to each of the plurality of enterprises." Pet. 43–44 (citing Ex. 1004, Fig.
1B). However, Petitioner goes on to map "enterprise" to Narain's "users" in
contending that "Narain discloses that a policy may apply to a set of users"
wherein "a 'user' may correspond to an enterprise and, thus, a policy may
apply to a particular enterprise." *Id.* at 47–48 (citing Ex. 1004, 19:1–7, 15–
17). In other words, under Petitioner's analysis, the claimed "enterprise" is
mapped to Narain's "enterprise network 110" but also a "user" that "may
correspond to an enterprise. " *Id.* at 44, 47.

Because the claims require the identified enterprises to be external to
the access control system storing action control policies for the enterprises,
and Petitioner relies on Narain's identification of "users" for the
identification of "enterprises," but relies then on Narain's "enterprise
network 110" for the "enterprise" external to the "access control system," at
this stage of the proceeding, we are unpersuaded by Petitioner's contention
that Narain anticipates claims 1, 13, and 18.

> 3. *Claims 5, 6, 9, and 17*

Petitioner contends that claims 5 and 17 would have been obvious
over Narain and Thomas; that claim 6 would have been obvious over Narain
and Joshi; and that claim 9 would have been obvious over Narain and
Shelest. Pet. 54–64. In its obviousness analysis, Petitioner does not contend
that Thomas, Joshi and Shelest provide a teaching or suggestion of identified
enterprises external to the access control system storing action control
policies for the enterprises. *Id.* Therefore, Thomas, Joshi, and Shelest do

IPR2018-00917
Patent 9,426,182 B1

not overcome the deficiency identified above with respect to Narain.

### III.   SUMMARY

Because we determine that Petitioner has demonstrated a reasonable likelihood that it would prevail in showing at least one of the challenged claims is unpatentable, we institute *inter partes* review.  At this stage of the proceeding, we have not made a final determination as to the patentability of any of these challenged claims or the construction of any claim term.

### IV.   ORDER

It is

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '182 patent is hereby instituted on the following grounds:

    A.  Obviousness of claims 1–5, 7, 8, and 10–18 over Qureshi;

    B.  Obviousness of claim 6 over Qureshi and Joshi;

    C.  Obviousness of claim 9 over Qureshi and Shelest;

    D.  Anticipation of claims 1–4, 7, 8, 10–16, and 18 by Narain;

    E.  Obviousness of claims 5 and 17 over Narain and Thomas;

    F.  Obviousness of claim 6 over Narain and Joshi; and

    G.  Obviousness of claim 9 over Narain and Shelest; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this decision.

IPR2018-00917
Patent 9,426,182 B1

PETITIONER:

Larissa Park
Kristoffer Lange
DLA PIPER LLP
larissa.bifano@dlapiper.com
kris.lange@dlapiper.com


PATENT OWNER:

Brian Buroker
Omar Amin
GIBSON, DUNN & CRUTCHER LLP
bburoker@gibsondunn.com
oamin@gibsondunn.com

# EXHIBIT 2

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

CITRIX SYSTEMS, INC.

Petitioner

v.

WORKSPOT, INC.

Patent Owner

---

CASE IPR <u>Unassigned</u>

Patent No. 9,426,182

---

**PETITION FOR**
***INTER PARTES* REVIEW OF U.S. PATENT NO. 9,426,182**

i

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................1

II.     GROUNDS FOR STANDING UNDER 37 C.F.R. § 42.104(A) ....................................1

III.    IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED...........................1

IV.    OVERVIEW OF THE '182 PATENT ........................................................................2

V.     PRIOR ART ................................................................................................8

VI.    SPECIFIC GROUNDS FOR PETITION ..................................................................13

VII.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) ......................................64

VIII.  CONCLUSION ...........................................................................................65

**EXHIBIT LIST**

| Exhibit No. | Description |
|---|---|
| 1001 | US 9,426,182 ("the '182 patent") |
| 1002 | Declaration of Dr. Jon Weissman ("Weissman Decl.") |
| 1003 | US 8,869,235 ("Qureshi") |
| 1004 | US 8,578,443 ("Narain") |
| 1005 | US 8,713,633 ("Thomas") |
| 1006 | US 2012/0210068 ("Joshi") |
| 1007 | US 2006/0282876 ("Shelest") |
| 1008 | Prosecution history of U.S. Patent No. 9,426,182 |
| 1009 | US 9,282,097 ("Agarwal") |

## I.      INTRODUCTION

Pursuant to 35 U.S.C. §§ 311-319, and 37 C.F.R. § 42.100, Petitioner Citrix

Systems, Inc. ( "Petitioner") requests *inter partes* review ("IPR") of claims 1-18

(the "Challenged Claims") of U.S. Patent No. 9,426,182 (the "'182 patent"), issued

on August 23, 2016.


## II.     GROUNDS FOR STANDING UNDER 37 C.F.R. § 42.104(A)

The Petitioner certifies that the '182 patent is available for IPR and that the

Petitioner is not barred or estopped from requesting an IPR challenging the patent

claims on the grounds identified in this Petition.


## III.    IDENTIFICATION OF CHALLENGE AND RELIEF REQUESTED

Petitioner challenges claims 1–18 of the '182 patent on the following

grounds:

| Ground | Challenged Claims | Basis | References |
|--------|-------------------|-------|------------|
| 1 | 1–5, 7, 8, 10–18 | § 103(a) | Qureshi |
| 2 | 6 | § 103(a) | Qureshi and Joshi |
| 3 | 9 | § 103(a) | Qureshi and Shelest |
| 4 | 1–4, 7, 8, 10–16, 18 | § 102(a)(2) | Narain |
| 5 | 5, 17 | § 103(a) | Narain and Thomas |

1

| 6 | 6 | § 103(a) | Narain and Joshi |
| 7 | 9 | § 103(a) | Narain and Shelest |

Section IV.D identifies how the Challenged Claims are to be construed. Section VI identifies (1) the statutory grounds on which the challenge to each claim is based, (2) an explanation as to how each Challenged Claim is unpatentable for each ground, and (3) the exhibit numbers and relevance of the supporting evidence (Ex. 1001–Ex. 1009).  The expert declaration of Dr. Jon Weissman, (Ex. 1002), is provided in further support of this Petition.  Taken together, this evidence establishes a reasonable likelihood that Petitioner will prevail as to the Challenged Claims.

## IV.   Overview of the '182 Patent

### A.   The Alleged Invention of the '182 Patent

The '182 patent issued on August 23, 2016 from Application No. 14/149,425 ("the '425 application"), filed on January 7, 2014.   The '425 application claimed priority to United States Provisional Application Nos. 61/749,670 and 61/749,676, both filed on January 7, 2013.   At the time of filing, the applicant stated the '425 application contains a claim that has an effective filing date on or after March 16, 2013 and, thus, the application should be examined under the first-to-file provisions of the AIA.   Ex. 1008, File History of 14/149,425,

January 7, 2014 ADS at p. 5.  Accordingly, this petition will treat the '182 patent

under the AIA.  Ex. 1002, Weissman Decl. at ¶31.

The '182 patent relates to context-based authentication of mobile devices.

The claims of the '182 patent are directed to systems and methods for storing a

mapping from request contexts to action control policies for a plurality of

enterprises, and using the mapping to process access control requests for

applications.   A request context is broadly recited as specifying one or more

attributes describing a request for applications, and an action control policy is

described as identifying actions that the client device can perform in a given

request context.  The claims require that some steps are performed by an access

control system external to the enterprises, and that the applications are hosted by a

software as a service ("SaaS") hosting system.  Ex. 1002, Weissman Decl. at ¶32.

### B.    Summary of the Prosecution History of the '182 Patent

During the prosecution of the '182 patent, claims 1–20 of the original '425

application were rejected under 35 U.S.C. 103(a) over combinations of U.S.

Publication No. 2013/0247162 ("Menon"), U.S. Publication No. 2011/0314261

("Brucker"), U.S. Publication No. 2014/0157380 ("Abrams"), and U.S. Publication

No. 2006/0236369 ("Covington").  Ex. 1008, File History of 14/149,425, April 22,

2015 Office Action at pp. 11–20.  Specifically, the combination of Menon in view

of  Brucker  and  Covington  disclosed  all  claim  limitations  of  then  pending

3

independent claims 1, 9, and 15. *Id.* at pp. 12–15, 19. The examiner also rejected

all claims of the original '425 application as non-statutory subject matter under 35

U.S.C. 101. *Id.* at pp. 7–11. Ex. 1002, Weissman Decl. at ¶33.

In the subsequent office action response, the applicant heavily amended

independent claims 1 and 15 to overcome the previously presented rejections. In

particular, claim element "*access* control policies" was revised to "*action* control

policies." Ex. 1008, File History of 14/149,425, August 24, 2015 Amendment at

pp. 3–9 (emphasis added). Applicant explained that "action control

policies…specify a set of actions that can be performed by a client device of a user

in a particular context." *Id.* at p. 14. Applicant further argued that the prior art did

not disclose the "action control policies" claim element as Menon only teaches

determining "whether the user is allowed to reach a particular document or

not…not determine whether or not the user is allowed to perform the reach

operation." *Id.* at p. 15. In addition, claim limitation "sending information

describing the first action control policy to the client device for enforcement of the

first action control policy by an agent executing on the client device" was added to

overcome the combination of Menon and Brucker. *Id.* at pp. 14–16; Ex. 1002,

Weissman Decl. at ¶34.

In response to a § 101 rejection, Applicant amended the claims to require

that the application be "hosted by the SaaS hosting system." Ex. 1008, August 24,

2015 Amendment at pp. 11–13; Ex. 1002, Weissman Decl. at ¶35.

The examiner issued a Final Rejection on November 5, 2015, rejecting all claims under 103(a) under combinations of newly presented U.S. Publication No. 2009/0165078 ("Samudrala") in view of Abrams, Menon, Covington, Brucker, and U.S. Patent No. 8,805,951 ("Faibish").  Ex. 1008, November 5, 2015 Office Action at pp. 5–19; Ex. 1002, Weissman Decl. at ¶36.

In a request for continued examination, filed on May 5, 2016, the applicant amended independent claims 1, 15, and 22 with the additional claim steps of "storing, by an access control system, action control policies for a plurality of enterprises, wherein the access control system is external to each of the plurality of enterprises" and "identifying a first enterprise from the plurality of enterprises." Ex. 1008, File History of 14/149,425, May, 5, 2016 Amendment at pp. 11–14.  The examiner deemed the amended claims allowable, stating that "it would not be obvious to one of ordinary skill in the art to reasonably combine the various teachings of the cited references to arrive at the claimed invention."  Ex. 1008, File History of 14/149,425, June 17, 2016, Notice of Allowance at pp. 3–5; Ex. 1002, Weissman Decl. at ¶37.

## C.   Level of Ordinary Skill in the Art

A person of ordinary skill in the art would have a bachelor's degree in computer science, with at least three to four years of experience in distributed

computing or access control, or Master's degree in computer science, with at least two years of experience in distributed computing or access control. Ex. 1002, Weissman Decl. at ¶14.

### D. Claim Construction under 37 C.F.R. § 42.104(b)(3)

In an IPR, a claim is given the "broadest reasonable construction in light of the specification in which it appears." 37 C.F.R. § 42.100(b); *see Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 195 L. Ed. 2d 423 (2016). The broadest reasonable construction is the broadest reasonable interpretation of the claim language. *See In re Yamamoto*, 740 F.2d 1569, 1572 (Fed. Cir. 2004). Any claim term that lacks a definition in the specification is therefore also given a broad interpretation. *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). Ex. 1002, Weissman Decl. at ¶17

### 1. "action control policies"

The term "action control policies," which is recited in independent claims 1, 13, and 18, does not appear anywhere in the '182 patent specification or in the claims as originally filed. The related term "action control policy" appears only once in the '182 patent specification, but is not explicitly defined by the '182 patent. Ex. 1001, '182 patent at 11:67-12:3 ("For example, an action control policy can specify that an action of certain type within an application can be performed only by client devices having a location within a particular region.")

During prosecution of the '182 patent, the applicant explained that action control policies "specify a set of actions that can be performed by a client device of a user in a particular context." Ex. 1008, File History of 14/149,425, August 24, 2015 Amendment at p. 14; Ex. 1002, Weissman Decl. at ¶18.

Accordingly, the broadest reasonable construction of "action control policies" is "a set of actions that can be performed by a client device of a user in a particular context." Ex. 1002, Weissman Decl. at ¶19.

### 2. "attributes describing a request received from a client device"

The term "attributes describing a request received from a client device" appears in independent claims 1, 13, and 18 of the '182 patent. Ex. 1002, Weissman Decl. at ¶20.

The '182 patent does not explicitly define "attributes describing a request received from a client device," but it does provide several examples of such attributes including: "a *location* of the client device sending the request," "a client *device type*," "a *time* of the request," "the *type* of request," and "a *parameter* of the request" (Ex. 1001, '182 patent at 1:52-64); "an *identifier of the application* being requested," "the *enterprise or company* for which the device is being used," and "the *type of network* used by the client device" (*Id.* at 4:17-22); and an "*employee status*" (*Id.* at 10:49). Ex. 1002, Weissman Decl. at ¶21.

Thus, the '182 patent broadly applies the term "attributes describing a request received from a client device" to encompass information about the request, such as the time of the request, the type of request and the application being requested, as well as information that describes the status or configuration of the client device that is making the request, such as device location, device type, the enterprise/company/employee associated with the device, and the type of network used by the device.  Ex. 1002, Weissman Decl. at ¶22.

Accordingly, the broadest reasonable construction of "attributes describing a request received from a client device" is "information describing a request received from a client device, including information describing the client device itself."  Ex. 1002, Weissman Decl. at ¶23.

## V.  Prior Art

### A.  Summary of the Prior Art

The subject matter claimed in the '182 patent was widely published and well known to those of skill in the art as of January 7, 2013, the filing date of United States Provisional Application Nos. 61/749,670 and 61/749,676, to which the '182 patent claims priority.  Each of the prior art references relied upon in this petition has an effective filing date earlier than January 7, 2013; Ex. 1002, Weissman Decl. at ¶39.

### B.  Overview of Qureshi



*FIG. 1B*

U.S. Patent No. 8,869,235 to Qureshi ("Qureshi") was filed on October 10, 2012, and issued on October 21, 2014.  Qureshi is prior art to the '182 patent under AIA § 102(a)(2).  Qureshi was not cited during prosecution of the '182 patent; Ex. 1002, Weissman Decl. at ¶40.

Qureshi teaches a system for enabling enterprise users to securely access enterprise resources using mobile devices.  Ex. 1003, Qureshi at ABSTRACT. The system may implement policies for controlling mobile device access to the enterprise resources.  *Id*; Ex. 1002, Weissman Decl. at ¶41.

A mobile device 120 sends device-related data to a mobile device management system 126, which is located external to the enterprise 110.  Ex. 1003,

Qureshi at FIG. 1B, 15:63-16:1.   The mobile device management system 126 stores various mobile device rules 214 for the enterprise.  *Id.* at 9:50-52, FIG. 2.  A rule can be associated with a particular user role, device type, or other device attribute.   *Id.* at 53:64-54:24.   The mobile device management system 126 identifies one or more rules that are appropriate for the mobile device.   *Id.* at 54:39-43.  The mobile device management system 126 sends these rule(s) to the device where they are enforced by an agent 320 running on the device.   *Id.* at 10:37-50; Ex. 1002, Weissman Decl. at ¶42.

A mobile device rule can control which actions the mobile device is allowed to perform in a given context.  For example, a rule can prevent a user from accessing the web if the user's device is located within the premises of the enterprise.  Ex. 1003, Qureshi at 61:15-22.  As another example, a rule can prevent the device from copying or sending data when the device is accessing confidential enterprise data.  *Id.* at 65:64-66:3; Ex. 1002, Weissman Decl. at ¶43.

## C.    Overview of Narain

U.S. Patent No. 8,578,443 to Narain ("Narain") was filed on May 25, 2012, and issued on November 5, 2013.  Narain is prior art to the '182 patent under AIA § 102(a)(2).  Narain was not cited during prosecution of the '182 patent; Ex. 1002, Weissman Decl. at ¶44.

Narain teaches the use of a policy enforcement engine to carry out security

policies for mobile devices.  Ex. 1004, Narain at 2:20-31.  Narain discloses storing

policies, characterized by actions allowed by the client device, for a plurality of

enterprises.  *Id.* at FIG. 2, 12:22-30, 13:64-65.  Narain also discloses receiving,

from a mobile device, a request for access to cloud-based mobile applications.  *Id.*

at FIG. 1B, 5:46-57; Ex. 1002, Weissman Decl. at ¶45.



The policy enforcement engine 150 identifies the characteristics of the

requesting mobile device and determines a relevant policy.  Ex. 1004, Narain at

8:5-28.  The relevant policies are customizable, describing different contexts of the

requesting mobile device.  *Id.* at 19:1-10.  The enforcement engine 150 then

communicates information regarding the relevant policy to the mobile device.  *Id.* at 9:38-43.  Narain further discloses applying the policy enforcement engine 150 in an environment accommodating multiple enterprise customers.  *Id.* at 4:6-8; Ex. 1002, Weissman Decl. at ¶46.

### D.   Overview of Thomas

U.S. Patent No. 8,713,633 to Thomas ("Thomas") was filed on July 13, 2012, and issued on April 29, 2014.  Thomas is prior art to the '182 patent under AIA § 102(a)(2).  Thomas was not cited during prosecution of the '182 patent. Thomas discloses using predictive models, based on client device data, to determine enterprise security policies.  Ex. 1005, Thomas at 5:23-30; Ex. 1002, Weissman Decl. at ¶47.

### E.   Overview of Joshi

U.S. Patent Application Publication No. 2012/0210068 to Joshi ("Joshi") was filed on November 2, 2011, and published on August 16, 2012.  Joshi is prior art to the '182 patent under AIA § 102(a)(1).  Joshi was not cited during prosecution of the '182 patent.  Joshi teaches a method for assigning differing cache sizes for cloud-based applications.  Ex. 1006, Joshi at [0060]–[0063]; Ex. 1002, Weissman Decl. at ¶48.

### F.   Overview of Shelest

U.S. Patent Application Publication No. 2006/0282876 to Shelest et al.

("Shelest") was filed on June 9, 2005, and published on December 14, 2006. Shelest is prior art to the '182 patent under AIA § 102(a)(1). Shelest was not cited during prosecution of the '182 patent. Shelest teaches a system for distributing a security policy to enterprise computers. Ex. 1007, Shelest at ABSTRACT. The security policy may be loaded onto the enterprise computers and activated only after certain activation criteria are met, such as when an activation time has occurred. *Id.* at ABSTRACT, [0030]; Ex. 1002, Weissman Decl. at ¶49.

### G.    Overview of Agarwal

U.S. Patent No. 9,282,097 to Agarwal ("Agarwal") was filed on May 6, 2011, and issued on March 8, 2016. Agarwal is prior art to the '182 patent under AIA § 102(a)(2). Related U.S. Patent Application No. 2011/0277027 was cited by the examiner but not discussed during prosecution of the '182 patent. Agarwal discloses a system for accessing SaaS hosted applications. Ex. 1009, Agarwal at ABSTRACT; Ex. 1002, Weissman Decl. at ¶50.

## VI.   SPECIFIC GROUNDS FOR PETITION

### A.    Ground 1:  Claims 1–5, 7, 8, and 10–18 are Obvious over Qureshi

#### 1.  <u>Independent Claims 1, 13, and 18</u>

One skilled in the art would understand that Qureshi renders obvious claims 1, 13, and 18 of the '182 patent under 35 U.S.C. § 103(a). Claim 1, a method

claim; claim 13, an apparatus claim; and claim 18, another apparatus claim, contain nearly identical limitations. Accordingly, Petitioners address these common limitations of claims 1, 13, and 18 together, with reference to claim 1, in the below ground. Ex. 1002, Weissman Decl. at ¶51.

In addition to the claim limitations set forth below, claims 13 and 18 require a non-transitory computer readable storage medium storing computer program instructions that cause a processor to perform the recited steps. Claim 13 additionally requires a computer processor. Qureshi discloses a computer processor that executes program instructions stored in a non-transitory computer readable storage medium. Ex. 1003, Qureshi at 98:20-30 ("All of the methods and processes described above may be embodied in, and fully automated via, software code modules executed by one or more computing devices (e.g., smartphones, tablets, other types of mobile devices, physical servers, etc.). Each such computing device typically includes a processor (or multiple processors) that executes program instructions or modules stored in a memory or other non-transitory computer-readable storage medium or device. The code modules may be stored in any type of computer-readable storage medium or other computer storage device."); Ex. 1002, Weissman Decl. at ¶52.

### a)     *The preamble: "A method comprising"*

Qureshi teaches methods for accessing enterprise resources using mobile

devices.  Ex. 1003, Qureshi at 2:15-17 ("method in which an enterprise computer system regulates access by mobile devices to an enterprise resource."); Ex. 1002, Weissman Decl. at ¶53.

> ### b) Limitation: "storing, by an access control system, action control policies for a plurality of enterprises"

Qureshi teaches an access control system storing action control policies for an enterprise.  In particular, Qureshi teaches a mobile device management system 126 ("access control system") storing mobile device rules 214 ("action control policies").  Ex. 1003, Qureshi at 52:52-55; Ex. 1002, Weissman Decl. at ¶54.

Applying the construction of "action control policies" set forth above, Qureshi teaches that mobile device rules are a set of actions that can be performed by a mobile device (client device of a user) in a particular context.  Ex. 1002, Weissman Decl. at ¶55.

For example, Qureshi teaches that specific device features ("actions") can be activated or deactivated based on the location ("particular context") of the mobile device.  Ex. 1003, Qureshi at 60:41-44 ("mobile device rules 214 can effectively lead to ***activation or deactivation of mobile device features based on a location*** of the mobile device 120."); *Id.* at 61:12-22 ("enterprise agent 320 can use a mobile device rule 214 to detect a problem defined as the ***mobile device 120 being located***

**within premises of the enterprise** with the device's web browser being available for use … [and] **disable the web browser** without the user's consent."); Ex. 1002, Weissman Decl. at ¶56.

As another example, Qureshi teaches preventing the device from performing certain actions (i.e., downloading, copying, and/or sending data) when the device is connected to the enterprise and accessing sensitive data. Ex. 1003, Qureshi at 65:64-66:3 ("a mobile device rule 214 can cause the enterprise agent 320 to detect when a user 115 or mobile device 120 is **connected to an enterprise resource 130 and accessing sensitive or confidential data**. In certain circumstances, a remedial action 216 can cause the agent 320 to **prevent the device 120 from downloading, copying, and/or sending the data** to anyone else."); Ex. 1002, Weissman Decl. at ¶57.

As yet another example of action control policy, Qureshi teaches restricting the device's network access if it attempts to connect to an unsecured network. Ex. 1003, Qureshi at 61:60-62:2 ("enterprise agent 320 can use a mobile device rule 214 to detect a problem defined as the mobile device's use of the network connection capability to **connect or attempt to connect to a communication network that is unsecured or blacklisted** by the enterprise (e.g., a false base Wi-Fi station). … A remedial action 216 can **prevent the device 120 from accessing the restricted network(s)**."); Ex. 1002, Weissman Decl. at ¶58.

16

Qureshi does not explicitly teach that the mobile device management system ("access control system") stores rules for a plurality of enterprises. However, Qureshi does disclose that another component of the same system, the secure mobile gateway 128, "can be implemented to handle requests associated with ***two or more different enterprise systems*** 110," and "can communicate with ***different mobile device management systems 126 of the enterprise computing systems 110 of different companies***." Ex. 1003, Qureshi at 19:35-48; Ex. 1002, Weissman Decl. at ¶59.

Like the mobile device management system, Qureshi's secure mobile gateway stores rules that are used to control access to enterprise resources. Ex. 1003, Qureshi at 23:48-51 ("secure mobile gateway 128 can include a gateway configuration service 406 that allows a user (e.g., administrators, IT personnel, etc.) to view, edit, and/or create gateway rules 404, and then ***save them in the local database***"); *Id*. at 6:30-33 ("gateway rules [] are used by ***a secure mobile gateway to grant and deny mobile device requests to access enterprise resource***."); Ex. 1002, Weissman Decl. at ¶60.

It would have been obvious for Qureshi's mobile device management to store rules for a plurality of enterprises as taught by Qureshi's secure mobile gateway for several reasons. Ex. 1002, Weissman Decl. at ¶61.

**Known system ready for improvement**: First, Qureshi's mobile device

management system is a prior art system ready for "improvement." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 401 (2007) (one rationale to combine is to apply "a known technique to a piece of prior art ready for the improvement" to "yield predictable results"). Qureshi's mobile device management system stores a plurality of mobile device rules that can be customized for particular users, devices, and enterprise resources. Ex. 1003, Qureshi at 17:49-53 ("to restrict mobile device access only to authorized enterprise resources 130, in a way that is *customizable based on user properties, mobile device properties, and/or the enterprise resources 130 for which mobile device access is requested*."). Qureshi's mobile device management system is ready to store rules for a plurality of enterprises because Qureshi explicitly teaches that it can be "*located in a cloud computing system ('the cloud'), external from the enterprise 110*." *Id.* at FIG. 1B. Qureshi also discloses that mobile device rules 214 can be stored "*outside of the enterprise system 110*." Ex. 1003, Qureshi at 45:28-30. Further, Qureshi teaches the mobile device management system "may be implemented by a computer system made up of one or more computing devices (e.g., *physical servers, workstations*, etc.)." Ex. 1003, Qureshi at 98:10-12; Ex. 1002, Weissman Decl. at ¶62.

**Known technique**: Second, the technique necessary to store action control policies for a plurality of enterprises was a known technique. *KSR Int'l Co.*, 550

U.S. at 401.  As shown by Qureshi's secure mobile gateway, controlling access to multiple enterprises through the use of action control policies was well known at the time of the alleged invention.  Ex. 1002, Weissman Decl. at ¶63.

**Predictable results and improved system**: Third, the application of the known technique of storing action control policies for a plurality of enterprises to Qureshi's mobile device management would yield predictable results and an improved system. *KSR Int'l Co.*, 550 U.S. at 401.  One of ordinary skill in the art would have been motivated to modify Qureshi's mobile device management system to store rules for multiple enterprises, as taught by Qureshi's secure mobile gateway, to obtain the predictable results of providing access control for multiple enterprises using a single mobile device management system.  The result would be less complex and costly compared to deploying and operating separate mobile device management systems for each enterprise.   For example, modifying Qureshi's mobile device management system to support multiple enterprises would eliminate the need for purchasing or renting separate physical servers for each enterprise.  Ex. 1002, Weissman Decl. at ¶64.

    c)       *Limitation: "wherein the access control system is external to each of the plurality of enterprises"*

Qureshi teaches that the mobile device management system can be located in the cloud 156, external to the enterprise 110.  *See* Ex. 1003, Qureshi at FIG. 1B,

1:49-51: ("FIG. 1B is an embodiment similar to FIG. 1A, with the mobile device management system located in a cloud computing system ('the cloud')"); Ex. 1002, Weissman Decl. at ¶65.

> **d)      Limitation: "storing, by the access control system, action control policies for the plurality of enterprises as a mapping from contexts of requests to the action control policies, each context specifying one or more attributes describing a request received from a client device"**

As discussed above for limitation (b), Qureshi teaches that the mobile device management system ("action control system") stores mobile device rules ("action control policies") for the enterprise.  Ex. 1002, Weissman Decl. at ¶66.

As discussed above, the term "attributes describing a request received from a client device" should be construed to mean "information describing a request received from a client device, including information describing the client device itself."  Qureshi teaches storing mobile device rules as a mapping from device information ("each context specifying one or more attributes describing a request") to the mobile device rules ("action control policies").  In particular, Qureshi discloses associating ("mapping") groups of mobile device rules with particular types of mobile devices (e.g., iPhones™ or Android™ devices).  Ex. 1003, Qureshi at 53:64-54:22 ("mobile device rules 214 and their associated remedial actions 216 are organized into separate 'rule packages,' … Each **rule package can be designed or customized for users 115 with specific types of user roles 206 and/or**

20

*mobile device properties* 208 … an enterprise can form one rule package of mobile device rules 214 and remedial actions 216 for sales people using *iPhones*™, another rule package of mobile device rules 214 and remedial actions 216 for sales people using *Android*™ *devices*."); *see also* Ex. 1003, Qureshi at 17:49-53 ("restrict mobile device access only to authorized enterprise resources 130, in a way that is *customizable based on user properties, mobile device properties, and/or the enterprise resources 130 for which mobile device access is requested*.");  Ex. 1002, Weissman Decl. at ¶67.

> e)      Limitation: *"wherein the request is for an action performed by an application hosted by a software as a services (SaaS) hosting system"*

Qureshi teaches the request is for an action performed by an application. First, Qureshi teaches that a mobile device sends a request to the mobile device management system enabling an application to access enterprise resources.  Ex. 1003, Qureshi at 15:63-16:1 ("enterprise agents 320 of the *mobile devices 120 can be configured to send device-related data to the mobile device management system* 126 periodically, and/or whenever the mobile devices 120 connect to the mobile device management system 126 (e.g., *upon the formation of an application tunnel*"));  *Id.* at 11:13-24 ("enterprise agent 320 installed on a given mobile device 120 may … create application tunnels for *enabling enterprise applications installed on the mobile device to securely access certain enterprise*

21

*resource*.").  Second, Qureshi teaches that enterprise resources being accessed by the application include documents, data, and database servers.  *Id.* at 4:8-11 ("allowing enterprise users to use their mobile devices to securely access *enterprise resources (documents, confidential data, corporate application and database servers*, etc.")).  Thus, Qureshi teaches the request is for an action performed by an application: opening a document, reading data, or querying to a database server.  Ex. 1002, Weissman Decl. at ¶68.

Qureshi further teaches applications hosted by a SaaS hosting system.  For example, Qureshi teaches that enterprise applications and other resources may be deployed in the cloud.  Ex. 1003, Qureshi at 67:33-34 ("any needed systems 126, gateways 128, and *resources 130 being deployed solely within the cloud* 156").  A skilled artisan would understand that a "cloud" is an SaaS hosting service in that it refers to services that are centrally hosted, can be used to delivery various types of applications, and offer subscription-based pricing models.  Ex. 1002, Weissman Decl. at ¶69.

As another example, Qureshi teaches restricting access to websites.  Ex. 1003, Qureshi at 41:37-41 ("enterprise may wish to restrict the *network sites (e.g., websites)* or *other online information resources* that a mobile device 120 is authorized to access.").  A skilled artisan would understand that websites include many different types of web-based applications hosted by an SaaS hosting system.

22

For example, Salesforce.com, is an SaaS application accessed as a website as evidenced by Agarwal.  Ex. 1009, Agarwal at 70:3-8 ("Step 2 (Cloud Access System does SSO to the backend *SaaS application*) … redirect the *browser* with new URL 'http://n6.*salesforce*.com/…'"); Ex. 1002, Weissman Decl. at ¶70.

To the extent that Qureshi does not disclose applications hosted by a SaaS hosting system, a skilled artisan would have found this limitation obvious in view of Agarwal[1]; Ex. 1002, Weissman Decl. at ¶71

### f)    Limitation: "each action control policy identifying actions that the client device is allowed in a given context"

Qureshi teaches that a mobile device rule can identify actions that the mobile device is allowed in a given context.  For example, Qureshi discloses that a mobile device rule can identify particular applications and features ("actions") that are allowed based on the location of the device ("context").  Ex. 1003, Qureshi at 60:12-36 ("use a mobile device rule 214 to detect a problem defined as the mobile device 120 being *located outside of an authorized geographical zone*, or the device being located within an unauthorized geographical zone. … The remedial

---

[1] Agarwal, which is in the same field of endeavor as Qureshi, is commonly owned with Qureshi, and describes a similar system as Qureshi, explicitly teaches a system for providing access to SaaS hosted applications.  Ex. 1009, Agarwal at ABSTRACT; Ex. 1002, Weissman Decl. at ¶71.

action 216 can further [include] … disabling the mobile device 120, *disabling features or software applications* (e.g., the camera, Bluetooth connectivity, Wi-Fi connectivity, etc.) of the device 120"); Ex. 1003, Qureshi at 60:41-45 ("mobile device rules 214 can effectively lead to *activation or deactivation of mobile device features based on a location of the mobile device*"); Ex. 1002, Weissman Decl. at ¶72.

> g)      Limitation: *"receiving, by the access control system, from a first client device, a first request for interacting with the application hosted by the SaaS hosting system, the first request providing information describing a first context"*

Qureshi teaches that the mobile device management system receives from a mobile device a request for interacting with an application.  In particular, Qureshi discloses that "*mobile devices 120 can be configured to send device-related data to the mobile device management system 126* periodically, and/or whenever the mobile devices 120 connect to the mobile device management system 126 (e.g., *upon the formation of an application tunnel*.)"  Ex. 1003, Qureshi at 15:63-16:1; Ex. 1002, Weissman Decl. at ¶73.

Qureshi further teaches that the application is hosted by a SaaS hosting system as discussed above for limitation (e).  Ex. 1002, Weissman Decl. at ¶74.

Qureshi also teaches the first request providing information describing a first context.  In particular, Qureshi discloses using information in the request header or

body to determine information about the user and/or device associated with the device (i.e., context). Ex. 1003, Qureshi at 44-30-34 ("system 126 can be configured to read information from the application tunnel ***request headers or bodies***, compare it to the mobile device data 204 (FIG. 2) to determine information about the user 115 and/or mobile device 120 associated with the request"). Ex. 1002, Weissman Decl. at ¶75.

> ### h)      Limitation: *"identifying a first enterprise from the plurality of enterprises, the first enterprise associated with the first client device"*

Qureshi teaches a plurality of enterprises. Ex. 1003, Qureshi at 19:36-38 ("secure mobile gateway 128 can be implemented to handle requests associated with ***two or more different enterprise systems*** 110"); *see also* information provided above for limitation (b); Ex. 1002, Weissman Decl. at ¶76.

Qureshi further teaches identifying if a mobile device user is associated with a particular ("first") enterprise. Ex. 1003, Qureshi at 80:30-36 ("analytics service 414 can employ a user determination algorithm for determining user information associated with the request 2302 received by the enterprise resource 130. In this context, user information can include ***a determination of whether the request 2302 was sent by a user 115 (as opposed to someone who is not associated or enrolled with the enterprise*e**).")*; Ex. 1002, Weissman Decl. at ¶77.

Qureshi discloses that mobile device rules can be customized for a particular

enterprise. Ex. 1003, Qureshi at 17:49-53 ("enabling *an enterprise* to restrict mobile device access only to authorized enterprise resources 130, in a way that is *customizable based on user properties, mobile device properties, and/or the enterprise resources 130 for which mobile device access is requested*."); Ex. 1002, Weissman Decl. at ¶78.

> i)      Limitation: *"determining, by the access control system, a first action control policy associated with the first enterprise for the first context based on the mapping"*

Qureshi teaches that the mobile device management system determines a mobile device rule ("first action control policy") based on the mapping from the context of a request (e.g., mobile device properties) to the rule. Ex. 1003, Qureshi at 54:39-43 ("mobile device manager 202 is preferably responsible for sending *appropriate rule packages to the mobile devices 120, based on, e.g., the properties 208 of the mobile devices* and/or the roles 206 of the users 115 assigned to the mobile devices."); Ex. 1002, Weissman Decl. at ¶79.

Qureshi further teaches that the mobile device rule is associated with an enterprise. Ex. 1003, Qureshi at 54:6-9 ("a rule package of *mobile device rules* … *can be prepared for* all users 115 having roles 206 that that are sales-oriented (e.g., all sales people of *the enterprise*)."); Ex. 1002, Weissman Decl. at ¶80.

> j)      Limitation: *"the first action control policy allowing a first set of actions supported by the application"*

The '182 patent gives examples of actions supported by an application that can be allowed/disallowed in a particular context. In one example, a rule specifies whether for a given context, "a user can … ***access particular networks or websites***." Ex. 1001, '182 patent at 7:30-33. As another example, the '182 patent explains that a rule can specify whether, for a given context, "a user can ***print pages of content from the applications or capture screenshots***." Ex. 1001, '182 patent at 7:30-32; Ex. 1002, Weissman Decl. at ¶81.

Qureshi teaches that a mobile device rule ("first action control policy") can determine whether particular actions supported by the application are allowed. For example, Qureshi discloses that a mobile device rule can determine if the device is allowed to access an unsecured network. Ex. 1003, Qureshi at 61:60-62-2 ("enterprise agent 320 can use a mobile device rule 214 to detect … the mobile device's use of the network connection capability to ***connect or attempt to connect to a communication network that is unsecured or blacklisted*** by the enterprise (e.g., a false base Wi-Fi station) … remedial action 216 can ***prevent the device 120 from accessing the restricted network(s)***."); Ex. 1002, Weissman Decl. at ¶82.

As another example, Qureshi discloses that a mobile device rule can specify when a device is allowed to download, copy, or share data. Ex. 1003, Qureshi at 65:64-66:3 ("mobile device rule 214 can cause the enterprise agent 320 to detect when a user 115 or mobile device 120 is ***connected to an enterprise resource 130***

27

*and accessing sensitive or confidential data*. In certain circumstances, a remedial action 216 can cause the agent 320 to **prevent the device 120 from downloading, copying, and/or sending the data**"); Ex. 1002, Weissman Decl. at ¶83.

### k)  Limitation: "sending information describing the first action control policy to the first client device"

Qureshi teaches sending the mobile device rule ("first action control policy") to the mobile device.  Ex. 1003, Qureshi at 54:39-43 ("mobile device manager 202 is preferably responsible for **sending appropriate rule packages to the mobile devices** 120");  Ex. 1002, Weissman Decl. at ¶84.

### l)  Limitation: "for enforcement of the first action control policy by an agent executing on the first client device"

Qureshi teaches enforcement of the mobile device rule by an agent executing on the mobile device.  Ex. 1003, Qureshi at 10:37-40 ("mobile device 120 includes an **enterprise agent** 320, which is preferably a software application or other **executable program installed on the mobile device**");  Ex. 1003, Qureshi at 10:46-50 ("**enterprise agent 320 executes the mobile device rules** 214 and cooperates with the enterprise system 110 to regulate the mobile device's access to the enterprise system 110, including to the enterprise resources 130"); Ex. 1002, Weissman Decl. at ¶85.

### m)  Remaining Limitations of Claim 1

The remaining limitations of claim 1 are substantially identical to

limitations (g)–(l) described above.  The differences are as follows: the term "first client" is replaced by "second client," "first request" is replaced by "second request," "first context" is replaced by "second context," "first enterprise" is replaced by "second enterprise," "first action control policy" is replaced by "second action control policy," and "first set of actions supported by the application" is replaced by "second set of actions supported by the application." Thus, claim 1 essentially requires that limitations (g)–(l) be repeated, but for a second client device, context, enterprise, action control policy, and set of actions supported by the application.  Ex. 1002, Weissman Decl. at ¶86.

Qureshi teaches multiple clients each configured to send requests.  Ex. 1003, Qureshi at FIG. 1A, 7:48-54 ("***one or more*** users 115 and mobile computing devices 120 … are preferably ***configured to communicate with the enterprise system*** 110."); Ex. 1002, Weissman Decl. at ¶87.

Qureshi further teaches multiple different contexts of requests, each specifying one or more attributes describing a request received from a client.  Ex. 1003, Qureshi at 17:48-53 ("restrict mobile device access … in a way that is ***customizable based on user properties, mobile device properties, and/or the enterprise resources 130 for which mobile device access is requested***."); Ex. 1002, Weissman Decl. at ¶88.

Qureshi further teaches multiple different action control policies and sets of

actions supported.  Ex. 1003, Qureshi at 62:1-2 ("***prevent the device 120 from***

***accessing the restricted network(s)***."); ("***prevent the device 120 from***

***downloading, copying, and/or sending the data***."); Ex. 1002, Weissman Decl. at

¶89.

Further, as discussed above with limitation (b), one of ordinary skill in the

art would find it obvious to store action control policies for multiple enterprises in

the mobile device management system of Qureshi.  Ex. 1002, Weissman Decl. at

¶90.

Accordingly, Qureshi renders claims 1, 13, and 18 obvious.

### 2.  <u>Dependent Claims 2 and 14</u>

Claims 2 and 14, which depend from claims 1 and 13 respectively, recite

"wherein the first context comprises ***one or more*** of a user identifier, the

application, and a time of the first request."  Ex. 1002, Weissman Decl. at ¶92.

Qureshi teaches the first context, described by the first request, comprising a

user identifier.  In particular, Qureshi discloses that the request headers can be used

to identify information about the user associated with the request.  Ex. 1003,

Qureshi at 44:30-34 ("system 126 can be configured to read information from the

application tunnel ***request headers*** or bodies, compare it to the mobile device data

204 (FIG. 2) to determine information about the user 115 and/or mobile device 120

associated with the request"); Ex. 1002, Weissman Decl. at ¶93.  Qureshi further

discloses that mobile device rules can be customized for specific user roles.  Ex. 1003, Qureshi at 53:64-54:22 ("mobile device rules 214 and their associated remedial actions 216 are organized into separate 'rule packages,' … Each rule package can be designed or customized for users 115 with ***specific types of user roles***"); Ex. 1002, Weissman Decl. at ¶94.

### 3.   <u>Dependent Claims 3 and 15</u>

Claims 3 and 15, which depend from claims 1 and 13, respectively, recite "wherein the first context comprises ***one or more*** of a request type and a parameter of the request."  Notably, these claims require the first context comprises ***either*** a request type or a parameter of the request, not both.  Ex. 1002, Weissman Decl. at ¶95.

Qureshi teaches the first context comprises a parameter of the request.  In particular, Qureshi teaches using request headers to determine information about the user or device associated with the request, and that mobile device rules can be customized for specific user roles and devices.  Ex. 1003, Qureshi at 44:30-34 (" read information from the application tunnel ***request headers*** or bodies, compare it to the mobile device data 204 (FIG. 2) ***to determine information about the user 115 and/or mobile device 120 associated with the request***").  A skilled artisan would understand that a request header is a "parameter of the request."  Ex. 1002, Weissman Decl. at ¶96.

Accordingly, Qureshi renders claims 3 and 15 obvious.

### 4. <u>Dependent Claims 4 and 16</u>

Claims 4 and 16, which depend from claims 1 and 13 respectively, recite the following limitations.

#### a)   Limitation: *"wherein determining the first action control policy comprises: receiving an identifier of a user associated with the first request"*

Qureshi teaches receiving an identifier of a user associated with the first request. Ex. 1003, Qureshi at 44:30-34 ("read information from the application tunnel request headers or bodies … to **determine information about the user** 115 and/or mobile device 120 associated with the request."); Ex. 1002, Weissman Decl. at ¶99.

#### b)   Limitation: *"determining a user type of the user; and"*

Qureshi teaches determining a user type of the user. Ex. 1003, Qureshi at 15:35-38 ("mobile device information 204 can also include user-device assignment records 210 that identify which users 115 or user accounts are assigned to the enrolled mobile devices 120, **as well as roles 206 of the users** 115 within the enterprise."); Ex. 1002, Weissman Decl. at ¶100.

#### c)   Limitation: *"selecting the first action control policy based on the user type of the user;"*

Qureshi teaches selecting the first policy based on the user type of the user. Ex. 1003, Qureshi at 16:17-20 ("Policies 218 can depend on **user roles**"); Ex.

1002, Weissman Decl. at ¶101.

Accordingly, Qureshi renders claims 4 and 16 obvious.

### 5.   <u>Dependent Claims 5 and 17</u>

Claims 5 and 17, which depend from claims 1 and 13 respectively, recite the

following limitations.

#### a)      Limitation: *"wherein determining the first action control policy comprises: generating a contextual model identifying expected contexts of the client device"*

Qureshi teaches generating a model of the enterprise system (contextual

model).  Ex. 1003, Qureshi at 49:13-16 ("constructing a queriable *model 814 of*

*the enterprise system*.").  Qureshi further teaches that the enterprise model can

model mobile devices (identify expected contexts of the client device).  *Id*. at

49:35-40 ("*the enterprise model 814 can thereby model one or more of the*

*devices*"); Ex. 1002, Weissman Decl. at ¶104.

#### b)      Limitation: *"comparing the context to the contextual model"*

Qureshi further teaches comparing the context to the enterprise (contextual)

model.  In particular, Qureshi teaches that logic rules can use the enterprise model

to detect problematic states ("context") of a mobile device.  Ex. 1003, Qureshi at

47:27-40  ("use encoded *logic rules to detect 'features and 'problems'* … a logic

rule can include queries for specific information … from a model of the enterprise

system ("***enterprise model query***"), wherein the enterprise model is generated by the meta-application 150. A problem can comprise any ***problematic state of*** any software, hardware, or firmware of the enterprise system 110 or of ***a mobile device*** 120."); Ex. 1002, Weissman Decl. at ¶105.

### c) Limitation: "determining the first action control policy based on a deviation of the context from the contextual model"

Qureshi also teaches determining a mobile device rule based on detecting a problematic state of a mobile device ("deviation of the context from the contextual model"). In particular, Qureshi discloses creating/modifying a mobile device rule based on the logic rule. Ex. 1003, Qureshi at 48:10-25 ("one type of remedial action defined by a logic rule … can be the ***creation of a mobile device rule*** 214 or the modification of an existing mobile device rule 214, along with ***sending the new or modified mobile device rule to the mobile device management system*** 126."); Ex. 1002, Weissman Decl. at ¶106.

### B. Ground 2: Claim 6 is Obvious over Qureshi in view of Joshi

Claim 6, which depends from claim 1, recites the following limitations.

### a) Limitation: "wherein the first action control policy specifies a first cache size for storing data associated with the application"

Qureshi teaches a cache for storing data associated with the application. For example, Qureshi discloses that the web browser 332 can run applications and store data in a cache. Ex. 1003, Qureshi at 90:16-19 ("web browser 332 is

34

preferably configured to act as a container for at least some other software applications 318 installed on the mobile device 120, to ***allow those applications 318 to run within the browser 332***"); *Id.* at 90:9-12 ("browser 332 can ***store data*** accessed via a network … ***in a secure browser cache***."); Ex. 1002, Weissman Decl. at ¶108.

Qureshi does not explicitly teach wherein the mobile device rule specifies a first cache size.

Joshi explicitly teaches a policy specifying a cache size. Ex. 1006, Joshi at [0210] ("***cache policy*** may further comprise ***cache size limits, such as a maximum cache size and/or minimum cache size***"). Joshi also discloses adjusting cache size for a particular application. Ex. 1006, Joshi at [0090] ("***adjustments to cache page sizes, cache allocations***, system resources, and other parameters based on ***changes in the operation of the application***"); Ex. 1002, Weissman Decl. at ¶110.

It would have been obvious to modify a mobile device rule of Qureshi to specify the cache size as taught by Joshi or to combine the teachings of Qureshi regarding mobile device rules with the cache size policy disclosed in Joshi. Ex. 1002, Weissman Decl. at ¶111.

**Known system ready for improvement**: First, Qureshi's mobile device rules can be used for "many different purposes" and the examples disclosed by Qureshi "are not exhaustive." Ex. 1003, Qureshi at 58:61-59:1; Ex. 1002,

Weissman Decl. at ¶112.  Qureshi explicitly teaches that a mobile device rule can be used to enable/disable the web browser.  Ex. 1003, Qureshi at 61:16-22 ("use a *mobile device rule 214* to … disable the web browser without the user's consent."). Qureshi further teaches that the contents of the secure browser's cache can be controlled by the mobile device management system.  Ex. 1003, Qureshi at 90:13-16  ("*mobile device management system 126 can initiate deletion or otherwise make data stored in* the secure document container 336 and/or *the secure browser cache inaccessible*.");  For these reasons, the mobile device rules of Qureshi are "prior art ready for … improvement." *KSR Int'l Co.*, 550 U.S. at 401 (2007);  Ex. 1002, Weissman Decl. at ¶112.

**Known technique**:  Second, as shown by Joshi, using a policy to specify cache size was a well-known technique at the time of the alleged invention.  *KSR Int'l Co.*, 550 U.S. at 401 (2007); Ex. 1002, Weissman Decl. at ¶113.

**Predictable results and improved system**: Third, one of ordinary skill in the art would have been motivated to implement, within Qureshi, a mobile device rule that specifies a cache size for storing data associated with the application, as taught by Joshi.  Doing so would lead to the predictable results of allowing IT personnel to specify the cache size for a particular application running within the web browser, thereby providing greater operational control and customization, and allowing more efficient allocation of resources on the mobile device.  *KSR Int'l*

*Co.*, 550 U.S. at 401 (2007); Ex. 1002, Weissman Decl. at ¶114.

> **b)      Limitation: "the second action control policy specifies a second cache size for storing data associated with the application"**

Qureshi in view of Joshi discloses that the first mobile device rule ("action control policy") specifies a first cache size for storing data associated with the application as discussed above for limitation (a).   Ex. 1002, Weissman Decl. at ¶115.

Joshi teaches implementing two different cache policies each specifying a cache size.  Ex. 1006, Joshi at [0210] ("Each cache management system 2612A-N may implement a respective cache policy … cache policy may further comprise cache size limits, such as a maximum cache size and/or minimum cache size"). Joshi further teaches that cache size may be adjusted on a per-application basis. Ex. 1006, Joshi at [0090] ("***adjustments to cache page sizes, cache allocations***, system resources, and other parameters based on ***changes in the operation of the application***"); Ex. 1002, Weissman Decl. at ¶116.

It would have been obvious to implement, within Qureshi, two different mobile device rules ("action control policies") each specifying different cache sizes, as taught by Joshi, because doing so would lead to the predictable results of allowing IT personnel to specify cache size on a per-application or per-user basis, providing greater operational control and customization, and allowing more

efficient allocation of resources on the mobile device. Ex. 1002, Weissman Decl.

at ¶117.

Accordingly, Qureshi in view of Joshi renders claim 6 obvious.

### C.   Ground 3:  Claim 9 is obvious over Qureshi in view of Shelest

Claim 9, which depends from claim 1, recites the following limitations:

> ***receiving information indicating a change in a particular
> action control policy associated with the first enterprise
> effective from a particular time; and***

> ***determining a time value associated with the first request; and***

> ***determining whether the changed action control policy is
> applicable to the first request based on the time value
> associated with the first request.***

Qureshi teaches receiving information indicating a change in a particular

mobile device rule ("action control policy") associated with the first enterprise.

For example, Qureshi discloses that "***creating new mobile device rules*** 214 for the

rule package, deleting rules 214 from the rule package, and/or ***modifying some of***

***the rules*** 214 of the rule package" and "***send[ing] the updated mobile device rule***

***package*** to each of the mobile devices 120 of the users 115 of that particular

group." Ex. 1003, Qureshi at 55:14-23; Ex. 1002, Weissman Decl. at ¶120.

Qureshi also teaches determining whether a particular mobile device rule(s)

is applicable to the first request based on information associated with the first

request.  In particular, Qureshi discloses: the first request providing information

describing a first context, as discussed above for limitation (g); and determining a mobile device rule based on the mapping from the context of a request to the rule, as discussed above for limitation (i).  Ex. 1002, Weissman Decl. at ¶121.

Qureshi inherently teaches a "time value associated with the first request." For example, the time at which the mobile device management system receives the first request is necessarily a time value associated with the first request.  Ex. 1002, Weissman Decl. at ¶122.

Qureshi also teaches that the mobile device rule may be effective only during certain times or days.  For example, Qureshi explains that a mobile device rule can specify that "the application is allowed to run only during certain times and/or days."  Ex. 1003, Qureshi at 63:63-64; Ex. 1002, Weissman Decl. at ¶123. Qureshi does not explicitly teach the mobile device rule is effective from a particular time or determining whether the changed mobile device rule is applicable to the first request based on the time value associated with the first request. Ex. 1002, Weissman Decl. at ¶123.

Shelest, in the same field of endeavor, teaches that an action control policy is effective from a particular time, and teaches determining whether the action control policy is applicable based on a time value.  In particular, Shelest discloses a system for distributing security policy ("action control policy") to enterprise computers.  Ex. 1007, Shelest at ABSTRACT ("conditional activation system

distributes a security policy to the computer systems of an enterprise."); *Id.* at

[0005] ("security *policy* is typically expressed as rules that each have a condition

indicating when the rule is satisfied and one or *more actions to be performed*").

Shelest further discloses that a policy can be effective ("activated") from a

particular time ("activation time"). *Id.* at [0019] ("example of a security policy

activation[] criterion is an *activation time*. When the administrative component

distributes the security policy, it may *indicate a time at which the security policy*

*should be activated* on the computer systems"). Shelest explains that a policy may

be activated (applicable) at the activation time (based on a time value). *Id.* at

[0021] ("security policy activation criterion may be satisfied … *at an activation*

*time*."); Ex. 1002, Weissman Decl. at ¶124.

It would have been obvious to make the mobile device rules of Qureshi

effective from a particular time, as taught by Shelest, and to determine if those

rules are applicable based on the time the request was received by the mobile

device management system for several reasons. Ex. 1002, Weissman Decl. at

¶125.

**Known system ready for improvement**: First, Qureshi determines which

mobile device rules are appropriate based on information associated with the

request. Ex. 1003, Qureshi at 44:30-34 ("read information from the application

tunnel *request headers or bodies* … *to determine information about the user 115*

40

*and/or mobile device 120 associated with the request*"); *Id*. at 54:40-43

("*appropriate rule packages* to the mobile devices 120, *based on, e.g., the*

*properties 208 of the mobile devices*"). The mobile device rules in Qureshi are

thus "ready for the improvement" taught by Shelest. *KSR Int'l Co.*, 550 U.S. at

401; Ex. 1002, Weissman Decl. at ¶126.

**Known technique**: Second, as shown by Shelest, action control policies

effective from a particular time and determining appropriate action control policies

based on a time value were well known at the time of the alleged invention. *KSR*

*Int'l Co.*, 550 U.S. at 401*;* Ex. 1002, Weissman Decl. at ¶127.

**Predictable results and improved system**: Third, one of ordinary skill in

the art would have been motivated to modify Qureshi to allow action control

policies to be effective from a particular time and to determine appropriate action

control policies based on a time value associated with a request as taught by

Shelest. One predictable result of this change is that mobile devices would avoid

enforcing (or even considering) rules which are not yet active. For example, if an

enterprise creates a series of mobile device rules that block access to legacy

applications starting from some future date, the proposed change would result in

the enterprise's mobile devices not having to consider those rules prior to that date,

thereby reducing processing within the mobile devices. Another predicable result

would be allowing IT personnel to create, in advance, mobile device rules that are

41

to be enforced at some future time, thereby improving operational flexibility within the system.  Ex. 1002, Weissman Decl. at ¶128.

Accordingly, Qureshi in view of Shelest renders claim 9 obvious.

### D.    Ground 4:  Claims 1–4, 7, 8, 10–16 and 18 are Anticipated by Narain

#### 1.  <u>Independent Claims 1, 13, and 18</u>

One skilled in the art would understand that Narain anticipates claims 1, 13, and 18 of the '182 patent under 35 U.S.C. § 102(a)(2).  Claim 1, a method claim, claim 13, an apparatus claim, and claim 18, another apparatus claim, contain nearly identical limitations.  Accordingly, Petitioners address these common limitations of claims 1, 13, and 18 together, with reference to claim 1, in the below ground.  Ex. 1002, Weissman Decl. at ¶130.

In addition to the limitations set forth below, claims 13 and 18 require a non-transitory computer readable storage medium storing computer program instructions.  Claim 13 requires a computer processor.  Narain discloses a computer processor that executes program instructions stored in a non-transitory computer readable storage medium.  Ex. 1004, Narain at 23:20-51 ("computing device 800 typically includes one or more processors 804 and a system memory 806. … including but not limited to volatile memory (such as RAM), non-volatile memory (such as ROM, flash memory, etc.) … memory 806 may include an

operating system 820, one or more applications 822 … Application 822 may include policy enforcement algorithms"); Ex. 1002, Weissman Decl. at ¶131.

### a) *The preamble: "A method comprising"*

Narain teaches "a method of mobile device management."  Ex. 1004, Narain at 2:20-31); Ex. 1002, Weissman Decl. at ¶132.

### b) *Limitation: "storing, by an access control system, action control policies for a plurality of enterprises."*

Narain teaches an access control system storing policies for a plurality of enterprises.  Specifically, Narain discloses an enforcement engine 150 ("access control system") that includes "a client-side enforcement engine (client-side engine) 154, a runtime enforcement engine (runtime engine) 142, and a management platform 156 that in some combination *enforce compliance with the policy*."  Ex. 1004, Narain at 8:30-33.  Narain further discloses that the management platform 156 "may accommodate a multi-tenant system in which *each tenant represents an enterprise customer 160A*."  Ex. 1004, Narain at 4:6-8. Finally, Narain discloses that the pooling module 228, which is part of the management platform 156, "may centrally *store information related to the policy*."  Ex. 1004, Narain at 13:64-65, FIG. 2 (depicting pooling module 228 as a part of enforcement engine system architecture 200); Ex. 1002, Weissman Decl. at ¶133.

Applying the construction of "action control policies" set forth above, Narain teaches policies as a set of actions that can be performed by a mobile device ("a client device of a user") in a particular context. For example, Narain discloses that a policy can prohibit access to certain applications unless a VPN connection is established. Ex. 1004, Narain at 11:36-51 ("***based on the policy … prohibit access to one or more mobile applications*** when a VPN connection is not established"); Ex. 1002, Weissman Decl. at ¶134.

### c)      Limitation: *"wherein the access control system is external to each of the plurality of enterprises"*

Narain teaches the enforcement engine ("access control system") is external from the enterprise network. Ex. 1004, Narain at FIG. 1B (showing runtime engine 142 and management platform 165 external to enterprise network 110); Ex. 1002, Weissman Decl. at ¶135.

### d)      Limitation: *"storing, by the access control system, action control policies for the plurality of enterprises as a mapping from contexts of requests to the action control policies, each context specifying one or more attributes describing a request received from a client device"*

Narain teaches storing policies for a plurality of enterprises by the enforcement engine as discussed above for limitation (b). Ex. 1002, Weissman Decl. at ¶136.

Applying the construction of "attributes describing a request received from a

44

client device" set forth above, Narain teaches storing policies as a mapping from information describing the mobile device ("each context specifying one or more attributes describing the request") to the policy.  For example, Narain discloses that the stored policies may be customized for specific types of mobile devices.  Ex. 1004, Narain at 19:3-10 ("***policy 308 may be customizable to a given operating environment***. For example, the provisions may apply to … ***a type of mobile device.***"); Ex. 1002, Weissman Decl. at ¶137.

> ### e)      Limitation: *"wherein the request is for an action performed by an application hosted by a software as a services (SaaS) hosting system"*

Narain teaches requests for actions performed by an application hosted by a SaaS hosting system.  For example, Narain teaches that the enforcement engine manages access to YouTube. Ex. 1004, Narain at 11:5-7 ("policy blocks access to YouTube by the mobile device 104 because YouTube usage consumes excessive bandwidth").  As is known in the art, YouTube is a centrally hosted video-sharing application which users can subscribe to and access via a mobile application. When a user clicks on a video, the mobile application sends a request to YouTube's servers to stream the video.  A skilled artisan would understand that this is a request for an action performed by an application hosted by a SaaS hosting service. Ex. 1002, Weissman Decl. at ¶138.

To the extent that it is found that Narain does not teach applications hosted

by a SaaS hosting system, a skilled artisan would have found this limitation obvious as evidenced by Agarwal[2]; Ex. 1002, Weissman Decl. at ¶139.

> ### f) Limitation: *"each action control policy identifying actions that the client device is allowed in a given context"*

Narain teaches policies identifying actions that a client device is allowed in a given context.  For example, Narain teaches using policy to prohibit access to a mobile application when a VPN connection is not established.  Ex. 1004, Narain at 11:36-51 ("management of the VPN tunnel may be based on the policy … client-side engine 154 may prohibit access to one or more mobile applications when a VPN connection is not established"); Ex. 1002, Weissman Decl. at ¶1140.

> ### g) Limitation: *"receiving, by the access control system, from a first client device, a first request for interacting with the application hosted by the SaaS hosting system, the first request providing information describing a first context"*

Narain teaches receiving, by the enforcement engine ("access control system"), from a mobile device, a request for interacting with an application hosted by a SaaS hosting system.  In particular, Narain teaches that the enforcement engine manages communications between the mobile device and cloud-based

---

[2] Agarwal describes a similar system as Narain for accessing SaaS hosted applications.  Ex. 1009, Agarwal at ABSTRACT; Ex. 1002, Weissman Decl. at ¶139.

applications.  Ex. 1004, Narain at 10:61-65 ("***client-side engine 154 and runtime***

***engine 142*** may manage one or more communications … communications 152,

149, 134, 136, 132, and/or 146 may include ***traffic related to mobile***

***applications***"); *see* also *id.* at 21:66-22:5 ("***routing communications between the***

***mobile device and the network/cloud*** *or enterprise network* ***through the***

***enforcement engine*** … ***runtime engines [] may manage the communications***

***between the mobile device and the network/cloud***"); Ex. 1002, Weissman Decl. at

¶141.

Narain also teaches the request providing information describing a first

context.  For example, Narain teaches the managed communications ("request")

describing a website IP address.  Ex. 1004, Narain at 14:39-47 ("mobile device

with an IP address of 192.168.0.1 is ***attempting to access, with a request, a public***

***website with an IP address of 10.20.30.40*** … request is directed to host 1.2.3.4 to

TCP port 443, it is internally redirected to the listening socket of the ***inspection***

***engine***"); *see also id.* at FIG. 2, showing inspection engine 234 as part of

enforcement engine 200; Ex. 1002, Weissman Decl. at ¶142.

### h)  Limitation: "identifying a first enterprise from the plurality of enterprises, the first enterprise associated with the first client device"

Narain teaches identifying an enterprise associated with a mobile device.

First, Narain discloses that a policy may apply to a set of users.  Ex. 1004, Narain

at 19:1-7 ("***policy 308*** may include one or more provisions ***applied to*** one or more mobile applications … the provisions may apply to… ***a user or set of users***.") Second, Narain discloses that a "user" may correspond to an enterprise and, thus, a policy may apply to a particular enterprise. *Id*. at 19:15-17 ("policy 308 may include provisions that ***enable a first user*** to use a first private mobile application … policy 308 may ***enable a second user*** to use a second private mobile application. The ***first user and/or the second user may include individuals, an enterprise group, or the enterprise***."). Finally, Narain discloses inspecting mobile traffic to identify a particular enterprise ("user"). *Id*. at 9:13-16 ("***runtime engine 142*** may include inspecting upstream mobile traffic in real time, ***identifying the originating*** mobile device 104 and/or ***user***"); Ex. 1002, Weissman Decl. at ¶143.

> i)      *Limitation: "determining, by the access control system, a first action control policy associated with the first enterprise for the first context based on the mapping"*

Narain teaches the runtime engine (which is part of the enforcement engine, or "access control system") determining a policy associated with the first enterprise for the first context based on the mapping. First, as discussed above for limitation (h), Narain discloses that a policy may be associated with a particular ("first") enterprise identified based on the mobile device request. Second, Narain discloses that the stored policy may be customized for a particular type of mobile device ("first context"). Ex. 1004, Narain at 19:3-10 ("provisions may apply to … ***a type***

*of mobile device.*").    Finally, Narain discloses inspecting mobile traffic to determine a policy that should be enforced for a particular mobile device.  *Id.* at 9:13-16 ("inspecting upstream mobile traffic in real time, *identifying the originating mobile device 104* and/or user, and then *enforcing the policy.*"); Ex. 1002, Weissman Decl. at ¶144.

> *j)      Limitation: "the first action control policy allowing a first set of actions supported by the application"*

Narain teaches policies allowing specific actions supported by a cloud-based application as discussed above for limitation (f).  Ex. 1002, Weissman Decl. at ¶145.

> *k)      Limitation: "sending information describing the first action control policy to the first client device"*

Narain teaches sending information describing the first policy to the first client device.  In particular, Narain teaches sending policy updates to the client-side engine, which is a part of the mobile device.  Ex. 1004, Narain at 9:21-43 ("*management platform 156 generally coordinates creation, modification, and enforcement of the policy … the client-side engine 154 may periodically "call home" to the management platform 156 to pull policy updates*"), FIG. 1B (showing client-side engine 154 as part of mobile device 104); Ex. 1002, Weissman Decl. at ¶146.

49

### l)   Limitation: "for enforcement of the first action control policy by an agent executing on the first client device"

Narain teaches enforcement of the first policy by an agent executing on the first device.   For example, Narain teaches that the client-side engine manages communication based on policy.   Ex. 1004, Narain at 10:66-11:5 ("*client-side engine 154 may manage access by the mobile device 104 to cloud-based applications 140* … including managing communications 152 between the client-side engine 154 and the cloud-based applications 140. The management by the client-side engine 154 may be *based on the policy*."); Ex. 1002, Weissman Decl. at ¶147.

### m) Remaining Limitations of Claim 1

The remaining limitations of claim 1 are substantially identical to limitations (g)–(l) described above.   The differences are as follows: the term "first client" is replaced by "second client," "first request" is replaced with "second request," "first context" is replaced by "second context," "first enterprise" is replaced by "second enterprise," "first action control policy" is replaced by "second action control policy," and "first set of actions supported by the application" is replaced by "second set of actions supported by the application." Thus, claim 1 essentially requires that limitations (g)–(l) be repeated, but for a second client device, context, enterprise, action control policy, and set of actions

50

supported by the application.  Ex. 1002, Weissman Decl. at ¶148.

Narain teaches multiple clients and requests as discussed above in limitations (b) and (g); multiple contexts as discussed above in limitation (d); multiple action control policies as discussed above in limitation (i); and different sets of actions supported by an application as discussed above in limitation (f).  Ex. 1002, Weissman Decl. at ¶149.

Accordingly, Narain anticipates claims 1, 13, and 18.

## 2.  Dependent Claims 2 and 14

Claims 2 and 14, which depend from claims 1 and 13 respectively, recite the following limitation.

### a)  Limitation: *"wherein the first context comprises one or more of a user identifier, the application, and a time of the first request"*

Narain teaches a first context comprising a user identifier, an application, or time-based provision.  Specifically, Narain discloses policies with customizable provisions ("context") comprising specific users ("user identifier"), specific mobile applications, or particular times ("time of the first request").  Ex. 1004, Narain at 19:1-10 ("provisions may apply to *(1) a specific mobile application* … *(3) a user or set of users* … *(6) a particular time*"); Ex. 1002, Weissman Decl. at ¶152.

Accordingly, Narain anticipates claims 2 and 14.

## 3.  Dependent Claims 3 and 15

Claims 3 and 15, which depend from claims 1 and 13, respectively, recite "wherein the first context comprises one or more of a request type and a parameter of the request."

Narain teaches the first context comprising a parameter of the request.  For example, as discussed above with limitation (g) of claim 1, Narain discloses mobile device communications specifying a website IP address.  A person skilled in the art would understand that an IP address is a request parameter.  Ex. 1002, Weissman Decl. at ¶155.

Accordingly, Narain anticipates claims 3 and 15.

### 4.   <u>Dependent Claims 4 and 16</u>

Claims 4 and 16, which depend from claims 1 and 13 respectively, recite the following limitations.

#### a)   *Limitation: "wherein determining the first action control policy comprises: receiving an identifier of a user associated with the first request"*

Narain teaches receiving a user identifier associated with a first request.  For example, Narain discloses inspecting mobile traffic to identify a particular user.  Ex. 1004, Narain at 9:13-16 ("inspecting upstream mobile traffic in real time, *identifying the originating* mobile device 104 and/or *user*"); Ex. 1002, Weissman Decl. at ¶158.

### b) Limitation: "determining a user type of the user; and"

Narain discloses determining a user type of the user.  First, Narain discloses that a policy may be customized for users within a particular department of an enterprise ("user type").  Ex. 1004, Narain at 5:9-13 ("*policy may be customized* to a *particular user* 168 … to a *particular set of users* 168 … to a *particular department* 166.").   Second, Narain discloses that a particular user can be associated with a department.  *Id*. at 13-14 ("second *department 166B that includes the first user*").   Third, Narain discloses traversing a tree structure to determine which policy applies to a particular user, including determining if the user is in a particular enterprise department ("user type").  Ex. 1004, Narain at 8:5-20 ("policy with a tree structure, *policy evaluation process* may start from a *bottom organizational unit such as the users 168* in FIG. 1A and *proceed to higher levels* in the substructure 170. Specifically, referring to FIG. 1A, *the second department 166B is at a higher level than the first user 168A … if the policy does not apply at a lowest level, then the policy evaluation proceeds to the next higher level*"); Ex. 1002, Weissman Decl. at ¶159.

### c) Limitation: "selecting the first action control policy based on the user type of the user"

Narain teaches selecting a policy based on the user type.  In particular, as discussed above with limitation (b), Narain discloses traversing a tree structure to

determine which policy applies based on the enterprise department ("user type") to which the user belongs.  Ex. 1002, Weissman Decl. at ¶160.

Accordingly, Narain anticipates claims 4 and 16.

### E.     Ground 5:  Claims 5 and 17 are Obvious over Narain in view of Thomas

Claims 5 and 17, which depend from claims 1 and 13 respectively, recite the following limitations.

#### a)      Limitation: *"wherein determining the first action control policy comprises: generating a contextual model identifying expected contexts of the client device"*

Narain teaches generating a contextual model identifying expected contexts of the client device.   In particular, Narain teaches generating a mapping ("contextual model") of mobile application usage on a mobile device ("contexts of the client device").  Ex. 1004, Narain at 12:22-26 ("***enforcement engine 150 may be configured to provide a four-way mapping between users, mobile devices 104, mobile applications***—both native mobile applications 103 and/or cloud-based applications 140, enterprise data, mobile device data, access times"); Ex. 1002, Weissman Decl. at ¶163.

Narain further teaches the mapping provides a historical account of mobile application usage and, thus, identifies "expected contexts" of the device.  Ex. 1004, Narain at 12:27-30 ("such that the enterprise can have visibility into which user

using a ***particular mobile device 104 accessed a particular mobile application and during which periods of time***."); Ex. 1002, Weissman Decl. at ¶164.

> **b)    Limitation: "comparing the context to the contextual model; and determining the first action control policy based on a deviation of the context from the contextual model"**

Narain does not explicitly teach comparing context to the mapping ("contextual model") or determining policy based on deviation of the context from the mapping.  Ex. 1002, Weissman Decl. at ¶165.

Thomas, in the same field of endeavor, teaches comparing context to the contextual model and determining policy based on deviation of the context from the contextual model.   First, Thomas teaches a predictive model ("contextual model") identifying expected contexts of mobile devices.   Ex. 1005, Thomas at 5:23-30 ("***Feedback of information may also be associated with behaviors of individuals*** within the enterprise, such as being associated with most common violations of policy, network access, ***unauthorized application loading***, unauthorized external device use, and the like … this type of information feedback may enable ***the evaluation or profiling of client actions that are violations of policy that may provide a predictive model***").   Second, Thomas teaches that the predictive model may be used to improve ("determine") enterprise policy.  *Id.* at 30 ("predictive model for the ***improvement of enterprise policies***."); Ex. 1002, Weissman Decl. at ¶166.

It would have been obvious for Narain to compare the context to the mapping and determine policy based on deviation there between, as taught by Thomas, for at least the following reasons.  Ex. 1002, Weissman Decl. at ¶167.

**Known system ready for improvement:**  First, Narain teaches that policy can be generated dynamically based on mobile application data.  Ex. 1004, Narain at ABSTRACT ("***generating a policy*** regarding the mobile applications from a signature database ('SigDB'). The SigDB includes ***signatures pertaining to mobile applications***.").  Narain also explains that "policy may be customized to the enterprise customer" and that the enforcement engine ("access control system") "may perform additional or alternative functions" and the disclosed functions "are illustrative and are not intended to be limiting."  Ex. 1004, Narain at 4:66-67, 12:19-22.  Therefore, the enforcement engine is a prior art system ready for "improvement."  *KSR Int'l Co.*, 550 U.S. at 401; Ex. 1002, Weissman Decl. at ¶168.

**Known technique:**  Second, as shown by Thomas, comparing a predictive model ("contextual model") to a context and determining policy based on deviation there between was well known at the time of the alleged invention.  Ex. 1002, Weissman Decl. at ¶169.

**Predictable results and improve system:** Third, one of ordinary skill in the art would have been motivated to modify Narain to determine policy based on

comparing context to Narain's mapping, as taught by Thomas, to obtain the predictable result of allowing the enforcement engine to dynamically adapt an enterprise's policies based on new information regarding mobile application usage. In particular, the modified system would result in the identification of new device usage situations that are not yet addressed by the policy so that IT professionals could address previously unidentified gaps in the policy.  For example, the modified enforcement engine would compare a mapping of a device using a new mobile application with the device's previous history and select a new policy that blocks or enables the new application.  Ex. 1002, Weissman Decl. at ¶170.

Accordingly, Narain in view of Thomas renders claims 5 and 17 as obvious.

### F.    Ground 6:  Claim 6 is Obvious over Narain in view of Joshi

Claim 6, which depends from claim 1, recites the following limitations.

#### a)  Limitation: *"wherein the first action control policy specifies a first cache size for storing data associated with the application"*

Narain teaches storing data associated with the application.  Ex. 1004, Narain at 16:45-47 ("client-side engine 206 may also include a memory 272. The **memory 272 may store** the policy, **mobile applications**"); Ex. 1002, Weissman Decl. at ¶173.

Narain does not explicitly teach a policy specifying the amount of memory ("first cache size") for storing this data.  Ex. 1002, Weissman Decl. at ¶174.

Joshi, in the same field of endeavor, teaches a policy specifying a cache size. Ex. 1006, Joshi at [0210] ("*cache policy* may further comprise *cache size limits, such as a maximum cache size and/or minimum cache size*").   Joshi also discloses adjusting cache size for a particular application.   Ex. 1006, Joshi at [0090] ("*adjustments to cache page sizes, cache allocations*, system resources, and other parameters *based on changes in the operation of the application*"); Ex. 1002, Weissman Decl. at ¶175.

It would have been obvious for the policy of Narain to specify the cache size as taught by Joshi for at least the following reasons.  Ex. 1002, Weissman Decl. at ¶176.

**Known system ready for improvement**:   First, Narain teaches that its policy can be used for a wide range of purposes and customized to the specific needs of an enterprise.  Ex. 1004, Narain at 7:50-52 ("policy may include specific *controls* and/or security *features/protocols specific to the operating environment*"); *Id*. at 4:66-67 ("policy may be *customized to the enterprise* customer").   Narain further teaches that a policy can be used to limit resource usage on mobile devices.  Ex. 1004, Narain at 11:5-7 ("policy blocks access to YouTube by the mobile device 104 because YouTube usage consumes *excessive bandwidth*"). This teaching shows that Narain is a system "ready for the improvement" of specifying the cache size for storing data associated with an

58

application.  *KSR Int'l Co.*, 550 U.S. at 401;  Ex. 1002, Weissman Decl. at ¶177.

**Known technique**:  Second, as shown by Joshi, using a policy to specify an amount of memory (cache size) for storing data was a well-known technique at the time of the alleged invention.  Ex. 1002, Weissman Decl. at ¶178.

**Predictable results and improved system**: Third, one of ordinary skill in the art would have been motivated to implement, within Narain, a policy that specifies the amount of memory ("cache size") for storing the data associated with the application, as taught by Joshi.  Doing so would lead to the predictable result of allowing an enterprise to manage an additional resource (i.e., memory) of its mobile devices.  Ex. 1002, Weissman Decl. at ¶179.

>  **b)     Limitation: *"the second action control policy specifies a second cache size for storing data associated with the application"***

Narain in view of Joshi discloses that the first mobile device rule ("action control policy") specifies a first cache size for storing data associated with the application as discussed above for limitation (a).

Narain explicitly teaches that the policy may be customized for specific applications.  Ex. 1004, Narain at 19:3-5 ("provisions may apply to (1) a ***specific mobile application***"); Ex. 1002, Weissman Decl. at ¶181.

Joshi teaches implementing two or more different cache policies each specifying a cache size.  Ex. 1006, Joshi at [0210] ("Each cache management

59

system 2612A-N may implement a respective cache policy").  Joshi further teaches that cache size may be adjusted for on a per-application basis.  Ex. 1006, Joshi at [0090] ("***adjustments to cache page sizes, cache allocations***, system resources, and other parameters based on ***changes in the operation of the application***"); Ex. 1002, Weissman Decl. at ¶182.

It would have been further obvious to implement, within Narain, two different policies specifying different cache sizes, as taught by Joshi, because doing so would lead to the predictable results of allowing an enterprise to manage mobile device memory usage on a per-application or per-user basis, providing even greater control over its mobile device resources.  Ex. 1002, Weissman Decl. at ¶183.

Accordingly, the combination of Narain in view of Joshi renders claim 6 as obvious.

### G.    Ground 7:  Claim 9 is obvious over Narain in view of Shelest

Claim 9, which depends from claim 1, recites the following limitations.

#### a)    Limitation: "receiving information indicating a change in a particular action control policy associated with the first enterprise effective from a particular time"

Narain teaches receiving information indicating a change in a particular policy associated with the first enterprise effective from a particular time.  In particular, Narain teaches the runtime engine component of the enforcement engine

receiving policy updates ("information indicating a change in a particular action control policy").  Ex. 1004, Narain at 12:22-30 ("***runtime engine 142 may periodically receive policy updates,*** such as mobile application signature changes (discussed below) or substructure modifications (discussed with reference to FIG. 1A) from the management platform 156.")  Ex. 1002, Weissman Decl. at ¶186.

Narain also teaches that enterprise policy can be effective from a particular time.  Ex. 1004, Narain at 19:1-18 ("***policy 308 may include one or more provisions applied to one or more mobile applications*** … ***the provisions may apply to*** … ***(6) a particular time***"); Ex. 1002, Weissman Decl. at ¶187.

> ### b)      Limitation: "determining a time value associated with the first request."

Narain teaches determining a time value associated with a first request.  In particular, Narain teaches that the enforcement engine records the time at which a mobile device accesses a mobile application.  Ex. 1004, Narain at 12:20-26 ("enforcement engine 150 may be configured to provide a four-way mapping between … mobile devices… ***access times*** … such that the enterprise can have visibility into which user using a particular mobile device 104 accessed a particular mobile application and ***during which periods of time***"); Ex. 1002, Weissman Decl. at ¶188.

### c)      Limitation: *"determining whether the changed action control policy is applicable to the first request based on the time value associated with the first request."*

Narain does not explicitly teach determining whether a changed policy is applicable to a first request based on the time value associated with the request. Ex. 1002, Weissman Decl. at ¶189.

Shelest, in the same field of endeavor, explicitly teaches determining whether the action control policy is applicable based on a time value associated with a request.  In particular, Shelest discloses a system for distributing security policy ("action control policy") to enterprise computers.  Ex. 1007, Shelest at ABSTRACT ("system distributes a security policy to the computer systems of an enterprise."); *Id.* at [0005] ("security *policy* is typically expressed as rules that each have a condition indicating when the rule is satisfied and one or ***more actions to be performed***").  Shelest further discloses that a policy can be effective ("activated") from a particular time ("activation time").  *Id.* at [0019] ("example of a security policy activation[] criterion is an ***activation time***. When the administrative component distributes the security policy, it may ***indicate a time at which the security policy should be activated***").  Shelest explains that policy may be activated ("applicable") at the activation time (i.e., based on a time value).  *Id.* at [0021] ("security policy activation criterion may be satisfied … ***at an activation time***."); Ex. 1002, Weissman Decl. at ¶190.

62

It would have been obvious for Narain to determine whether the changed policy was applicable based on the time value associated with the request, as taught by Shelest for the following reasons.  Ex. 1002, Weissman Decl. at ¶191.

**Known system ready for improvement:** First, Narain teaches identifying ("determining") a policy for enforcement based on an enterprise's default policy ("first action control policy associated with the first enterprise").  Ex. 1004, Narain at 20:52-64 ("if the mobile application is a public mobile application 536, the policy 308 includes a default rule for allowing the mobile application except for mobile applications that are blocked.").  This teaching shows that Narain is a system "ready for the improvement" of determining whether a changed policy was applicable based on the time value associated with the request.  *KSR Int'l Co.*, 550 U.S. at 401; Ex. 1002, Weissman Decl. at ¶192.

**Known technique:** Second, as shown by Shelest, determining whether a policy is applicable based on a time value associated with a request was well known at the time of the alleged invention.  Ex. 1002, Weissman Decl. at ¶193; *KSR Int'l Co.*, 550 U.S. at 401.

**Predictable results and improved system:** Third, one of ordinary skill in the art would have been motivated to modify Narain to determine whether the changed policy was applicable based on the time value associated with the request as taught by Shelest.  One predictable result of this change is that mobile devices

would avoid having to consider rules which are not yet active.  For example, if an enterprise creates policies to block legacy applications starting from some future date, the improved system would result in the enterprise devices not having to consider those policies prior to that date, thereby reducing processing.  Ex. 1002, Weissman Decl. at ¶194; *KSR Int'l Co.*, 550 U.S. at 401.

Accordingly, the combination of Narain in view of Shelest renders claim 9 obvious.

## VII.   MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1)

### A.    Real Party-In-Interest and Related Matters

Citrix Systems, Inc. is the real party in interest.

### B.    Lead and Back-Up Counsel

Petitioner provides the following designation and service information for lead and back-up counsel. 37 C.F.R. § 42.8(b)(3)-(b)(4). Petitioner consents to electronic service.

**Lead counsel**: Larissa B. Park (Reg. No. 59,051)

**Back-Up Counsel**: Kristoffer W. Lange (Reg. No. 68,084).

| Larissa B. Park, Kristoffer W. Lange | 33 Arch Street, 26th Floor, Boston, MA 02110-1447; Phone: (617) 406-6000, Fax: (617) 406-6100 larissa.park@dlapiper.com; kris.lange@dlapiper.com |
|---|---|

## VIII. CONCLUSION

For the foregoing reasons, Petitioner requests *inter partes* review of claims

1–18 of U.S. Patent No. 9,426,182.

*Petition for Inter Partes Review of*
*U.S. Patent No. 9,426,182*

Dated:  April 19, 2018                    Respectfully Submitted,


                                           /Larissa B. Park/_____
                                          Larissa B. Park
                                          Registration Number 59,051
                                          **DLA Piper LLP (US)**
                                          33 Arch Street, 26th Floor
                                          Boston, Massachusetts 02110-1447
                                          (617) 406-6013

66

Patent No. 9,426,182
Petition for *Inter Partes* Review

## CERTIFICATION UNDER 37 CFR § 42.24(d)

Under the provisions of 37 CFR §42.24(d), the undersigned hereby certifies that the word count for the foregoing Petition for *Inter Partes* Review totals 13,956 words, as calculated by Microsoft Word, which is less than the 14,000 allowed under 37 CFR §42.24(a)(i).

Dated:  April 19, 2018                    Respectfully Submitted,

                                  By:    /Larissa B. Park/_____
                                        Larissa B. Park
                                        Registration Number 59,051
                                        **DLA Piper LLP (US)**
                                        33 Arch Street, 26th Floor
                                        Boston, Massachusetts 02110-1447
                                        (617) 406-6013

Patent No. 9,426,182
Petition for *Inter Partes* Review

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Petition for

*Inter Partes* Review and all Exhibits and other documents filed together with the

petition were served on April 19, 2018, via Express Mail, by placing them in a

Express Mail package and depositing them in a Express Mail drop box prior to

midnight Eastern time, addressed to the following correspondence address of

record for the '182 Patent:

      FENWICK & WEST LLP
      Silicon Valley Center
      801 California Street
      Mountain View, CA 94041

Dated:  April 19, 2018        Respectfully Submitted,

        By:   /Larissa B. Park/
            Larissa B. Park
            Registration Number 59,051
            **DLA Piper LLP (US)**
            33 Arch Street, 26th Floor
            Boston, Massachusetts 02110-1447
            (617) 406-6013

# EXHIBIT 3

Trials@uspto.gov                                                  Paper 8
571-272-7822                                            Entered: October 30, 2018

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

CITRIX SYSTEMS, INC.
Petitioner

v.

WORKSPOT, INC.
Patent Owner
_____

Case IPR2018-00917
Patent 9,426,182 B1
_____

Before WILLIAM M. FINK, *Vice Chief Administrative Patent Judge*,
THU A. DANG, and CHRISTA P. ZADO, *Administrative Patent Judges*.

DANG, *Administrative Patent Judge*.

SCHEDULING ORDER
and
GENERAL INSTRUCTIONS
*37 C.F.R. § 42.5*

IPR2018-00917
Patent 9,426,182 B1

A. GENERAL INSTRUCTIONS

*1.  Request for an Initial Conference Call*

Unless at least one of the parties requests otherwise, we will not conduct an initial conference call as described in the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765–66 (Aug. 14, 2012).  The parties **must request** an initial conference call if either party is aware of any conflicts or concerns with DUE DATES 6 or 7 set forth in the Appendix of this Scheduling Order.  Any request for an initial conference call must be made no later than 25 days after the institution of trial.

*2.  Standing Procedure for Requests for Conference Calls*

If the parties request a conference call, including an initial conference call, the parties must follow these procedures:

    a.  Prior to requesting a conference call, the parties must confer in an effort to resolve any issue to be discussed with the Board, or be prepared to explain to the Board why such a conference was not possible.

    b.  Parties may request a conference call by contacting the Board at the email address or telephone number listed above the caption of this Order.  Requests via email are expected and preferred; requests via telephone should be reserved for time-critical circumstances.  Requests by email must copy opposing counsel.  Requests by telephone should include opposing counsel as practicable.

    c.  The request must include a list of proposed issues and/or motions to be discussed during the call.

IPR2018-00917
Patent 9,426,182 B1

    d.  The request may include a brief background discussion of the issue(s) and/or motion(s) to be discussed, but must not include arguments.  Email correspondence between the parties and the Board is for administrative purposes only and is not a part of the record.

    e.  The request must certify that the parties conferred in accordance with 2.a., and must indicate the result of the conference (e.g., whether the non-requesting party opposes or does not oppose the request).

    f.  The request must include a list of dates and times when both parties are available for the call.

    *3.  Motions to Seal, Protective Orders, and Confidential Information*

Papers and exhibits filed with the Board are public unless designated as confidential when filed.  37 C.F.R. § 42.14.  Papers and exhibits may be filed as confidential if filed with a motion to seal.  *Id.*  Those papers and exhibits will remain under seal provisionally until the Board renders its decision on the motion.  *Id.*  A motion to seal must include a proposed protective order, or must refer to a protective order already approved in the proceeding.  37 C.F.R. § 42.54(a).  A protective order does not exist in this proceeding unless the parties file one and the Board approves it.  Board approval typically does not occur until its decision on a motion to seal, although the parties may request a conference call to seek approval prior to a decision on a motion to seal if the particular circumstances of the case so require.

Often, a party moves to seal confidential or protective order material of the opposing party.  In this case, the opposing party is authorized to file a

3

IPR2018-00917
Patent 9,426,182 B1

response to the motion to seal to address why the motion to seal should be granted.  Such a response is due within 7 days of the filing of the motion to seal and is subject to the same filing requirements (e.g., length, document format) as the motion to seal.

We encourage the parties to adopt the Board's default protective order if they conclude that a protective order is necessary.  *See* Default Protective Order, Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, App. B (Aug. 14, 2012).  If the parties choose to propose a protective order deviating from the default protective order, they must submit the proposed protective order jointly along with a marked-up comparison of the proposed and default protective orders showing the differences; and the parties must explain why the proposed deviations from the default protective order are necessary.

The Board has a strong interest in the public availability of the proceedings.  We advise the parties that redactions to documents filed in this proceeding should be limited to isolated passages consisting entirely of confidential information, and that the thrust of the underlying argument or evidence must be clearly discernible from the redacted versions.  We also advise the parties that information subject to a protective order will likely become public if identified in a final written decision in this proceeding, and that a motion to expunge the information will not necessarily prevail over the public interest in maintaining a complete and understandable file history. *See* Office Patent Trial Practice Guide, 77 Fed. Reg. at 48,761.

*4. Discovery Disputes*

The panel encourages parties to resolve disputes relating to discovery on their own and in accordance with the precepts set forth in 37 C.F.R.

IPR2018-00917
Patent 9,426,182 B1

§ 42.1(b).  To the extent that a dispute arises between the parties requiring Board intervention, the parties are to follow the procedures for requesting a conference call set forth above.

    5. *Depositions*

        The parties are advised that the Testimony Guidelines appended to the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,772 (Aug. 14, 2012) (Appendix D), apply to this proceeding.  The Board may impose an appropriate sanction for failure to adhere to the Testimony Guidelines. 37 C.F.R. § 42.12.  For example, reasonable expenses and attorneys' fees incurred by any party may be levied on a person who impedes, delays, or frustrates the fair examination of a witness.

        Whenever a party submits a deposition transcript as an exhibit in this proceeding, the submitting party shall file the full transcript of the deposition rather than excerpts of only those portions being cited.

    6. *Cross-Examination*

        Except as the parties might otherwise agree, for each due date—

        a. Cross-examination begins after any supplemental evidence is
           due.  37 C.F.R. § 42.53(d)(2).

        b. Cross-examination ends no later than a week before the filing
           date for any paper in which the cross-examination testimony is
           expected to be used.  *Id.*

    7. *Oral Argument*

        Requests for oral argument must comply with 37 C.F.R. § 42.70(a). To permit the Board sufficient time to schedule the oral argument, the parties may not stipulate to an extension of the request for oral argument beyond the date set forth in the Due Date Appendix.  Unless the Board

IPR2018-00917
Patent 9,426,182 B1

notifies the parties otherwise, oral argument, if requested, will be held at the USPTO headquarters in Alexandria.  The parties may jointly file a paper stating their preference for the hearing location within one month of this order.  Note that the Board may not be able to honor the parties' preference of hearing location due to, among other things, the availability of hearing room resources and the needs of the panel.  The Board will consider the location request and notify the parties accordingly if a request for change in location is granted.

Seating in the Board's hearing rooms may be limited, and will be available on a first-come, first-served basis.  If either party anticipates that more than five (5) individuals will attend the argument on its behalf, the party should notify the Board as soon as possible, and no later than the request for oral argument.  Parties should note that the earlier a request for accommodation is made, the more likely the Board will be able to accommodate additional individuals.

*8. Additional Formatting Requirements of Papers and Exhibits*

All papers and exhibits must include at least the proceeding number and consecutive page numbers on each page.  Citations to exhibits may be in whatever manner the submitting party deems appropriate (i.e., stamped or original pagination).  Each page of an exhibit must also include the exhibit number.  The filing of complete documents and transcripts is encouraged, rather than excerpts.  Electronic documents filed with the Board should be text searchable, to the extent feasible (e.g., having undergone optical character recognition).

IPR2018-00917
Patent 9,426,182 B1

B.  DUE DATES

This order sets due dates for the parties to take action after institution of the proceeding.  The parties may stipulate to different dates for DUE DATES 1 through 5 (earlier or later, but no later than DUE DATE 6).  A notice of the stipulation, specifically identifying the changed due dates, must be promptly filed.  The parties may not stipulate to an extension of DUE DATES 6 and 7, or of the request for oral argument.  Due to scheduling constraints, such as hearing room availability, ***the parties must request a conference call with the panel if there are any conflicts that arise with DUE DATE 7 as soon as practicable***, which will be modified only upon a showing of good cause.

In stipulating to different times, the parties should consider the effect of the stipulation on times to object to evidence (37 C.F.R. § 42.64(b)(1)), to supplement evidence (37 C.F.R. § 42.64(b)(2)), to conduct cross-examination (37 C.F.R. § 42.53(d)(2)), and to draft papers depending on the evidence and cross-examination testimony.

*1.  DUE DATE 1*

Patent Owner may file—

    a.  A response to the petition (37 C.F.R. § 42.120), and

    b.  A motion to amend the patent (37 C.F.R. § 42.121).

Patent Owner must file any such response or motion to amend by DUE DATE 1.  If Patent Owner elects not to file anything, Patent Owner must arrange a conference call with the parties and the Board.  Patent Owner is cautioned that any arguments for patentability not raised in the response will be deemed waived.  Patent Owner may file a motion to amend without prior authorization from the Board.  Nevertheless, Patent Owner must confer with

IPR2018-00917
Patent 9,426,182 B1

the Board before filing such a motion by requesting a conference call under the procedures set forth above.  *See* 37 C.F.R. § 42.121(a).  The conference call must occur at least ***two weeks*** before DUE DATE 1 in order to satisfy the conferral requirement.

### 2.  DUE DATE 2

Petitioner may file a reply to Patent Owner's response.

Petitioner may file an opposition to the motion to amend.

### 3.  DUE DATE 3

Patent Owner may file a sur-reply to Petitioner's reply.

Patent Owner may file a reply to the opposition to the motion to amend.

### 4.  DUE DATE 4

Petitioner may file a sur-reply to Patent Owner's reply to the opposition to the motion to amend.

Either party may file a motion to exclude evidence (37 C.F.R § 42.64(c)).

 Either party may file a request for oral argument (37 C.F.R. § 42.70(a)).  The due date for the request for oral argument may not be changed by stipulation.

### 5.  DUE DATE 5

Either party may file an opposition to a motion to exclude evidence.

### 6.  DUE DATE 6

Either party may file a reply to an opposition to a motion to exclude evidence.

Either party may file a request for a pre-hearing conference.

IPR2018-00917
Patent 9,426,182 B1

### 7.  DUE DATE 7

The oral argument (if requested by either party) shall be held on this

date.

IPR2018-00917
Patent 9,426,182 B1

## DUE DATE APPENDIX

DUE DATE 1 ...................................................................January 29, 2019

    Patent Owner's response to the petition

    Patent Owner's motion to amend the patent

DUE DATE 2 ......................................................................April 29, 2019

    Petitioner's reply to Patent Owner's response to the petition

    Petitioner's opposition to Patent Owner's motion to amend

DUE DATE 3 ........................................................................May 29, 2019

    Patent Owner's sur-reply to Petitioner's reply to the response to the

        petition

    Patent Owner's reply to Petitioner's opposition to the motion to

        amend

DUE DATE 4 .......................................................................June 19, 2019

    Petitioner's sur-reply to Patent Owner's reply to the opposition

        to the motion to amend

    Motion to exclude evidence

    Request for oral argument (parties may not stipulate to an

        extension for the request for oral argument)

DUE DATE 5 ...........................................................................July 3, 2019

    Opposition to motion to exclude

DUE DATE 6 .........................................................................July 10, 2019

    Reply to opposition to motion to exclude

    Request for pre-hearing conference

IPR2018-00917
Patent 9,426,182 B1

DUE DATE 7 .............................................................................July 24, 2019

     Oral argument (if requested)

PETITIONER:

Larissa Park
Kristoffer Lange
DLA PIPER LLP
larissa.bifano@dlapiper.com
kris.lange@dlapiper.com

PATENT OWNER:

Brian Buroker
Omar Amin
GIBSON, DUNN & CRUTCHER LLP
bburoker@gibsondunn.com
oamin@gibsondunn.com

# EXHIBIT 4
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 5
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 6

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     CITRIX SYSTEMS, INC.,
 4                                    :      CIVIL ACTION
             Plaintiff,              :
 5                                    :
             v.                      :
 6                                    :
     WORKSPOT, INC.,                  :
 7                                    :      NO. 18-588-LPS
             Defendant.
 8                              - - -

 9                       Wilmington, Delaware
                       Wednesday, December 12, 2018
10               Preliminary Injunction Hearing
                              and
11           Temporary Restraining Order Hearing

12                              - - -

13   BEFORE:          HONORABLE LEONARD P. STARK, Chief Judge

14                              - - -
     APPEARANCES:
15

16            DLA PIPER LLP (US)
              BY:  DENISE S. KRAFT, ESQ., and
17                 BRIAN A. BIGGS, ESQ.

18                 and

19            DLA PIPER LLP (US)
              BY:  MICHAEL STRAPP, ESQ., and
20                 LARISSA BIFANO, ESQ.
                   (Boston, Massachusetts)
21
                        Counsel for Plaintiff
22

23

24
                             Brian P. Gaffigan
25                           Registered Merit Reporter
```

110

1  attention is focused on the issues, and we're going to put
2  some more attention on the issues.  So in denying the
3  motion, I'm not saying that we're done with in particular
4  the Mr. Chawla issue, and let's talk about that.
5          The Court does remain highly troubled by what
6  appears to have been the filing of a false declaration by
7  Workspot but a false declaration signed by Mr. Chawla under
8  penalty of perjury.
9          The reasons for all of that in the record
10  supporting the Court's concern I think is well set out in
11  writing and in our discussion particularly of this morning.
12          I do think it's appropriate, indeed required,
13  that we put some more attention on that issue through
14  some limited expedited discovery.  Once the discovery is
15  completed, the plaintiffs are permitted, should they think
16  they have a basis at that point to do so, to file a motion
17  for additional sanctions.
18          I'm also going to require that the parties, and
19  I'll give you a date for all this in just a moment, but
20  that the parties work together and propose an order to
21  impose additional sanctions on Workspot now to the extent
22  that they can agree on some sanctions that can be put in
23  place even before the discovery.  Some things have been
24  talked about that sound like they may be agreeable already
25  to Workspot.

111

1          And I also am going to require the parties to
2  submit a proposal about what information, if any, should be
3  redacted and not provided to both companies internally about
4  what has occurred.
5          I do have a concern about costs.  I do have a
6  concern about the limited discovery turning into unlimited
7  discovery.  I do have a concern about time.  And I think
8  that these things are more likely to be efficiently handled
9  on both sides if you can come to some ground rules about
10  what can be shared, for instance, with the Workspot board
11  so that you all can hopefully get to the bottom of what
12  happened as quickly and inexpensively as possible.
13          So I'm going to give you it a chance to work on
14  exactly what do we mean by limited expedited discovery,
15  what do we mean by what needs to be redacted, and what can
16  be shared internally.  But ultimately, the plaintiffs will
17  have a chance to ask me to impose further sanctions.
18          One sanction I am imposing now is I am going
19  to make the defendants pay 50 percent of the costs that the
20  plaintiffs have incurred to date in connection with the
21  filing of the TRO motion.  And that is reasonable attorney
22  fees as well as the costs including their retention of the
23  forensic expert to do the investigation.
24          You all have to work out a process in timing to
25  hopefully figure out what that dollar amount is.  If you

112

1  have disputes, then you will have to bring them to me.  But
2  it was fair for the plaintiff to bring the TRO motion.  It
3  was fair for them to be highly concerned about what they saw
4  happening seemingly in a targeted way to their executives in
5  October, and the suspicions that they have about Mr. Chawla
6  from the beginning of that process appear to have been
7  proven through the further investigation and briefing.
8          Some part of the sanction for the false filings
9  that were submitted to the Court has to be a financial cost,
10  and I'm beginning that by the 50 percent of the cost and
11  fees associated with the TRO motion.
12          This is without prejudice to asking for further
13  financial sanctions, depending on how the plaintiffs assess
14  things going forward.
15          Further, the defendant's request for email
16  discovery from the plaintiff's executives is denied.  I
17  don't see a basis to order that discovery at this point.
18          So that is all for the moment on the TRO.
19          On the PI motion, it is denied.  An opinion will
20  follow at some point, but it's enough for me to say at this
21  point that with respect to false advertising and the patent
22  infringement, I find that the plaintiff on this record
23  before me have failed to show a likelihood of irreparable
24  harm on the merits.  They have also failed to show
25  irreparable harm and have failed to show the balance of

113

1  harms favors injunctive relief that they have requested.
2          What I want you to do, I don't want to ruin
3  anybody's holidays but I don't want this to linger forever.
4  So what I am thinking, but I will take your explanation on
5  this, it's to give you until a week from Friday to meet and
6  confer.  And what I would ideally like from you by next
7  Friday is a proposed schedule consistent with my form
8  scheduling order, and that that schedule should include your
9  proposals for the limited expedited sanctions related, let's
10  call it discovery, to potentially be followed by the filing
11  of the motion for sanctions and also your positions ideally
12  within the form of the scheduling order.  But if it is
13  easier to put it in a separate document, that's fine, but
14  your positions on redactions, and the whole question of how
15  can we educate both companies as to what is going on in
16  hopes of making things move efficiently.
17          If next Friday is reasonable and won't ruin the
18  holidays, then we'll make it next Friday.  If you want to
19  propose a different date, I'm open to it.
20          Any thought from the plaintiffs?
21          MR. STRAPP:  I think next Friday is a good idea
22  because that way we'll have a proposal to you before we get
23  to the holidays.
24          THE COURT:  You can ruin my holiday ...
25          (Lawyers laugh.)

1          THE COURT:  I didn't think of that until you
2  said that.  But what do you think?
3          MR. LYON:  That's fine.
4          THE COURT:  Yes.  So don't expect that I will
5  necessarily have it back to you immediately, but I will turn
6  to it as soon as I can.
7          Anything else before we break?
8          MR. STRAPP:  No.  Thank you, Your Honor.
9          THE COURT:  Is there anything else?
10         MR. LYONS:  No.  Thank you, Your Honor.
11         THE COURT:  Thank you all very much.  We will be
12  in recess.
13         (Hearing ends at 4:27 p.m.)
14
15
16     I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.
17

18          /s/ Brian P. Gaffigan
              Official Court Reporter
19             U.S. District Court
20
21
22
23
24
25

# EXHIBIT 7

| | |
|---|---|
| **From:** | Moore, David E. <dmoore@potteranderson.com> |
| **Sent:** | Wednesday, February 06, 2019 12:40 PM |
| **To:** | Strapp, Michael G. |
| **Cc:** | Ghassab, Yasmin; Kraft, Denise; Bifano, Larissa, Lange, Kris; Biggs, Brian; Lopez, Ronald; Werber, Matthew; Hayes, Jennifer; Karen Gibbs; Palapura, Bindu A. |
| **Subject:** | RE: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend |

**[EXTERNAL]**

At this time, WS does not agree to stipulate to a stay.  We are willing to revisit after the amended answer and complaint is on file. May we /s/ the previously circulated stipulation to amend for Denise or Brian?

Dave

**From:** Strapp, Michael G. [mailto:Michael.Strapp@dlapiper.com]
**Sent:** Tuesday, February 05, 2019 5:38 PM
**To:** Moore, David E. <dmoore@potteranderson.com>
**Cc:** Ghassab, Yasmin <Yasmin.Ghassab@dlapiper.com>; Kraft, Denise <denise.kraft@dlapiper.com>; Bifano, Larissa <Larissa.Bifano@dlapiper.com>; Lange, Kris <Kris.Lange@dlapiper.com>; Biggs, Brian <Brian.Biggs@dlapiper.com>; Lopez, Ronald <rflopez@nixonpeabody.com>; Werber, Matthew <mwerber@nixonpeabody.com>; Hayes, Jennifer <jenhayes@nixonpeabody.com>; Karen Gibbs <karen.gibbs@workspot.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>
**Subject:** Re: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

Dave,

We don't intend to oppose Workspot's request to amend, but we'd appreciate a response regarding whether you intend to oppose a motion to stay before we get the stipulation on file.

Regards,

Michael

On Feb 5, 2019, at 5:29 PM, Moore, David E. <dmoore@potteranderson.com> wrote:

> **[EXTERNAL]**
>
> Just checking back on the stip to amend.
>
> Thanks,
> Dave

> **From:** Moore, David E.
> **Sent:** Monday, February 04, 2019 8:48 PM
> **To:** Strapp, Michael G. <Michael.Strapp@dlapiper.com>; Ghassab, Yasmin <Yasmin.Ghassab@dlapiper.com>; Kraft, Denise <denise.kraft@dlapiper.com>; Bifano, Larissa <Larissa.Bifano@dlapiper.com>; Lange, Kris <Kris.Lange@dlapiper.com>; Biggs, Brian

1

<Brian.Biggs@dlapiper.com>
**Cc:** 'Lopez, Ronald' <rflopez@nixonpeabody.com>; 'Werber, Matthew' <mwerber@nixonpeabody.com>;
'Hayes, Jennifer' <jenhayes@nixonpeabody.com>; 'Karen Gibbs' <karen.gibbs@workspot.com>;
Palapura, Bindu A. <bpalapura@potteranderson.com>
**Subject:** Re: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

We will consider yor request and discuss the proposed stay with our client, but first we would
like to get our proposed amended pleading on file.  May we sign the previously circulated
stipulation for your side?

Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone

-------- Original message --------
From: "Strapp, Michael G." <Michael.Strapp@dlapiper.com>
Date: 2/4/19 6:08 PM (GMT-05:00)
To: "Moore, David E." <dmoore@potteranderson.com>, "Ghassab, Yasmin"
<Yasmin.Ghassab@dlapiper.com>, "Kraft, Denise" <denise.kraft@dlapiper.com>, "Bifano,
Larissa" <Larissa.Bifano@dlapiper.com>, "Lange, Kris" <Kris.Lange@dlapiper.com>, "Biggs,
Brian" <Brian.Biggs@dlapiper.com>
Cc: "'Lopez, Ronald'" <rflopez@nixonpeabody.com>, "'Werber, Matthew'"
<mwerber@nixonpeabody.com>, "'Hayes, Jennifer'" <jenhayes@nixonpeabody.com>, 'Karen
Gibbs' <karen.gibbs@workspot.com>, "Palapura, Bindu A." <bpalapura@potteranderson.com>
Subject: RE: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

Dave,

That was not the intent of my email. But we would like to know whether Workspot will oppose a
motion to stay its infringement counterclaim pending resolution of the IPR if the Court grants
Workspot's motion for leave to amend to add the counterclaim.

Regards,

Michael

Michael Strapp
Partner

T +1 617.406.6031
F +1 617.406.6100
M +1 917.518.3828
E michael.strapp@dlapiper.com

DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
United States
www.dlapiper.com

-----Original Message-----
From: Moore, David E. <dmoore@potteranderson.com>
Sent: Monday, February 4, 2019 6:04 PM
To: Strapp, Michael G. <Michael.Strapp@dlapiper.com>; Ghassab, Yasmin
<Yasmin.Ghassab@dlapiper.com>; Kraft, Denise <denise.kraft@dlapiper.com>; Bifano, Larissa
<Larissa.Bifano@dlapiper.com>; Lange, Kris <Kris.Lange@dlapiper.com>; Biggs, Brian
<Brian.Biggs@dlapiper.com>
Cc: 'Lopez, Ronald' <rflopez@nixonpeabody.com>; 'Werber, Matthew'
<mwerber@nixonpeabody.com>; 'Hayes, Jennifer' <jenhayes@nixonpeabody.com>; 'Karen
Gibbs' <karen.gibbs@workspot.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>
Subject: Re: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

[EXTERNAL]

Are you saying that your position on our request to amend is contingent upon our response to
your proposed stay motion?


Sent via the Samsung Galaxy S8, an AT&T 4G LTE smartphone


-------- Original message --------
From: "Strapp, Michael G." <Michael.Strapp@dlapiper.com>
Date: 2/4/19 4:52 PM (GMT-05:00)
To: "Moore, David E." <dmoore@potteranderson.com>, "Ghassab, Yasmin"
<Yasmin.Ghassab@dlapiper.com>, "Kraft, Denise" <denise.kraft@dlapiper.com>, "Bifano,
Larissa" <Larissa.Bifano@dlapiper.com>, "Lange, Kris" <Kris.Lange@dlapiper.com>, "Biggs,
Brian" <Brian.Biggs@dlapiper.com>
Cc: "'Lopez, Ronald'" <rflopez@nixonpeabody.com>, "'Werber, Matthew'"
<mwerber@nixonpeabody.com>, "'Hayes, Jennifer'" <jenhayes@nixonpeabody.com>, 'Karen
Gibbs' <karen.gibbs@workspot.com>, "Palapura, Bindu A." <bpalapura@potteranderson.com>
Subject: [EXT] RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

Dave,

As you know, the PTAB issued an order on October 30, 2018 instituting an IPR for the
Workspot patent that Workspot now seeks to add to the litigation. The IPR is already far along,
with final oral argument (if requested) scheduled to take place at the PTAB on July 24, 2019.
Given the pendency of the IPR, please let us know if Workspot will stipulate to a stay of its
counterclaim of infringement pending resolution of the IPR if Citrix agrees not to oppose
Workspot's motion for leave to amend to add the counterclaim.

Regards,

Michael

Michael Strapp
Partner

T +1 617.406.6031

3

F +1 617.406.6100
M +1 917.518.3828
E michael.strapp@dlapiper.com <mailto:michael.strapp@dlapiper.com>

[DLA Piper Logo]

DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
United States
www.dlapiper.com <http://www.dlapiper.com>

From: Moore, David E. <dmoore@potteranderson.com>
Sent: Monday, February 4, 2019 4:44 PM
To: Strapp, Michael G. <Michael.Strapp@dlapiper.com>; Ghassab, Yasmin
<Yasmin.Ghassab@dlapiper.com>; Kraft, Denise <denise.kraft@dlapiper.com>; Bifano, Larissa
<Larissa.Bifano@dlapiper.com>; Lange, Kris <Kris.Lange@dlapiper.com>; Biggs, Brian
<Brian.Biggs@dlapiper.com>
Cc: 'Lopez, Ronald' <rflopez@nixonpeabody.com>; 'Werber, Matthew'
<mwerber@nixonpeabody.com>; 'Hayes, Jennifer' <jenhayes@nixonpeabody.com>; 'Karen
Gibbs' <karen.gibbs@workspot.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>
Subject: RE: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

[EXTERNAL]
_____
Counsel,

We are coming up on a week since we sent our proposed amended pleading and redlines to you.
Please let us know if Citrix will oppose our request to amend. Thank you.

Dave

From: Moore, David E.
Sent: Tuesday, January 29, 2019 4:55 PM
To: 'Strapp, Michael G.'
<Michael.Strapp@dlapiper.com<mailto:Michael.Strapp@dlapiper.com>>; 'Ghassab, Yasmin'
<Yasmin.Ghassab@dlapiper.com<mailto:Yasmin.Ghassab@dlapiper.com>>; 'Kraft, Denise'
<denise.kraft@dlapiper.com<mailto:denise.kraft@dlapiper.com>>; 'Bifano, Larissa'
<Larissa.Bifano@dlapiper.com<mailto:Larissa.Bifano@dlapiper.com>>; 'Lange, Kris'
<Kris.Lange@dlapiper.com<mailto:Kris.Lange@dlapiper.com>>; 'Biggs, Brian'
<Brian.Biggs@dlapiper.com<mailto:Brian.Biggs@dlapiper.com>>
Cc: Lopez, Ronald <rflopez@nixonpeabody.com<mailto:rflopez@nixonpeabody.com>>;
Werber, Matthew <mwerber@nixonpeabody.com<mailto:mwerber@nixonpeabody.com>>;
'Hayes, Jennifer' <jenhayes@nixonpeabody.com<mailto:jenhayes@nixonpeabody.com>>;
'Karen Gibbs' <karen.gibbs@workspot.com<mailto:karen.gibbs@workspot.com>>; Palapura,
Bindu A. <bpalapura@potteranderson.com<mailto:bpalapura@potteranderson.com>>
Subject: Citrix v. Workspot - Proposed Amended Pleading and Stip to Amend

Counsel:

Please find attached Workspot's proposed Amended Answer to the Complaint, revised in light of

our discussion on Jan 3rd. We have attached two redlines - one comparing the amended pleading to our as-filed Answer, and the second which compares the amended pleading to the amended version you previously reviewed. As you will see, we have 1) kept the counterclaim for infringement of Workspot's '182 patent; 2) removed the state law counterclaims; and 3) added DJ counterclaims of invalidity and non-infringement of Citrix's asserted patents. Previously you indicated that Citrix does not oppose the patent infringement counterclaim. Given that the DJ counterclaims are fairly straightforward, let us know if you believe a meet and confer is necessary and whether Citrix will oppose Workspot's request to amend its answer.

Dave


David E. Moore
Partner
Potter Anderson & Corroon LLP
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6147 Direct Dial
302 658 1192 Fax
dmoore@potteranderson.com<mailto:dmoore@potteranderson.com>
www.potteranderson.com<http://www.potteranderson.com>

Potter Anderson & Corroon LLP is not providing any advice in this communication with respect to any federal tax matters.

THIS ELECTRONIC MAIL TRANSMISSION AND ANY ATTACHMENTS MAY CONTAIN PRIVILEGED, CONFIDENTIAL, OR PROPRIETARY INFORMATION INTENDED ONLY FOR THE PERSON(S) NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE AUTHORIZED REPRESENTATIVE OF THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, COPYING, OR DISCLOSURE OF THIS COMMUNICATION IS STRICTLY PROHIBITED.
Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.
Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure,

dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT 8

| | |
|---|---|
| **From:** | Lopez, Ronald <rflopez@nixonpeabody.com> |
| **Sent:** | Monday, May 13, 2019 2:52 PM |
| **To:** | Biggs, Brian; Strapp, Michael G. |
| **Cc:** | Hayes, Jennifer; Werber, Matthew; Kraft, Denise; bpalapura@potteranderson.com; dmoore@potteranderson.com |
| **Subject:** | RE: Citrix Motion to Stay |

[EXTERNAL]

Brain, thanks for your email.  Workspot will oppose any motion to stay given, among other reasons, how close we are to a final PTAB decision.  Regards,  Ron



**Ronald F. Lopez**
Partner
rflopez@nixonpeabody.com
T 415-984-8368 | C 415-823-7950 | F 866-293-2789
Nixon Peabody LLP | One Embarcadero Center, 32nd Floor | San Francisco, CA 94111
nixonpeabody.com | @NixonPeabodyLLP

The NP San Francisco office is *on the rise!* Our new address effective **January 7, 2019** is:
One Embarcadero Center, **32nd Floor**, San Francisco, CA 94111.

**Please consider the environment before printing this email.**

This email message and any attachments are confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you are not an intended recipient, please notify the sender immediately and delete the message from your email system. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful. Thank you.

**From:** Biggs, Brian <brian.biggs@dlapiper.com>
**Sent:** Friday, May 10, 2019 12:32 PM
**To:** Lopez, Ronald <rflopez@nixonpeabody.com>; Strapp, Michael G. <michael.strapp@dlapiper.com>
**Cc:** Hayes, Jennifer <jenhayes@nixonpeabody.com>; Werber, Matthew <mwerber@nixonpeabody.com>; Kraft, Denise <denise.kraft@dlapiper.com>; bpalapura@potteranderson.com; dmoore@potteranderson.com
**Subject:** RE: Citrix Motion to Stay

Ron,

Citrix first requested Workspot's position on a stay of the Workspot patent infringement counterclaim pending the already-instituted IPR on February 4, 2019.  Workspot should certainly know its position three months later.  Our request for Workspot's position during the Tuesday meet and confer should have been a formality, and now our motion to stay has been delayed several additional days.

We will plan to file an opposed motion by COB on Monday; we would appreciate Workspot's position in advance.

Best regards,
Brian

**Brian Biggs**

**T** +1 302.468.5661
**F** +1 302.778.7813
**M** +1 302.388.6903
**E** brian.biggs@dlapiper.com



DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801-1147
United States
www.dlapiper.com

---

**From:** Lopez, Ronald <rflopez@nixonpeabody.com>
**Sent:** Friday, May 10, 2019 2:49 PM
**To:** Strapp, Michael G. <Michael.Strapp@us.dlapiper.com>
**Cc:** Biggs, Brian <Brian.Biggs@us.dlapiper.com>; Hayes, Jennifer <jenhayes@nixonpeabody.com>; Werber, Matthew <mwerber@nixonpeabody.com>
**Subject:** RE: Citrix Motion to Stay

---

[EXTERNAL]

---

I just got into the office.  Our client is travelling and I hope to have an answer for you on Monday.  Regards  Ron



**Ronald F. Lopez**
Partner
rflopez@nixonpeabody.com
T 415-984-8368 | C 415-823-7950 | F 866-293-2789
Nixon Peabody LLP | One Embarcadero Center, 32nd Floor | San Francisco, CA 94111
nixonpeabody.com | @NixonPeabodyLLP

---

The NP San Francisco office is *on the rise!* Our new address effective **January 7, 2019** is:
One Embarcadero Center, **32nd Floor**, San Francisco, CA 94111.

---

**Please consider the environment before printing this email.**

This email message and any attachments are confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you are not an intended recipient, please notify the sender immediately and delete the message from your email system. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful. Thank you.

---

**From:** Strapp, Michael G. <michael.strapp@dlapiper.com>
**Sent:** Thursday, May 9, 2019 5:30 PM
**To:** Lopez, Ronald <rflopez@nixonpeabody.com>
**Cc:** Biggs, Brian <brian.biggs@dlapiper.com>; Hayes, Jennifer <jenhayes@nixonpeabody.com>; Werber, Matthew <mwerber@nixonpeabody.com>
**Subject:** Re: Citrix Motion to Stay

Thanks Ron.  When can we expect an answer?  As you know, we raised this with you several weeks ago, and I've brought it up at least a couple of times over the past week.

On May 9, 2019, at 8:22 PM, Lopez, Ronald <rflopez@nixonpeabody.com> wrote:

> [EXTERNAL]
> _____
>
> Michael, I will review with client and get back to you.  Thanks.  Ron



**Ronald F. Lopez**
Partner
rflopez@nixonpeabody.com
T 415-984-8368 | C 415-823-7950 | F 866-293-2789
Nixon Peabody LLP | One Embarcadero Center, 32nd Floor | San Francisco, CA 94111
nixonpeabody.com | @NixonPeabodyLLP

_____

The NP San Francisco office is *on the rise!* Our new address effective **January 7, 2019** is:
One Embarcadero Center, **32nd Floor**, San Francisco, CA 94111.

_____

**Please consider the environment before printing this email.**

This email message and any attachments are confidential and may be protected by the attorney/client or other applicable privileges. The information is intended to be conveyed only to the designated recipient(s) of the message. If you are not an intended recipient, please notify the sender immediately and delete the message from your email system. Unauthorized use, dissemination, distribution or reproduction of this message by other than the intended recipient is strictly prohibited and may be unlawful. Thank you.

> **From:** "Strapp, Michael G." <michael.strapp@dlapiper.com>
> **Date:** May 9, 2019 at 4:51:14 PM PDT
> **To:** "Hayes, Jennifer" <jenhayes@nixonpeabody.com>, "Werber, Matthew" <mwerber@nixonpeabody.com>
> **Cc:** "Biggs, Brian" <brian.biggs@dlapiper.com>
> **Subject: Citrix Motion to Stay**
>
> [EXTERNAL E-MAIL]
>
> Jennifer and Matt:
>
> I'm writing to request confirmation that, as you indicated was likely during our call yesterday, Workspot will oppose a motion to stay its newly-added patent infringement counterclaim.
>
> Thanks,
>
> Michael
>
> **Michael Strapp**
> Partner
> **T** +1 617.406.6031

**F** +1 617.406.6100
**M** +1 917.518.3828
**E** michael.strapp@dlapiper.com

<image001.gif>

DLA Piper LLP (US)
33 Arch Street, 26th Floor
Boston, Massachusetts 02110-1447
United States
www.dlapiper.com

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Please consider the environment before printing this email.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

## CERTIFICATE OF SERVICE

I, Denise S. Kraft, hereby certify that on this 13th day of May 2019, I caused a true and correct copy of the foregoing **[FILED UNDER SEAL] PLAINTIFF CITRIX SYSTEMS, INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO STAY DEFENDANT'S PATENT INFRINGEMENT COUNTERCLAIM PENDING INSTITUTED INTER PARTES REVIEW WITH EXHIBITS 1-8** to be electronically filed with the Clerk of the Court using the CM/ECF system and a true and correct copy was served on the following counsel of record via email.

David E. Moore
Stephanie E. O'Byrne
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
1313 N. Market Street
Wilmington, DE 19801
dmoore@potteranderson.com
sobyrne@potteransderson.com
bpalapura@potteranderson.com

Matthew A. Werber
Angelo Christopher
Nixon Peabody LLP
70 West Madison St.
Chicago, IL 60602
Tel:  (312) 977-4400
mwerber@nixonpeabody.com
achristopher@nixonpeabody.com

Karen A. Gibbs
1901 S. Bascom Ave
Suite 900
Campbell, CA 95008
karen.gibbs@workspot.com

Jennifer Hayes
Nixon Peabody LLP
300 South Grand Avenue
Los Angeles, CA 90071
Tel:  (213) 629-6000
jenhayes@nixonpeabody.com

Ronald F. Lopez
Nixon Peabody LLP
One Embarcadero Center
San Francisco, CA 94111
Tel:  (415) 984-8200
rflopez@nixonpeabody.com

*/s/ Denise S. Kraft*
Denise S. Kraft (DE Bar No. 2778)

14