# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

CITRIX SYSTEMS, INC.,

      Plaintiff,

v.                                                            C.A. No. 18-588-LPS

WORKSPOT, INC.,

      Defendant.

David E. Moore, Bindu A. Palapura, and Stephanie E. O'Byrne, POTTER ANDERSON & CORROON LLP, Wilmington, DE

H. Mark Lyon, GIBSON DUNN & CRUTCHER LLP, Palo Alto, CA

Y. Ernest Hsin, GIBSON DUNN & CRUTCHER LLP, San Francisco, CA

Jennifer Rho, GIBSON DUNN & CRUTCHER LLP, Los Angeles, CA

Karen A. Gibbs, Campbell, CA

    Attorneys for Plaintiff


Denise S. Kraft and Brian A. Biggs, DLA PIPER LLP (US), Wilmington, DE

Michael G. Strapp, Larissa Park, Kristoffer W. Lange, and Yasmin Ghassab, DLA PIPER LLP (US), Boston, MA

    Attorneys for Defendant

## MEMORANDUM OPINION

August 16, 2019
Wilmington, Delaware


**STARK, U.S District Judge:**

Plaintiff Citrix Systems, Inc. ("Citrix") filed suit against Defendant Workspot, Inc. ("Workspot") on April 19, 2018. (D.I. 1) Citrix claimed infringement of U.S. Patent Nos. 7,949,677 ("the '677 patent"), 8,341,732 ("the '732 patent"), 7,594,018 ("the '018 patent), and 8,135,843 ('the '843 patent). (D.I. 21) Citrix also claimed false advertising and unfair competition under the Lanham Act, the Delaware Deceptive Trade Practices Act, and common law. (*Id.*) On May 4, 2018, Citrix moved for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65(a), to enjoin Workspot from what Citrix contends to be (1) infringement of the asserted patents; and (2) false and misleading statements about Citrix's products. (D.I. 8) On December 12, 2018, the Court held a hearing and denied Citrix's motion. (*See* D.I. 136; *see also* 145 ("Tr.")) This opinion further explains the Court's reasoning for its decision.

I.     **LEGAL STANDARDS**

Federal Circuit law provides the standard for granting an application for a preliminary injunction of patent infringement, and Third Circuit law provides the standard for a preliminary injunction of false and misleading statements. *See Hybridtech, Inc. v. Abbott Labs*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578 (3d Cir. 2002). A preliminary injunction is "extraordinary" relief. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1375 (Fed. Cir. 2009); *see also Novartis*, 290 F.3d at 586. A "patentee's entitlement to such an injunction is a matter largely within the discretion of the trial court." *Id.* A plaintiff seeking a preliminary injunction must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

**II. DISCUSSION**

Citrix moves for a preliminary injunction on two grounds. First, Citrix moves to enjoin Workspot from infringing the asserted patents. (D.I. 8) Second, Citrix moves to enjoin Workspot from making what Citrix contends to be false and misleading statements. (*Id.*)

For the reasons below, the Court concludes that Citrix has not met its burden on the likelihood of success and irreparable harm prongs. Therefore, the Court will deny Citrix's motion for a preliminary injunction. *See Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002) (holding that district court may "deny a motion based on a patentee's failure to show any one of the four factors – especially either of the first two – without analyzing the others").[1]

**A. Likelihood of Success on the Merits**

**1. Patent Infringement**

To establish a likelihood of success on the merits of its patent infringement cause of action, Citrix must demonstrate that it will "likely prove" that Workspot infringes at least one claim of an asserted patent, and that the asserted claims "will likely withstand" Workspot's challenges to that claim's validity. *See Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). In other words, a preliminary injunction should not issue if an alleged infringer raises a "substantial question" regarding either infringement or validity, that is,

---

[1] At the hearing, the Court additionally held that the balance of harms did not favor the relief sought by Citrix. (Tr. at 112-13) The Court adheres to this holding.

the alleged infringer asserts an infringement or invalidity defense that the patentee has not shown "lacks substantial merit." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1050 (Fed. Cir. 2010).

Workspot asserts that (a) Citrix's infringement theory is not sufficiently complete or coherent (D.I. 62 at 5-11); (b) the asserted patents are invalid (*id.* at 11-12); and (c) Workspot has a license to use the '843 patent (*id.* at 12-13). The Court concludes that Workspot has raised a substantial question as to Citrix's infringement theory. Therefore, the Court will not address Workspot's invalidity and license defenses.

### a. Infringement

The parties focus on one representative claim for each of the four asserted patents: claim 15 of the '677 patent, claim 20 of the '732 patent, claim 1 of the '018 patent, and claim 1 of the '843 patent. (D.I. 23 at 11-16) Citrix charts the claims against Workspot's cloud-based virtual desktop solution, which includes components such as Workspot Control, Workspot Client, Workspot Connector, and Workspot Agent. (D.I. 1 Exs. 5-8; D.I. 85) The Court will address each representative claim in turn.

#### i. Claim 15 of the '677 patent

The parties dispute infringement of limitations 15[a][iii] and 15[c][iii] of the '677 patent, which recite "grant[ing] [a] first client machine a first level of access to [a] resource" and "grant[ing] [a] second client machine a second level of access to [the] resource," respectively. Citrix contends that Workspot Control meets these limitations by granting or denying access to an app based on the user's device type; a first device type might be granted or denied access, and a second device type might independently be granted or denied access. (D.I. 85-1 Appx. A at 2) Workspot argues that the limitation is not met because, by the plain meaning of the term, denying access to an application cannot be granting a "level of access." (D.I. 129 at 3)

Workspot further contends that Citrix's infringement theory is foreclosed by distinctions made during prosecution to overcome cited prior art. (*Id.*)

The Court finds that Workspot has raised a substantial question as to infringement of the '677 patent. Workspot would not infringe under its construction of "level of access," and the Court might well adopt Workspot's construction.

### ii. Claim 20 of the '732 patent

The parties dispute infringement of limitations 20[c], 20[d], and 20[f][iii]-[v] of the '732 patent, which recite an "identification component," an "execution component," and various method steps performed by the identification and execution components. Citrix contends that Microsoft's Azure "provides functionality attributed to the identification and execution components." (D.I. 85-1 Appx. A at 5) Workspot argues that it cannot be liable for direct infringement based on functionality in Azure because Workspot *itself* does not "direct" that functionality to be performed in Azure; instead, Workspot's *customers* can choose whether their backend is hosted on Azure or by the customer (i.e., on-premises). (D.I. 129 at 4-5)

The Court concludes that Workspot has raised a substantial question as to infringement of the '677 patent. There remains factual uncertainty as to whether Workspot sufficiently "directs or controls" Azure. *Cf. Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015).

### iii. Claim 1 of the '018 patent

The parties dispute infringement of limitation 1[c] of the '018 patent, which recites "identifying [a] plurality of disconnected application sessions already associated with [a] user in response to [] received information." Citing portions of Workspot's source code, Citrix contends that Workspot Client for Android meets this limitation by displaying a user's most frequently

4

used applications using icons that are larger than other icons. (D.I. 85-1 Appx. A at 11) Workspot counters that the cited source code is "dead code" – that is, it is not actually executed when Workspot Client is run – and that Workspot Client does not, in fact, vary icon sizes. (D.I. 129 at 2)

The Court finds that Workspot has raised a substantial question as to infringement of the '677 patent. The "dead code" defense, which would seem to defeat Citrix's infringement theory, appears to have merit.

### iv. Claim 1 of the '843 patent

The parties dispute infringement of claim 1 of the '843 patent, which recites, in relevant part, "[a] method of providing access to a remote application . . . comprising: (a) receiving, by a client, from a web service directory on a content server, a service access point associated with a first application, the service access point identifying a web server." Citrix contends that Workspot Control is both the "web service directory on a content server" and a "web server." (D.I. 85-1 Appx. A at 13) Workspot argues that, based on the intrinsic record, the same component cannot satisfy both limitations. (D.I. 129 at 5-6)

The Court finds that Workspot has raised a substantial question as to infringement of the '843 patent. Workspot would not infringe under its constructions of "web service directory" and "web server," and the Court might well adopt Workspot's constructions.

### 2. False and Misleading Statements

To prevail in a Lanham Act[2] claim, the plaintiff must show that a message or statement is (1) "literally false," (2) "completely unsubstantiated," or (3) "literally true or ambiguous, but has

---

[2] Citrix also brings claims under Delaware state law. (D.I. 1) Citrix does not separately argue that it meets its burden under state law, but rather contends that any Lanham Act violation

the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citation omitted). Here, Citrix does not rely on a consumer survey or other evidence of consumer deception, and acknowledges (Tr. 61-62) that it must show that Workspot's statements were either literally false or completely unsubstantiated. *See Novartis*, 290 F.3d at 587; *FMC Corporation v. Summit Agro USA, LLC*, 2014 WL 6627727, at *9 (D. Del. Nov. 14, 2014). Citrix has failed to demonstrate a likelihood of success on the merits of its false and misleading statements claim.[3]

### a. Statements 1, 4, 5, and 6

Workspot statements numbered 1, 4, 5, and 6 generally characterize Workspot's products as being significantly faster to "roll out" or having significantly less "time to value" than Citrix's products – minutes versus months. (*See* D.I. 10-3 Exs. 14-17) Citrix argues that these statements are literally false, contending that Citrix products can be rolled out in minutes or hours. (D.I. 23 at 17-18; D.I. 84 at 9-10) Workspot contends that its statements are not literally false because, in the view of Workspot, Juan Rivera (Citrix's Vice President of Cloud & Server Engineering) admits that (a) Citrix's arguments rely on Citrix products that either did not exist when Workspot made the purportedly false statements, or do not compete with Workspot products; and (b) some Citrix roll-outs can last for months. (D.I. 62 at 15)

Citrix has failed to show that statements 1, 4, 5, and 6 are literally and unambiguously false or completely unsubstantiated. *See Novartis*, 290 F.3d at 587 (holding that "only an ***unambiguous*** claim can be literally false") (emphasis in original). These statements only

---

necessarily establishes a state law claim. (D.I. 23 at 16 n.7) Accordingly, the Court will consider the likelihood of success of Citrix's Lanham Act and state law claims together.

[3] The Court will address each purportedly false statement, referring to them by the numbers given in Citrix's Opening Brief. (*See* D.I. 23 at 17-18)

vaguely refer to Citrix products (leaving it to the audience to determine which products are comparable) and use terms like "time to value" and "roll-out" that have no clear and unambiguous meaning (at least on the record developed to this point). Indeed, Citrix admits that these terms are "subjective and require the customer's input, so there is no way to quantify them." (D.I. 84 at 10 n.10; *see also Novartis*, 290 F.3d at 587 ("The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, . . . the less likely it is that a finding of literal falsity will be supported."))

### b. Statements 2 and 7

Workspot statements 2 and 7 characterize Workspot as having a feature velocity (i.e., the pace of adding new features) of days, and contrast Citrix's feature velocity as being months or more. (D.I. 10-3 Exs. 14-15) Citrix contends that these statements are literally false because some cloud-hosted Citrix products are updated on a daily to two-weekly basis. (D.I. 23 at 17-18; D.I. 84 at 10) But, according to Workspot, Citrix's Mr. Rivera admits that (a) two Citrix products, XenApp and XenDesktop, have a feature velocity of three months; and (b) other Citrix products operated on at least a 12-month release cycle. (D.I. 62 at 15-16)

Citrix has failed to show statements 2 and 7 are unambiguously false or completely unsubstantiated. Citrix admits that at least some of its products were undisputedly on a 12-month release cycle when statements 2 and 7 were made. (*See* D.I. 62 at 15-16) It is unclear whether statements 2 and 7 may have referred to these products.

### c. Statement 3

Workspot statement 3, made in 2016, states that Citrix does not have "automatic scaling." (D.I. 10-3 Ex. 14) Citrix argues that this statement is literally false because Citrix Cloud was

7

automatically scalable in 2014.  (D.I. 84 at 10)  Workspot counters that, according to Mr. Rivera, Citrix's "Smart Scale" feature was only announced in 2017.  (D.I. 62 at 16)

Mr. Rivera's arguably conflicting statements as to Citrix's automatic scaling feature lead the Court conclude that Citrix has not sufficiently demonstrated a likelihood of success on the merits with respect to statement 3.

### B. Irreparable Harm

Citrix has not met its burden to demonstrate irreparable harm.

#### 1. Patent Infringement

To satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish that, absent an injunction, it will suffer irreparable harm; and that a sufficiently strong "causal nexus" relates the alleged harm to the alleged infringement.  *Apple Inc. v. Samsung Electronics Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) (hereinafter *Apple II*).  The causal nexus requirement "distinguish[es] between irreparable harm caused by patent infringement and irreparable harm caused by otherwise lawful competition – e.g., sales that would be lost even if the offending feature were absent from the accused product."  *Apple Inc. v. Samsung Electronics Co., Ltd.*, 735 F.3d 1352, 1361 (Fed. Cir. 2013) (hereinafter *Apple III*).  To meet the casual nexus requirement, the patentee must show "some connection" between the patented feature and the demand for the accused product.  *Id.* at 1364.

Citrix presents no evidence that directly ties demand for Workspot products to the allegedly infringing features.  Rather, Citrix relies on Workspot marketing materials, which promote allegedly infringing features of Workspot's product.  (D.I. 84 at 4 n.4) (citing D.I. 84 Ex. 15)  But, as Workspot notes, Citrix only ties the touted features to specific claim ***limitations***, not claims.  Moreover, Citrix has failed to tie these features to customer ***demand*** for Workspot's

products. At best, Citrix has demonstrated that Workspot considers the touted features important to customers. This, by itself, does not satisfy Citrix's burden on the causal nexus requirement. *See Apple II*, 695 F.3d at 1376-77 (holding that document in which accused infringer characterizes accused feature as "core" does not establish causal nexus because it "says too little about what draws consumers" to accused product); *Apple III*, 735 F.3d at 1367 (approving of district court's conclusion that accused infringer's "impressions of what might lure customers, while relevant, are not dispositive" of causal nexus inquiry).

### 2. False and Misleading Statements

A party seeking a preliminary injunction in a Lanham Act case is "not entitled to a presumption of irreparable harm" but, rather, is required to demonstrate that "she is likely to suffer irreparable harm if an injunction is not granted." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014). The harm must have a "causal nexus" to the false or misleading statements. *See Warner-Lambert Co. v. Breathasure, Inc.*, 204 F.3d 87, 93 (3d Cir. 2000). A plaintiff may demonstrate a causal nexus by showing that a false statement "likely . . . has caused or will cause" the harm. *Id*.

Citrix has failed to show a causal nexus between the allegedly false statements and the purported harm. (*See* D.I. 23 at 19-22) Citrix claims that Workspot has caused Citrix to lose customers (*id.* at 20), has harmed Citrix's reputation among customers (*id.* at 21), and has damaged Citrix's relationships with other market participants (*id.* at 21-22). But Citrix has failed to link these purported harms to Workspot's allegedly false statements. For example, Citrix has not provided evidence that a Citrix customer has or likely would switch to Workspot because of the allegedly false statements.

9

Citrix's attempts to establish a causal nexus are unpersuasive. Citrix contends that: (1) Workspot admits it is a direct competitor of Citrix (D.I. 84 at 5); (2) Workspot targeted its advertisements at Citrix customers (*id.* at 5-6); (3) a majority of Workspot customers are Citrix customers (*id.* at 6); and (4) "Workspot has successfully pursued 'Citrix refugeees' and [has] taken 'Citrix technology off the table' through its use of 'BS' advertisements" (*id.* at 6) (internal citations omitted). Citrix's first three contentions, even if taken as true, are unpersuasive because they fail to show that Workspot's allegedly false advertisements (as opposed to, for example, better prices or better non-patented technology) likely caused Citrix customers to switch to Workspot. Citrix's fourth point also lacks merit. Neither Workspot's pursuit of "Citrix refugees" nor its attempt to take "Citrix technology off the table" indicates that the allegedly false advertisements *caused* Citrix customers to switch to Workspot. In addition, Workspot did not characterize its own advertisements as "BS;" instead, the employee Citrix quotes stated that "no one has called BS on our [total cost of ownership] slides." (D.I. 87 Ex. 23)

In sum, Citrix has not met its burden to show that Workspot's allegedly false advertisements likely caused Citrix to lose customers.

## III. CONCLUSION

For the foregoing reasons, as well as those stated at the hearing, the Court has denied Citrix's motion for a preliminary injunction. (*See* D.I. 136)