```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      CITRIX SYSTEMS, INC.,
 4                                     :     CIVIL ACTION
                 Plaintiff,            :
 5                                     :
                      v.               :
 6                                     :
      WORKSPOT, INC.,                  :
 7                                     :     NO. 18-588-LPS
                 Defendant.            :
 8                              - - -

 9                         Wilmington, Delaware
                        Wednesday, April 15, 2020
10                  Telephonic Sanctions Motion Hearing

11                              - - -

12    BEFORE:        HONORABLE LEONARD P. STARK, Chief Judge

13                              - - -
      APPEARANCES:
14

15              DLA PIPER LLP (US)
                BY:  DENISE S. KRAFT, ESQ., and
16                   BRIAN A. BIGGS, ESQ.

17                   and

18              DLA PIPER LLP (US)
                BY:  MICHAEL STRAPP, ESQ.
19                   (Boston, Massachusetts)

20                   and

21              DLA PIPER LLP (US)
                BY:  JOY KIM, ESQ.
22                   (San Francisco, California)

23                        Counsel for Plaintiff

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

```
 1    APPEARANCES:   (Continued)

 2
                    ASHBY & GEDDES, P.A.
 3                  BY:  ANDREW C. MAYO, ESQ.

 4                       and

 5                  NIXON PEABODY, LLP
                    BY:  RONALD F. LOPEZ, ESQ.
 6                       (San Francisco, California)

 7
                         and
 8
                    NIXON PEABODY, LLP
 9                  BY:  JENNIFER HAYES, ESQ.
                         (Los Angeles, California)
10
                         and
11
                    NIXON PEABODY, LLP
12                  BY:  MATTHEW A. WERBER, ESQ.
                         (Chicago, Illinois)
13
                                Counsel for Defendant
14

15

16

17

18

19

20                          - oOo -

21                  P R O C E E D I N G S

22                  (REPORTER'S NOTE:  The following telephonic

23    sanctions motion hearing was held remotely, beginning at

24    10:00 a.m.)

25                  THE COURT:  Good morning, everybody.  This is
```

1    Judge Stark.  I hope you all can hear me just fine.  Thanks

2    for being on the line, and we are ready to proceed.

3                 Who is on the line today for Citrix, please?

4                 MS. KRAFT:  Good morning, Your Honor.  Denise

5    Kraft on behalf of Citrix.  On the line with me today is

6    Michael Strapp, who will be arguing; Brian Biggs, Joy Kim,

7    all of DLA Piper.  And also with us is Lesley Hamlin, the

8    Citrix Vice President - Legal, and Stephen Tytran, Citrix

9    Associate General Counsel.

10                THE COURT:  Okay.  Thank you and good morning to

11   all of you.

12                And who is on the line, please, for Workspot?

13                MR. MAYO:  Good morning, Your Honor.  This is

14   Andrew Mayo from Ashby & Geddes on behalf of Workspot.  I am

15   joined today on the telephone by my co-counsel from Nixon

16   Peabody.  You have Ronald Lopez, Jennifer Hayes, and Matthew

17   Werber, as well as Workspot's CEO, Amitabh Sinha, and

18   Workspot's Outside General Counsel, Karen Gibbs.

19                THE COURT:  Okay.  Thank you.  And good morning

20   to all of you as well.

21                I know my court reporter is on the line also,

22   and I will note for the record it is our case of Citrix

23   Systems, Inc. versus Workspot, Inc.  Our Civil Action

24   No. 18-588-LPS.  And we're going to have argument on the

25   plaintiff's motion for sanctions.

1              As we all know, we're doing this by

2      teleconference in light of the unfortunate ongoing

3      coronavirus pandemic.

4              Just a few things as preliminaries, given that

5      we are doing this on the phone.

6              First off, I have received your slides

7      presentations electronically, and I have printed those out.

8      I have them in front of me so you can, of course, feel free

9      to refer to them, and I will be following along on my own

10     copy here on my end.

11             Please do try to identify yourself when you

12     speak.  That will aid the court reporter a great deal.  If

13     you are not speaking, please put us on moot so we can

14     minimize the background noise.

15             I will have some questions for both sides.  It

16     can be challenging for me to interrupt you in this forum.

17     So occasionally it's helpful if you pause and maybe listen

18     to see if I'm trying to break-in with a question.

19             I'll also note, as I'm sure counsel saw, the

20     call-in number for today's proceeding was published in the

21     docket.  The public has a right of access.  This is a

22     proceeding that would have been in the courtroom but for the

23     state of emergency that we are under.  So do understand I

24     don't know who else is on the line.  It is possible that

25     others besides those who have noted their appearance may be

1   on the line.

2           I don't believe that anything confidential is

3   going to need to be discussed during this hearing.  If that

4   turns out to be wrong, you will have to let me know and

5   we'll have to figure out what to do about it.

6           I will remind everyone as well that regardless

7   of who is on the line, there is no broadcasting of this

8   proceeding and no recording of it is permitted.

9           We've allocated one hour a side, and before we

10  jump into that, I'll just see if there's any questions about

11  anything I've said or how we're going to proceed.

12          First from Citrix.

13          MR. STRAPP:  There are no questions from Citrix,

14  Your Honor.

15          THE COURT:  Okay.  And from Workspot?

16          Any questions from Workspot before we proceed?

17          MR. LOPEZ:  Your Honor, Ronald Lopez.  No

18  questions from Workspot.

19          I had to take it off mute.

20          THE COURT:  Thank you.  Then we'll begin with

21  Citrix as the moving party.  I believe it will be

22  Mr. Strapp, and he may proceed.

23          MR. STRAPP:  Thank you, Your Honor.  This is

24  Mr. Strapp speaking.

25          I would like to ask Your Honor to turn to

1    slide 2 of Citrix's PowerPoint presentation, please.

2              THE COURT:  Okay.

3              You can go ahead when you are ready.

4              MR. STRAPP:  When Citrix presented argument at

5    the TRO hearing in December 2018, evidence from third

6    parties indicated that Puneet Chawla, Workspot's co-founder,

7    board member, and chief technical officer, had sent

8    harassing e-mails to Citrix's executives and posted

9    threatening materials about Citrix's online, and then lied

10   about this conduct in a sworn declaration submitted by

11   Workspot to this court.

12             At the TRO hearing, Your Honor ordered expedited

13   discovery.  Workspot initially refused to provide this

14   discovery.  Citrix, in turn, needed to file several motions

15   to compel.  And eventually, over the course of eight months

16   and at great cost to Citrix, Citrix obtained information

17   that revealed that Workspot had failed to preserve, collect,

18   or analyze evidence enabling Chawla to spoliate critical

19   evidence.

20             Workspot and its counsel, not just Mr. Chawla,

21   knowingly filed a false declaration with the Court.

22   Mr. Chawla admitted to Workspot and Workspot's counsel that

23   the IP address at issue was his, but Workspot never informed

24   the Court or Citrix of this critical fact; and several

25   statements made by Workspot counsel at the TRO hearing were

1    deliberately misleading.

2              Turn to slide 3, Your Honor.

3              THE COURT:  Okay.  You can assume I'm following

4    your directions so you can proceed when you are ready.

5              MR. STRAPP:  Thank you.

6              Guerrilla Mail is an e-mail service that

7    provides users with an anonymous e-mail address.  On the

8    evening of October 9th, Mr. Chawla sent a test e-mail from a

9    Guerrilla e-mail account he had created to his Workspot

10   e-mail address, Puneet@Workspot.com.

11             Although Citrix brought Mr. Chawla's conduct to

12   Workspot's counsel's attention on October 15th, less than a

13   week after Chawla began harassing Citrix executives,

14   Workspot withheld from production the e-mail shown on this

15   slide until July 2019, more than seven months after the

16   Court ordered Workspot to provide Citrix with expedited

17   discovery.

18             After testing his Guerrilla e-mail account by

19   sending an e-mail to his Workspot e-mail address, Chawla

20   proceeded, over the next two weeks, to send several

21   threatening e-mails to Citrix executives.  For example, in

22   the e-mail we produced at slide 4, Chawla physically

23   threatened Juan Rivera, a Citrix senior vice-president, who

24   only weeks before the e-mail at slide 4 was sent, had been

25   deposed by Workspot in this litigation.

1          Another one of Mr. Chawla's threatening e-mails

2     is shown at slide 5.

3          This is an e-mail that Chawla sent to Citrix's

4     CEO, David Henshaw; and the e-mail supplied by Mr. Chawla

5     informs Citrix's CEO that his e-mails had been leaked and

6     that he needs to transfer bitcoin before October 30th.

7          In addition to his e-mails, Mr. Chawla also

8     posted threats to Citrix on publicly accessible internet

9     message boards.  For example, as shown at slide 6, Chawla

10    suggested that Henshaw's e-mails had been leaked, and that

11    this leak would cause Citrix serious stock issue.

12         The series of threatening e-mails and Internet

13    posts gave rise to concerns within Citrix that an illegal

14    intrusion had taken place into Citrix's systems, and that

15    highly confidential Citrix information had been hacked and

16    would be leaked soon on the dark web.  Citrix immediately

17    launched an intense, thorough, and expensive investigation.

18         As soon as preliminary information from Citrix's

19    investigation was available, indeed, even as Mr. Chawla

20    continued to send harassing e-mails to Citrix executives,

21    Citrix's counsel notified Workspot's outside counsel of the

22    preliminary results of its investigation in a detailed,

23    lengthy e-mail shown on slide 7.

24         Citrix explained to Workspot counsel in its

25    notice e-mail that it suspected Chawla was the one sending

the harassing and threatening e-mails; that the e-mails had

been sent using Guerrilla Mail; and that the IP addresses

associated with the threats were tied to a Comcast Internet

subscriber located in Freemont, California, and to a

Microsoft Azure user.

As shown on slide 8, only 53 minutes after

Citrix sent its notice e-mail to Workspot outside counsel,

Workspot outside counsel forwarded the notice e-mail to the

suspected culprit, Puneet Chawla.

Unsurprisingly, after Mr. Chawla was tipped off

by Workspot outside counsel about Citrix's allegations, he

tried to cover his tracks.

On October 16th, as shown on slide 9, Mr. Chawla

erased the entire hard drive of his MacBook Pro laptop.  In

so doing, Mr. Chawla not only deleted evidence related to

his extortionate and harassing e-mails, he also deleted

evidence critical to the underlying claims at issue in this

litigation.

When Chawla was eventually deposed in July 2019,

he testified that:  "As a founder in the company, unlike

other employees, I wasn't asking the company to always buy

me a device, so I had a personal laptop that I used for

work."

Chawla explained during his deposition that it

was his personal MacBook Pro that he used for work, and he

testified at his deposition that the MacBook Pro, whose hard drive he deleted, was his "primary device," and that he had acquired that MacBook at some point between 2012 and 2014.

Workspot, of course, had a duty to preserve the MacBook as of the date the litigation was filed, but it did not.

Workspot's failure to ensure that relevant data was preserved enabled Chawla to spoliate evidence. And because Workspot did not back up Chawla's primary device, when Chawla deleted the hard drive of his MacBook in October 2018, Citrix was completely deprived of the opportunity to inspect the evidence on that laptop.

But Chawla did not only delete his laptop hard drive. As shown in slide 10, after Workspot outside counsel forwarded Citrix's notice e-mail to Chawla, Chawla also deleted the disk, the network interface, the security group, and the virtual network associated with a virtual machine that Chawla had used to send some of his harassing e-mails.

Because of Chawla's spoliation, it was not possible for Citrix to obtain an image of or to analyze Chawla's virtual machine.

Mr. Chawla was deposed in July. And at the deposition, he was questioned about the spoliation of his laptop and of the virtual machine. An excerpt of the transcript and an embedded video clip from the deposition

are shown on slide 11.  As shown on this slide, instead of
answering questions about his spoliation, Mr. Chawla pled
the Fifth Amendment.

As the Third Circuit explained in *Rad Services v
Aetna Casualty*, this Court should infer that Chawla would
have answered Citrix's questions adversely to Workspot.  The
Third Circuit explained in *Rad Services* that the mere fact
that the witness no longer works for the corporate party
does not preclude as evidence the witness's indication of
the Fifth Amendment.

Although Citrix provided notices -- notice of
its allegations to Workspot in the detailed notice e-mail on
October 15th, Workspot did nothing to investigate Citrix's
allegation in the days after receiving that e-mail.  Indeed,
in an e-mail that is shown at slide 12, Workspot's in-house
counsel, Karen Gibbs, wrote to Puneet Chawla and to Amitabh
Sinha, Workspot's CEO, to inform them that there had been
"no investigation of claims, no proactive discovery proposal
or plan, and no real engagement or reaction by Workspot's
outside counsel."

In a March 28th order, Magistrate Judge Fallon
likewise found that Workspot's counsel "reviewed the
allegations in the TRO motion, which was filed on October
16th, and nonetheless took no steps to investigate the
allegations independently in the two weeks prior to filing

1    Workspot's response."

2              But it's important to note that it was not just

3    Workspot outside counsel who chose to ignore Citrix's

4    allegation.  In fact, Ms. Gibbs, Workspot's in-house

5    counsel, wrote in a separate e-mail that she sent to Sinha,

6    Chawla, and Workspot outside counsel that Workspot would

7    refuse to investigate Citrix's allegations unless Citrix

8    provided Workspot with additional evidence.

9              It was not only Workspot's in-house counsel and

10   outside counsel that refused to investigate Citrix's

11   allegations.  In fact, as shown on slide 13, even after

12   Workspot engaged Kivu, a forensic consulting firm, Workspot

13   directed Kivu not to undertake any forensic analysis of

14   Workspot's network data.

15             An e-mail from Workspot outside counsel, Mark

16   Lyon to Ms. Gibbs, Mr. Sinha, and Mr. Chawla, shown at slide

17   14, makes clear exactly why Workspot instructed Kivu not to

18   review Workspot's available network logs for evidence of

19   access to or the use of Guerrilla Mail.

20             As Mr. Lyon explained in his October 26th

21   e-mail, "The review of the log is not likely to be all that

22   helpful for purposes of our response.  So we are leaning

23   away from having them do that task."

24             When Workspot filed its TRO opposition on

25   October 30th, it attached as powerful evidence in support of

1      that opposition a sworn declaration from Mr. Chawla.

2              On slide 15, paragraph 3 of the declaration is

3      highlighted.  Mr. Chawla was answered about paragraph 3 of

4      his declaration at his deposition.  As is evident from the

5      embedded video clip and the deposition transcript excerpt on

6      slide 15, Mr. Chawla pled the Fifth Amendment in response to

7      a series of questions about this particular statement in his

8      declaration.

9              On slide 16, paragraph 4 of the October 30th

10     declaration is a highlight.  Chawla was also asked several

11     questions about paragraph 4 of his declaration at his

12     deposition.  And he likewise invoked the Fifth Amendment in

13     response to each one of these questions.

14             Critically, evidence uncovered after the

15     December 2018 TRO hearing revealed that Workspot and

16     Workspot's counsel, not just Mr. Chawla, knew that

17     information in Chawla's declaration was false when the

18     declaration was filed.

19             As shown in the e-mail on the bottom half of

20     slide 17, the day before Chawla's declaration was filed,

21     Chawla wrote to Workspot counsel, including Workspot

22     in-house counsel Ms. Gibbs, and to Amitabh Sinha, Workspot's

23     CEO co-founder and board member, to suggest revisions to his

24     draft declaration.

25             The highlighted edit in this e-mail proposed by

1 Mr. Chawla is a statement that "Workspot is investigating if

2 any machine was compromised or if the IT address mentioned

3 by Citrix was ever used in the Workspot cloud."

4    In response to Chawla's suggested edit,

5 Workspot's Delaware counsel asked Chawla in an e-mail, also

6 shown here on slide 17, whether the Workspot investigation

7 would be complete by 6:00 p.m. on October 30th, the filing

8 deadline for the declaration.

9    An e-mail at the top of slide 17, Chawla answers

10 that question by informing Workspot outside counsel

11 Ms. Gibbs and Mr. Sinha that although Workspot's

12 investigation into the IP address mentioned by Citrix had

13 begun the prior week, that is the week of October 22nd, the

14 investigation was not yet complete.

15    Chawla quite clearly requested a revision to his

16 draft declaration so as to inform the Court that Workspot

17 was already investigating the IP addresses at issue.  And he

18 did so because days before his declaration was filed on

19 October 30th, Workspot had received confirmation from

20 Workspot counsel about the specific IP addresses referenced

21 in Citrix's Attorneys' Eyes Only TRO motion.  And at that

22 point, Workspot had begun investigating whether those IP

23 addresses were used in the Workspot cloud.

24    An exchange of e-mails between Chawla and

25 Workspot outside counsel on October 18th, shown on slide 18,

1    underscores this point.

2              In the e-mail on the upper left of slide 18,

3    Chawla sends an e-mail to Mr. Lyon, Workspot's lead counsel,

4    Ms. Gibbs, Workspot in-house counsel, and Mr. Sinha in which

5    he asked Mr. Lyon to share with him the IP addresses called

6    out in Citrix's TRO filing, filings that Citrix had marked

7    as Attorneys' Eyes Only precisely so that it would not be

8    shared with Mr. Chawla.

9              In the e-mail on the upper right-hand corner of

10   slide 18, Mr. Lyon informs Mr. Chawla that the IP addresses

11   Citrix identified in its TRO motion are the same IP

12   addresses Citrix had disclosed in its October 15th notice

13   e-mail.

14             The October 15th notice e-mail is shown on the

15   bottom half of slide 18.  And as you will recall, this

16   notice e-mail had been forwarded by Mr. Lyon to Chawla, to

17   Gibbs, and to Sinha only 53 minutes after it was sent by

18   Citrix's counsel.

19             The key takeaway from slide 18 is that no later

20   than October 18th, Workspot knew exactly which IP addresses

21   were at issue in Citrix's TRO motion; and as shown in the

22   e-mail exchange on the previous slide, Workspot had already

23   begun investigating whether those IP addresses were used in

24   the Workspot cloud during the week of October 22nd.

25             But with this background in mind, Chawla's

1   suggested adding to his declaration on October 29th makes

2   complete sense.  A week before Workspot filed the Chawla

3   declaration on October 30th, Workspot was already

4   investigating whether the IP addresses referenced in

5   Citrix's notice e-mail and in Citrix's TRO motion were used

6   in the Workspot cloud.

7          Workspot outside counsel, Workspot's CEO,

8   Workspot's CTO, and Workspot's in-house counsel all knew

9   about this ongoing investigation.  Yet if we turn to slide

10  19, we can see clearly that instead of incorporating

11  Chawla's suggested edit, Workspot and its counsel included a

12  statement in the actual filed declaration that was precisely

13  the opposite of the factual statement that Chawla had asked

14  Workspot to include.

15         Instead of informing the Court that Workspot was

16  already investigating the IP addresses that Mr. Lyon had

17  shared with Ms. Gibbs, Mr. Sinha, and Puneet Chawla,

18  Workspot, and Workspot's counsel, indicated in the filed

19  declaration that Workspot was not yet aware of the IP

20  addresses apparently associated with the e-mails at issue,

21  but that once Citrix permitted those IP addresses to be

22  shared with Workspot, Workspot would investigate whether

23  those IP addresses were used in the Workspot cloud.

24         Workspot intentionally misled the Court when it

25  filed Chawla's declaration on October 30th because Workspot

1    wanted the Court to believe that it had no access to the IP

2    addresses at issue.  Workspace choose to mislead this Court

3    so that it could paint for the Court the false narrative

4    that Workspot was unable to investigate Citrix's claims.

5              Mr. Chawla was asked about paragraph 6 of his

6    declaration at his deposition.  At slide 20, an excerpt from

7    the video and the transcript of the deposition is

8    reproduced.

9              Mr. Chawla was asked:  "You falsely suggested

10   that Citrix had not shared with Workspot the IP addresses

11   apparently associated with the e-mails at issue, as of

12   October 30th, when you submitted this declaration; correct?"

13             He answered:  "Fifth Amendment."

14             In Re:  *Winstar*, a decision from the Delaware

15   Bankruptcy Court, is instructive here.  In that case, two

16   former Lucent employees refused to answer deposition

17   questions and instead, asserted their right against

18   self-incrimination.  The Court there chose to draw negative

19   adverse inferences from their testimony even though neither

20   employee was a party to the lawsuit.

21             This Court, too, should draw a negative adverse

22   inference against Workspot from Chawla's testimony regarding

23   paragraph 6 of the declaration.  And that adverse inference

24   that should be drawn is that Workspot and Workspot's

25   counsel, not just Mr. Chawla, knowingly and falsely

1    suggested in paragraph 6 of the declaration that Citrix had

2    not shared with Workspot the IP addresses associated with

3    the e-mails at issue.

4            As shown in slide 21, in the weeks after Chawla

5    submitted his declaration, Citrix received confirmation from

6    Comcast, Microsoft, and from TheLayoff.com, the public

7    message board where Chawla had posted online threats about

8    Citrix, that the IP addresses at issue were tied to

9    Mr. Chawla.

10           Additional information about this corroborating

11   information, much of which was detailed on Citrix's TRO

12   motion, is available for the Court's reference at slides 32

13   through 34.

14           But what Citrix did not know when it appeared

15   before the Court for the TRO hearing was that even after

16   Workspot received evidence from third parties corroborating

17   Chawla's involvement in the harassing e-mails and in the

18   threatening posts, Workspot still refused to conduct any

19   investigation of Chawla's devices.

20           Even by December, Workspot had not inspected a

21   single one of Chawla's computing devices or taken any steps

22   to preserve the data on those devices.  It was only at

23   Citrix's insistence that Workspot arranged on December 7th

24   to image Chawla's laptop.

25           And it is worth noting that because Chawla had

already wiped clean the hard drive of his primary device,
his MacBook laptop in October, at the point that Workspot
arranged for the imaging of Chawla's laptop, Chawla was
using a different laptop, a Surface Pro laptop.

If we turn to slide 22, there are a series of
e-mails that reveal remarkably that Workspot allowed Chawla
to oversee and to control the imaging of his own laptop.

Even more telling, perhaps, is the fact that
after a forensic image of Chawla's laptop was taken and
provided to Chawla, Chawla was instructed not to turn over
that image to Workspot counsel or even to upload the image
to a secure site.

Instead, Chawla was instructed to simply hold on
to the image because, as Chawla learned through these
e-mails, the purpose of his imaging Surface Pro laptop was
not to analyze the data or to provide a copy of the image to
Citrix or to the Court, but instead "to be able to represent
to the Court a forensic image has been completed."

When Chawla, who was in India at the time on
vacation, received these instructions, he wrote to Workspot
outside counsel, Workspot's CEO, and to his personal
attorney to inform them he had the forensic image of his own
laptop on a hard drive.  He noted:  "I am back in the U.S.
by Christmas and will hand over the drive to Workspot IT."

Although Citrix requested a copy of the forensic

1    image of Chawla's laptop, Workspot refused to turn it over.

2    Citrix was forced to file motions to compel in this court

3    and in California in 2019.  And eventually, after Citrix

4    prevailed on its motions, a report from the forensic images

5    of Chawla's computing devices was provided to Citrix on June

6    26th, 2019.

7            The report indicated that for months, Workspot

8    had withheld from production several relevant documents on

9    Chawla's Surface Pro laptop, including the test e-mail that

10   Chawla had sent from his Guerrilla Mail account to his

11   Workspot e-mail account on October 9th, 2018.  That

12   Guerrilla Mail e-mail was finally produced by Workspot on

13   July 2nd, 2019, more than six months after the Court had

14   ordered Workspot to provide expedited discovery.

15           And several additional highly relevant documents

16   from Chawla's Surface Pro were not produced by Workspot

17   until the middle of August 2019.

18           One more fact that Citrix learned of only after

19   the TRO hearing was that several days before the parties

20   received a response to the Comcast subpoena, Ms. Gibbs,

21   Mr. Sinha, and Workspot outside counsel received

22   confirmation from Chawla himself that the Comcast IP address

23   at issue was his.

24           Slide 23 includes an e-mail dated November 5 in

25   which Ms. Gibbs asked Sinha and Chawla if either of them

1    received a letter that had been sent by Comcast to the

2    Comcast customer with the IP address in question.

3              In response to Gibbs e-mail, Chawla e-mailed

4    Gibbs, Sinha, and Workspace outside counsel on November 6th

5    to inform them that the IP address was, in fact, his, and

6    that he planned to meet with his personal attorney that same

7    day to get guidance.

8              It's worth pausing for a moment to consider that

9    no later than November 6th, 2018, Workspot lead counsel,

10   Workspot Delaware counsel, Workspot CEO, and Workspot's

11   in-house counsel all knew that the Comcast IP address at

12   issue was Chawla's; and that Chawla had retained his own

13   personal attorney.  None of these facts were ever shared

14   with Citrix or with the Court.

15             Instead, 31 days later, on December 7th,

16   Workspot informed the Court, in a footnote to a surreply

17   brief, that it "no longer seeks to rely on the Chawla

18   declaration."

19             I think that it's also worth noting that during

20   this intervening 31-day period between November 6th, when

21   Workspot and its counsel received definitive corroboration

22   from Chawla that the Comcast IP address was his, and

23   December 7th, when Workspot submitted the Nieman footnote in

24   its surreply brief, Workspot did no independent

25   investigation into Citrix's allegations and made no attempt

1   to obtain a forensic image of Chawla's devices.  Instead,

2   Workspot permitted Chawla to take a vacation to India in

3   late November and to bring with him his Surface Pro laptop.

4           It is quite remarkable that even after Workspot

5   knew Chawla was culpable, it did nothing to ensure that data

6   on that Surface Pro was preserved or backed up.

7           Information that was uncovered only after Citrix

8   filed several motions to compel in 2019 also revealed that

9   several statements made by Workspot counsel to this Court at

10  the TRO hearing were seriously misleading.  Examples of

11  counsel's misleading statements are included on slide 24.

12          At the TRO hearing, Workspot's lead counsel,

13  Mr. Lyon, represented to the Court that Workspot counsel had

14  been very limited in its ability to share Citrix's

15  allegations with Sinha or Chawla.  Workspot counsel stated

16  that up until a couple weeks before December 12th, Sinha,

17  Workspot's CEO, was not able to "understand what was at

18  issue."

19          Mr. Lyon also informed the Court that he had

20  never been able to share Citrix's allegation with

21  Mr. Chawla.

22          Mr. Lyon's representations at the TRO hearing

23  simply cannot be squared with the actual facts.  When

24  Mr. Lyon made his statements to the Court on December 12th,

25  he did so knowing full well that he had forwarded himself to

1    Sinha and Chawla Citrix's notice e-mail on October 15th, and

2    that he had confirmed for Sinha and for Chawla in an October

3    18th e-mail that the IP addresses disclosed in Citrix's

4    Attorneys' Eyes Only TRO motion was the same IP addresses

5    referenced in the Citrix notice e-mail he had forwarded a

6    few days before.

7              Mr. Lyon claimed that Workspot could not get to

8    the bottom of Citrix's allegation is also belied by the fact

9    that no later than the week of October 22nd, Workspot was

10   already investigating whether the IP addresses referenced in

11   the Citrix's TRO motion had been used in a Workspot cloud; a

12   fact that Workspot lied about in Mr. Chawla's declaration.

13             And as another example of Mr. Lyon's misleading

14   statements at the TRO hearing, he was asked by the Court

15   whether Chawla had filed a false declaration.  Instead of

16   admitting that the declaration was false, Mr. Lyon stated:

17   "I'm here today to tell you we don't know for certain, one

18   way or the other."

19             At the TRO hearing, the Court ordered the

20   parties to engage in expedited discovery.  As shown in slide

21   25, Workspot nonetheless refused to provide Citrix with

22   almost any discovery.  For example, in response to Citrix's

23   request for documents and for information, Workspot

24   initially turned over only four documents.

25             Citrix was forced to file several motions to

1    compel.  Citrix prevailed on its motions in this court and

2    in federal court in California.

3                    Ultimately it took Citrix more than eight months

4    to obtain discovery from Workspot.

5                    In fact, many of the documents referenced in

6    this presentation, including the e-mails and the documents

7    shown on slides 8, 12, 13, 14, and 17, 18, and 19 were only

8    produced by Workspot on August 19th, 2019, more than ten

9    months after Citrix filed its TRO motion.

10                   THE COURT:  Okay.  Mr. Strapp, I'm going to stop

11   you there and ask you some questions.

12                   So one of the purposes of the expedited

13   discovery, I think, was to determine how widespread, if at

14   all, the efforts that Mr. Chawla undertook that you have

15   carefully detailed again today and remain highly troubling

16   to me.  How widespread was knowledge that he had done that?

17   Was there a cover-up?

18                   The defendants insist that you found nothing to

19   show that there was a cover-up or a participation by anyone

20   other than Mr. Chawla, and it seems that Judge Fallon

21   reached a similar conclusion.

22                   Do you agree with that interpretation?

23                   MR. STRAPP:  I do not, Your Honor, for a few

24   reasons.

25                   First of all, with regard to the actions at

1    issue here, if we're talking about the specific e-mails that

2    were sent to the Citrix executives in the Internet posts,

3    those were, in fact, sent by Mr. Chawla and authored by

4    Mr. Chawla.

5           But if we expand a bit the scope of the

6    misconduct here not to just focus on those particular

7    e-mails and Internet posts and focus on, for example, the

8    declaration, facts reveal -- and this was not apparent in

9    December 2018, but the facts have now revealed that Workspot

10   and Workspot's counsel had a hand in submitting to the Court

11   a declaration that was knowingly, at a minimum, misleading,

12   including paragraph 6 of the declaration.

13          The facts have revealed; and, again, this was

14   not clear in December 2018; that Workspot took steps,

15   affirmative steps to stop the investigation by Workspot

16   itself and by a forensic consulting firm that was hired by

17   Workspot to actually look at any evidence, and that Workspot

18   took no steps to preserve any evidence related to the

19   misconduct.

20          I would also say, Your Honor, that after the

21   fact, after the December 2018 hearing when Your Honor had

22   asked the parties to engage in expedited discovery, Workspot

23   refused.  And so to the extent that there was a directive

24   from Your Honor to the parties to try to work

25   collaboratively to figure out on an expedited basis what had

1    happened here, Workspot entered that investigation, and it

2    was only in August 2019 when the bulk of the documents that

3    are referenced here were provided by Workspot that shows the

4    complicity of Workspot and its counsel and the misconduct

5    that happened prior to the TRO hearing.

6                THE COURT:  One of the main arguments from

7    Workspot in the briefing, and I'm sure we'll hear today, is

8    that what Mr. Chawla did and kind of everything related to

9    what he did, you have already been compensated for in the

10   50 percent financial sanction that I already imposed.

11               I want to understand what Citrix's view is on

12   that point.  Do you interpret my 50 percent sanction as

13   fully compensating you for what Mr. Chawla did?  Do you have

14   to persuade me that you did, in fact, learn something new in

15   the expedited discovery in order for me to contemplate

16   additional sanctions?

17               MR. STRAPP:  Your Honor, I would say that the

18   50 percent sanction that Your Honor awarded was described by

19   Your Honor at the December 2018 hearing as only an initial

20   sanction.

21               Your Honor suggested that at the time, in

22   December 2018, you were troubled by the information which at

23   that point was providing only an incomplete picture

24   regarding misconduct and wrongdoing.  There was not yet a

25   lot of the definitive and corroborating proof that was

developed in 2019 regarding that misconduct.  And there

certainly was not much evidence, if any, regarding the

misconduct of Workspot and its counsel at that point.

And so at that point, Your Honor recognized that

additional discovery was warranted; that it should be done

on an expedited basis; and Your Honor invited Citrix, if it

so chose, to file an additional sanctions motion seeking

sanctions after that discovery was complete.

Your Honor, Citrix filed that motion about a

week after it received the final production of documents

from Workspot on August 19th.

And what I would say, Your Honor, is that the

50 percent of the costs of fees that were awarded prior to

the TRO -- in connection with the work prior to the TRO

hearing did not cover and compensate Citrix for all of the

investigative efforts that it took Citrix to, first of all,

ensure that its own systems were secure; and then, secondly,

to try to understand whether there were others who were at

fault here beyond Mr. Chawla himself.

The facts Citrix has presented in its sanctions

motion certainly justify the additional 50 percent of fees

and costs because of the magnitude of Workspot's misconduct

and because of its counsel's lack of candor to the Court.

And what is more, facts learned after the

December 12th hearing show that there was spoliation:

spoliation of the primary work device of the founder of

Workspot and its key technical employees who deleted the

hard drive of the primary laptop he had been using for at

least four years, from 2014 to 2018, and possibly for six

years, dating back to the founding of the company in 2012,

based on his testimony.

So the notion that somehow 50 percent of fees

and costs incurred by Citrix between October 9th and

December 12th, 2018 are sufficient to compensate Citrix for

its wrongdoing I would suggest would be inappropriate here

and certainly would not, first of all, compensate Citrix or,

secondly, serve as a deterrent to Workspot or to others to

engage in the types of misconduct that I would suggest

subvert the entire integrity of the judicial process.

THE COURT:  All right.  Another argument that

features prominently from Workspot is that you have not

shown that what was spoliated, if, in fact, it was, is at

all relevant to the underlying claims that, after all, are

what this case is about; I think a patent claim and a Lanham

Act claim.

Help me understand.  I think I understand, and I

think you've set out today, how what you learned in

discovery makes even more clear what Mr. Chawla did and

arguably shows that others participated at least after the

initial wrongdoing.

1          But what have you shown or could I find about

2     the relevance to the underlying claims that you brought in

3     this case originally?

4               MR. STRAPP:   Yes, Your Honor.   So I would say a

5     couple of points on that front.

6               First of all, just in terms of the legal

7     framework for addressing spoliation issues.   As your Honor

8     has noted in its prior decisions in the *Greatbatch* case and

9     the *GN Netcom* case, the proper framework was articulated by

10    the Third Circuit in *Schmid* which asked the Court to

11    initially look at whether this spoliation was done in bad

12    faith.

13              And here, I would strongly suggest that there

14    can be no conclusion other than that the deletion of the

15    hard drive that was the primary device for the key technical

16    employee of Workspot was done in bad faith.   And if that is

17    the case, then the question about prejudice, the burden on

18    that question of prejudice shifts from Citrix to Workspot.

19    It's Workspot's burden, except there was bad faith

20    spoliation suggests there was and proves there was no

21    prejudice to Citrix.

22              Workspot certainly cannot possibly meet that

23    burden because the MacBook that was deleted was apparently

24    never backed up by Workspot, even though it was his primary

25    work device for several years.   And when he deleted the hard

1    drive of that laptop, it is simply inconceivable that there

2    was not information, including e-mails and documents,

3    schematics, other information, relating to the Workspot

4    products that are accused of patent infringement in this

5    case and relating to the marketing efforts that are at the

6    center of the Lanham Act case.

7            And I would also say to Your Honor that between

8    the time that we had that December 2018 hearing and now,

9    Workspot has also asserted a counterclaim where it is

10   suggesting that Citrix is infringing a Workspot patent.  And

11   the Workspot patent that is asserted against Citrix in

12   Workspot's counterclaim is a patent that names Mr. Chawla as

13   the inventor.

14           Now, Mr. Chawla and his work on that purported

15   invention is certainly captured in the hard drive that is no

16   longer recoverable by Citrix.  And Citrix has concerns that

17   it will never be able to obtain or understand evidence

18   linking Mr. Chawla listed as the inventor of that particular

19   patent to develop defenses to the counterclaim that has been

20   asserted by Workspot.

21           So certainly if it were Citrix's burden to prove

22   prejudice, I believe Citrix could carry that burden.  But in

23   this instance, Workspot certainly cannot carry its burden to

24   show that Citrix was not prejudiced because of Mr.  Chawla's

25   spoliation.

1          THE COURT:  All right.  To the extent that you

2     are asking me to sanction Gibson Dunn and Workspot, and

3     particularly Gibson Dunn, do they have notice of what it is

4     you are seeking, and have they had an opportunity to be

5     heard on that?

6          MR. STRAPP:  Your Honor, certainly I would

7     suggest that Gibson Dunn is fully aware of all of the facts

8     involved here and was counsel of record when Your Honor

9     presided over the December 2018 hearing, ordered the parties

10    to engage in expedited discovery, and remained as counsel

11    for Workspot through early 2019.

12          Now, to the extent Your Honor is concerned about

13    interim sanctions against parties that are not present to

14    this litigation, such as Mr. Chawla himself who is now a

15    former employee, and Gibson Dunn, who has withdrawn as

16    counsel, I would suggest that the easiest solution is for

17    Your Honor to enter sanctions against Workspot.  And to the

18    extent that Workspot believes that these other actors,

19    lawyers from Gibson Dunn or Mr. Chawla are culpable or

20    should share in some sort of pro rata fashion regarding

21    whatever sanctions are entered by Your Honor, that it be

22    Workspot's burden, not Citrix's burden, for Workspot to try

23    to obtain some proportion of the payments that may be

24    payable to Citrix from those actors.

25          Certainly it's within Your Honor's discretion,

1    especially under the broad discretion provided to Your Honor

2    in your inherent authority to issue sanctions, to issue

3    against even nonparties, such as Gibson Dunn and Chawla.

4    But to the extent Your Honor chooses to enter sanctions

5    against Workspot and Workspot chooses to seek some portion

6    of payment from the sanctions by nonparties, that should be

7    Workspot's burden, not Citrix's.

8            THE COURT:  One of the other contentions from

9    Workspot is they didn't have a, say, redacted versions of

10   the TRO briefs to share with their board until I think it

11   was in December some time, in 2018, near the time of the

12   board meeting.  And to my surprise, and I think

13   disappointment, so maybe there's an explanation, it doesn't

14   look like redacted versions of the TRO filings got on the

15   docket until even 2019.

16           Help me understand why redacted versions weren't

17   available to the public and particularly to the Workspot

18   board within a week or so of when you will filed them.

19           MR. STRAPP:  There's a couple of issues there,

20   Your Honor.

21           First of all, the Workspot board is a small

22   board.  At the time in 2018, the relevant time period, two

23   of those board members were Mr. Amitabh Sinha, the CEO, and

24   Mr. Puneet Chawla, the CTO.  So when Your Honor suggested

25   the board did not have information regarding Citrix's

1    allegations, I would resist that suggestion simply because

2    the August -- I mean the October 15th notice e-mail that was

3    sent to Workspot counsel that included three single-spaced,

4    detailed -- three single-spaced pages of detailed

5    allegations, including the IP addresses at issue largely was

6    the same set of facts that was included in the TRO motion

7    that was filed the next day.  And that notice e-mail in its

8    entirety was sent to two members of the board on October

9    16th:  to Mr. Sinha -- excuse me, October 15th:  to

10   Mr. Sinha and to Mr. Chawla.

11          With respect to the redacted versions -- and I

12   guess one other point.

13          On October 18th, Mr. Lyon, from Gibson Dunn,

14   confirmed for Ms. Gibbs, for Mr. Chawla, a board member, and

15   for Mr. Sinha, a board member, that the TRO allegation

16   dovetailed with the notice e-mail in terms of the IP

17   addresses that were at the center of the evidence that

18   Citrix was trying to shore up to prove that Mr. Chawla was

19   indeed the culprit here.

20          Now, with respect to the redacted versions

21   itself of the briefs, and the mechanics of getting those

22   publicly filed with the Court, my recollection, Your Honor,

23   is that there were lengthy negotiations between the parties

24   given the sensitivity of some of the allegations included in

25   the TRO filings about exactly what would and would not be

1    redacted in the publicly available versions of these briefs

2    that would be filed and placed on the docket.  And it was

3    because of those lengthy negotiations which involved several

4    outside counsel and which involved comment from multiple

5    different members of the parties' respective clients, that

6    those redacted versions of the TRO filings were not made

7    publicly available on the public docket until early 2019.

8                    THE COURT:  Okay.  Just talk briefly about this

9    imputation point, whether you are contending that either I

10   or Judge Fallon had made an express finding that what

11   Mr. Chawla did is imputed to Workspot; and if we haven't

12   made a finding on that point, and if I had to undertake a

13   choice-of-law analysis, is it your view that Delaware had

14   the more significant relationship here to the issues than

15   California, and would that be the test?

16                    MR. STRAPP:  Certainly, Your Honor.

17                    So in terms of the law of the case analysis,

18   we're not suggesting there was an explicit finding by either

19   Your Honor or by Magistrate Judge Fallon regarding

20   imputation.  We're suggesting that that is something that

21   could be inferred from Your Honor's prior initial sanctions

22   hearing, and could also be inferred from Magistrate Judge

23   Fallon's ruling regarding the crime-fraud exception to the

24   attorney-client communication privilege.

25                    But with respect to the part of the analysis

1    itself, we think that in terms of choice of law, clearly

2    Delaware law, not California law, should apply here.

3    Delaware has a greater interest than does California in

4    regulating the conduct of Workspot in a registered Delaware

5    corporation.  And unlike the case law cited by Workspot

6    regarding choice of law, which was in the context of

7    supplemental jurisdiction, where each separate state law

8    claim at issue had to be adjudged on a choice-of-law basis,

9    here the jurisdiction in terms of this case is a federal

10   jurisdiction question.

11           And we cited the *CTS v Dynamics* case, the

12   Supreme Court case from 1987 that we believe is on point

13   here with respect to choice of law, and we believe that

14   Delaware law governs.

15           And to the extent your Honor is going to look to

16   Delaware law to address the imputation issue, we would

17   strongly urge Your Honor to look carefully at the *Stewart*

18   case that we cite from the Delaware Chancery Court in 2015

19   that was affirmed by the Delaware Supreme Court in 2015.

20   And we believe that case clearly holds that the type of

21   conduct here can -- the type of conduct that is at issue

22   here can and should be imputed to Workspot.

23           But I think one final point I will say regarding

24   imputation.

25           It bears repeating, I think, that Workspot and

```
 1      Workspot's counsel, not just Mr. Chawla, engaged in the

 2      egregious misconduct here, including by intentionally

 3      misrepresenting facts to the Court.  So Workspot should be

 4      held responsible not just for Chawla's unlawful actions

 5      under the imputation theory but also for its own misconduct.

 6                THE COURT:  Okay.  We're down to not much more

 7      than ten minutes for you.  I want to just have you briefly

 8      identify for me what sanctions it is you think I should be

 9      considering and then we'll save the rest of your time for

10      rebuttal.

11                MR. STRAPP:  Certainly, Your Honor.

12                I would ask Your Honor to turn, please, to slide

13      27 of our presentation.

14                THE COURT:  Yes.

15                MR. STRAPP:  I'm sorry.  Slide 30 of our

16      presentation.

17                THE COURT:  Okay.

18                MR. STRAPP:  On slide 30, we have set out a

19      summary of the sanctions that should be entered against

20      Workspot.  And the specific sanctions that we're requesting

21      are included in more detail in our sanctions motion,

22      including in a proposed order accompanying the motion at

23      Docket 260- (Beeping sound.)  But as set forth here in the

24      summary slide, (Beeping sound) Your Honor -- can Your Honor

25      hear me?  I just want to make sure.
```

1           THE COURT:  Yes, I can hear you.  Thank you for

2    checking.

3           MR. STRAPP:  In terms of a summary of the

4    sanctions that Citrix is requesting here, first of all, the

5    Court should strike Workspot's equitable defenses.

6    Equitable defenses require clean hands here.  And Workspot's

7    misconduct should bar Workspot from asserting any equitable

8    defenses, including waiver, equitable estoppel, unclean

9    hands and laches.

10           Second, Citrix request that the Court issue

11    instructions to the jury at the trial concerning Chawla's

12    harassing e-mails, Internet posts, spoliation of evidence,

13    and the false declaration, Chawla's credibility is very

14    likely to be at issue at trial.  He is an inventor of the

15    patent that is asserted against Citrix in a counterclaim.

16    He is the key technical employee involved with the products

17    at issue accused of infringement, but he is unlikely to be a

18    witness at trial because he is no longer employed by

19    Workspot and he is outside the subpoena power of the court.

20           The jury should be permitted to make an

21    assessment of his credibility.

22           Citrix also requests that an adverse inference

23    instruction be provided to the jury regarding the spoliation

24    of evidence.

25           The instruction should be provided to permit the

1  jury to infer that the destroyed evidence here would have

2  been unfavorable to Workspot and favorable to Citrix; and we

3  cited several cases in our briefing to this point.

4          And I think it is important to note, as I

5  mentioned in response to Your Honor's question, that the

6  spoliation here was done in bad faith.  And for that reason,

7  the burden is not Citrix's to show that it was prejudiced,

8  but rather it's Workspot's burden to show no prejudice; a

9  burden that Workspot cannot possibly meet.

10         In addition to these jury instructions

11 referenced on this slide and spelled out in more detail in

12 our sanctions briefing, the Court should also levy punitive

13 monitor sanctions for Workspot's bad faith spoliation and

14 for the misconduct of Chawla, Workspot, and Workspot's

15 counsel.

16         This Court awarded $3 million in punitive

17 sanctions in *GN Netcom* specifically because of spoliation.

18 And like in *GN Netcom*, in this case there is evidence that

19 key -- there's evidence that key information was spoliated

20 in bad faith by Mr. Chawla.  But unlike in *GN Netcom*, here

21 there also is evidence that there was a false perjured

22 declaration filed by Workspot and its counsel in an effort

23 to undermine the integrity of the judicial process.

24         And I would suggest, Your Honor, that in any

25 event, this Court's comment regarding the defendant in *GN*

1   *Netcom* is equally applicable to Workspot here.   In *GN*

2   *Netcom*, Your Honor imposed the punitive sanctions because of

3   defendants' "high degree of fault, its bad faith intent to

4   deprive GN Netcom of responsive documents, the prejudice

5   that it has caused to GN Netcom's case, and its

6   unwillingness to acknowledge wrongdoing."  Workspot's fault

7   and bad faith here is beyond dispute.

8          And, finally, as I already mentioned in response

9   to Your Honor's questions, Citrix should be awarded its

10  reasonable attorneys' fees and costs for all of its efforts

11  to investigate, uncover, and attempt remediate Workspot's

12  unlawful conduct from October 2018 through the date on which

13  the Court resolved the sanctions motion.

14          THE COURT:  Okay.

15          MR. STRAPP:  Unless Your Honor has any

16  questions, I'll reserve the remainder of my time for

17  rebuttal.

18          THE COURT:  Okay.  That's fine.  Yes.

19          MR. STRAPP:  And, Your Honor, just one last

20  thing before I do that.

21          I just want to point out that we've included at

22  slide 35 of this presentation a master timeline of all the

23  events relevant to the motion to the extent that that is

24  helpful to Your Honor in deciding this motion.

25          THE COURT:  Okay.  Thank you very much.

```
 1              You will have about seven minutes left for
 2    rebuttal; but at this point, let's turn it over to Workspot.
 3              I believe Mr. Lopez; is that correct?
 4              MR. LOPEZ:  Yes, Your Honor.  Let me see if I
 5    can get my computer working because it -- if I can have a
 6    couple minutes?  Apparently it went -- it logged me off the
 7    network.
 8              THE COURT:  Okay.  Well, we will certainly wait.
 9    I do have your slides in front of me whenever you are ready.
10              MR. LOPEZ:  Let me see if it will log me back on
11    the network while we're ...  If not, I have a set of hard
12    copies I can use.
13              (Pause.)
14              MR. LOPEZ:  Okay.  It logged me back on.
15              THE COURT:  Great.
16              MR. LOPEZ:  Your Honor, Ronald Lopez appearing
17    on behalf of Workspot from Nixon Peabody.
18              First of all, on behalf of Workspot, I want to
19    apologize to the Court regarding the false declaration that
20    was submitted on behalf of Workspot and executed by the
21    former employee Mr. Chawla in connection with the TRO filed
22    last October 16th.
23              I want to underscore that Workspot understands
24    the seriousness of what happened.
25              On December 12th, the Court sanctioned Workspot
```

1    for the Citrix declaration.  Workspot takes Citrix's

2    sanctions totaling $271,000, and this was a very significant

3    sum for a relatively small company.

4              At this stage, Workspot and Citrix take very

5    different views of the December 12th hearing and order.

6              Workspot accepts that it has been sanctioned for

7    the Chawla declaration, and Citrix was permitted to pursue

8    discovery to determine if others were involved or there was

9    a cover-up.

10             Citrix, on the other hand, wishes to re-sanction

11   Workspot for the same Chawla declaration; and, Your Honor,

12   we believe this is not warranted.

13             So if you look at slide 3.

14             THE COURT:  Yes, I do have your slide in front

15   of me.  Go ahead.

16             MR. LOPEZ:  At the December 12th hearing, we

17   believed that Mr. Chawla's involvement was not contested.

18   And as mentioned, the Court ordered additional discovery,

19   and the request was to determine whether others at Workspot

20   knew about Chawla's actions or were involved in a cover-up

21   after the fact.

22             And, of course, Your Honor ordered that

23   additional discovery could take place and an additional

24   motion could be filed.

25             So what happened following December 12th,

1    Mr. Chawla -- and I'll show a little detail on that in a

2    minute -- was terminated, additional discovery was

3    conducted, and there was no one else involved in sending the

4    e-mails or making the posts, and there was no cover-up.

5              In all of the papers that had been submitted by

6    Citrix, they have not pointed to any cover-up, or that

7    anyone else was involved in sending those e-mails or making

8    the posts.

9              And I think as the Court just noted, it is a

10   little interesting, or it is interesting they are seeking

11   sanctions against not only Workspot but Mr. Chawla and

12   Gibson Dunn, and they really just failed in fundamental due

13   process and providing notice of this motion for them.  I'm

14   not sure why they did that.  But this idea that we would

15   seek sanctions, you sanction Gibson Dunn and Chawla and then

16   shift those sanctions to us and we can figure it out isn't

17   the way motion practice works.

18             If we can move to slide 4, let me give you a

19   recap of what this additional discovery entailed.

20             At the end of the day, it entailed producing

21   over 300 attorney-client communications, five Workspot

22   devices were forensically inspected by a neutral, and there

23   was no evidence of any wiping of any of the five devices,

24   and Mr. Chawla was deposed for a full day in July of 2019.

25   But I'll get back to the Mac Pro.

1               But Magistrate Judge Fallon did look at all of

2    those e-mails, and she did conclude that those e-mails do

3    not suggest an intention to cover up the alleged false

4    Chawla declaration.

5               And as I mentioned, in all of the 55 exhibits

6    and 655 pages, there is no evidence that anyone else at

7    Workspot knew of Mr. Chawla's actions or engaged in a

8    cover-up.

9               What they're accusing is of maybe sloppy

10   lawyering and maybe not moving fast enough -- Workspot not

11   moving fast enough to conduct an investigation.  But there

12   is no evidence, and there is really no affirmative

13   allegation at this point, that others at Workspot knew or

14   engaged in anything related to his actions in sending those

15   e-mails and makes the posts.

16              And what the evidence does demonstrate is that

17   after October 15th, Chawla lied to Workspot and misdirected

18   Workspot.

19              If you go to slide 5, this is the e-mail you've

20   already seen.  This is the DLA to Gibson Dunn e-mail on

21   October 15th notifying counsel about the harassing and

22   threatening e-mails, providing two IP addresses, the Comcast

23   service subscriber IP address located in Freemont, and a

24   Microsoft Azure IP e-mail address.

25              And you can see outside counsel, Mark Lyon,

1    forwarding this to Amitabh Sinha, Puneet Chawla, Karen

2    Gibbs, as well as the rest of the lawyers representing

3    Workspot, and they wanted to have a meeting about that

4    immediately.  And, in fact, a meeting did occur that

5    very night to discuss this.  This was all part of the

6    confidential communications that were disclosed.  They took

7    it very seriously.

8              And immediately what happened is Chawla lied to

9    Workspot and he misdirected Workspot.  He said, "The IP

10   address that was identified is not my IP address.  Here is

11   my IP address, 71.202.96.100.  So that's not me."

12             If you go to slide 7.  This is about -- this was

13   on October 29th, the day before the Chawla declaration was

14   filed.

15             Chawla is writing to the lawyer at Gibson Dunn

16   as well as Mark Lyon, the lawyer -- Ernie Sander was

17   responsible for putting together the Chawla declaration with

18   him.  At least, that's what the evidence is based on these

19   e-mails.  And he specifically tells him:  "I never e-mailed

20   Citrix folks.  I'm not an ex-employee."  And then he even

21   kind of puts an emphasis and says, "Look, I don't even --

22   let's put in I will resign if any of this was true."

23             He's clearly misdirecting Workspot and his

24   counsel and kind of perpetuating the lie that he told.

25             If you go to slide 8, the CEO is a bit confused

1    here.  And there is a lot of accusation coming from Citrix

2    that we didn't -- Workspace did not move fast enough.  It

3    should have done a more thorough investigation.

4              What they don't really make clear is that there

5    was kind of an underlying kindering of sharing the

6    underlying papers and evidence with Workspot's management.

7    And they really initially did it through this process of

8    claiming its all attorneys' outside counsel eyes only,

9    they're sealed, and they're unsealed.  And, in fact, local

10   counsel, Potter Anderson, really the day after they get this

11   e-mail, they start requesting that Citrix allow management,

12   Workspot's management, to see the TRO papers.

13             And you know what's very interesting, if you just

14   step back and think about this a minute, none of the evidence

15   that was in those Citrix TRO papers was confidential Citrix

16   information, except maybe the belief that there was one e-mail

17   that had actually been written by the CEO of Citrix had sent,

18   which shortly thereafter, Citrix will confirm was not his

19   e-mail.

20             Okay.  So maybe that was confidential at that

21   point.  But the rest of it, none of it was.  The posting,

22   the e-mails.  Why aren't they sharing it?

23             Now, you could argue, well, maybe they should

24   have -- they didn't want Mr. Chawla to see it.  Okay.  Well,

25   why didn't you say, okay, everybody else can see but Chawla?

1    Just restrict him from seeing it.

2              No, there was a concerted effort by Citrix to

3    restrict management from seeing these papers and

4    understanding really the gravity and what was being accused

5    in those papers.  And we have a timeline, and you will see

6    that actually Mr. Sinha doesn't actually get to see the

7    sealed TRO papers until November 26th, much after this.

8              So there was this fundamental problem.  But --

9    and at this point in slide 8, you can see he is confused.

10   He hadn't actually seen the papers.  He's kind of heard

11   about some allegations.  He hadn't seen anything, and he

12   knows there's a Freemont IP address.  And he says, "Well,

13   has Citrix done an investigation to look into its own

14   employees, former employees that may be in Freemont," given

15   what's being communicated to him.

16             So he is confused about this.

17             And slide 9, if you take a look at that, the

18   Court had a question, and a legitimate question, and that

19   is:  What have you, Workspot, done about Mr. Chawla?  And

20   that was a question that really, I think, the Court was

21   struggling with on December 12th when we received the

22   sanction; that there was really no dispute that this

23   declaration was false.

24             And what happened is the board, who has the

25   responsibility for not only removing Mr. Chawla but

1   terminating him, it is not allowed to see the papers

2   until -- or given authorization on December 18th.  And then

3   we have Christmas, and they meet on 26th, and they remove

4   him and they fire him.

5           Now, I heard this morning that "Oh, it's a small

6   board.  It's Mr. Chawla and Mr. Sinha."

7           Well, that's not true.  There's three outside

8   directors on that board.  It's a board comprised of five

9   people.  And that is who needed to look at this information.

10  Mr. Sinha had looked at the information and made the

11  decision that the board needs to be involved in this.

12          And so there was this, for some unknown reason,

13  why are they restricting everyone from seeing these papers?

14  It was pulling teeth to allow both management and the board

15  to see these papers.

16          But when they protest so strongly of, you know,

17  Workspot dragging its feet on some investigation that rings

18  a little bit hollow given what was -- what Citrix's counsel

19  was doing to kind of impede and restrict both management and

20  the board from seeing these allegations and understanding

21  the full import of it.

22          THE COURT:  Yes, let me interrupt you there.

23  I've got some questions.

24          MR. LOPEZ:  Sure.

25          THE COURT:  So it's undisputed that the October

```
 1    15th e-mail was in the hands of Mr. Chawla and Mr. Sinha

 2    within an hour or so of when it was --

 3                  MR. LOPEZ:  That's right.

 4                  THE COURT:  -- outside counsel; correct?

 5                  MR. LOPEZ:  Yes.

 6                  THE COURT:  So what is it that you contend

 7    materially Mr. Chawla and Mr. Sinha did not know between

 8    October 15th on December 18th when they got the redacted

 9    versions of the TRO filings?  What --

10                  MR. LOPEZ:  All of the --

11                  THE COURT:  What were they missing?  Yes.

12                  MR. LOPEZ:  Well, they didn't even have all of

13    the -- they didn't even have all the e-mails and the posts.

14    I mean, none of that was shared with them.  They couldn't

15    even read those on October 15th.

16                  And, in fact, what happens after October 15th is

17    an e-mail is sent and the filing occurs -- a filing -- an

18    e-mail was sent saying, "Hey, by the way, all of this,

19    including the IP addresses, are outside counsel only."

20    That's what Citrix does.  It immediately, after sending that

21    initial e-mail, it says:  "And, by the way, all of that

22    information is outside counsel only, including the IP

23    address."

24                  Now, realize the situation that Workspot is in

25    there.  I mean, they have been accused in those -- and
```

1   counsel knows this.  They have been accused of violating the

2   protective order because they inadvertently allowed the

3   Microsoft agreement, or some element of the Microsoft

4   agreement, to be shared with Mr. Sinha and Chawla.  And they

5   have also been accused of potentially, you know, violating

6   the protective order by leaking an internal e-mail from the

7   production that was made by Citrix to Workspot.

8              Now, both of those things, at the end of the

9   day, turn out to be not true.  There was no violation of the

10  protective order because, as the Court may remember, it

11  turns out that that Microsoft agreement had been produced

12  years before in a filing in the SEC.  And anything that

13  was shared was not confidential, it was public.  But there

14  was a huge motion about that that the Court had to consider

15  on December 12th, plus they're being accused of leaking an

16  e-mail, violating the protective order by leaking an e-mail

17  that came from the CEO of Citrix.

18             Now, that turned out -- and later, they were

19  informed that that doesn't look like it was an authentic

20  e-mail.  And, in fact, it was an e-mail created by Mr.

21  Chawla.  But that's not -- but they're being damned and

22  they're saying, by the way, all of this is confidential.

23  We're restricting everything, and they're not allowing them

24  to see it.

25             So it's not just -- and they have a denial from

1    Mr. Puneet Chawla that "That is not my IP address."  So,

2    yeah, they need to see those papers to understand the

3    magnitude of what is being said here.  And there is a

4    restriction on it, a significant restriction in light of,

5    you know, they're being accused of violating the protective

6    order right and left as part of this.  So they're very

7    careful.

8         And that is actually going to lead into this

9    paragraph 6 of the Chawla declaration and why, you know,

10   that may have been inartfully drafted.  But the concern was,

11   you know, what can we -- show me what is correct here.

12        THE COURT:  All right.  Yes, we'll get to

13   paragraph 6.

14        But before we get there, what is your response

15   to -- for instance, it's at slide 12 of the Citrix

16   presentation, but it's this e-mail from Ms. Gibbs, October

17   24th, explaining, you know, it's been a week.  No

18   investigation, no proactive discovery proposal or plan.  No

19   real engagement --

20        MR. LOPEZ:  Yes.

21        THE COURT:  -- or action by outside counsel.

22        And then jumping forward just a little bit, it

23   seems that your client well knew in November that the IP

24   address in question was Mr. Chawla's, but yet that was not

25   disclosed to me or to the plaintiff until some time quite

1    after all of that.

2              How do you fit those into your portrayal that

3    your client was being diligent, and your attempt to suggest

4    that some of this response is really Citrix's fault?

5              MR. LOPEZ:  Well, what I was suggesting that

6    Citrix did is it did impede by the outside counsel on the

7    designation, and it did impede management from looking at

8    that, and I think that is what.

9              When you look at Ms. Gibbs's e-mail on October

10   24th, I think you have to look at the entire e-mail chain

11   that she sent, and I think that is probably around

12   Exhibit 20.  That e-mail of October 24th is in that e-mail

13   chain.  This is Exhibit 20 to, I think it's DI 262, the

14   Strapp declaration.

15             And if you look at the e-mail sent on October

16   24th that is not part of that, she says:  "On the redactions

17   within the TRO opposition, I'm struggling with how we

18   respond without Puneet and Amitabh being able to see the

19   accusations.  How can they submit declarations denying the

20   alleged facts without knowing the alleged facts?  Should we

21   seek an extension for the response until the redaction issue

22   is covered?  How would we do that, if we do?  Then it seems

23   we should raise this.  This is a lead counsel."

24             So Ms. Gibbs is actually very concerned about

25   the fact they can't see the allegations and how are we

1    preparing a declaration without, without, you know,

2    management seeing the allegations.  And, you know, she does

3    call out Gibson Dunn on how it's doing these.

4            You know, they hired Gibson Dunn.  Gibson Dunn

5    says, now, they've gotten the same denial or misdirection

6    from Chawla and, look, it's not his IP address.

7            So before October 30th, October 30th is the day

8    they filed the declaration that turns out to be false.  You

9    know, all they have and what they don't is that is a

10   different IP address.  It's not Mr. Chawla's -- not the IP

11   address that has been submitted by Citrix.

12           And I would say something else, if we're going

13   to talk about this point right now, and I think this maybe

14   makes sense and it's later in the slides you will see it.

15           But at this point, October 30th, Citrix knows

16   more than it's telling us.  And that's the ShareFile issue.

17           And the Court asked Mr. Strapp directly at the

18   hearing on December 12th:  "When did you know about

19   ShareFile, and kind of when did you disclose it?  What did

20   you know?"

21           And he never answered when they actually did the

22   ShareFile work.  And, in fact, we think the evidence

23   strongly suggested by October 24th, Citrix had completed a

24   looking for the IP address in the ShareFile logs.  And

25   what -- if you will recall what the ShareFile logs are is it

1    turns out that Potter Anderson and Gibson Dunn are both

2    Citrix users.  They use their system.  And Citrix provides

3    something called a ShareFile, which is like an FTP site.

4    And Citrix logs who accesses those ShareFiles with what IP

5    addresses.

6              THE COURT:  Okay.  Let me interrupt you,

7    Mr. Lopez.  I do recall this.  Since you went there, I will

8    ask you a few questions.

9              MR. LOPEZ:  Okay.

10             THE COURT:  Is it your contention that Citrix

11   did something in violation of its customers agreements with

12   respect to the ShareFile search?

13             MR. LOPEZ:  Well, I would put it this way.

14   Unfortunately, you know, that record of what those

15   agreements are is not before the Court.  But I would say

16   this about it.

17             They accessed those without permission from

18   either Potter Anderson or Gibson Dunn.  Remember, these are

19   attorney ShareFiles.  This isn't just -- which is obviously

20   where they're passing confidential information.  Now, they

21   say, "We didn't actually look at any confidential

22   information.  We just accessed who was kind of accessing it

23   and downloading things.  That's what we did.  We just kind

24   of looked at who was making the calls and so forth, if it

25   was like telephone records."

1                    THE COURT:  Mr. Lopez, you're now making, and

2        you did it in the papers, a very serious allegation against

3        Citrix.

4                    Do you have any evidence that they did anything

5        in violation of their customer agreements or anything

6        improper that constitutes what you are arguing now is

7        unclean hands and I think alarming conduct?

8                    MR. LOPEZ:  Yes.  We think it was -- one, I will

9        say it was without permission.

10                   Do I have the customer agreement?  No, that was

11       not put in the record by the -- by Gibson Dunn or by Potter

12       Anderson who are no longer counsel here.  But we believe

13       that if you looked at those, there would probably be

14       provisions, but those aren't in the record before you.

15                   So what we can say today, it was certainly done

16       without permission, first point.  They didn't say, "Hey,

17       we're going to access logs of ShareFile and see who was

18       going into this, that this IP address appears."  But maybe

19       more importantly for purposes of this motion right now, we

20       believe that Citrix actually had that information before

21       October 30th and declined to share it with us until after we

22       filed -- after Workspot filed the October 30th motion.

23                   And the reason we say that is if you look very

24       carefully at the declaration that was -- you know, that goes

25       through this ShareFile and that's this declaration of -- let

1   me find his name here.  It's the technical consultant that

2   Citrix hired to do this.

3               And if you look at David McSweeney, which was

4   filed November 6th, 2018, if you look at that, he very

5   carefully talks about every -- all the dates he did

6   everything.  The one date that's missing is when they

7   actually did that and found that IP address, that Freemont

8   IP address associated with accessing files in Gibson Dunn

9   and Potter Anderson's ShareFiles.

10              And when you asked that question to Mr. Strapp

11  on December 12th, he did not tell you when they had that

12  information.  He said, "Oh, we had to verify it.  We had to

13  look.  We had to see if it was relevant."  It was already

14  relevant because they already looked and found the date

15  range they wanted to look at.  And they already knew the IP

16  address they wanted to look at.  They had already determined

17  it was relevant.

18              And we believe they actually had it before the

19  30th and just --

20              THE COURT:  All right.  Fine.  I understand your

21  argument.  I've got a lot of questions for you, so we'll try

22  to keep them short.

23              MR. LOPEZ:  Sure.

24              THE COURT:  In all that you've said now about

25  ShareFile, I take it you have no evidence Citrix looked at

1    the substance of any communications at Gibson Dunn or Potter

2    Anderson.

3             MR. LOPEZ:  Yes.  No, and I think there's

4    evidence support there.

5             THE COURT:  Okay.

6             MR. LOPEZ:  No.  I don't believe that they

7    actually looked inside and it's an attorney-client

8    communication.  If he says he didn't, I believe him.

9             THE COURT:  All right.  Now, you didn't get to,

10   I think, address the issue about some time in November it

11   appears your client did learn that the IP address in

12   question belonged to Mr. Chawla or his wife.  They got those

13   communications from Comcast.

14            You did not disclose that, not you but your

15   client.  Address that.

16            MR. LOPEZ:  Well, yes.  Look, after October

17   30th, the next time they have a filing that they have to

18   make, I believe, is December 7th.  And Mr. Sinha still

19   hasn't reviewed the TRO papers until the 27th.  And yes,

20   remember on December 7th, we also have Kivu, you know,

21   making the connection between Puneet and the Azure logs.  We

22   actually affirmatively put that in, you know, that there was

23   this connection.

24            But, remember, we're also waiting to get the

25   supplemental Comcast subpoena response that doesn't come

1    until November 19th, and the Microsoft subpoena which came

2    earlier, but that required us to do work in the network

3    logs.

4            But it's not until November 9th that we get the

5    response from Comcast.  And remember, we immediately agreed

6    that they should be able to subpoena those.  We didn't delay

7    that -- those subpoenas.

8            So from the 19th, yes.  You know, okay, it's

9    Chawla.  Well, should they have immediately written the

10   Court or something?  You can argue that, but what they --

11   what counsel and Workspot did is they made a filing on

12   December 7th.  And, you know, basically -- and that was

13   after on the 27th, Mr. Sinha sees all of the papers, by the

14   way, they make the filing and they basically say they're not

15   going to rely on it.  And December 12th, I think it is even

16   more clear.

17           But I will readily concede that the statement

18   wasn't as clear in some parts of the record from Workspot's

19   counsel.  But if you look at the record -- and I can show

20   you which slide it is, he does -- Gibson does say we're --

21   you know, We're not relying, and we believe that the

22   declaration was false.  They're relying on, essentially, you

23   know, a statement by counsel to that effect.

24           THE COURT:  Yes.  When you find that, you are

25   going to have to point that out to me because you have said

1    repeatedly that it was not contested at the December 2018

2    hearing that it was Mr. Chawla and that the declaration was

3    false.

4             I don't -- I'm not sure that I see that in the

5    record.  I see a footnote, you know, saying:  We, Workspot,

6    no longer rely on the declaration; and I see a similar

7    comment to that effect at the hearing.

8             But that seems arguably quite materially

9    different than the posture we're in today where I do take it

10   as completely uncontested that the Chawla declaration was

11   false.

12            I'm not seeing where on or before the December

13   2018 hearing you all were clear and definitive about that.

14            And further, and you can try to help me on this,

15   I think your last answer indicates you concede that your

16   client was comfortable with learning that it was, in fact,

17   Mr. Chawla who did the e-mails and posts, learning that in

18   or around early November, and letting me and the other side

19   continue to be unsure as to whether or not you all thought

20   that was the facts.  You waited until the December 7th

21   filing and put it in a footnote saying simply you no longer

22   seek to rely on it.

23            So it's hard for me to get my head around your

24   overall argument that your client was really very diligently

25   dealing with this problem -- a significant problem that

1    there was a false declaration that you all had told me was

2    important that you now knew was false.

3              MR. LOPEZ:  Well, first of all, let me kind of

4    address that first issue.

5              Remember, counsel did not permit Mr. Sinha to

6    review the unredacted filings until November.  November 26th

7    is when he has to go to Gibson Dunn's offices to look at

8    those sealed papers.  And, look, we -- so management at that

9    point hadn't seen it; right?  They know what Mr. Sinha knows

10   about the IP address, and beyond that, I'm not sure what the

11   discussions were internally, but, you know, we have Gibson

12   Dunn representing them and the decision was made on December

13   7th to withdraw reliance on that, and counsel for Gibson

14   Dunn made the statements that they made at the hearing.

15             I mean, you know, Gibson Dunn knew what they

16   were doing or -- you know, and made the statements to the

17   Court that they made.  They believed it was sufficient to

18   say they were not relying, that they were barring reliance

19   on the declaration, and that all the evidence seemed to

20   point to Mr. Chawla.

21             Now, did they come out -- did he come out and,

22   you know, clearly, you know, say, "Chawla submitted a false

23   declaration"?  I think Your Honor is probing for.  Could he

24   have been clearer?  Yes, he could have been clearer.  I take

25   it you read that transcript, I think he could have been

1    clearer, and he should have been clearer.

2              But, you know, the fact is they're not relying

3    on it, and, you know, they're basically conceding that it

4    false.

5              THE COURT:  All right.  So then isn't that --

6    isn't there a change between your client's position as to

7    whether or not it was Mr. Chawla who did the postings and

8    e-mails, whether his declaration was false, there's a change

9    between your posture and position in December 2018 and your

10   posture and position now after the discovery?  And doesn't

11   that show that something material was learned as a result of

12   the discovery?

13             And another way I would put it is, the very

14   first sentence of your answering brief is:  "On December

15   12th, 2018, the Court concluded that Mr. Puneet Chawla had

16   executed a false declaration in which he denied making

17   improper posts and sending improper e-mails," I'm not sure

18   that's quite accurate.  I'm not sure I was in a position to

19   make a firm, factual finding and conclusion as opposed to

20   recognizing very highly suspicious indications at that point

21   where it today, I can make that finding and it is, in fact,

22   uncontested.  You concede it.

23             So hasn't there been such a change in the

24   record?  Isn't it the result of the expedited discovery?

25   And if so, doesn't it follow that there really has to be

1    some additional sanctions here?

2              MR. LOPEZ:  Well, no, because by December 12th,

3    we knew the IP address that was the subject of it was Mr.

4    Chawla's IP address.  We had that from Comcast.  That was

5    before the Court on December 12th.  That was Mr. Chawla's

6    wife's.  We knew that.

7              There was no contesting that the IP address from

8    which the e-mails had been sent were Mr. Chawla's home IP

9    address.  That was known.  That was before the Court.  There

10   was no contesting that on December 12th.

11             We didn't do discovery after December 12th and

12   learn -- and I fully intend to talk about what we learned

13   after December 12th, but we did not learn anything new that,

14   you know, that showed that it was something -- that that IP

15   address wasn't used or something.  It was always that IP

16   address, and it was Mr. Chawla who sent that, the e-mails,

17   and he had denied and lied to us about it.

18             And the evidence started coming in that, oh, it

19   looks like this isn't true.  Yes.  And we submitted some of

20   that evidence.  We submitted some of that evidence as part

21   of the Kivu declaration, looking at and saying the other IP

22   address, and looking at the network logs, show that it was

23   Mr. Puneet at his e-mail address who was accessing those

24   network logs.

25             So we actually submitted further direct evidence

1    linking to Mr. Chawla that was before the Court on December

2    12th.   That involved -- none of that came out after December

3    12th.   It was all in the record before December 12th.

4              THE COURT:  All right.

5              MR. LOPEZ:  Any --

6              THE COURT:  Let's assume, for the sake of

7    argument, that nothing new and relevant was learned from the

8    discovery.  Help me understand where, either in my bench

9    ruling on December 12th or anywhere else in the record, I

10   indicated that I would only be willing or likely to impose

11   additional sanctions if, in fact, the expedited discovery

12   revealed something new.

13             MR. LOPEZ:  I don't think you said that, Your

14   Honor.

15             THE COURT:  In fact -- right.  Thank you for

16   acknowledging that.  In fact --

17             MR. LOPEZ:  No, I don't think you said that.  I

18   think you --

19             THE COURT:  And, in fact -- hold on a second.

20             Isn't it pretty clear that I -- that that was

21   not my view?  That, in fact, this 50 percent of what had

22   been incurred just to that point was a starting point?

23             I invited the plaintiff to file a motion for

24   additional sanctions, and I said this at the beginning.  I'm

25   looking at page 112 of the transcript.

1          "Some part, some part of the sanction for the

2    false filings that were submitted to the Court has to be a

3    financial cost.  And I'm beginning that by the 50 percent of

4    the costs and fees associated with the TRO motion.  This is

5    without prejudice to asking for further financial sanctions

6    depending on how the plaintiff assess things going forward."

7          In light of that, and in light of what I

8    appreciate your candor, that I never said I was done for

9    this very highly troubling conduct that we -- you know,

10   we're talking about on December 12th of 2018.  How is it

11   that your principal argument in your brief and in the slides

12   you've proposed to go through is essentially that I should

13   not -- that I have already done enough for this highly

14   troubling conduct, and at least implying, I think a

15   reasonable reader would think, that I have already indicated

16   I have done with dealing with the highly troubling conduct?

17   Help me understand how that is your lead argument on this

18   motion.

19          MR. LOPEZ:  Well, look, I can't.  It's clear

20   what you said on the record.  And I'm looking at page 112,

21   and you absolutely say that.

22          You know, the point of the -- you don't say that

23   you're not going revisit, you know, the concept of, you

24   know, the 50 percent.  Our understanding of the

25   50 percent -- and, look, you know, the Court has made the

1    decision so we're trying to interpret what we think the

2    Court was doing.  What we think the Court was doing, and we

3    might be wrong, but what we think the Court was doing was

4    there were -- there was TRO, the Order to Show Cause, so we

5    had, you know, the Microsoft issue, we had, you know, the

6    alleged, you know, leaked -- violation of the protective

7    order because we leaked documents outside of Citrix's

8    production, you know, plus then we have the Chawla thing.

9              So, you know, there wasn't an exact calculation,

10   and, you know, what I was assuming was you kind of roughly

11   estimated:  Well, okay, I denied the TRO, I denied the Order

12   to Show Cause.  I'm very troubled.  And there is no doubt

13   you were troubled by what happened.  I mean, I told you

14   that.  We take this very seriously.  But I think that was

15   kind of a rough estimate of what is fair.

16             And then I think before the Court also should

17   take into the account the size of the company.  You know,

18   Workspot -- that was a significant penalty for Workspot to

19   pay.  Workspot is not Citrix.  You know, these sanctions can

20   be crippling in the context of a patent litigation.

21             So I don't know if that plays into the Court's

22   mind at all but, you know, we viewed that the 50 percent

23   sanctions, given this, you know, we paid them.  We were

24   sanctioned.  You know, we had an employee that upon his own

25   did something very bad.  We readily concede that.  So that

```
 1    is our view of the 50 percent.

 2              THE COURT:  All right.

 3              MR. LOPEZ:  I understand if you have a different

 4    view now.

 5              THE COURT:  All right.  Let's talk about

 6    paragraph 6 of the --

 7              MR. LOPEZ:  Okay.

 8              THE COURT:  -- declaration.

 9              MR. LOPEZ:  Maybe we should just turn to the

10    slide on that --

11              THE COURT:  Yes.

12              MR. LOPEZ:  -- if I can, you know, find where

13    that is because there is quite a bit on this paragraph 6.

14              If I can jump ahead.

15              Matt, what slide on this?

16              MR. GERBER:  Slide 22.

17              MR. LOPEZ:  Got it.

18              Okay.  Right.  So here is the sentence that is

19    now the subject of quite a bit of discussion today:  "And we

20    should be sanctioned for this."

21              So if you go slide 23, I think even as counsel

22    for Citrix pointed out, really that language was suggested

23    by Gibson Dunn.  I do not think in any way that language was

24    intended to mislead the Court or even to mislead Citrix.

25              I think that language, the first part of the
```

language, the first part of the language being when Citrix
allowed the IP addresses apparently to be shared with
Workspot, I think there was a very big concern that counsel
has gone back and designated these IP addresses as outside
counsel only.

        If you look at slide 24, look at October 16th.
This is all outside counsel only.  This is from Mr. Strapp
to Mr. Lyon.  He says, "This is outside counsel only.
Outside Counsel Eyes' Only including the two IP addresses."

        If you look at what they filed on October 22nd,
this is the redaction.  All of the IP addresses are
redacted.

        I think that they were very concerned, counsel
was very concerned that we have to be careful.

        Yes, apparently it was shared initially, but
what do we do?  We have been accused in other cases of
violating a protective order.  We have to be careful how we
say this.

        Now, I think it was inartfully drafted.  I've
said that.  We've said it in our papers.  But I don't think
there was really an intent to mislead the Court or anyone on
this because, remember, the IP addresses were being
investigated.  They had agreed immediately to the Comcast
subpoena, to figure out who owned it.  That happened before
this was filed.  They wanted the definitive.  They had

1    already gotten Chawla's statement that it wasn't his, that

2    his was a different one, but they immediately agreed to

3    that.

4              And then they also needed to look at the

5    Microsoft IP address, and they had to do that work through

6    the subscription.  And they needed the Microsoft

7    subscription information, and then they -- the second part

8    of that paragraph 6, "... we intend to investigate whether

9    those IP addresses were used in the Workspot cloud."  On

10   slide 26, that did happen.  They did investigate whether

11   those IP addresses were used in the Workspot cloud.

12             And on December 7th, again, that's this Kivu

13   declaration we've talked about, they went through and they

14   linked the activity logs to Puneet@Workspot.com and they

15   filed that with the Court.  So they did do that.

16             I will say it was inartfully drafted.  I do not

17   believe there was any intent to lie, to mislead, or anything

18   else with the Court.  At the same time, they were filing a

19   very extensive, you know, opposition to the PI motion.  You

20   know, they were trying to get this declaration drafted.  I

21   think it was inartfully drafted.  I do not believe any way

22   that was intended to mislead the Court.

23             THE COURT:  All right.  Well, if there is no

24   intent to mislead, how do you explain that Mr. Chawla

25   himself, you know, was suggesting that instead you tell the

1    Court and tell the plaintiff that we are investigating, and

2    he is having back and forth with his counsel talking about

3    the timing for that investigation to be completed and would

4    it be completed before your filling.

5            And, you know, related to all of that, isn't the

6    only fair reading of this paragraph 6 as you all submitted

7    it, and as it was followed up by argument at the December

8    hearing, to make me think that you all did not have what you

9    needed in order to conduct a reasonable and diligent

10   investigation, and that was really Citrix's fault that you

11   couldn't undertake that investigation?

12           Isn't that -- putting aside whether it's true or

13   untrue, and I think the best reading is of paragraph 6 is

14   not true as you submitted it, but putting that aside, the

15   whole tone and the whole strategy seems to be to make me

16   think that this problem with the investigation is Citrix's

17   fault and not Workspot's.  And that derives in part from the

18   change in the language of paragraph 6.

19           That all seems like a lot more going on than

20   just an inartful sentence written by an attorney, which

21   we've all done that.  I understand.

22           MR. LOPEZ:  Yeah.  Well, I appreciate that

23   question, Your Honor.  But remember the timing of this.

24   This is October 30th.  I don't think in October -- they

25   didn't have the results of the Comcast subpoena at that

1    point.  They didn't even have the notification at that point

2    where, you know, Chawla says his wife had received some

3    notice of Comcast.  They didn't have any of that.  They just

4    had Chawla's denial.

5              So I think given -- as of October -- and they

6    had, as of October 30th, they had these -- they were

7    confronting alleged violations of the protective order, and

8    they were being told that these IP addresses were outside

9    counsel only and could not be shared with people within

10   Workspot.  Presumably, that included Mr. Chawla and

11   Mr. Sinha.

12             So, yeah, I think the lawyer, looking at that,

13   is kind of saying, well, what can we -- you know, I don't

14   want to be violating the protective order saying we're going

15   to do all this investigation when we have been told, or

16   Workspot, you know, when it's been told all of a sudden

17   retroactively those are all outside counsel only.  I think

18   that was the struggle.  That's -- I really do not believe,

19   Your Honor, there was affirmative intention to mislead the

20   Court.  Because, remember, this is as of October, October

21   30th.  This isn't, you know, some later date.  The

22   declaration turns out to be wrong and not relied on.  They

23   didn't want you to rely on it; and they do say that.

24             But at that specific date, they didn't have the

25   evidence linking that IP address to Mr. Chawla.  And they

1    were being told, that is outside counsel eyes' only.  I

2    think that is the explanation.  I really do believe that's a

3    reasonable explanation.  Minds differ on that.  You know,

4    Mr. Chawla had suggested some other language, but this came

5    from Gibson Dunn.  These guys are sophisticated lawyers.

6                I think the Court even recognized on December

7    12th you were not ascribing any bad faith to Gibson Dunn.

8                Are there things they should have done better?

9    We certainly, in hindsight, agree with that.  I don't think

10   there was any intent to mislead the Court there.

11               THE COURT:  All right.  You're down to under ten

12   minutes.  I'm going to give each side an extra 15 minutes,

13   but, Mr. Lopez, I'm going to ask you a few more questions,

14   and then I will try to give you some time to get to whatever

15   else you may want to get to.

16               But talk just briefly about this imputation

17   point.  I guess a couple things there.

18               Isn't it at least implicit in my previous

19   finding and in Judge Fallon's finding that Workspot is, in

20   fact, responsible for what Mr. Chawla did?  And even if that

21   is not already clear, if I did undertake a choice-of-law

22   analysis, I think the only case you cited, a California

23   case, *Meyers*, has to do with *respondeat superior*, I'm

24   unclear of the relevance of that, and why wouldn't I just

25   apply Delaware law in any event and, under *Stewart*, you

1    know, hold Workspot responsible anyway?  So talk about

2    imputation.

3                    MR. LOPEZ:  Yes.  Let me talk about imputation

4    and *Stewart*.

5                    First of all, the way I think about imputation

6    in this issue is I think the Court has already held Workspot

7    responsible for the declaration.  That's what the sanction

8    order was all about on December 12th.

9                    I don't think imputation is in any way needed.

10   I think the Court has concluded that because that was a

11   declaration that is inaccurate and false, and because it was

12   a declaration submitted on behalf of Workspot, that Workspot

13   is therefore responsible for that declaration can be

14   sanctioned.  I think that's -- I think that's what the

15   Court's analysis was, and I think that is correct.  I mean,

16   that is a correct analysis.  I don't think there's any need

17   to talk about imputation there.

18                   Imputation means, are we going to make further

19   steps to start, you know, to look at, okay, those e-mails he

20   sent, were those e-mails that he sent on his own time from

21   his home?  You know, are we going to impute those e-mails to

22   Workspot?  I think that is a step beyond what the Court

23   needs to do.  I don't think it is required.  And I don't --

24   and I think it becomes mired in choice-of-law imputation

25   principles.

```
 1                    So let's just start with Stewart.

 2                    And the way I would analyze this is two parts.

 3       I think the California law and Delaware law are consistent

 4       on -- and Stewart said this -- on kind of course and scope

 5       of employment and authority.  So that part I think --

 6                    MR. WERBER:  Slide 16.

 7                    MR. LOPEZ:  Yes, slide 16.  But I think it is

 8       consistent.  I mean, both courts, whether you apply

 9       California, they're going to say, "Look, was he acting

10       within the course and the scope of his employment?  Was he

11       really authorized to do this act?"

12                    He was not authorized to send these e-mails from

13       his -- (Transmission lost for about 24 seconds by court

14       reporter.  Parties met and conferred and agreed that the

15       transcript, if heard, should have said:

16                    "He was not authorized to send these e-mails

17       from his home using his personal computer and his wife's

18       Comcast Internet. In fact, he violated Workspot's policies

19       on use of social media, which covered personal postings,

20       and prohibited publishing this type of content.  Rather

21       than acting within the scope of his employment, he acted

22       secretly, denied that he did it and lied to protect himself.

23       His conduct was also contrary to Workspot's interests.")

24                    Look, I'm looking at page -- I think it's 303 or

25       thereabouts, if I can find it.  It says, quote -- this is
```

1    under B, Exception to the Rule.  "A principal, however, is

2    not presumed to have knowledge of or be liable for the

3    actions of an agent that abandons the principal's interest."

4              I think that's exactly what happens here.

5              And then *Stewart* goes on to talk about, and plus

6    there's another exception, and that's when the "corporate

7    agent is responsible for all wrongdoing, was acting solely

8    to advance his own personal financial interest and not that

9    of the company."  And he's abandoning the corporate's

10   interest.

11             I think we have all of those things here.

12             And then if you kind of go over on the next

13   page of *Stewart*, "Nevertheless, where the act is purely in

14   pursuit of their own interest to the detriment of the

15   principal to whom they owe a fiduciary duty, the deciding

16   interest in deterring such action is strong enough that the

17   policies underlie ..." -- but now here -- remember, *Stewart*

18   is talking about this whole in pari delicto doctrine, but

19   they're looking at this, you know, this imputation or the

20   agency principles in light of that, you've waived, and the

21   acts and knowledge of the faceless agent are not imputed to

22   the corporation.

23             I think under -- even under *Stewart,* under those

24   analyses, I think you shouldn't be imputing the e-mails

25   opposed to Workspot.  You've already have gotten to where

1    you wanted to go which was the sanction for the false

2    declaration.  I don't think we need to -- there's any reason

3    to go one step beyond.

4              And on the choice of law, we do believe that the

5    interest of California -- look, Citrix is based -- or

6    Workspot is based in California.  The employees are in

7    California.  Chawla was in California.  The acts committed

8    were committed, you know, happened in California, the bad

9    acts that he did.  And what I would add is that even under

10   California, you know, is this foreseeability test as well

11   that adds to it.

12             So I think under both of those, you would have

13   to get through.  But I don't think the Court actually has to

14   get there, because I think the Court has gotten there,

15   determining that the declaration was false, and I'm

16   sanctioning you for that, you know, because that was filed

17   on behalf of Workspot in a motion here.  And that is all you

18   have to do.

19             THE COURT:  Okay.  Thank you on that.

20             To the extent I am concerned about the interest

21   of deterrence and punishment for the false declaration, do

22   you argue that the 50 percent financial sanction already

23   does that?  And, if so, help persuade me of that.

24             MR. LOPEZ:  It sure does.  Look, I think there

25   was something in the TRO papers, you know, of the disparity

1    and financial situation between Citrix and Workspot.

2              So, look, the absolute money, the $271,900 that

3    was sanctioned against us was a huge penalty for Workspot.

4    You know, Workspot is a relatively small company, you know,

5    trying to make it in a very difficult environment.   You

6    know, Citrix is a huge company, and I think you can see that

7    between the disparity.

8              So, yes.   I mean, you know, sure you could --

9    you could penalize them out of existence, but I think it has

10   to be kind of proportional.   And I think that was a

11   measuring stick, a good measuring stick to use.   They got

12   their full rate of attorneys' fees.   There was no -- you

13   know, they got the basically New York or Boston fees, and

14   none of that was reduced.

15             You know, they got almost everything they asked

16   for in their fees.   So it was a significant penalty.   I

17   mean, we thought the fees should be reduced and that, so

18   they got a significant penalty.

19             So I can tell you as we sit here, that has been

20   a very significant penalty levied against Workspot.

21             THE COURT:   All right.   Talk about --

22             MR. LOPEZ:   Do you want me talk about the

23   MacBook Pro?

24             THE COURT:   That's where I was going next.   Talk

25   about the MacBook Pro, yes.

1           MR. LOPEZ:  I know I'm running out of time, but

2    I think that is very important in this whole issue of

3    subsequent discovery.

4           MR. WERBER:  Slide 36.

5           MR. LOPEZ:  Yes, slide 36.

6           Workspot did not impede subsequent discovery in

7    any way.  Workspot did object to turning over

8    attorney-client privilege documents.  And we went to the

9    magistrate on that.  A lot of them were turned over.  A

10   bunch were not.  That was a legitimate discovery dispute.

11          We also had a question about whether or not

12   certain devices should be imaged and forensically examined.

13   We argued they shouldn't -- that it was sufficient to do a

14   search within Workspot's cloud files.

15          And the magistrate, based on an argument that

16   there was slack space in those devices, that there may be

17   some deletions, said, "Oh, I'm going to allow the forensic

18   examination."

19          The forensic examination went forward, and on

20   all of the devices that were actual Workspot devices that

21   were provided to Chawla, nothing was deleted.  They looked

22   at all those.  There was no wiping what was there; and

23   that's on slide 38.  You know, what was there was there.

24          Now, what did happen -- and we'll talk about the

25   MacBook Pro in a second.  What did happen is Citrix decided

1    it wanted to do word searches.  And actually, we agreed to

2    the word searches.  Now, the word searches were in the

3    context of e-mails.  And what happened was, is e-mails on

4    the Surface Pro or the Microsoft Surface device were pulled

5    down off of the device even though the device was used

6    after, really after the e-mails, or after the MacBook.  So

7    word searches were done on those.  Those word searches we

8    would agree to -- that we agreed to could have easily been

9    done on the network e-mail server.

10          But the parties agreed on what the searches

11   should be, and the searches turned up the e-mails that were

12   ultimately turned over that were privileged, and we agreed

13   to.  We didn't hinder that.  We agreed to what the e-mail

14   searches should be.  And that was the first time Citrix ever

15   asked for specific e-mail searches.

16          So we did not hinder that.  It took a lot of

17   time to get through all of that, but we did not hinder it.

18          The MacBook Pro.  They deposed Mr. Chawla; and

19   one thing is Workspot is a cloud company.  You access the

20   Workspot cloud in Microsoft Azure from any device, but files

21   are stored in the cloud.  In fact, Mr. Chawla made that very

22   point.  That all the work that he did for Workspot was

23   actually being stored in the cloud.  And that was on page

24   163.

25          Let me -- the question was:  "Okay.  Did you

1    ever create a virtual machine on your personal laptop in or

2    around October 2018 so you could use the virtual machine to

3    post information?"

4              And then he said:  "So let me be very clear.

5    The virtual machines are created in the cloud and they're

6    not on the laptop.  They're run in the cloud."

7              So let's put aside when he was trying to cover

8    his tracks, but all of his work that was one done for

9    Workspot, you know, prior to posting these devices, that's

10   all done in the cloud.  That is all stored.  There has been

11   no evidence that anything Mr. Chawla did prior to posting

12   these e-mails has in any way been destroyed at all, the fact

13   that he accesses the cloud and our storage is in the cloud,

14   because that's the way it works.  It's not like the old days

15   where you stored and had everything done locally.  You don't

16   do that.  Our system is in the cloud.

17             So there is no evidence -- and they didn't ask

18   him in that whole eight hours of depositions, what was on

19   your laptop that was deleted that related to Lanham Act

20   patent infringement?  Well, because it's all stored in the

21   cloud.  We already have everything in the cloud.  They

22   didn't even ask him that.  That's because if they probably

23   understood how it worked.  But they weren't interested in

24   that, they knew that, that we stored information in the

25   cloud.

1           He did wipe his MacBook Pro, which was his

2     personal computer; and we think he wiped it to -- so he

3     wouldn't be found out to have sent those e-mails from, you

4     know, his home using that IP address.

5           But there is no evidence that anything he ever

6     did for Workspot in its technical capacity isn't in the

7     cloud.  In fact, we have identified where we keep our files.

8     We've searched them.  Gibson Dunn did, you know, collect all

9     the documents, all the source code.  All of that has been

10    collected, it has been produced.  We don't know what they

11    think has been destroyed.  Nothing has, based on the way we

12    run our business.  It's up in the cloud.

13          He did delete the machine.  We do not deny that.

14    But based on how we run our machine, they need some

15    evidence.

16          And they're citing the case *Schmid v Milwaukee*

17    *Tool;* and it says, "Prejudice requires plausible, concrete

18    evidence."

19          You know, what it was that is in dispute in the

20    underlying case that has been destroyed, they don't have

21    that.  They can't point to it.

22          MR. WERBER:  Slide 37.

23          THE COURT:  All right.  Mr. Lopez, if the

24    admitted wiping of his MacBook Pro, if I were to find that

25    that is bad faith spoliation, do you dispute that the burden

1    then becomes one on Workspot to show that there is not

2    prejudice?

3              MR. LOPEZ:  Yes, we do, because I don't think

4    that is what that case says, the *Schmid* case says.  I think

5    that we've ...

6              You know, they've just made this allegation.

7    They didn't ask the question.  They had him for a day, and

8    they didn't ask the question in eight hours saying what

9    information, if any, did you have on your MacBook Pro that

10   isn't in the Workspot cloud relating to the underlying

11   patent case or Lanham Act?  They never asked that question

12   once.

13             It doesn't exist.  They had eight hours.  They

14   didn't do it.  There was no evidence that he did.

15             What he did was he wiped it to hide his tracks

16   from sending the e-mails.  And remember, our e-mails,

17   which is primarily how people do business, and creating the

18   virtual machines to do the technical work that he had to do,

19   that is all there.  And the e-mails, we have an e-mail

20   exchange server in the cloud.  And all of those e-mails are

21   there.  None of that is deleted.  And we've produced all of

22   the technical information.

23             So we do not believe it shifts the burden.  They

24   haven't met that test in *Schmid*.

25             THE COURT:  Okay.  This other computer that he

```
 1          evented and takes to India on vacation for a month --
 2                  MR. LOPEZ:  Sure.
 3                  THE COURT:  -- you all put him in charge of
 4          imaging, undergoing forensic exam.  Help me understand that.
 5                  MR. LOPEZ:  Let's talk about that.
 6                  MR. WERBER:  Slide 41.  Slide 41.
 7                  MR. LOPEZ:  Well, let's just look at 38 in
 8          order -- or 41.  Let me look at 41.
 9                  Was that, was that a good idea in hindsight?
10          No, it was not a good idea in hindsight.
11                  But if you look at slide 38, that Surface laptop
12          was completely imaged.  Nothing was deleted.
13                  Yes, he did take it to India.  It did get imaged
14          and they looked at it and nothing had been deleted.  They
15          looked at the slack space to see if it had been tampered
16          with, and nothing had been tampered with.
17                  So, yes, can you criticize them for kind of,
18          you know, letting him do it and not image.  You know, a
19          third-party consultant did it while he was in India, but
20          there was nothing deleted.  They haven't pointed to anything
21          that is deleted.
22                  In fact, Califorensics, the agreed-upon party,
23          found that there was nothing wrong if you look at slide 38.
24          Evidence of wiping and Microsoft, I think it's 1370104,
25          the Surface 2.  They did the keyword.  It was responsive.
```

1    That's because it pulled down all the e-mails, and they were

2    able to pull the e-mails off it from the network, and there

3    was no evidence of wiping.  It was all there.

4              I mean, so, yes, they criticize us for that.

5    But there was, there was no loss of data with respect to

6    that Microsoft Surface.  They pointed to nothing.  They

7    said -- they say we should have done a better job in how

8    that was handled.  That could be argued, but it didn't lead

9    to any loss of data that we should be spoliation of data

10   that we could be sanctioned for.

11             THE COURT:  To the extent, though, that part of

12   what I'm asked to do is assess the reasonableness and the

13   diligence with which your client responded to these very

14   serious allegations, many of which turned out, unfortunately,

15   to be true, isn't even something that is maybe only, you say,

16   is clear in hindsight was a bad idea, isn't that relevant to

17   the analysis?  It's a fairly late date that which your client

18   is still doing things that you acknowledge, in hindsight at

19   least, are troubling or at least not a good idea?

20             MR. LOPEZ:  Sure.  Yes, you are absolutely

21   right.  I will concede that if I was running that

22   investigation, I wouldn't have done that.  But we have the

23   facts, and we couldn't prevent Mr. Chawla from going on his

24   vacation.  And we did hire Kivu to go out and image the

25   disk; and they did go image them.

1              And, okay, should they have imaged them earlier

2      or taken that laptop?  Possibly.  But the fact that they did

3      it in India, did it change in any way the data?  It did not

4      change in any way the data.  Nor if we had taken the

5      Microsoft Pro, which wasn't our laptop, he had already wiped

6      that.  Remember?  He wiped it on the 16th so there was

7      nothing that could be done.

8              So there was -- I think from our purposes, could

9      there be criticism of how -- were we reasonable in how we

10     did it?  We think given the circumstances of how access to

11     information was being restricted, you know, it's

12     understandable how they proceeded slowly.  And there was a

13     lot to get through.

14             THE COURT:  Okay.  I'm going to --

15             MR. LOPEZ:  Could they have done a better job?

16             THE COURT:  Right.  I'm just interrupting you,

17     telling you I'm giving you five more minutes, and I'm going

18     to try not to ask you more questions, so you can wrap up

19     however you like.

20             MR. LOPEZ:  Well, let me -- okay.  Well, you

21     know, I don't think the *GN Netcom* case is at all relevant.

22     You know the case, so I think you are going to have a view

23     on that.  You know, there were multiple custodians in that

24     case -- this is slide 42 -- who intentionally deleted

25     thousands of e-mails, including anticompetitive activity

1    which was the direct underlying claim in the case.

2              Here, if you look at 43, Chawla was the lone

3    actor.  There's no prejudice that has been shown or can be

4    shown that -- they didn't ask Chawla, you know, and we know

5    of nothing, frankly, that relates to the underlying patent

6    and Lanham Act claims.  And so we don't think *GN Netcom* and

7    the significant sanctions there is a good model or what we

8    have before us, this, you know, lone actor who did what he

9    did.

10             The last thing I would say, because the Court

11   went through this with counsel, and we can look at counsel's

12   slides -- and let me pull up maybe our last slide, and that

13   is all -- if you look at slide 55 on our deck, 56, what

14   about all these additional sanctions they're asking for in

15   this case; specifically, evidentiary sanctions, jury adverse

16   inferences, and so forth.

17             You know, the declaration doesn't really

18   prejudice Citrix's ability to prosecute, you know, the

19   claims it is asserting.  And if we went through each of the

20   cases that were really cited, and that is on slide 56, and

21   where the sanction and, you know, Greatbatch withholding

22   core technical documents, you know, a destruction of the

23   central piece of physical evidence in the case.

24             *Positran*, sanction for destroying notes that

25   were relevant to the central issue of the case.

1           *GE Harris*, plaintiffs "destroyed all documents

2    implicating a contract bid," which was an element of the

3    case.

4           And, "sanctioned party withheld documents

5    relating to plaintiff's claims."

6           The fact -- and goes on to page 57, *In Re: Fine*

7    *Paper*, sanction for failing to answer interrogatories.

8           You know, failed to produce documents related to

9    key issues in the case because they knew sanctions

10   heightened when the misconduct relates to pivotal or

11   "linchpin" issues.

12          Let me underscore again.  One of the documents,

13   even the documents that were produced late, and we wouldn't

14   say they were produced late because they were produced

15   pursuant to the agreement with Citrix on what the keyword

16   search terms should be, and they were produced after we went

17   through that and we agreed what should produce and what

18   shouldn't be produced, none of that was wrong.  It was all

19   there.  And that was relating to these -- this declaration,

20   not even to the underlying case.

21          And so if you look at the last two cases, you

22   know, *Kvitka*, and *Leor*, again, you know, all of those cases

23   have a theme of, you know, is something central to the case.

24          Now, look, we call this collateral because

25   these e-mails and posts he did were collateral to the -- it

1    doesn't have anything to do -- it wasn't like Chawla went

2    out and destroyed, you know, source code or deleted evidence

3    that, you know, from our e-mail server to cover up the

4    something, you know, on the underlying cases.  He was

5    covering up what he was doing in sending those -- making

6    those posts and sending those e-mails, and there is no

7    evidence in anything that he did any -- that anything

8    beyond that was lost in terms of evidence.

9              So our position is certainly that none of those

10   additional sanctions that are being sought here would be

11   appropriate, you know, given what is at issue with respect

12   to that declaration.

13             THE COURT:  Okay.  Thank you very much.  That's

14   right on the extra time that I gave you.  I appreciate that

15   very much, Mr. Lopez.

16             Mr. Strapp, back to you, and I have given you an

17   extra 15 minutes so you have up to 20 minutes.  I will have

18   a few questions for you.

19             Go ahead.

20             MR. STRAPP:  Thank you, Your Honor.  There are

21   a few points I'd like to raise in rebuttal.  I'd like to

22   start first with the issue of redactions and the notion that

23   somehow Citrix hindered the opportunity for Workspot to do

24   any further investigation into the allegation.

25             I would ask, Your Honor, it's not on one of

1   slides, but when Your Honor has an opportunity, both

2   parties here have referenced Exhibit 20 to Docket 262, which

3   was my declaration submitted in support of our motion for

4   sanctions.  And that is an e-mail chain, and we both have

5   been -- both counsel have been reading e-mails from that

6   chain, but I think there is one e-mail that neither party

7   has referenced yet that is particularly relevant to this

8   issue of redactions.  And that is an e-mail that was sent by

9   Mark Lyon, counsel at Gibson Dunn for Workspot, on October

10  24th, to Karen Gibbs, in-house counsel, and to Ernie Hsin

11  and Bindu Palapura, additional outside counsel for Workspot.

12          The e-mail is dated October 24th again.  It's at

13  6:06 p.m.  And this e-mail was sent by Mr. Lyon in response

14  to the e-mail that counsel for Workspot, Mr. Lopez, just

15  read regarding the redactions issue.  As Mr. Lopez

16  mentioned, Ms. Gibbs had said in an e-mail -- written an

17  e-mail on the redaction of struggling -- in the TRO

18  opposition of struggling with how we respond without Puneet

19  and Amitabh being able to see the accusations.

20          And so what Mark Lyon, counsel for Workspot,

21  wrote in response is he says -- this is a quote:  "As to

22  the redactions, I haven't carefully reviewed the redactions

23  proposed by Citrix on Monday.  What portions of what they

24  are suggesting remain confidential do we think Amitabh and

25  Puneet have to see in order to be able to provide a

1    declaration?  It strikes me that a number of the details

2    wouldn't matter to their declaration."

3              And, you know, when we look at the actual

4    declarations -- excuse me, the actual redacted version of

5    the TRO that was promptly provided by Citrix to Workspot

6    on Monday, October 22nd, only six days after the TRO was

7    filed, that version redacted out primarily the IP address

8    information, which, as it turns out in hindsight, and we

9    didn't know at the time, but as it turned out in hindsight,

10   Mr. Sinha and Mr. Chawla knew these IP addresses.  And they

11   had confirmation from Mr. Lyon that those IP addresses were

12   the same IP addresses that had been disclosed in the October

13   15th notice.

14             So I would strongly resist the notion that

15   somehow Workspot was hindered in its investigation.  And I

16   think, as your Honor picked up on, I think that this was a

17   false narrative painted by Workspot in paragraph 6 of Mr.

18   Chawla's declaration and continued on by statements made by

19   Mr. Lyon in open court at the December 12th hearing.  It

20   simply was not true that Workspot was unable to investigate

21   Citrix's allegations.  In fact, we know from the e-mail

22   record now that Workspot was investigating, was

23   investigating those allegations as early as October 22nd by

24   searching for the IP addresses in Workspot's cloud, contrary

25   to the sworn under oath statement made in the declaration on

1    October 30th.

2              So that's point one regarding the redactions.

3              Point two I would like to make, and this is

4    regarding the ShareFile issue.  So there is some sort of, I

5    think, suggestion by Mr. Lopez that Citrix was looking at

6    who individually was sending and receiving various

7    communications.  And while Mr. Lopez acknowledged there was

8    no review of the content, I think he misrepresented the fact

9    as to what Citrix actually investigated because Citrix

10   didn't investigate the names or the identities of anyone who

11   was sending or receiving information.

12             What happened was Citrix began an investigation

13   into whether the IP addresses at issue here, the Comcast IP

14   address, Azure IP address, were contained with any -- within

15   any log files in any of Citrix's systems.  Not just

16   ShareFile, but all of the different systems and software and

17   hardware available on Citrix's networks.

18             And Citrix did a massive search to see whether

19   those -- that particular string of numbers showed up in any

20   of the log files.  And what happened was, as a result of

21   that search, Citrix found the particular IP addresses in

22   connection with ShareFile, ShareFile systems.  It didn't

23   know who was associated with those IP addresses.  It didn't

24   know who was sending or receiving the particular

25   communications.  All it did was search for the IP addresses.

1   And when it identified the fact that those IP addresses

2   could have relevance to the TRO proceedings, it brought that

3   information to Citrix in a prompt fashion.

4           I'd like to turn next to the state of the record

5   as of December 12th.  And Your Honor was asking Mr. Lopez

6   whether or not the state of the record was such that

7   Workspot had conceded that, in fact, the Chawla declaration

8   was false.  And I would ask Your Honor to turn to slide 24

9   of Citrix's presentation.

10          And if you look in the middle column, there

11  at the top of the middle column at slide 24, there is a

12  question from Your Honor.  And Your Honor asked:  "I'm not

13  faulting at this point what the litigators did based on what

14  you knew at the time.  But are you, here today, telling me

15  that he didn't file the false statement?"

16          And the answer Mr. Lyon gave was:  "So I'm here

17  today to tell you we don't know for certain, one way or the

18  other."

19          Now, that certainly cannot be jived with

20  Mr. Lopez's suggestion that Workspot, by December 12th, had

21  acknowledged the declaration was false.  Mr. Lyon was

22  telling Your Honor in open court that Workspot did not know

23  for certain one way or the other whether Mr. Chawla's

24  declaration was false.

25          I'd like to turn next Your Honor to the issue of

1    imputation.

2            And regarding imputation, I think, first of all,

3    Your Honor doesn't necessarily even need to reach the

4    imputation point given the severity and egregiousness of

5    Workspot's misconduct, but to the extent Your Honor is going

6    to reach the issue of imputation and impute Mr. Chawla's

7    conduct to Workspot, we believe imputation is appropriate,

8    and it's appropriate in particular under the *Stewart* case.

9            And I would point Your Honor in particular to

10   a portion of the *Stewart* case where the Delaware Chancery

11   Court states that "... even when the agent acts fraudulently

12   or causes injury to certain persons through illegal

13   conduct," imputation is appropriate.

14           And the Court says:  "So at superficial level,

15   it may appear harsh, it pulled an innocent corporation and

16   ultimately it stopped worse, to answer for the bad acts of

17   its agents.  Such corporate liability is essential to the

18   continued tolerance of the corporate forum as any other

19   result would lack integrity."

20           And the Court went on to say that that is the

21   case even when "the benefit enjoyed by the corporation is

22   outweighed by the long-term damage that is done when the

23   agent's mischief comes to light," as it did here with

24   Mr. Chawla.

25           Your Honor, I'd like to turn next to the issue

1    about the size of Workspot and the notion that this was a

2    severe sanction and that no further sanction -- that the

3    initial sanction Your Honor awarded was sufficient to deter

4    Workspot and others from the misconduct that happened here.

5              Your Honor, on Workspot's website, they

6    announced in September that they had raised $19 million

7    series D round of funding; and Mr. Sinha was interviewed

8    about that round of funding on a website called a

9    Brianmatta.com.  And what Brianmatta.com -- on this website,

10   Brianmatta.com published on October 16, 2019, what the

11   journalist there noted after his interview with Mr. Sinha

12   was that Workspot is growing at a 318 percent revenue

13   figure, that it has about 90 employees, and that the total

14   funding is about $56 million.

15             So I think that that undermines the notion that

16   Workspot here is a tiny company that can't afford these

17   sanctions.

18             Your Honor, I'd like to turn next to the issue

19   about the word searches.  And Mr. Lopez suggested, you know,

20   it took some time to get agreement about the word searches.

21             Once we had agreement on the terms, we did it.

22   And, you know, we acted reasonably and diligently with

23   respect to the discovery request that Citrix made after the

24   December 2018 hearing.

25             And I would suggest, Your Honor, that that is

1    not true.

2              Your Honor, we received a letter from counsel

3    for Workspot, Potter Anderson, dated February 15th, 2019.

4    And in that letter, Workspot counsel represented that they

5    had completed a search, using several different keyword

6    searches, including the keyword "Guerrilla," and that they

7    had searched several different inboxes and sent boxes,

8    including of Mr. Chawla, for all the e-mails, documents,

9    and/or communications using those search terms.  And the

10   representation made on February 15th that were all such

11   e-mails, documents, and/or communications, as of December

12   15th, 2019, has been produced by that date.

13             And we know that is not true because on July

14   2nd, 2019, only on July 2nd, 2019, several months after

15   that representation was made by Workspot counsel, Workspot

16   produced the Guerrilla Mail test e-mail that should have

17   been captured by that word search and included the word

18   "Guerrilla" and had been sent by Mr. Chawla from his

19   Guerrilla Mail account to his Workspot e-mail account.

20             So although Workspot represented of such

21   communications had been produced in February 2019, we didn't

22   receive that e-mail until we saw it noted in a forensic

23   inspection report in June and specifically requested that

24   Workspot produce it in July 2019.

25             Your Honor, with regard to the MacBook, and I'd

1    like to turn to that next, the notion that this was not --

2    this was not a device that was under Workspot's control I

3    don't think is plausible.  And the reason why, Your Honor,

4    is because -- is because Mr. Chawla's MacBook was not just a

5    personal device, it was, as he testified at his deposition,

6    the primary device he used for his work at Workspot.  And he

7    had used that device -- he mentioned that he acquired that

8    device for use as his primary work device some point between

9    2012 and 2014, and he used it all the way through October

10   2018 until he deleted the hard drive.

11            The notion that, you know, there is nothing that

12   relevant that could have been deleted because everything is

13   backed up in the cloud defies -- you know, it defies

14   credibility.  Because, first of all, Mr. Chawla had this

15   MacBook in his possession for over four years, at least.

16   Maybe up to six, six-and-a-half years.  He was using it as

17   his primary device for work.  And we know that Mr. Chawla

18   and others at Workspot didn't follow company policy

19   regarding litigation hold, regarding social media posts,

20   regarding cloud data.  So -- and we know that because I

21   asked Mr. Chawla at his deposition in July 2019 -- this is

22   at page 209 of the deposition transcript, which is Exhibit 2

23   to Docket 262.

24            I asked him, you know, whether or not they

25   implemented policies that were put in place by Gibson

1    Dunn after the litigation began.  And so what Mr. Chawla

2    testified was:  "Yeah, so when the litigation started, we

3    were instructed by Gibson Dunn, the counsel, that during

4    the process of the litigation certain things have been

5    withheld."

6             But then, Your Honor, Mr. Chawla went on to say,

7    and to testify under oath:  "But I don't think guideline was

8    followed in a very stringent manner.  It's a startup.  So

9    you were asked to do certain things and not do certain

10   things but people crossed the line."

11            The notion that there was some sort of strict

12   cloud storage-type policy in place from 2014 or as early as

13   2012 as a startup and that was closely followed by everyone

14   such that there wouldn't be relevant data on an MacBook that

15   was spoliated defies credulity.

16            Your Honor, I think with that I will rest unless

17   Your Honor has any additional questions.

18            THE COURT:  I do have some questions.  Thank

19   you.

20            So on the MacBook Pro, is it correct that in the

21   entire length of your deposition of Mr. Chawla, no one asked

22   him if, in fact, specifically he had failed to comply with

23   the policy and save some things on the hard drive and maybe

24   whether they related to this case in any way?

25            MR. STRAPP:  Your Honor, we did ask Mr. Chawla

1   during the deposition about the various company policies and

2   the policies that were put in place after litigation was

3   filed; and whether or not he and others of the company

4   complied with those policies.

5            And his testimony was that there were certain

6   guidelines that were offered by the company and by counsel.

7   And I asked him, "Well, you know, to the extent you had

8   specific guidelines did you follow them?  And if not, why

9   didn't you follow these guidelines?"

10            And his testimony was, "Well, you know, these

11  were guidelines and that's how we do them.  They weren't

12  followed in a stringent manner.  It's a just a startup.  So

13  we were asked to do certain things and not do certain

14  things."

15            But as he testified, "people crossed the line."

16            THE COURT:  Right.  Okay.  But if I had to make

17  a finding that there was information relevant to your

18  substantive claims in this case that was on the MacBook and

19  that he wiped, so it was spoliated, I'm not going to find

20  any direct confirmation of that in his deposition; correct?

21            MR. STRAPP:  Your Honor, I did ask him about

22  what was on his MacBook and what was wiped and what was

23  deleted, and he pled the Fifth Amendment.  So what I would

24  suggest to Your Honor, and I hinted at this earlier in my

25  opening presentation, is that an adverse inference can and

1   should be drawn against Workspot; that what was deleted was

2   relevant to this litigation.  It was intentionally spoliated

3   in that space by Workspot.

4        And certainly if the response we get from the

5   witness when we ask about his laptop is that he is refusing

6   to testify about it, either because he says, "Well, there

7   are policies in place that we didn't necessarily follow" or

8   because he's invoking the Fifth Amendment in response to my

9   direct and specific question, it can't be the case, I don't

10  think, Your Honor, that somehow that -- those responses

11  should be held against Citrix in a spoliation analysis but,

12  instead, it should be a finding that Workspot cannot show

13  that Workspot was not prejudiced since it is Workspot's

14  burden, not Citrix's burden here.

15       THE COURT:  All right.  In terms of the actual

16  e-mails and Internet posts that started all of this, I think

17  there is a suggestion from Workspot that management and then

18  the board didn't get to see that underlying evidence until

19  late in the process.

20       Can you pinpoint when they saw not just your

21  allegations but those actual postings and the e-mails?

22       MR. STRAPP:  Your Honor, I believe -- and I

23  would need to confirm this, I don't know that off the top of

24  my head -- but I believe that on October 22nd, 2018, which

25  is a Monday, I believe that a redacted version of the Citrix

1    TRO briefing was provided to Workspot, and that amongst the

2    information provided were some of these e-mails.  I don't

3    know that for certain so I don't want to represent that that

4    is definitively the case.  But I know that at some point

5    between then and at a minimum December, the e-mails and all

6    the exhibits were provided to Workspot.  I think it was on

7    October 22nd, but I can't say that with 100 percent

8    confidence here.

9             THE COURT:  Okay.  The *Stewart* case, one of the

10   distinctions that the defendant argues, as I'm sure you have

11   seen, is that that was a small corporation, maybe just one

12   shareholder, the same person who I think was the one

13   employee and officer.  Why should I not view that as a

14   persuasive distinction of *Stewart*?

15            MR. STRAPP:  Yes.  Your Honor, the notion -- the

16   idea that there was a single actor in *Stewart*, and that is

17   what makes that case distinguishable, I think it misreads

18   *Stewart* because the full shareholder portion of that opinion

19   regarding *Stewart* is concerned with whether the sole actor

20   exception to this in pari delicto rule applies.  That was a

21   separate issue being discussed in parallel with the

22   imputation doctrine.  It is a bit confusing unless you read

23   through the opinion a few times, but if you do, you will see

24   that the Court is interweaving its holdings with respect to

25   imputation with its holdings with respect to whether the

1    sole actor exception to the in pari delicto rule applies.

2              And it was in connection not with imputation

3    but with whether the sole actor exception to the in pari

4    delicto rule applies, that the Chancery Court discussed the

5    executive sole shareholder rule.  And for that reason, we

6    would say that is inapposite, not relevant here, with

7    respect to the fact that Chawla was not the sole employee of

8    Workspot but was instead a board member and cofounder and an

9    officer of the company.

10             THE COURT:  I think it was Califorensics was the

11   entity that you all agreed on in California, I guess, to do

12   a forensic analysis.  Who paid for that forensic analysis?

13             MR. STRAPP:  Your Honor, we split the cost of

14   the Califorensics analysis 50/50 with Workspot.

15             THE COURT:  Okay.  What categories of financial

16   fees and costs would you ask me to consider awarding to you

17   on this motion?  Can you identify it by sort of categories?

18             MR. STRAPP:  Yes, Your Honor.

19             So let me just say a background.  That when Your

20   Honor awarded the initial sanctions of 50 percent of the

21   pre-December fees and costs, we sought recovery of the fees

22   and costs associated with Citrix's outside counsel and

23   disbursements related to the investigation, as well as our

24   estimate of the fees and costs incurred by Citrix's in-house

25   counsel and Citrix's in-house employee in conducting its

1    investigation.  And those were considerable.

2              But those were rejected by Magistrate Judge

3    Fallon, and she ruled that what was recoverable was not the

4    in-house fees and in-house employees' time, but only the

5    outside counsel fees and costs.

6              And given Magistrate Judge Fallon's prior

7    guidance, I think what, Your Honor, we would seek here, to

8    the extent Your Honor would rule the fees and costs are

9    recoverable here, are the outside counsel fees and outside

10   counsel disbursements relevant to these issues presented in

11   our sanctions motion, including both the 50 percent of fees

12   and costs we did not recover prior to December 12th, 2018,

13   through the date that Your Honor decides the motion.

14             THE COURT:  Okay.  And then finally, to the

15   extent you're, and I think you are, asking for certain

16   evidentiary sanctions, including a permissive, I take it,

17   adverse inference instruction at trial, I assume you are

18   familiar with what happened on appeal in the *GN Netcom* case

19   and that the case has been remanded for the new trial.

20             Could you comment on that?  And have you thought

21   through at all the complexity of a trial with a permissive,

22   adverse inference instruction?

23             MR. STRAPP:  So, Your Honor, certainly we

24   have -- we understand the importance of being precise in

25   terms of the actual instruction that is provided to the

1    jury -- or instructions provided to the jury, and we are

2    not necessarily asking Your Honor to issue a specific ruling

3    on the wording of what that instruction will look like or

4    whether there will be additional evidentiary instructions

5    issued prior to trial.

6         We don't necessarily ask for those to be

7    specified at this moment given that the trial is still about

8    a year away.

9         Rather, what we ask for, Your Honor, is given *GN*

10   *Netcom*, given the appeal decision, given the plethora of

11   other decisions in this District and in the Third Circuit

12   regarding adverse inference instruction that we be permitted

13   after Your Honor -- if Your Honor were to grant our request

14   here in connection with the sanctions motion, to offer a

15   proposed jury instruction that we could negotiate with

16   Workspot to see whether we could get agreement on prior to

17   pretrial conference, and then present that hopefully as an

18   agreed-upon instruction.  And to the extent there is no

19   agreement, present it at the pretrial conference to Your

20   Honor for resolution.

21        THE COURT:  Okay.  Thank you for that.  I know

22   we're well beyond the time we had set aside, but, Mr. Lopez,

23   I can give you a couple minutes if there was something that

24   jumped out that you wanted to add before we finish.

25        MR. LOPEZ:  There is, Your Honor.  Thank you

1    very much for going over.

2              The quote that I wanted from counsel during the

3    December 12th hearing is at DI 145, lines -- page 27, lines

4    24 through 25.

5              Counsel states, "We are not challenging for

6    purposes of this motion that Mr. Chawla is involved."

7              That was, I believe, the most direct statement

8    of Mr. Chawla's involvement that was made at that hearing

9    that I was looking for and you were asking about.

10             A couple other things that were raised.

11             There is this suggestion that the Guerilla Mail

12   was hidden, and that Potter Anderson had searched and didn't

13   find it.  It turns out there was an issue with the spelling

14   of Guerrilla Mail in the search term and it sat -- Citrix

15   had the wrong spelling, and so what got searched was the

16   wrong spelling, and that is why it didn't even pop up.  And

17   I believe that was the issue with respect to why that

18   Guerrilla Mail didn't come up, but it was -- it was the fact

19   that the nature of the search term that was spelled wrong in

20   the search by proposal that Citrix made.

21             They called out the amount that we had raised

22   money over the course of our eight years of existence of $56

23   million.  You know, that's over eight years.  That is what,

24   less than $7 million a year for a company that has, you

25   know, over 70 employees and a lot of people and a lot of

1   expenses.  So, you know, to just try to measure that and

2   say, "Oh, well, they can go out and raise money, therefore

3   they ought to be sanctioned a lot," you know, there is -- I

4   can assure you there is not, you know, $56 million sitting

5   in a bank account that can pay a sanction.  You know, the

6   $219,000 was a very big sanction for Workspot to pay.

7            This issue about what they ask at Mr. Chawla's

8   deposition.  When Mr. Chawla took the Fifth Amendment, it

9   was because they were asking about the e-mails he had been

10  sent and the deletion of those e-mails related to his

11  device.  They didn't ask him, "Well, how about prior to

12  this?  What did you have on your laptop?"  They didn't ask

13  that question.  They ignored that.  They didn't even look

14  for any information that he had anything relevant.

15           And as I said, given the nature of our business

16  and given that all the documents we maintained are in the

17  cloud, it probably -- they probably knew that at the time.

18  So they basically did not ask the question, and they don't

19  have evidence that that MacBook contained any evidence that

20  would be in any way germane to the underlying dispute here.

21           And, Your Honor, with respect to sanctions, we

22  think that any sort of evidentiary sanctions would be

23  inappropriate, really just not justified based on applicable

24  precedent.

25           We have acknowledged the seriousness of what

1    happened.  We paid a significant financial penalty for that.

2    You know, to take something that was certainly collateral

3    to the underlying claims and then penalize the company on

4    patent claims or Lanham Act claims that are central to its

5    defense, you know, you would be really taking something

6    collateral.

7              Even on the investigation, let's just assume for

8    purposes of argument that the investigation could have been

9    better and, you know -- but to start then assessing -- and

10   that would be debatable because it's still what would be

11   reasonable under the circumstances.  And I would say this:

12   That under the circumstances what they did could be argued

13   was reasonable given the restrictions.

14             But even given that, you know, to take what is

15   being sanctioned for that declaration and what was, what

16   was, you know, put before the Court, and then to go under

17   the substantive cases and say, now you're really going to

18   pay a sanction, which is, we're going to tip the scale

19   significantly in Citrix's favor on the underlying case, we

20   just don't think is right.  It's not justified.  There is no

21   precedent for it; and we urge the Court not to do that.

22             THE COURT:  Okay.  Thank you very much.

23             I thank both counsel.  I know it's more

24   challenging doing this sort of thing by phone --

25             THE COURT REPORTER:  Your Honor?

1           THE COURT:  -- but I thought it was important that

2      we move forward.

3           THE COURT REPORTER:  Your Honor?

4           THE COURT:  Mr. Strapp, is that you?

5           THE COURT REPORTER:  No, Your Honor.  This is

6      your court reporter, Brian Gaffigan.

7           THE COURT:  Uh-huh.

8           THE COURT REPORTER:  I wanted to, while our

9      counsel is on the phone, mention that there was a certain

10     point in time when my phone was starting to die, that it was

11     needing to be switched over.  And at the time it was being

12     switched over, I lost about 45 seconds.

13          (Pause while court reporter looks for possible

14     read back to help supplement record.)

15          THE COURT REPORTER:  I'm sorry, I can't find it

16     right now.

17          THE COURT:  Okay.  Well, then, let's do this.

18     When you find it, I'll have you, Brian, confer with counsel;

19     and I'll ask counsel to work together to figure out what, if

20     anything, we should do about trying to complete the record.

21     Obviously, we don't know exactly which portion is missing.

22          I was on the call the whole time and paying

23     careful attention and taking detailed notes for my own

24     benefit, so -- but we do want a complete record.

25          So I would ask counsel to work with the court

1    reporter.  And if you can't work that out or have a dispute,

2    you will have to let me know.

3                   Is there anything further, Mr. Strapp, before we

4    say good-bye?

5                   MR. STRAPP:  No, Your Honor.  Thank you, Your

6    Honor, for your time.  Appreciate it.

7                   THE COURT:  Sure.

8                   Mr. Lopez, anything else?

9                   MR. LOPEZ:  No, Your Honor.  Thank you very

10   much.

11                  THE COURT:  Okay.  Thanks, everybody.  Be safe.

12   Good-bye.

13                  (The attorneys respond, "Thank You, Your Honor.")

14                  (Telephonic motion hearing ends at 12:52 p.m.)

15

16       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

17

18                        /s/ Brian P. Gaffigan
                           Official Court Reporter
19                          U.S. District Court

20

21

22

23

24

25