## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Citrix Systems, Inc. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 18-588-LPS |
| | : | |
| Workspot, Inc. | : | |
| | : | |
| Defendant. | : | |
| | : | |

Denise S. Kraft, Brian A. Biggs, Erin E. Larson, DLA PIPER LLP, Wilmington, DE

Michael Strapp, Safraz Ishmael, DLA PIPER LLP, Boston, MA

      Attorneys for Plaintiff

Steven J. Balick, Andrew C. Mayo, ASHBY & GEDDES, P.A., Wilmington, DE

Ronald F. Lopez, NIXON PEABODY LLP, San Francisco, CA

Jennifer Hayes, NIXON PEABODY LLP, Los Angeles, CA

Matthew A. Werber, Angelo J. Christopher, NIXON PEABODY LLP, Chicago, IL

      Attorneys for Defendant

## <u>MEMORANDUM OPINION</u>

September 21, 2020
Wilmington, Delaware

STARK, U.S. District Judge:

Plaintiff Citrix Systems, Inc. ("Citrix" or "Plaintiff") initiated this action against

Defendant Workspot, Inc. ("Workspot" or "Defendant") on April 19, 2018, alleging, *inter alia*,

infringement of U.S. Patent Nos. 7,594,018 ("the '018 patent"), 7,949,677 ("the '677 patent"),

8,135,843 ("the '843 patent"), 8,341,732 ("the '732 patent"), and 10,063,595 ("the '595 patent")

(collectively, "patents-in-suit"). (*See* D.I. 1, 218)  The technologies of the patents-in-suit

generally relate to cloud-based virtual desktop solutions.

Presently before the Court is the issue of claim construction.  The parties have submitted

claim charts (D.I. 319, 363), technology tutorials (D.I. 362), and claim construction briefs with

supporting expert declarations (D.I. 322-24, 335-38).  The Court held a claim construction

hearing through videoconferencing on June 5, 2020.  (D.I. 366) ("Tr.")

## I.    LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law.  *See*

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview*

*Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)).  "It is a bedrock principle of patent law that the

claims of a patent define the invention to which the patentee is entitled the right to exclude."

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation

marks omitted).  "[T]here is no magic formula or catechism for conducting claim construction."

*Id.* at 1324.  Instead, the court is free to attach the appropriate weight to appropriate sources "in

light of the statutes and policies that inform patent law."  *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . .

[which is] the meaning that the term would have to a person of ordinary skill in the art in the

question at the time of the invention, i.e., as of the effective filing date of the patent application."

*Id.* At 1312-13 (internal citations and quotation marks omitted).  "[T]he ordinary meaning of a

1

claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claims terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifference among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should not be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358

2

F.3d 898, 906 (Fed. Cir. 2004)).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete records of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower that it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science of the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purposes of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may

be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II.    CONSTRUCTION OF DISPUTED TERMS[1]

| Term 1: "web service directory" |
| ('843 patent, claims 1, 2, 9, 12, 20, 22, 23) |
| **Citrix Proposal:** |
| Plain and ordinary meaning or in the alternative searchable directory of information for web services |
| **Workspot Proposal:** |
| a directory of information for web services |
| **Court** |
| a directory of information for web services |

The '843 patent is directed to methods and systems for providing access to a remote application to an application client or end user application by, in part, "receiving, by a client,

---

[1] The Court's analysis is organized in a fashion similar to that followed in Citrix's Opening Construction Brief. (*See* D.I. 322 at iv-xx) After addressing several terms to be construed (Terms 1-7, 9-14, 16), the Court turns to the Means-Plus-Function Disputes and the Ordering of the Method Steps (Terms I-IX). Prior to the June 5th hearing, the parties reached agreement on Term 8 ("a resource") and Term 15 ("enterprise agent"). (D.I. 364)

4

from a ***web service directory*** on a content server, a service access point associated with a first application, the service access point identifying a web server." ('843 patent at 10:21-36) (emphasis added)  The parties dispute whether the "web service directory" includes non-searchable directories: Citrix contends it does not while Workspot argues it does.  (D.I. 322 at 1; D.I. 323 at 15)  The Court agrees with Workspot.

As Workspot explains, Citrix's construction would improperly read out of the claims an embodiment disclosed in the specification.  The patent discloses an embodiment in which "client **105 . . . *queries*** a service name from the web service directory **145**," which a person of ordinary skill in the art ("POSA") would understand to be a searchable web service directory, as well as an as an embodiment in which "the user of the client **105 *navigates*** the web service directory **145** until locating a particular service name that the user of the client **105** was attempting to find," which a POSA would understand to be a non-searchable web service directory.  ('843 patent at 7:43-49) (emphasis added)  The patent uses "navigates" and "searches" differently (*id.* at 1:43-49), so Citrix's contention that the "navigates" embodiment is subsumed within its proposed searchable limitation is unpersuasive.

| Term 2: "authenticating the user" ('018 patent, claims 1, 29) |
| --- |
| **Citrix Proposal:** Plain and ordinary meaning or in the alternative verifying the user |
| **Workspot Proposal:** verifying that the user is who they claim to be via the received authentication information |
| **Court** verifying that the user is who they claim to be via the received authentication information |

During *inter partes* review proceedings on the '018 patent, Citrix submitted an expert declaration opining that the term "authentication" "typically refers to verifying the identity of an object or individuals ***as being what it purports to be***."  (D.I. 319 Ex. 7 at *249, ¶ 82) (emphasis added)  The Court agrees with Workspot that this statement, along with other intrinsic evidence

in the specification (*see, e.g.*, '018 patent at 7:20-21 ("The authentication module **130** is responsible for authenticating a user that attempts to log on to the server **106** . . . . The authentication model then authenticates the user based on the user-provided authentication information")), supports its proposed construction.

| Term 3: "determining via the rule that the user is one of required, permitted and forbidden to connect"[2] ('018 patent, claims 1, 17, 29) |
|---|
| **Citrix Proposal:** Plain and ordinary meaning or in the alternative determining via the rule that the user is required, permitted, or forbidden to connect |
| **Workspot Proposal:** "one of . . . and" Each of the options of required, permitted, and forbidden must be present Entire phrase:  Indefinite |
| **Court** determining via the rule that the user is required, permitted, or forbidden to connect |

The parties dispute whether "one of . . . and" is disjunctive or conjunctive. (D.I. 322 at 2-4; D.I. 323 at 1-4)  The Court agrees with Citrix that these limitations are disjunctive.

As Citrix acknowledges, "one of A, B, and C" implies a conjunctive list under general grammatical guidelines, meaning that one of A, one of B, and one of C would have to be selected. (*See* Tr. at 31; *see also SuperGuide v. Direct TV Enters., Inc.*, 358 F.3d 870, 886 (Fed. Cir. 2004) (analyzing "common treatise on grammar," which teaches that "an article of a preposition applying to all the members of the series must either be used only before the first term or else be repeated before each term")) But the result is sometimes different in the context of claim construction, as is the case here. *See, e.g., Joao Bock Transaction Sys., LLC v. First*

---

[2] Like the parties, the Court considers the issues presented in connection with Term 3 to be the same as those presented in connection with Terms 4 and 5. (*See* D.I. 322 at 2-4; D.I. 323 at 1-4)  Therefore, the Court's analysis and decision with respect to Term 3 applies with equal force to Terms 4-5.

*Nat'l Bank*, 2013 WL 3199981, at \*6-7 (N.D. Ill. June 24, 2013) (construing "**one of** a limitation **and** a restriction" disjunctively as "one or more of the items in the list" or "either both of the items in the list," as a conjunctive construction "would render a substantial portion of [the] claims meaningless") (emphasis added); *see also Sun Pharm. Indus., Ltd. v. Eli Lilly and Co.*, 611 F.3d 1381, 1388 (Fed. Cir. 2011) (explaining that courts should construe claim terms "in light of the entirety of the patent, including its specifications," thereby attempting to "stay true to the claim language and most naturally align[] with the patent's description of the invention").

Here, a conjunctive reading of the claim term would render a substantial portion of claims 1, 17, and 29 meaningless and be contrary to the specification. The claimed invention is aimed at multiple steps of granting remote access to a certain user; it does not appear to contemplate the same user simultaneously being required to, permitted to, **and** forbidden from accessing a particular session, as would be the result of Workspot's conjunctive reading. (*See* Tr. at 32; D.I. 322 at 2) Instead, various disclosures in the specification support a disjunctive reading. (*See* D.I. 322 at 3) For example, the '018 patent discloses an embodiment of "[o]ne rule stored in the rule source **128** [that] might require **or** forbid automatic connection to disconnected application sessions **118**." ('018 patent at 7:6-8 (emphasis added); *see also id.* at 7:8-18, 9:38-48)

Workspot has not persuaded the Court that the prosecution history leads to a different result. It is true that the patentee amended "required, permitted, **or** forbidden" to "required, permitted, **and** forbidden" at the request of the Examiner. (Tr. at 43; *see also* D.I. 319 Ex. 7 at CTX00002389-240) But, as Workspot acknowledges, "[w]e don't know precisely why the Examiner wanted it to change or to and. We would be speculating to do so." (Tr. at 44; *see also id.* at 34) The Court does not find the amendment to have been a clear and unmistakable

disclaimer, particularly given that the change from "or" to "and" could be read as not changing the meaning at all (particularly since the amendment was made after claim 1 was initially allowed with the disjunctive "or," *see* D.I. 335 at 3). *See generally Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063-64 (Fed. Cir. 2016) ("The party seeking to invoke prosecution history disclaimer bears the burden of proving the existence of a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art."); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (instructing that prosecution disclaimer should not be applied "where the alleged disavowal of claim scope is ambiguous"). In other words, the impact (if any) of the amendment is ambiguous, which is insufficient to constitute a clear and unmistakable disavowal.

Workspot also argues that the challenged terms are indefinite, but Workspot has failed to show by clear and convincing evidence that a POSA would not know, with reasonable certainty, the scope of the claims. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). To the contrary, the specification provides strong support for the view that a POSA would understand the scope of the term in the way Citrix posits. (*See* '018 patent at 7:6-18, 9:38-48) The parties have provided conflicting expert declarations on whether a POSA, considering the terms in the context of rules for providing access to computer resources, would understand the scope of "required," "permitted," and "forbidden" with reasonable certainty. (*Compare* D.I. 338 ¶¶ 7-9 (Smith Ans. Decl.) *with* D.I. 323 Ex. E ¶ 37 (Labruyére Decl.)) There is not clear and convincing evidence in the record (at least at this point) of indefiniteness.

| Term 6: "desktop computing environment" ('677 patent, claims 1, 15) |
| --- |
| **Citrix Proposal:** |
| Plain and ordinary meaning or in the alternative a computing environment that includes one or more graphical user interface components, such as windows, desktop icons, backgrounds, folders, and pull-down menus |

| Workspot Proposal: |
| --- |
| a display of a combination of graphical user interface components, such as of graphical user interface components, such as windows, desktop icons, backgrounds, folders, and pull-down menus |
| **Court** |
| a computing environment that includes one or more graphical user interface components, such as windows, desktop icons, backgrounds, folders, and pull-down menus |

Given what remains in dispute in connection with this term, Citrix's proposal is best supported by the intrinsic evidence. The term "desktop" is defined in the '677 patent specification to mean "[t]he collection of graphical user interface ["GUI"] components displayed to a user by the display" ('677 patent at 153:51-53), calling out as examples of GUIs windows, desktop icons, background folders, and pull-down menus (*see id.* at 31:41-43, 153:51-53). Moreover, the specification explains that a "collection" of GUI components can include "one or more components of a [GUI], such as windows and pull-down menus." (*Id.* at 153:49-51)

| **Term 7: "plurality of levels of access" / "level of access"** **('677 patent, claims 1, 15)** |
| --- |
| **Citrix Proposal:** |
| Plain and ordinary meaning or in the alternative plurality of access levels/access levels |
| **Workspot Proposal:** |
| a plurality of allowable actions associated with the resources and/or a plurality of methods of execution of the resource |
| **Court** |
| plurality of access levels/access levels |

The '677 patent teaches that conventional prior art methods "typically requir[ed] that the access control decision result in either a denial or grant of access to a resource" and, "[i]n the event of a grant, the [conventional] methods can provide only full and complete disclosure of the resource." ('677 patent at 1:40-49) The specification goes on to describe embodiments of the invention in which "[i] the enumeration of resources includes an enumeration of levels of access to the resource . . . [ii] a plurality of allowable actions associated with the resource is enumerated. . . [and iii] a plurality of methods of execution of the resource is enumerated." (*Id.*

9

at 38:14-19)  Citrix's proposed construction properly captures all of these disclosed

embodiments.  Moreover, during prosecution, Citrix overcame certain prior art on the basis that

the prior art "grants only one level of access to a resource; otherwise, the system denies access

altogether."  (D.I. 319 Ex. 8 at *25-26)  Citrix's statements did not clearly and unambiguously

disclaim binary access embodiments, contrary to Workspot's contention (D.I. 323 at 9-10; D.I.

335 at 9-10), but instead support the conclusion that binary access and plurality levels of access

are included (D.I. 335 at 6).

| Terms 9-12: [first/second] terms ('677 patent, claims 1, 15) | |
|---|---|
| **Term 9: level of access** | **Citrix Proposal:** Plain and ordinary meaning or in the alternative a [first/second] level of access chosen from a plurality of levels of access |
| | **Workspot Proposal:** a second level of access that is different than the first level of access |
| **Term 10: desktop computing environment** | **Citrix Proposal:** Plain and ordinary meaning or in the alternative a [first/second] desktop computing environment provided by one or more virtual machines |
| | **Workspot Proposal:** a second desktop computing environment that is different than the first desktop computing environment |
| **Term 11: virtual machines** | **Citrix Proposal:** Plain and ordinary meaning or in the alternative a first and second virtual machines are not necessarily different |
| | **Workspot Proposal:** a second virtual machine that is different than the first virtual machine |
| **Term 12: execution machine** | **Citrix Proposal:** Plain and ordinary meaning or in the alternative a first and second execution machine are not necessarily different |
| | **Workspot Proposal:** a second execution machine that is different than the first execution machine |
| **Court** Citrix's alternative proposed constructions are adopted for each of the foregoing terms, each of which do not require separate and distinct levels of access, desktop computing environments, virtual machines, or execution machines | |

While the parties agree that the "first request" and "second request" limitations are distinct, they disagree as to whether the "first" and "second" levels of access, desktop computing environment, virtual machines, and execution machines can be the same. (D.I. 322 at 6-7; D.I. 323 at 11-12)  The Court agrees with Citrix that these terms do not require separate and distinct levels of access, desktop computing environments, virtual machines, or execution machines.

As Citrix points out, the '677 patent specification teaches that levels of access are specific to the data received from a particular client machine; the "level of access" provided to a first client machine in response to its request for access to a resource may be (but need not be) different than the "level of access" provided to a second client machine in response to its request for access to the same resource.  (See D.I. 335 at 7; see also '677 patent at 38:7-18 ("In [one] embodiment, a plurality of allowable actions associated with the resource is enumerated."); id. at 35:43-63))

The Court's conclusion is further supported by unrebutted testimony from Citrix's expert, Dr. Smith, who opines that a POSA would understand the patent's disclosure to mean that "if the policy engine includes five different levels of access that may be provided to client machines in response to requests for access to resources, it is possible that the policy engine could provide access level 3 to both the first and second client machines in response to a request from those client machines for access to a particular resource."  (D.I. 338 at ¶ 14)

Workspot's suggestion that the applicant's amendments adding "first" and "second" prior to "a computing environment," "a virtual machine," and "a client machine" requires its narrow construction is not persuasive.  (See D.I. 323 at 12) (citing D.I. 319 Ex. 8 at CTX00000257-65) Rather, the Court agrees with Citrix that the words "first" and "second" are simply used to differentiate between a "first request" and a "second request" for access to a resource.

11

| **Term 13: "the plurality of predetermined methods including a method for executing, on the client machine or on a remote machine"** ('732 patent, claims 1, 20, 42) |
| :--- |
| **Citrix Proposal:** the plurality of predetermined methods includes a method for executing on the client machine or a method for executing on a remote machine |
| **Workspot Proposal:** the plurality of predetermined methods includes a method for executing on the client machine and a method for executing on a remote machine |
| **Court** the plurality of predetermined methods includes a method for executing on the client machine or a method for executing on a remote machine |

Claims 1, 20, and 42 of the '732 patent are directed to a method and systems relating to the execution of an application program, including the step of selecting, by a broker machine, one of a plurality of predetermined methods including a method for executing, on the client or on a remote machine, the requested application in a desktop computing environment provided by a virtual machine.  ('732 patent at 234:62-235:26, 236:30-237:5, 238:21-52)  The parties' dispute is whether both the "method for executing on the client machine" *and* the "method for executing on a remote machine" must be within the "plurality of predetermined methods," as Workspot contends, or whether it is sufficient that at least *one of these methods* be within the plurality of predetermined methods, as Citrix proposes.  (D.I. 322 at 7-8; D.I. 323 at 13-14; *see also* Tr. at 90-98)  The Court agrees with Citrix.

The claim language supports Citrix's position, as the claims use "or," as does Citrix, while Workspot would replace the claims' "or" with Workspot's preferred "and."  The specification also supports Citrix, as the '732 patent specification includes an embodiment illustrating only a method for executing on a client machine (*see* '732 patent at 39:25-31, 127:17-20), as well as another embodiment teaching only a method for executing on a remote machine (*see id.* at 39:31-35, 127:14-17).  Workspot's proposal would read out these embodiments.  (*See* Tr. at 91)

12

Workspot relies on the prosecution history, including especially the examiner's summary

of a telephone interview, stating that the applicant interpreted a particular prior art reference as

"teaching that either [method option] can be done rather than a decision." (D.I. 391 Ex. 10 at

*22)  This is not a clear and unambiguous disclaimer of claim scope, for reasons including that it

is not even clear what was discussed during the interview. (*See id.*)  It does appear that the

examiner and applicant disagreed about whether the prior art taught a method of executing both

locally and remotely, and the examiner noted that "[n]o particular agreement was reached." (*Id.*)

| Term 14: "only accessible by" ('595 patent, claims 1, 21, 27) |
|---|
| **Citrix Proposal:** Plain and ordinary meaning or in the alternative access to secure container is limited to a client device with a verified user and to the one or more applications associated with the enterprise |
| **Workspot Proposal:** Access to the secure container is exclusively limited to (i) a verified user of the one or more applications associated with the enterprise, and (ii) the enterprise applications themselves. Alternative: Indefinite. |
| **Court** access to secure container is limited to a client device with a verified user and to the one or more applications associated with the enterprise |

Claims 1, 21, and 27 include the limitation "wherein the secure container is *only*

*accessible by* [i] the verified user and [ii] by the one or more applications associated with the

enterprise." ('595 patent at 101:36-38) (emphasis added)  Citrix contends that the term limits

access to any verified user and not, as Workspot (more narrowly) counters, only to any verified

user of the one or more applications associated with the enterprise. (D.I. 322 at 8; D.I. 323 at 17-

19)  The Court agrees with Citrix. (*See* Tr. at 19)

The '595 patent specification states that access to the secure container may be accessed

"by applications **318** and *other components* of the mobile device **120**." ('595 patent at 86:46-49)

(emphasis added)  It adds that "a document access policy can limit access to the file system **338**"

based on, among other things, "whether the user of the device **120** provide[s] credentials." (*Id.* at

86:51-59)  An example is also provided whereby "the access manager **340** can enable enterprise applications installed on the mobile device **120** to access data stored in the container **336** and to prevent non-enterprise application[s] from accessing the data stored in the container **136**." (*Id.* at 86:67-87:4)  All of this intrinsic evidence supports the conclusion that (i) access to the container is not limited to verified users of enterprise applications or the applications themselves, (ii) any verified user of the client device can access the container, e.g., upon providing correct credentials, and (iii) applications associated with the enterprise can access the container. (*See* Tr. at 19)

| Term 16: "the secure container being encrypted" ('595 patent, claims 1, 21, 27) |
| --- |
| **Citrix Proposal:** |
| certain files within the secure container are stored in encrypted form |
| **Workspot Proposal:** |
| the secure container itself is encrypted |
| **Court** |
| certain files within the secure container are stored in encrypted form |

Workspot insists that the secure container itself must be encrypted while Citrix contends that the claim limitation is satisfied if certain files within the container are stored in encrypted form. (D.I. 322 at 9; D.I. 323 at 19; D.I. 335 at 11; Tr. at 5-8)  Again, the Court agrees with Citrix.

As Citrix points out, the specification does not show an example of a container itself being encrypted. (*See* Tr. at 5-6)  A POSA would understand that files are secured if the files are secured, even if the container in which the files are contained is not itself secured. (*See id.* at 6) ("[I]f, as Workspot contends, [the] secure container itself were encrypted, [then] the encryption keys within the container would be inaccessible and could not be used by applications as described in the specification to encrypt files and other data.")

Citrix's proposed construction is also supported by Figure 3A, which depicts a secure

14

document container **336** accessing manager **340** governing access to the file system **338**. (*See id.* at Fig. 3A, 86:22-26, 86:46-49)  In this way, Figure 3A teaches that installed software applications **318** "can be programmed to encrypt or decrypt documents stored or to be stored within the container **336**." (*Id.* at 88:7-9)  This is additional intrinsic evidence that the secure container is a repository for information that may be encrypted, not that the container itself must be encrypted.

## III.   MEANS-PLUS-FUNCTION DISPUTES

Means-plus-function limitations permit a patentee to claim an element of the invention in terms of the element's function without reciting the corresponding structure in the claim itself:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6.  If a claim does not use the word "means," there is a presumption that means-plus-function claiming does not apply. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).  The presumption may be overcome if the claim term recites a function without reciting sufficiently definite structure for performing that function. *See Williamson*, 792 F.3d at 1349.  Courts may consider both intrinsic and extrinsic evidence to determine whether a claim limitation is "so devoid of structure that the drafter constructively engaged in means-plus-function claiming." *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011), *rev'd on other grounds by Williamson*, 792 F.3d at 1349.

To construe a means-plus-function claim term, the Court must first determine the claimed function.  Then the Court is to "identify the corresponding structure in the written description of

the patent that performs that function." *Applied Med. Res. Corp.* v. *Us. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (internal citation omitted).  Means-plus-function claims are statutorily limited to the structure disclosed in the patent specification that corresponds to the claimed function, and equivalents.  *See Med. Instrumentation & Diagnostics Corp.* v. *Elekta AB*, 344 F.3d 1205, 1219 (Fed. Cir. 2003).  The identified structure is required to "permit one of ordinary skill in the art to know and understand what structure corresponds to the means limitation." *Finisar Corp.* v. *DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal quotation marks omitted).

In cases where the claimed invention is computer-implemented, the structure identified in the specification must be more than a general-purpose computer or microprocessor, which "can be programmed to perform very different tasks in very different ways." *Aristocrat Techs. Austl. Pty Ltd.* v. *Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Instead, a computer-implemented means-plus-function term must generally disclose a computer programmed to carry out an algorithm, in which case "the disclosed structure is not the general-purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm." *Id.* (internal quotation marks omitted); *see also Harris Corp.* v. *Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).  An exception to this rule arises when the claimed functions "can be achieved by any general-purpose computer without special programming." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303,1316 (Fed. Cir. 2011).  This exception is a "narrow" one that applies "only in the rare circumstances where any general-purpose computer without any special programming can perform the function." *Ergo Licensing, LLC* v. *CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012).

**Terms A-C: "network module" / "authentication module" / "server process"
('018 patent, claim 29)**

16

| Term A: "network module for receiving authentication information associated with a user operating a client computer" | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: receiving authentication information associated with a user operating a client computer<br><br>Structure: a server (i) programmed with software executable on one of several computer operating systems, including without limitation the Windows family of operating systems (Microsoft Corporation), the MacOS family of operating systems (Apple Computer, Inc., Cupertino, Calif.), and Unix based operating systems (e.g., Solaris, Sun Microsystems, Sunnyvale, Calif.) or implemented in hardware as application specific integrated circuits (ASICs), Read Only Memory (ROM) devices, or other digital hardware circuitry; or (ii) programmed to receive user information over standard telephone lines, LAN or WAN links (using, e.g., 802.11, T1, T3, 56 kb, or X.25 protocols), broadband connections (using, e.g., ISDN, Frame Relay, or ATM protocols), Internet connections, or wireless connections, or some combination of any or all of the above |
|---|---|
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Function: receiving authentication information associated with a user operating a client computer<br><br>Structure: (i) a server programmed with software executable on the Windows family of operating systems, the MacOS family of operating systems, and Unix based operating systems, or (ii) application specific integrated circuits (ASICs), Read Only Memory (ROM) devices, or other digital hardware circuity, where (i) or (ii) are programmed to (a) receive authentication information over one or more data networks or links and decrypt the received authentication information or (b) receive authentication information according to one of HTTP, Independent Computing Architecture (ICA) protocol, Remote Desktop Protocol (RDP), or Common Gateway Protocol (GCP), wherein the data network includes standard telephone lines, LAN or WAN links (using 802.11, T1, T3, 56 kb, or X.25 protocols), broadband connections (using ISDN, Frame Relay, or ATM protocol), and wireless connections, or a combination thereof |
| Term B: "authentication module for authenticating the | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6 |

17

| user via the authentication information received from the user" | To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: authenticating the user via the authentication information received from the user<br><br>Structure: a server programmed with software executable on one of several computer operating systems, including without limitation the Windows family of operating systems (Microsoft Corporation), the MacOS family of operating systems (Apple Computer, Inc., Cupertino, Calif.), and Unix based operating systems (e.g., Solaris, Sun Microsystems, Sunnyvale, Calif.) or implemented in hardware as application specific integrated circuits (ASICs), Read Only Memory (ROM) devices, or other digital hardware circuitry. |
|---|---|
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Function: authenticating the user via the authentication received from the user<br><br>Structure: None; Indefinite |
| **Term C: "server process for reestablishing the first disconnected application"** | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: reestablishing the first disconnected application<br><br>Structure: a server programmed with software executable on one of several computer operating systems, including without limitation the Windows family of operating systems (Microsoft Corporation), the MacOS family of operating systems (Apple Computer, Inc., Cupertino, Calif.), and Unix based operating systems (e.g., Solaris, Sun Microsystems, Sunnyvale, Calif.) or implemented in hardware as application specific integrated circuits (ASICs), Read Only Memory (ROM) devices, or other digital hardware circuitry. |
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Function: reestablishing the first disconnected application<br><br>Structure: i) a server programmed with software executable on the Windows family of operating systems, the MacOS family of operating systems, and Unix based operating systems, or (ii) application specific integrated circuits (ASICs), Read Only |

| | Memory (ROM) devices, or other digital hardware circuity, where (i) or (ii) are programmed to modify an entry in a data store to indicate that the user is connected to the first application session and to indicate from which client computer the user is connected to the server |
|---|---|
| **Court:** Not construed under 35 U.S.C. § 112, ¶ 6 | |

Claim 29 claims a server for providing remote access to an application session, wherein the "server" comprises software processes programmed to perform particular functions, including: (1) a "network module" programmed to "receiv[e] authentication information associated with a user operating a client computer" (Term A); (2) an "authentication module" programmed to "authenticat[e] the user via the authentication information received from the user" (Term B); and (3) a "server process" programmed to "reestablish[] the first disconnected application" (Term C). ('018 patent at 14:41-62)

As the word "means" does not appear in claim 29, the parties agree that Section 112(6) is presumed not to apply to any of Terms A-C. (*See* Tr. at 60-61)  In Workspot's view, the claim is a means-plus-function claim because a POSA would not understand "module" in Terms A and B and "process for" in Term C to convey a specific known structure. (*See* D.I. 323 at 4-6)  The Court, however, agrees with Citrix that Workspot has failed to rebut the presumption that Terms A-C are not means-plus-function terms.

Terms A-C convey sufficiently definite structure.  Figure 1 of the '018 patent depicts a "client-server computer system" with "server **106**" containing a "network module **120**" (Term A), an "authentication module **130**" (Term B), and a "server process **122**" (Term C).  Figures 2 and 3 provide flowcharts showing how these processes and modules interact.  *See Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (explaining that to POSA, "the 'structure' of computer software is understood through, for example, an outline of an algorithm, a flowchart,

19

or a specific set of instructions of rules"); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2016 WL 1171496, at *3 (D. Del. Mar. 24, 2016). The specification goes on to disclose multiple embodiments of "server **106**," including that the server can run specific operating systems (such as Mac OS X and Windows XP) and that the server can include multiple connected computers configured as a "server farm." (*Id.* at 2:28-29, 4:33-56)  The specification also discloses structural embodiments for Terms A-C within the context of server **106**.  (*See, e.g., id.* at 4:57-5:17 ("network module **120**" communicates through specific protocols), 5:18-31 ("server process **122**" can initiate new application sessions, disconnect client computers from application session, and detect client computer disconnection), 7:20-30 ("authentication module **130**" transmits results of authentication process to server process **122**)

Further supporting the Court's conclusion is the opinion of Citrix's expert, Dr. Hugh Smith, that the terms "module" and "process" are generally known in the art and would convey definite structure to a POSA. (*See* D.I. 324 at ¶¶ 12-18)  Dr. Smith relies on the Fifth Edition of the Microsoft Computer Dictionary, which defines "module" as a noun meaning "a collection of routines and data structures that perform a particular task," and "process" as a noun meaning "[a] program or part of a program; a coherent sequence of steps undertaken by a program." (*Id.* Ex. A at 34, 42; *see also Sound View Innovations, LLC v. Facebook, Inc.*, 2017 WL 2221177, at *10-11 (D. Del. May 19, 2017) (relying on Third Edition of the Microsoft Computer Dictionary to support proposition that "'[s]erver' has a well-known meaning to a [POSA] and connotes a definite structure"))

Taken together, the Court is not persuaded that Terms A-C within claim 29 do not sufficiently convey structure to a POSA such that Section 112(6) applies. *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008-09 (Fed. Cir. 2018) (holding the terms "program" and "user

20

interface code," despite their functional language, were not subject to Section 112(6) when

viewed in the full context of the written description).

| Terms D-F: "broker machine" limitations | |
|---|---|
| ('677 patent, claims 1, 15; '732 patent, claim 1) | |
| **Term D: "identifying, by a broker machine, a first desktop computing environment already associated with the user . . . establishing, by the broker machine responsive to the first granted level of access, a connection between the first client machine and the first desktop computing environment"**<br><br>**('677 patent, claim 1)** | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: (1) identifying a first desktop computing environment already associated with the user, and (2) establishing, responsive to the first granted level of access, a connection between the first client machine and the first desktop computing environment<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed functions, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or an application acceleration appliance. |
| | **Workspot**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Functions: (1) identifying a first desktop computing environment already associated with the user, and (2) establishing responsive to the first granted level of access, a connection between the first client machine and the first desktop computing environment<br><br>Structure: None; Indefinite |
| **Term E: "a broker machine that i) enumerates a first desktop computing environment... and ii) establishes a first connection . . ."**<br><br>**('677 patent, claim 15)** | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: (1) enumerating a first desktop computing environment (2) establishing a first connection<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed functions, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or |

| | |
|---|---|
| | an application acceleration appliance. |
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Functions: (1) enumerating a first desktop computing environment associated with the client machine, and (2) establishing a first connection between the first client machine and the first desktop computing environment providing the resource according to the first granted level of access<br><br>Structure: None; Indefinite |
| **Term F: "selecting, by a broker machine, one of a plurality of predetermined methods for executing the requested application . . . by . . . i) selecting the method of execution . . . ii) selecting the virtual machine . . . iii) selecting an execution machine . . . iv) launching the virtual machine . . . v) launching the desktop computing environment . . . vi) launching the requested application . . ."**<br><br>('732 patent, claim 1) | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: selecting one of a plurality of predetermined methods for executing the requested application by<br>i) selecting the method of execution responsive to the policy based on at least the received user credentials,<br>ii) selecting the virtual machine that can provide the desktop computing environment and an operating system in which to execute the desktop computing environment,<br>iii) selecting an execution machine executing a hypervisor providing access to hardware resources required by the virtual machine,<br>iv) launching the virtual machine into the execution machine,<br>v) launching the desktop computing environment into the executing operating system on the execution machine, and<br>vi) launching the requested application into the desktop computing environment<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed functions, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or an application acceleration appliance. |
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Functions: selecting one of a plurality of predetermined methods for executing the requested application,<br>i) selecting the method of execution responsive to the policy based on at least the received user credentials, |

|  | ii) selecting the virtual machine that can provide the desktop computing environment and an operating system in which to execute the desktop computing environment, iii) selecting an execution machine executing a hypervisor providing access to hardware resources required by the virtual machine, iv) launching the virtual machine into the execution machine, v) launching the desktop computing environment into the executing operating system on the execution machine, and vi) launching the requested application into the desktop computing environment<br><br>Structure: None; Indefinite |
|---|---|
| **Court**<br>Not construed under 35 U.S.C. § 112, ¶ 6 | |

The parties dispute whether the term "broker machine" conveys sufficient structural meaning to a POSA.  (D.I. 322 at 12-13; D.I. 323 at 6-7)  As the word "means" does not appear in the claims in dispute, the burden is on Workspot to show that Section 112(6) applies. Workspot fails to meet this burden.  Thus, Terms D-F are not subject to means-plus-function construction.

Intrinsic evidence indicates that "machine" has a sufficiently definite structure.  For example, the '677 patent specification discloses that "broker machines" are a species of "remote machine **30**," which in turn "may be servers, file servers, application servers, appliances, network appliances, gateways, application gateways, gateway servers, virtualization servers, deployment servers, or firewalls."  ('677 patent at 13:8-11)  Figures 7A, 7B, and 8 depict an embodiment in which the "broker server" – a term the specification uses interchangeably with "broker machine" (*see id.* at 3:57-59) – is on remote machine **30** and interacts with a separate structure.  (*See id.* at 38:25-38) ("[T]he policy engine **706** transmits an assigned level of action applicable to a requested recourse to a remote machine **30** functioning as a broker server.").

Citrix's expert, Dr. Smith, again supports the Court's conclusion, opining that "broker" is

a "common industry term used to mean a structure of an intermediate server that performs brokering function." (D.I. 324 at ¶ 24; *see also* Tr. at 65 (Citrix arguing that "broker machine" is "something that sits between a client and the resource that want to access")) Even Workspot's witnesses do not do not strongly undermine Dr. Smith's opinion. (*See* D.I. 323 Ex. 1 at ¶ 49 (Dr. LaBruyére, relying on IEEE dictionary definition, declaring that machine is "device such as a processor or computer"); D.I. 324 Ex. B at 349 (Workspot's founder and CEO, Amitabh Sinha, testifying (10 years after relevant filing date) that "broker machine" is "common industry term" and means "something sits between a client and the resource they want to access"))

| Terms G-I: "identification," "management," and "execution" component limitations ('732 patent, claim 20) | |
|---|---|
| **Term G: "an identification component" / "selecting, by the identification component, an execution machine . . ."** | **Citrix Proposal:** Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: selecting an execution machine executing a hypervisor providing access to hardware resources required by the virtual machine<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed function, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or an application acceleration appliance. |
| | **Workspot Proposal:** Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Function: selecting an execution machine executing a hypervisor providing access to hardware resources required by the virtual machine<br><br>Structure: None; Indefinite |
| **Term H: "a management component" / "selecting, by the virtual machine management component,** | **Citrix Proposal:** Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6: |

| the virtual machine . . ." | |
|---|---|
| | Function: (1) selecting the virtual machine that can provide the desktop computing environment and an operating system in which to execute the desktop computing environment, and (2) establishing a connection between the client machine and the desktop computing environment<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed functions, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or an application acceleration appliance. |
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Function: selecting the virtual machine that can provide the desktop computing environment and an operating system in which to execute the desktop computing environment, and establishing a connection between the client machine and the desktop computing environment<br><br>Structure: None; *Indefinite* |
| **Term I: "an execution component" / "launching, by the execution component, the virtual machine . . ." and "launching, by the execution component, the desktop computing environment . . ."** | **Citrix Proposal:**<br>Not construed under 35 U.S.C. § 112, ¶ 6<br><br>To the extent the Court construes under 35 U.S.C. § 112, ¶ 6:<br><br>Function: (1) launching the virtual machine into the executing machine, and (2) launching the desktop computing environment into the executing operating system on the execution machine<br><br>Structure: a general purpose computing device or a software component programmed to perform the claimed functions, including but not limited to a general purpose computer, a general purpose server, file server, application server, appliance, network appliance, gateway, application gateway, gateway server, virtualization server, deployment server, firewall, VPN server, or an application acceleration appliance. |
| | **Workspot Proposal:**<br>Means plus function limitation under 35 U.S.C. § 112, ¶ 6<br><br>Functions: launching the virtual machine into the executing machine, and launching the desktop computing environment into the executing operating system on the execution machine |

| | Structure: None; Indefinite |
|---|---|
| **Court** | |
| Not construed under 35 U.S.C. § 112, ¶ 6 | |

The parties dispute whether the "identification," "management," and "execution" components of claim 20 of the '732 patent convey sufficient structure to avoid a means-plus-function construction. (D.I. 322 at 13-14; D.I. 323 at 12-13) Again, the claims do not use the term "means," the presumption is that Section 112(6) applies, and Workspot has not rebutted that presumption.

Figure 13 and the accompanying disclosure in columns 50-52 of the specification make clear that the disputed components reside within the session management component, which in turn may reside on one or more machines. (*See* '732 patent at Fig. 13, 10:30-11:5, 13:25-41, 50:48-52:6) These disclosures describe software processes on a remote machine (such as a server) in communication over a network with the virtual machine, which, to a POSA, connotes sufficient structure.

Extrinsic evidence further supports this conclusion. Dr. Smith explains that a POSA would find in claim 20 a sufficiently detailed algorithm for how each of the structures interact. (*See* D.I. 338 ¶¶ 17-18) (opining on sub-steps (ii)-(v))

Workspot points out that the examiner initially considered these claim terms as being covered by Section 112(6) (*see* D.I. 319 Ex. 10 at *42-43, *69-70), but the examiner appears to have changed course after an interview in which the applicant stated that these terms were not intended to be interpreted as means-plus-function terms (*see id.* at *10). Regardless of the weight, if any, given to an applicant's subjective intent on this point, the Court concludes that the specification conveys sufficient structure with respect to disputed Terms G-I. *See Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1001, 1008 (Fed. Cir. 2018).

26

## IV. ORDERING OF THE METHOD STEPS

To determine whether steps of a method claim must be performed in a particular order, courts look to whether the claims require, as a matter of logic or grammar, that the steps be performed in the order written; and, if not, then courts look to whether the specification directly or implicitly requires such a construction. *See Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001); *see also Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70; *Personalized User Model LLP v. Google Inc.*, 2012 WL 295048, at *28 (D. Del. Jan. 25, 2012) ("If the invention could potentially be performed without going in the specific sequence, then the claim does not require an order of steps.").

| Terms I-II: "receive" / "direct" / "grant" limitations ('677 patent, claims 1, 15) | |
| --- | --- |
| Term I: "(a) receiving, by a policy engine, a first request . . . (b) directing, by the policy engine . . ." and "(c) granting, by the policy engine . . ." | **Citrix Proposal:** Plain and ordinary meaning; step (b) need not necessarily occur after step (a) |
| | **Workspot Proposal:** Step (b) must be performed after step (a) |
| Term II: "i) receives a first request . . . ii) direct a first collection agent . . ." and "iii) grants . . ." | **Citrix Proposal:** Plain and ordinary meaning; step (ii) need not necessarily occur after step (i) |
| | **Workspot Proposal:** Step (ii) must be performed after step (i) |
| **Court:** Step (b)/(ii) must be performed after step (a)/(ii) | |

The Court agrees with Workspot that for Terms I and II the second listed step of the method (step (b) or step (ii)) must be performed after the first listed step of the method (step (a) or step (i)).[3]

Claim 1 of the '677 patent is directed to "a method for providing authorized remote

---

[3] Citrix agrees that step (c)/(iii) in Terms I-II must be performed after step (b)/(ii). (D.I. 363 at 3-4; D.I. 335 at 17)

access to resources on desktop computing environments provided by virtual machines"
comprising the steps (a) "receiving, by a policy engine, a first request for access to a resource
from a user at a first client machine" and (b) "directing, by the policy engine, a first collection
agent to gather information about the first client machine." ('677 patent at 234:59-235:17)
Claim 15 is similarly directed to a system with a policy engine that "i) receives a first request for
access to a resource" and "ii) directs a first collection agent to gather information." (*Id.* at
236:45-238:12)

The logic and grammar of the claim language support an ordered construction. The
policy engine in step (b)/(ii) gathers information "*about* the first client machine" – that is, the
"first client machine" from step (a)/(i) from which access to a resource was first requested by a
user. As Workspot explains, "logically, there must be a restriction on the relative timing of the
receiving step, otherwise the claims would permit an absurd scenario where the collection agent
[in step (b)/(ii)] gathers information about the first client machine, the policy engine grants the
first level of access, and the broker machine establishes a connection for the first client machine
*before* the user even requests access to the resource." (D.I. 323 at 11) (emphasis in original)

Given the Court's conclusion based on the logic and grammar of the claim language, the
Court need not address Citrix's points based on the specification or the extrinsic evidence.

| Term III: "(c) launching, by the client, a second application . . . (d) launching, by the application server, the first application"[4] ('843 patent, claim 1) |
| --- |
| **Citrix Proposal:**<br>Plain and ordinary meaning; steps (c)-(d) are not required to be performed in that order[5] |

---

[4] The parties agree that Term III is illustrative of the disputes also presented by Terms
IV-IX. (Tr. at 88-90) Therefore, the Court's analysis and ruling with respect to Term III apply
with equal force to Terms IV-IX.

[5] At this point, Citrix "does not take issue with Workspot's contention that elements (a)
and (b) must be performed in the order as written." (D.I. 322 at 18; *see also* D.I. 363 at 2-4; Tr.

| Workspot Proposal: |
|---|
| steps (a)-(d) must be performed in order |
| **Court:** |
| Steps (c)-(d) are not required to be performed in that order |

Claim 1 of the '843 patent recites the following method:

> A method of providing access to a remote application to an application client or end user application comprising:

> (a) receiving, by a client, from a web service directory on a content server, a service access point associated with a first application, the service access point identifying a web server;

> (b) receiving, by the client, from the web server identified by the service access point, address information associated with the first application;

> (c) [1] launching, by the client, a second application, [2] the second application communicating via a presentation layer protocol with an application server identified by the received address information; and

> (d) [1] launching, by the application server, the first application and [2] returning information to the second application via the layer protocol.

('843 patent at 10:21-36)

"If the invention could potentially be performed without going in the specific sequence, then the claim does not require an order of steps." *Personalized User Model*, 2012 WL 295048, at *28. The intrinsic evidence supports Citrix's view that the launch of the second application in (c)[1] and of the first application in (d)[1] could occur in either order. (*See* D.I. 322 at 18) The specification discloses an embodiment in which "the customer's computer establishes a communication session with the application server **205** *to view* the latest version of Spreadsheet

_____

at 76 (Citrix counsel: "We have conceded that B must take place after A . . . .")

X [the first application] using the ICA client **215**." ('843 patent at 10:7-10) (emphasis added) Citrix explains that since the customer's computer can "view" the latest version of the first application, this "suggests that the first application has already been launched by the application server ((d)[1]), before the client established the communication session with the application server ((c)[2])." (D.I. 322 at 18)  Workspot's position would read out this embodiment from the claims.

Dr. Smith's opinion further supports the Court's understanding of the claim:

> 39. . . . [I]t is technically possible, and sometimes desirable, to perform the launching of the first and second application even before step (a) in claim 1.  For example, the claimed method could launch one or both of the two application and keep them executing, before the client receives the SAP, and before the client receives the address information associated with the first application.  In other words, the application would already be executing before the steps labeled (a) and (b) take place.

> 40.  In such a system, in step (c)[2] ("the second application communicating . . ."), the previously launched second application would then communicate with the application server.  And in step (d)[2] ("returning information to the second application via the presentation layer protocol"), the previously launched first application would perform the returning step.

(D.I. 324 at ¶¶ 39-40; *see also id.* at ¶¶ 41-42)  Dr. Smith's testimony on this point is not rebutted by Workspot's expert.  (*See* Tr. at 73; '843 patent at 10:7-10)

Workspot's argument based on prosecution history is unavailing.  (*See* D.I. 323 at 16-17) While the applicant has articulated that steps (a)-(d) of the method can happen in the order written (*see, e.g.*, D.I. 319 Ex. 9 at *75-76), that is not inconsistent with an understanding that the method may also be performed in a manner in which step (d) occurs prior to step (c).  *See TQ Beta LLC v. Dish Network Corp.*, 2016 WL 356064, at *3 (D. Del. Jan. 28, 2016).

## V.    CONCLUSION

An appropriate Order follows.

30